1  DAVID H. ANGELI (admitted *pro hac vice*)
   EDWARD A. PIPER (Cal. Bar No. 288289)
2  TYLER P. FRANCIS (admitted *pro hac vice*)
   MICHELLE H. KERIN (admitted *pro hac vice*)
3  ANGELI LAW GROUP LLC
   121 SW Morrison Street, Suite 400
4  Portland, Oregon 97204
   Telephone: (503) 954-2232 │ Facsimile: (503) 227-0880
5  Email: david@angelilaw.com; ed@angelilaw.com; tyler@angelilaw.com;
              michelle@angelilaw.com
6
   JOHN D. CLINE (Cal. Bar No. 237759)
7  50 California Street, Suite 1500
   San Francisco, CA 94111
8  Telephone: (415) 662-2260 │ Facsimile: (415) 662-2263
   Email: cline@johndclinelaw.com
9
   *Attorneys for Defendant Joseph Sullivan*
10

11              UNITED STATES DISTRICT COURT

12             NORTHERN DISTRICT OF CALIFORNIA

13                SAN FRANCISCO DIVISION

14
   UNITED STATES OF AMERICA,            Case No. 3:20-cr-00337-WHO
15
                Plaintiff,
16
        v.                              DEFENDANT JOSEPH SULLIVAN'S
17                                      OPPOSITION TO UBER'S MOTION TO
   JOSEPH SULLIVAN,                     QUASH RULE 17(C) SUBPOENA
18
                Defendant.
19
                                        Date: February 3, 2022
20                                      Time: 1:30 p.m.
                                        Crtrm: 2, 17th floor
21
                                        Hon. William H. Orrick
22

23

24

25

26

27

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ..............................................................................................................1

BACKGROUND .................................................................................................................2

    I.     The 2016 Incident ...........................................................................................2

    II.    The FTC Investigation ....................................................................................4

    III.   Uber's Role in the Criminal Investigation ...................................................5

    IV.   The Documents at Issue ..................................................................................9

ARGUMENT ....................................................................................................................10

    I.     Sullivan has satisfied the requirements of Fed. R. Crim. P. 17(c) and *Nixon* for pretrial production of the documents at issue...................................10

        A.    The documents at issue are relevant. .........................................10

        B.    The responsive documents are admissible. ................................19

        C.    The responsive documents are specifically identified. ..............21

    II.    Privilege cannot shield the requested documents from production. .....................22

        A.    Uber has failed to establish that all the documents are privileged............22

        B.    Uber waived its privilege regarding the 2016 Incident............25

        C.    Sullivan's Fifth and Sixth Amendment rights override any valid privilege or work-product protection Uber still maintains in the requested documents. ..................................................................28

        D.    The Court can take steps to preserve the confidentiality of any privileged materials to the extent possible.................................31

CONCLUSION..................................................................................................................32

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Admiral Ins. Co. v. U.S. Dist. Ct.*,
881 F.2d 1486 (9th Cir. 1989) ........................................................................24

*In re California Pub. Util. Comm'n*,
892 F.2d 778 (9th Cir. 1989) ..........................................................................24

*Chambers v. Mississippi*,
410 U.S. 284 (1973)..........................................................................................28

*Crane v. Kentucky*,
476 U.S. 683 (1986)..........................................................................................28

*Gomez v. Vernon*,
255 F.3d 1118 (9th Cir. 2001) ........................................................................25

*In re Grand Jury Investigation*,
974 F.2d 1068 (9th Cir. 1992) ........................................................................23

*In re Grand Jury Subpoena, Judith Miller*,
438 F.3d 1141 (D.C. Cir. 2006) ......................................................................29

*Hearn v. Rhay*,
68 F.R.D. 574 (E.D. Wash. 1975).....................................................................27

*Hernandez v. Tanninen*,
604 F.3d 1095 (9th Cir. 2010) ........................................................................25

*Holmes v. South Carolina*,
547 U.S. 319 (2006)..........................................................................................28

*In re Lidoderm Antitrust Litig.*,
No. 14-md-02521-WHO, 2016 WL 4191612 (N.D. Cal. Aug. 9, 2016).................27

*McDaniel v. Temple Indep. Sch. Dist.*,
770 F.2d 1340 (5th Cir. 1985) ........................................................................20

*Murdoch v. Castro*,
365 F.3d 699 (9th Cir. 2004) ..........................................................................30

*Murdoch v. Castro*,
609 F.3d 983 (9th Cir. 2010) (*en banc*) ........................................................30

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*New York Times Co. v. Gonzales*,
　　459 F.3d 160 (2d Cir. 2006)..................................................................................29

*In re Pacific Pictures Corp.*,
　　679 F.3d 1121 (9th Cir. 2012) .............................................................................25

*Permian Corp. v. United States*,
　　665 F.2d 1214 (D.C. Cir. 1981) .......................................................................25, 27

*In re Sealed Case*,
　　121 F.3d 729 (D.C. Cir. 1997) ............................................................................29

*Tennenbaum v. Deloitte & Touche*,
　　77 F.3d 337 (9th Cir. 1996) ................................................................................25

*Trammel v. United States*,
　　445 U.S. 40 (1980)...............................................................................................22

*United States v. Amlani*,
　　169 F.3d 1189 (9th Cir. 1999) .............................................................................27

*United States v. Brown*,
　　459 F.3d 509 (5th Cir. 2006) ..............................................................................20

*United States v. Carriles*,
　　263 F.R.D. 400 (W.D. Tex. 2009) ........................................................................21

*United States v. Carrillo*,
　　20 F.3d 617 (5th Cir. 1994) ................................................................................20

*United States v. Caruso*,
　　948 F. Supp. 382 (D.N.J. 1996) ..........................................................................21

*United States v. Connelly*,
　　395 Fed. Appx. 407 (9th Cir. 2010) ....................................................................21

*United States v. Gas Pipe, Inc.*,
　　No. 3:14-cr-298-M, 2018 WL 5262361 (N.D. Tex. June 18, 2018)......................21

*United States v. Graf*,
　　610 F.3d 1148 (9th Cir. 2010) .............................................................................23

*United States v. Greenspan*,
　　923 F.3d 138 (3d Cir. 2019)................................................................................20

*United States v. Harris*,
　　733 F.2d 994 (2d Cir. 1984)................................................................................21

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*United States v. Lischewski,*
    860 Fed. App'x 512 (9th Cir. 2021) ........................................................................20

*United States v. Martin,*
    278 F.3d 988 (9th Cir. 2002) ...........................................................................22, 23

*United States v. McLennan,*
    563 F.2d 943 (9th Cir. 1977) ..............................................................................20

*United States v. Mix,*
    No. CRIM.A. 12-171, 2012 WL 2420016 (E.D. La. June 26, 2012) ................................30, 31

*United States v. Nixon,*
    418 U.S. 683 (1974)................................................................................ *passim*

*United States v. Nobles,*
    422 U.S. 225 (1975)........................................................................................24

*United States v. Parry,*
    649 F.2d 292 (5th Cir. 1981) ..............................................................................21

*United States v. Paul,*
    No. CR19-0194JLR, 2020 WL 6544702 (W.D. Wash. Nov. 6, 2020)................................29

*United States v. Payne,*
    944 F.2d 1458 (9th Cir. 1991) .............................................................................21

*United States v. Reyes,*
    239 F.R.D. 591 (N.D. Cal. 2006)........................................................................6, 21

*United States v. Richey,*
    632 F.3d 559 (9th Cir. 2011) ..............................................................................22

*United States v. Ruehle,*
    583 F.3d 600 (9th Cir. 2009) ..............................................................................23

*United States v. Sanmina Corp.,*
    968 F.3d 1107 (9th Cir. 2020) .............................................................................28

*United States v. Scully,*
    877 F.3d 464 (2d Cir. 2017)...............................................................................20

*United States v. Sleugh,*
    896 F.3d 1007 (9th Cir. 2018) .............................................................................10

*United States v. Thomas,*
    32 F.3d 418 (9th Cir. 1994) ...............................................................................28

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*United States v. W.R. Grace*,
   439 F. Supp. 2d 1125 (D. Mont. 2006)..................................................29, 30, 31, 32

*Upjohn Co. v. United States*,
   449 U.S. 383 (1981).................................................................................................22

*Washington v. Texas*,
   388 U.S. 14 (1967).................................................................................................28

**Statutes**

18 U.S.C. § 4.................................................................................................................1

18 U.S.C. § 1030...........................................................................................................1

18 U.S.C. § 1505...........................................................................................................1

**Rules**

Fed. R. Crim. P. 17(c)..................................................................................................10

Fed. R. Evid. 502(a)....................................................................................................25

Fed. R. Evid. 801(c)....................................................................................................20

Fed. R. Evid. 803(1)....................................................................................................20

Fed. R. Evid. 803(3)....................................................................................................20

Fed. R. Evid. 803(5)....................................................................................................20

Fed. R. Evid. 803(6)....................................................................................................20

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Defendant Joseph Sullivan respectfully submits this opposition to Uber's motion to quash his Rule 17(c) subpoena duces tecum (ECF No. 68) ("MTQ"). Having selectively disclosed attorney-client privileged materials to the government in a thus-far successful effort to scapegoat Sullivan for conduct known and approved at the highest level of the company and within its Legal department, Uber now seeks to withhold from Sullivan documents essential to his defense. The Court should review the documents at issue *in camera* to the extent it deems necessary and then deny Uber's motion to quash.

## INTRODUCTION

The intial indictment (ECF No. 13) alleged that Sullivan, Uber's former Chief Security Officer, sought to conceal a November 2016 cyber-security incident (the "2016 Incident") from the FTC (Count 1)[1] and from "some judge or other person in civil or military authority under the United States" (Count 2).[2] The Superseding Indictment (ECF No. 71) adds three wire fraud counts, based on the theory that Sullivan somehow sought to defraud persons who drove for Uber.[3] Sullivan has been charged with those offenses even though the 2016 Incident was indisputably contemporaneously disclosed to (among others) Uber's then-Chief Executive Officer, at least two members of Uber's Legal department (including the head of Privacy within that department), a member of Uber's Communications team, and numerous individuals within Uber's Security department.

Just two weeks after Uber fired and publicly blamed Sullivan for the 2016 Incident, the company's lawyers sat down with representatives of the FBI and the U.S. Attorney's Office. During that meeting—and in correspondence and meetings that followed—Uber's counsel selectively disclosed portions of the company's internal investigation and provided the government with carefully chosen and selectively redacted documents. Perhaps unsurprisingly—

---

[1] An alleged violation of 18 U.S.C. § 1505.

[2] An alleged violation of 18 U.S.C. § 4, alleging concealment of violations of various subsections of 18 U.S.C. § 1030.

[3] The newly added wire fraud counts have significant legal defects, which we expect to raise in a motion to dismiss.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Uber was then the target of a separate criminal investigation being conducted by the same U.S. Attorney's Office—Uber's narrative sought to paint the company's current management as "change agents" while claiming that Sullivan and Uber's former CEO, both of whom had recently been forced out of the company, had "concealed" the 2016 Incident. Uber invoked the attorney-client privilege and the attorney work-product doctrine to redact and withhold key documents and other information that would significantly undermine that narrative, which the government adopted wholesale when charging Sullivan. (*See, e.g.*, Complaint (ECF No. 1) ¶¶ 10, 12, 13, 43.)

Sullivan now seeks to obtain critical portions of the selectively redacted and withheld material. Uber resists on two principal grounds: it contends that Sullivan has not satisfied the standard for Rule 17(c) subpoenas set in *United States v. Nixon*, 418 U.S. 683 (1974), and it maintains that the documents must be withheld under the attorney-client privilege. As we demonstrate below, Uber is wrong on both points. First, Sullivan's subpoena seeks relevant and admissible documents and identifies those documents with specificity. It thus satisfies the *Nixon* standard. Second, Uber has not carried its burden of showing that a number of the documents at issue are privileged, and it has waived any privilege that existed through its selective disclosure of privileged material to the government. Finally, to the extent Uber has established an existing, non-waived privilege, Sullivan's Fifth and Sixth Amendment right to compel essential evidence for his defense overcomes any remaining interest in confidentiality.

**BACKGROUND**

## I.     The 2016 Incident

On November 14, 2016, Sullivan, Uber's Chief Security Officer, learned via email of a potential data breach by someone purporting to be a "white hat" hacker—an individual who exposes potential cyber security vulnerabilities in exchange for money through entities' "bug bounty" programs, which are common in the industry. Sullivan immediately began an investigation in accordance with written policies prepared by Uber's Security and Legal groups—policies which tasked Sullivan's Security group with investigating the technical aspects

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

of data breaches and tasked the Legal department's "Privacy" attorneys (a group that did not include Sullivan) with understanding and carrying out Uber's breach-related legal and reporting obligations.

Among Sullivan's first actions was to notify the highest level of Uber management—Uber's Chief Executive Officer—of the incident and to seek the assistance of Uber Privacy attorney ████, a member of Uber's Legal department responsible for advising Sullivan's team and others at Uber about the company's security-related legal responsibilities. From there, at least two dozen Uber employees from the company's Security, Legal, and Communications groups played a variety of roles responding to the 2016 Incident. Those individuals communicated with each other extensively throughout the ensuing investigation.

Sullivan's Security team meticulously documented the incident and Uber's response in real time. A key document used for this purpose was the Preacher Central Tracker ("PCT"). The PCT was updated regularly, sometimes multiple times per day, and documented the Security team's efforts to investigate the incident, take steps in response, and memorialize meetings and issues that arose throughout. This document was stored on Uber's systems and made widely available to the response team.

Throughout Uber's response to the 2016 Incident, Legal's ████—in furtherance of his twin duties to provide legal advice to Sullivan's Security team and to assist Legal in understanding and carrying out its reporting obligations—was provided the details about the investigation (indeed, he created the PCT) and was involved in key decisions. Similarly, senior Uber Privacy attorney ████, a former longtime AUSA in this District who regularly interacted with law enforcement while at Uber, was informed of the details of the 2016 Incident within 24 hours of its occurrence.

Despite all this, the government contends that Sullivan "withheld knowledge of the breach from others within Uber who were in a position to disclose that information to the FTC" (Compl. ¶ 43) and Uber's drivers (Superseding Indictment ¶ 10).

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## II.     The FTC Investigation

About a year and a half before the 2016 Incident, in 2015, the FTC had launched an investigation into a separate data breach that occurred at Uber in 2014, before Sullivan joined the company (the "2014 Incident"). Uber was required to produce documents to the FTC and answer interrogatory-style questions. On November 4, 2016 (shortly before the 2016 Incident), Sullivan sat for a deposition and provided testimony on behalf of Uber regarding, among other things, the remedial security measures Uber had implemented following the 2014 Incident.

Sullivan was not a Privacy lawyer in Uber's Legal department, had little interaction with the FTC during its investigation apart from the deposition and an earlier presentation, and was not responsible for preparing Uber's responses to the FTC's inquiries. He was occasionally consulted about particular issues related to the FTC investigation and was copied on or asked to review certain of Uber's submissions to the FTC, typically at or near the submission deadline after the drafting process was complete. And he instructed members of his team to provide detailed information to, and meet with, Uber's in-house and outside attorneys handling the FTC matter. The government has not alleged that Sullivan ever instructed those individuals to lie to, or withhold information from, the Uber lawyers handling the FTC investigation.

The government nonetheless alleges that Sullivan concealed the 2016 Incident from the FTC, which, the government argues, should have been made aware of the incident because the FTC's ongoing investigation of the 2014 Incident "focused on data security, data breaches, and protection of [personal identifying information]." ( Compl. ¶ 13.) Sullivan "concealed" the 2016 Incident, the government contends, principally by failing to disclose it to Uber's Legal department as it worked to respond to the FTC's investigation into the 2014 Incident. (*See, e.g.*, Compl. ¶¶ 13, 43; Superseding Indictment ¶ 5.) In the Superseding Indictment, the government alleges similar omissions and misrepresentations as part of a purported scheme to defraud persons who drove for Uber. (Superseding Indictment ¶ 10.) The government further contends that this alleged concealment continued through November 2017, when Uber terminated both Sullivan ██████ (Compl. ¶¶ 9, 44-47.)

DEF'S OPP. TO UBER MTQ FED. R. CRIM. P. 17 SUBPOENA
3:20-cr-00337-WHO                                                        4

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

### III. Uber's Role in the Criminal Investigation

Uber played an unusually hands-on role in shaping the criminal investigation that resulted in Sullivan's indictment. Even before its November 21, 2017 termination of Sullivan, Uber fed a carefully crafted narrative to the New York Times, Bloomberg News, and other media outlets. Seeking to burnish the image of its new CEO—who had recently taken over after a series of embarrassing public revelations about Uber and its culture (unrelated to security or Sullivan's group)—Uber claimed that the 2016 Incident had remained "hidden" until discovered by investigators who had been tasked with inquiring into other issues at Uber. The new CEO, framing Uber's disclosure of this supposed revelation as part of what he was calling "Uber 2.0," proclaimed, "We are changing the way we do business, putting integrity at the core of every decision we make and working hard to earn the trust of our customers."[4]

In a contemporaneous document, Uber's Global Head of Security, Privacy & Engineering Communications—who had deep knowledge of the 2016 Incident and Mr. Sullivan's role in it—called Uber's narrative "completely false," characterizing it as a baseless effort to position the new CEO as a "change agent." Nevertheless, Uber immediately set to work on pushing that same narrative with the government.

On December 8, 2017—just two weeks after Sullivan's termination—Uber's lawyers met with representatives of the U.S. Attorney's Office and the FBI, laid out the company's narrative, and walked the government through a binder of documents selected to support that narrative. Uber's lawyers were familiar with the Northern District's U.S. Attorney's Office; it was revealed in May 2017 that the office had launched a criminal investigation into certain of Uber's *other* activities, further incentivizing new management to press the "change agent" narrative.[5]

---

[4] As discussed below, the actual reason Uber disclosed the 2016 Incident and terminated Sullivan may have more to do with not wanting to jeopardize its then-pending $7 billion transaction with SoftBank.

[5] *See* Dan Levine & Joseph Menn, *Uber Faces Criminal Probe Over Software Used to Evade Authorities*, Reuters, May 4, 2017, https://www.reuters.com/article/us-uber-tech-crime-exclusive/exclusive-uber-faces-criminal-probe-over-software-used-to-evade-authorities-idUSKBN1802U.

DEF'S OPP. TO UBER MTQ FED. R. CRIM. P. 17 SUBPOENA
3:20-cr-00337-WHO

5

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

On September 28, 2018, Uber's lawyers returned to present a 58-slide PowerPoint to the government, again supported by selectively chosen, heavily redacted documents (which were apparently collected in a large binder that counsel provided to the government that day). The presentation disclosed the names of the individuals who were interviewed by the company's lawyers, revealed what some of those individuals told counsel during those interviews, and otherwise detailed the results of what the lawyers had learned and concluded from their internal investigation.[6] As the government continued its own investigation, it permitted Uber's counsel— usually multiple lawyers—to attend virtually every FBI interview of current and former Uber employees (each of whom was undoubtedly aware of the company's public narrative), even when the employee had his or her personal lawyer present. Uber provided the government with documents in response to numerous grand jury subpoenas, but invoked the attorney-client privilege and work product doctrine as the basis for withholding or redacting (among other things) many key communications between lawyers in Uber's Legal department and Uber employees (including Sullivan) related to the 2016 Incident. The redactions were so significant that the government conceded in its Complaint that it was unable fully to review a key email (which it cited in support of its concealment theory) because "Uber has asserted the attorney-client privilege over most of the contents." (Compl. ¶ 39, n.2). In that document, Sullivan is alleged to have provided a false or misleading response to a Legal department inquiry that is

---

[6] Despite these disclosures of the details of its 2017 internal investigation to the government, Uber claims that documents related to that investigation are protected by the attorney-client privilege and work product doctrine. But given its conduct, Uber has almost certainly waived any privilege. *United States v. Reyes*, 239 F.R.D. 591, 602 (N.D. Cal. 2006) (holding that "law firms waived both the attorney-client privilege and the work-product privilege when they disclosed the substance of their investigative interviews, reports, and conclusions with the government."). The subpoena Uber moves to quash in its current Motion does not seek documents specifically related to the internal investigation, and we discuss waiver as to the requested documents below. But in light of Uber's explicit conduct and the government's most recent allegation that Sullivan committed wire fraud, in part, by providing false information to Uber's lawyers in the 2017 internal investigation, Sullivan intends to file a motion with this Court to issue a second subpoena for specific documents related to that investigation. Sullivan anticipates the motion will be filed before the hearing on Uber's Motion.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

substantially redacted; the General Counsel's response to Sullivan is redacted in its entirety:[7]



(UBER-DATA-00072799.[8])

To the extent the redacted portions may have been privileged (because they were communications between counsel and a company employee for the purpose of rendering legal advice), so too was Sullivan's response. But Uber chose only to reveal Sullivan's statement, while asserting privilege over all or significant portions of the statements of its two lawyers, which may be necessary to provide important context for what Sullivan wrote. Such sword-and-shield tactics are precisely what the doctrine of waiver is intended to guard against.

This is not the only such email explicitly referenced in the charging documents where

---

[7] ■■■ was Uber's General Counsel. ■■■ and ■■■ were Privacy lawyers in Uber's Legal department.

[8] The emails cited in this opposition are attached, in Bates-number order, to the accompanying Declaration of David H. Angeli.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Sullivan's ability to effectively defend himself has been undermined by Uber's redactions. The Superseding Indictment alleges that, in a September 25, 2017 email to WilmerHale (the firm Uber engaged to investigate a number of issues at the company), Sullivan "falsely suggested . . . that the 2016 Data Breach was not, in fact, a data breach." (Superseding Indictment ¶ 10.) Leaving aside that this email says nothing of the sort, nearly all of this exchange—*including the entirety of the actual question to which Sullivan was responding and most of his response*—has been redacted by Uber, making it all but impossible to establish the full context of Sullivan's statements at trial:



**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

As described below, these are just two among many examples of documents that will be critical to demonstrating Sullivan's knowledge and state of mind, but which Uber has selectively withheld or redacted under the guise of privilege.

## IV. The Documents at Issue

The documents requested in the proposed subpoena are those that Uber either produced to the government with key redactions or withheld entirely from its grand jury productions, citing the attorney-client privilege and/or work-product doctrine. Each of the requested documents generally falls into one or more of the following five subject areas:

- documents indicating the degree to which ████, ████ and other members of Uber's Legal department were aware of the 2016 Incident, contrary to the government's assertions that this information was concealed from Uber's attorneys;

- documents containing comments or advice from Uber's attorneys (including ████ and other members of the Legal department) regarding the 2016 Incident;

- documents discussing Uber's responses to the FTC, including communications between Sullivan and the Legal department regarding the FTC investigation, communications regarding the content of Uber's responses to the FTC, communications showing that others at Uber with knowledge of the 2016 Incident were responsible for and/or substantially assisted in preparing Uber's responses to the FTC, and communications rebutting the government's contention that Sullivan played a significant role in crafting those responses;

- evidence that ████ and the Legal department, not Sullivan, were responsible for deciding whether a given incident was a reportable data breach; and/or

- documents demonstrating the full extent of what Sullivan and his team stated about the incident to Uber's management and to internal investigators in 2017 and/or demonstrating what Uber's management team knew about the 2016 Incident before November 21, 2017.

The subpoena identifies each document by Bates-number as produced by Uber to the government. In total, the subpoena as narrowed seeks approximately 1179 documents. Some of those documents are duplicates or earlier versions of certain email "threads." Nevertheless, out of an abundance of caution (*e.g.*, because Uber apparently applied different redactions to multiple versions of the same document), the proposed subpoena seeks this entire set of

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

documents, including potential duplicates. The actual number of *unique* documents at issue is approximately 660.

## ARGUMENT

## I. Sullivan has satisfied the requirements of Fed. R. Crim. P. 17(c) and *Nixon* for pretrial production of the documents at issue.

A party seeking pretrial production of documents under Rule 17(c) must show "(1) relevancy; (2) admissibility; and (3) specificity." *Nixon*, 418 U.S. at 700; *see, e.g.*, *United States v. Sleugh*, 896 F.3d 1007, 1012 (9th Cir. 2018). Sullivan's subpoena satisfies the *Nixon* standard.

### A. The documents at issue are relevant.

As outlined above, Sullivan seeks full copies of approximately 1179 documents. Each of the documents sought is relevant under *Nixon* because each fits into one or more key subject matter areas, as explained below. To establish relevance for purposes of *Nixon*, Sullivan need only show that the circumstances of the communications and other information in a document, "taken in their total context, permit a rational inference that at least part of the [document] relate[s] to the offenses charged in the indictment." *Nixon*, 418 U.S. at 700 (discussing relevance of conversations on tape recordings).

### 1. Documents indicating the degree to which ▮▮▮▮ ▮▮▮▮ and other members of Uber's Legal department were aware of the breach, contrary to the government's assertions that Sullivan concealed this information from Uber's attorneys

Sullivan is charged with engaging in a scheme to withhold and conceal the 2016 Incident from the FTC and to keep knowledge of the 2016 Incident from being discovered by Uber's Legal department and others within the company who were in a position to disclose that information to the FTC and to Uber drivers. The redacted documents and other evidence demonstrate that ▮▮▮▮ a member of Uber's Legal department, was fully informed of the 2016 Incident and provided legal advice throughout Uber's response. That evidence further demonstrates that the decision to disclose the breach to law enforcement or the public was discussed multiple times during the response and that ultimately it was ▮▮▮▮ and the Legal

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

department's responsibility to determine (among other things) Uber's reporting obligations following the incident. The redacted documents also show that █████ (who was supervising █████████, the in-house Uber lawyer with primary responsibility for interacting with the FTC in connection with its investigation of the 2014 Incident) was advised of the 2016 Incident. Uber has produced to the government a number of redacted documents directly relevant to the Legal department's knowledge of the 2016 Incident, including:

- an email thread reflecting that █████ (a central person in both the Legal department and Uber's response to the FTC) was informed both of the 2016 Incident and that █████ was "leading for legal with the security team" (UBER-DATA-00060799);

- a 2017 email thread with Uber outside counsel, incoming CEO █████ █████████, and Senior VP of Communications █████████ in which the group discussed Sullivan's explanation to █████████ of the 2016 Incident (█████ who also was aware of the 2016 Incident as it was occurring, was a participant in this discussion as well) (*e.g.*, UBER-DATA-00072652); and

- a series of communications including Sullivan, █████ █████ (Uber's General Counsel), █████████ (another in-house Uber lawyer), and WilmerHale attorneys in connection with WilmerHale's 2017 internal investigation into the 2016 Incident, which appear to include discussions regarding why the 2016 Incident was handled in the way it was (including whether "legal" was involved in these decisions) (*e.g.*, UBER-DATA-00073599; UBER15_0049403[9]).

Documents such as these are plainly relevant to the core issues in the government's charges against Sullivan.

**2. Documents containing comments or advice from Uber's attorneys (including █████ and other members of the Legal department) regarding the 2016 Incident**

At least two dozen Uber employees played a variety of roles in Uber's response to the 2016 Incident. The response team's actions and concerns were documented in the PCT. Although Uber has produced the PCT, important portions of the document are redacted, including real-time legal advice that █████ provided to Sullivan and the security team. Given that the government has accused Sullivan of *concealing* the breach from the Legal department, these

---

[9] The subpoena itself refers to this document with the Bates number assigned to it by the government, SEC-DOJ-EPROD-000050980.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

communications are directly relevant to establish that Legal was not only aware of the 2016 Incident, but that it gave legal advice to Sullivan and his team as to how they should respond. Such advice goes directly to Sullivan's state of mind and why he may or may not have provided information about the 2016 Incident to others at Uber, including those who were responding to the FTC investigation. In addition, the Superseding Indictment charges Sullivan with engaging in a scheme to ensure that the California drivers did not receive data breach notifications as a result of the 2016 Incident. While the unredacted portions of the PCT already indicate that Uber's decision not to initiate a data breach notification was the result of ████ legal advice to the security team, understanding the full extent of ████ advice is directly relevant to rebut the government's contention that Sullivan acted with criminal intent.

> **3.**   **Documents discussing Uber's responses to the FTC, including communications between Sullivan and the Legal department regarding the FTC investigation, communications regarding the content of Uber's responses to the FTC, communications showing that others at Uber with knowledge of the 2016 Incident substantially assisted in preparing Uber's responses to the FTC, and communications rebutting the government's contention that Sullivan played a significant role in crafting those responses**

The government alleges that Sullivan continued to conceal the 2016 Incident even after it was resolved, principally by "failing to disclose" it to Uber's Legal department as Uber worked to respond to the FTC investigation. For example, the Complaint alleges that Sullivan withheld information about the 2016 Incident from Uber's Legal department during the preparation of two documents submitted to the FTC: (1) supplemental interrogatory responses submitted in December 2016 (Compl. ¶ 38); and (2) a draft of a letter Uber sent to the FTC in April 2017 requesting that the FTC close its investigation (Compl. ¶¶ 39–44). In fact, Sullivan played an extremely limited role with respect to both of these documents.[10]

With respect to the December 2016 interrogatory responses, the contemporaneous,

---

[10] For example, Sullivan's "comments" on the seven-page April 2017 letter—sent 6 minutes after he received it—were, in their entirety: "Letter looks ok to me. Thanks." The draft letter, Sullivan's response, and the final letter submitted to the FTC nine days letter, are detailed in the government's Complaint, although the email that Sullivan was actually responding to (reproduced *supra* at p.7) is heavily redacted. (Compl. ¶¶ 39-43.)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

redacted email exchanges produced by Uber regarding the interrogatory responses include ██ (who, again, was alerted to the 2016 Incident in real time), ██ (who Sullivan knew to have been an integral participant in Uber's response to the incident), and ████, an Uber security engineer deeply involved in the response to the 2016 Incident and who (at Sullivan's urging) was the individual who worked most closely with Uber's Legal department in preparing Uber's responses to the FTC. When reviewing the interrogatory responses, Sullivan did not need to inform these individuals of the 2016 Incident because the team preparing those responses was already well aware of it.

With respect to Uber's April 2017 letter to the FTC urging it to close its investigation, redacted emails show that ██ and ██ also saw drafts of the letter, and that ██ (unlike Sullivan) offered substantive comments on the letter. Thus, even the redacted documents undermine the government's contention that "[none] of the individuals responsible for drafting the April 19 letter to the FTC had been made aware of the 2016 data breach." (Compl. ¶ 43.)

Put simply, where the government asserts that Sullivan's *failure to make a particular statement* in an email reply constitutes evidence of a crime, the actual, unredacted content of the email to which Sullivan was replying is obviously relevant—indeed, essential—as are the communications by those within Uber who (unlike Sullivan) played a substantive role in responding to the FTC. Subpoenaed materials falling into this category include the email threads in December 2016 and April 2017 that are directly referenced in the Complaint, as well as a series of email exchanges in late 2016 and early 2017 following Sullivan's testimony to the FTC. These email exchanges appear to provide critical context regarding the scope of the FTC's follow-up questions after Sullivan's testimony and will likely shed light on why virtually all of the Legal department's interrogatory responses in this period—even those that on their face responded to seemingly broader questions—were expressly limited to the *2014* Incident. This is of critical importance where the government has alleged that Sullivan was obligated to suggest to Uber's counsel that it supplement these responses with details about a completely separate incident, and that his failure to do so was criminal.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

**4.** **Evidence that ▆▆▆ and Uber's Privacy lawyers, not Sullivan, were responsible for deciding whether a given incident was a reportable data breach**

The government alleges that Sullivan worked to conceal the 2016 Incident by resolving the incident using Uber's "bug bounty" program rather than treating it as a reportable data breach. In fact, it was not Sullivan's job to decide what to disclose to regulators or law enforcement. This responsibility lay with ▆▆▆ and the rest of the Privacy lawyers in Uber's Legal department. A number of redacted emails specified in the subpoena are relevant to establish that division of responsibility. For example, the materials sought in the subpoena include unredacted copies of:

- an email thread with ▆▆▆ regarding a prior security incident in late November 2016 (UBER-DISC-0033789);

- an email discussion with ▆▆▆ in 2017 regarding whether a team of hackers should be referred to the bug bounty program (UBER-DISC-0035903);

- the PCT, and other communications and documents capturing ▆▆▆ advice to Sullivan and the rest of the Security team with regard to the 2016 Incident (*e.g.*, UBER-DATA-72473); and

- communications from ▆▆▆ Sullivan, and others regarding the 2016 Incident in connection with Uber's 2017 investigation into the incident (*e.g.*, UBER-DATA-00073599; UBER15_0049403).

**5.** **Documents demonstrating the full extent of what Sullivan and his team stated about the incident to Uber's management and to internal investigators in 2017 and/or demonstrating what Uber's management team knew about the 2016 Incident before November 21, 2017**

In September 2017, Sullivan sent Uber's new CEO, ▆▆▆▆▆▆▆▆, an email providing "more details" of the 2016 Incident. The government contends that the summary provided in this email contained "affirmative misrepresentations and misleading omissions of fact," which, it asserts, demonstrates Sullivan's "ongoing intent to obstruct the FTC," as well as his consciousness of guilt. (Compl. ¶¶ 44–47.) Moreover, the Superseding Indictment charges Sullivan with a wire fraud scheme based in part on this email, as well as a separate email sent on September 25, 2017 to WilmerHale attorneys investigating the 2016 Incident. (Superseding Indictment ¶ 10.)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Documents sought in the subpoena will help rebut these assertions. Sullivan's email to ████████—which began by making clear that Sullivan was providing "more details" of the incident (*i.e.*, in addition to those he had already provided)—was never intended to be a comprehensive accounting of the 2016 Incident; Sullivan was well aware that Uber was conducting a wide-ranging investigation into the incident and that ████████ was briefed on the results of that investigation. Indeed, Sullivan sat for multiple interviews with WilmerHale during this very period (including at least one interview in August 2017, one in September 2017, and another in early October 2017) and revealed the very information the government now claims he withheld: that hackers had downloaded data and that Sullivan and his team worked to ensure that this stolen data was deleted. Sullivan was aware that the members of his team involved in the 2016 Incident response were being interviewed as well, and that they would undoubtedly provide any additional technical details requested by Uber and the investigators. Again, the government has never suggested that Sullivan instructed those individuals to lie or withhold any information from the investigators.

Uber has selectively released the results of this investigation as necessary to support its "change agent" narrative. But it has redacted or withheld altogether numerous documents—including, most prominently, its notes and memoranda of its interviews with Sullivan from August to October 2017—reflecting or referring to *additional information* about the 2016 Incident that Sullivan and his team provided to Uber's new management or to the WilmerHale investigators. That information is obviously critical to establish both Sullivan's state of mind when drafting the emails that the government claims to be materially false and/or misleading, and what ████████ others in Uber management, and WilmerHale *already knew* (or could be reasonably expected to know) when Sullivan sent those emails. Moreover, to the extent Uber's investigation uncovered facts that are inconsistent with its chosen narrative (*e.g.*, that a broad range of individuals within Uber were aware of the 2016 Incident, that ████████ had been briefed on the details of the incident from sources other than Sullivan, or that Uber

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

disclosed the incident for reasons other than the altruistic "change agent" motive that it espoused), those facts would similarly be critical to Sullivan's defense.

One less altruistic reason that Uber may have disclosed the incident is suggested by a number of the documents sought in this category: In the fall of 2017, Uber was in negotiations with SoftBank to sell a 15% stake of the company for more than $7 billion. In connection with this transaction, SoftBank—undoubtedly erring on the side of caution—informed Uber on November 3, 2017 that it would not go forward with the deal unless Uber publicly disclosed the 2016 Incident. (UBER-DATA-00056193.) Although Uber's plan for disclosing the 2016 Incident was "unclear" at that point (even though the company's new CEO and other senior members of management had been aware of it for months), Uber ultimately agreed to SoftBank's demand, and the companies drafted a detailed letter agreement outlining Uber's disclosure obligations regarding the 2016 Incident. Just a few weeks later, Uber publicly disclosed the 2016 Incident, terminated Sullivan and ███ and proclaimed that its decision to disclose was driven by a new commitment to "putting integrity at the core of every decision we make." It is certainly relevant whether new management at Uber initially *agreed* with ███ and the Legal department's earlier determination that the 2016 Incident did not require disclosure, but were forced to conclude otherwise by SoftBank's demand. Uber should be required to produce documents that shed light on this important issue.

A number of the requested documents are relevant to this topic, including:

- a September 25, 2017 email from Sullivan to WilmerHale attorney ███ ███ in which, the Superseding Indictment alleges, Sullivan "falsely suggested that the 2016 Data Breach was not, in fact, a data breach." (Superseding Indictment ¶ 10.) As noted above, not only has ███'s question to Sullivan been redacted in its entirety, so has more than half of Sullivan's answer (UBER-DATA-00079500);

- internal Uber communications regarding the 2017 internal investigation, particularly a lengthy thread among various Uber employees and WilmerHale attorneys in October 2017 that are redacted in their entirety (*see, e.g.*, UBER-DATA-00063547);

- a series of email threads in October and November 2017 regarding the SoftBank transaction, and SoftBank's insistence that Uber disclose the 2016

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Incident as a condition of launching its tender offer (*see, e.g.*, UBER-DATA-00056193); and

- communications regarding the 2016 Incident in connection with a Russian joint venture known as "Project Maple Leaf" (*see, e.g.*, UBER-DATA-00060801).[11]

### 6. Uber's Relevance Categories

Uber argues that most of the requested documents fall within at least one of three categories that (it contends) could not possibly be relevant under *Nixon*: (1) emails that were not to or from Sullivan or documents that did not come from his purported "custodial file" (MTQ at 5); (2) documents dated after November 21, 2017, the date Uber terminated Sullivan (MTQ at 5); and (3) documents that pre-date the 2016 Incident (MTQ at 5–6). Uber's reading of *Nixon's* relevance prong, however, is far too narrow. Sullivan must merely show "a sufficient likelihood" that the documents or information sought are "relevant to the offenses charged in the indictment." *Nixon*, 418 U.S. at 700. The requested documents, including those in Uber's identified categories, easily meet this standard.

### a. Documents Not From Sullivan's "Custodial File"

Uber contends that 497 of the requested documents are not relevant under *Nixon* because "they are emails that were not sent to [Sullivan] or from him or are documents that did not come from his custodial file." (MTQ at 5.) This is wrong. In addition to the documents identified above, there are numerous requested documents in this category that undermine the government's theory of the case. For example:

- As described, the PCT was a contemporaneous memorialization of discussions and actions during the initial investigation of the 2016 Incident, including real-time legal advice given about disclosure to affected persons and contacting law enforcement. Numerous versions of this document are requested in the subpoena, as are similar contemporaneous notes that capture statements and actions of Sullivan and other key witnesses during the investigation of the 2016 Incident. Given the allegations in the Superseding Indictment, it is hard to imagine more relevant documents, even if they did not come from Sullivan's "custodial file" or an email sent to/by him;

---

[11] In addition, as noted above, Uber has not produced the notes and memoranda of Sullivan's lengthy interviews with Uber between August and October 2017—which we believe to exist—in any form, redacted or not.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

- An email thread reflecting that ▇▇ (a central figure in both the Legal department and Uber's response to the FTC) was informed at the time of the 2016 Incident that ▇▇ was "leading for legal with the security team," and many of the key facts underlying the 2016 Incident that the government alleges were hidden from the Legal department;

- Even though Uber's CEO, at least two Privacy lawyers from Uber's Legal department (including the lead), and scores of others knew about the 2016 Incident, the government contends Sullivan concealed the 2016 Incident from the FTC, law enforcement, and those at Uber who could have disclosed the 2016 Incident to the government and Uber drivers. The discovery produced however, demonstrates that key witnesses who were equally familiar with and involved in the 2016 Incident worked more closely with Uber's outside counsel than Sullivan in responding to the FTC's inquiries, and that Sullivan knew that. Some of the documents requested that do not include Sullivan, and presumably did not come from his "custodial files," are communications relating to FTC submissions involving individuals who were also intimately familiar with the 2016 Incident. Such documents clearly meet the *Nixon* relevance standard. *See, e.g.*, UBER-DATA-00073431 (email between Uber Privacy attorneys ▇▇, ▇▇ and ▇▇ regarding December 2016 submission to FTC); UBER-DATA-00072800 (email between ▇▇ and ▇▇ regarding April 2017 submission to FTC); UBER-DATA-00079419 (Uber Chief Information Security Officer ▇▇▇▇'s email commenting on January 2016 submission to FTC).

As these examples demonstrate, relevance does not depend on whether Sullivan appears on a document or had it in his "custodial file."

### b. Documents Dated After Sullivan's Termination

Uber insists that 225 of the requested documents are not relevant because they post-date Sullivan's termination in November 2017. But documents created after Sullivan's termination obviously can shed light on preceding events. For example, many of these documents are related to the SoftBank tender offer and may concern SoftBank's November 2017 demand that Uber disclose the 2016 Incident as a condition of launching its tender offer, and the role this demand had in Uber's decision to disclose the incident to regulators and others. Some of the documents appear to be communications regarding potential investigations from various regulatory bodies following the November 2017 disclosure of the 2016 Incident. Some relate to Uber's disclosure of the 2016 Incident in connection with a Russian joint venture known as "Project Maple Leaf." These requested documents may all provide insight into what Uber learned about the 2016 Incident during its 2017 investigation, and when it learned it. Such information is clearly relevant under *Nixon* to rebut the government's allegation that Sullivan made material false statements

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1  during that investigation.

2  **c.    Documents That Pre-Date the 2016 Incident**

3      Uber maintains that 56 documents are not relevant under *Nixon* because they pre-date the

4  2016 Incident. Again, Uber's reading of relevance under *Nixon* is overly narrow, particularly

5  because the government's allegations arise in the context of Sullivan's role in an FTC

6  investigation that pre-dates the 2016 Incident. For example, the government alleges that Sullivan

7  knew about the scope of the FTC investigation, knew of specific duties related to the 2014

8  Incident, and actively participated in the response to the FTC investigation before the 2016

9  Incident. (Superseding Indictment ¶¶ 2, 3, 8.) Some of the requested documents that pre-date the

10  2016 Incident provide information about Sullivan's knowledge of the 2014 Incident, the FTC

11  investigation, the Legal department's role in responding to the investigation, and the actions

12  Sullivan oversaw to correct security deficiencies following the 2014 Incident. (*See, e.g.*, UBER-

13  DATA-00073330 (email dated June 2015 about the 2014 Incident and testimony needed)). Such

14  documents clearly meet the *Nixon* relevance standard.

15                                          * * *

16      As demonstrated above, the subpoena seeks documents that are directly relevant to

17  Sullivan's defense. At a minimum, the circumstances of the communications and other

18  information in the requested documents, "taken in their total context, permit a rational inference

19  that at least part[s] of the [documents] relate to the offenses charged in the indictment." *Nixon*,

20  418 U.S. at 700. Sullivan has satisfied the *Nixon* relevance requirement.

21  **B.    The responsive documents are admissible.**

22      Uber contends (MTQ at 6–7) that the documents sought in the subpoena constitute

23  inadmissible hearsay. (Uber also maintains that the documents are inadmissible because they are

24  privileged; we discuss that contention below.)

25      Many—perhaps most—of the documents at issue will be admissible as Uber business

26  records. Courts now routinely admit emails between a company's employees about work-related

27  matters under Fed. R. Evid. 803(6), as long as an appropriate foundation is laid. *See, e.g.*, *United*

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*States v. Lischewski*, 860 Fed. App'x 512, 516 (9th Cir. 2021). Documents will also likely be admissible because they reflect present sense impressions (Fed. R. Evid. 803(1)), then-existing states of mind (Fed. R. Evid. 803(3)), or recorded recollections (Fed. R. Evid. 803(5)). Other documents will not be hearsay at all, because they may be offered for purposes other than proving the truth of the statements they contain. Fed. R. Evid. 801(c); *see, e.g.*, *United States v. Carrillo*, 20 F.3d 617, 619 (5th Cir. 1994). For example, documents reflecting statements by Uber's lawyers and other members of Uber's management team and the team responding to the 2016 Incident might be offered to show Sullivan's state of mind and/or the effect the documents had on him. *See, e.g.*, *United States v. Greenspan*, 923 F.3d 138, 148 (3d Cir. 2019) ("Greenspan was not using the [lawyer's] statements to show that the agreements were *in fact* lawful. He wanted to use them to prove their effect on his state of mind—to explain why he *believed* that they were lawful. So the lawyer's advice was admissible non-hearsay."); *United States v. Scully*, 877 F.3d 464, 474 (2d Cir. 2017) (lawyer's statement to defendant non-hearsay, because not offered for its truth); *United States v. McLennan*, 563 F.2d 943, 947 (9th Cir. 1977) ("Advice is customarily given in words, and when advice is the question, the words which constitute the advice are classic examples of verbal acts, admissible because they were spoken, whether true or false. Such verbal acts are not hearsay. They come in to bring home notice to the defendant in a case like this one."); *see also McDaniel v. Temple Indep. Sch. Dist.*, 770 F.2d 1340, 1349 (5th Cir. 1985) (hearing transcript not hearsay when offered to show board of trustees' motive and intent in not renewing employment contract, rather than for the truth of the matters asserted).

Similarly, statements made to Uber's Legal department by Sullivan, Uber management, and the 2016 Incident response team are non-hearsay to the extent they are offered solely to show what the lawyers knew, what Sullivan believed or intended, or the basis for the advice the lawyers gave. *See, e.g.*, *United States v. Brown*, 459 F.3d 509, 528 n.17 (5th Cir. 2006) (defendant's email admissible as non-hearsay under Rule 801(c) "to reveal [his] state of mind, i.e., his belief that the side deal had been entered into and confirmed by Fastow"); *United States v. Harris*, 733 F.2d 994, 1003–04 (2d Cir. 1984) (defendant's out-of-court statements offered to

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

show his state of mind, and not for their truth, were non-hearsay); *United States v. Parry*, 649 F.2d 292, 294–95 (5th Cir. 1981) (exclusion of defendant's out-of-court statements erroneous because offered to prove his knowledge, rather than for the truth of the matters asserted); *see also United States v. Connelly*, 395 Fed. Appx. 407, 408 (9th Cir. 2010) (statement not hearsay where it was not offered for its truth, but rather to show the effect on the listener and explain why she took certain actions); *United States v. Payne*, 944 F.2d 1458, 1472 (9th Cir. 1991) ("We find that the statement properly was treated as non-hearsay because it was not introduced for the truth of the matter asserted. The statement was introduced . . . to show the effect on the listener[.]").

### C.    The responsive documents are specifically identified.

The documents sought in the subpoena are specifically identified (the subpoena provides the exact Bates numbers of the documents sought) and, as described above, relate to a particular set of issues that go to the heart of Sullivan's defense. Courts have enforced Rule 17(c) subpoenas with far less specificity. *See, e.g.*, *United States v. Gas Pipe, Inc.*, No. 3:14-cr-298-M, 2018 WL 5262361, at *8–*17 (N.D. Tex. June 18, 2018) (Rule 17(c) subpoena for "[a]ny documents" in several categories sufficiently specific); *United States v. Carriles*, 263 F.R.D. 400, 405 (W.D. Tex. 2009) (Rule 17(c) subpoena sufficiently specific where it "specifies a limited set of original recordings, known to exist, of a specific content, involving known participants during a delineated time frame."); *United States v. Caruso*, 948 F. Supp. 382, 396, 398-99 (D.N.J. 1996) (enforcing Rule 17(c) subpoena for "[a]ll documents" in several categories). Uber's request for details about the substance of each document requested far exceeds what *Nixon* requires. As this Court has observed (through Judge Breyer), "the proponent of a subpoena cannot be expected to identify the materials he seeks in exacting detail, when (as demonstrated by the fact that he must employ a subpoena) he does not have access to them." *United States v. Reyes*, 239 F.R.D. 591, 599 (N.D. Cal. 2006) (citing *Nixon*, 418 U.S. at 700).

* * * *

The subpoena satisfies the *Nixon* requirements of relevance, admissibility, and specificity.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## II.     Privilege cannot shield the requested documents from production.

For three reasons, Uber's assertion of the attorney-client privilege and the attorney work-product protection cannot shield the documents from production. First, as to at least some of the documents, Uber has not established that the privilege covers the communications at issue. Second, Uber has waived any privilege it had by selectively disclosing closely related privileged communications to the government in the course of its effort to scapegoat Sullivan. Third, Sullivan's Fifth and Sixth Amendment right to present a defense overcomes any validly asserted, non-waived privilege that Uber still possesses.

### A.     Uber has failed to establish that all the documents are privileged.

The party asserting the attorney-client privilege "has the burden of establishing the relationship and privileged nature of the communication." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). The privilege protects confidential communications between lawyer and client for the purpose of obtaining legal advice and is designed to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). But the privilege "contravene[s] the fundamental principle that the public has a right to every man's evidence." *Trammel v. United States*, 445 U.S. 40, 50 (1980) (quotation omitted). "As such, [the privilege] must be strictly construed and accepted only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." *Id.* (quotation omitted); *see, e.g.*, *United States v. Martin*, 278 F.3d 988, 999 (9th Cir. 2002) ("Because it impedes full and free discovery of the truth, the attorney-client privilege is strictly construed." (quotation omitted)).

The Ninth Circuit has recognized that "[t]he attorney-client privilege may be divided into eight essential elements: (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such (3) the communication relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

himself or by the legal adviser, (8) unless the protection is waived." *In re Grand Jury Investigation*, 974 F.2d 1068, 1071 n.2 (9th Cir. 1992) (quotation omitted); *see, e.g.*, *United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010). "The party asserting the privilege [here, Uber] bears the burden of proving each essential element." *United States v. Ruehle*, 583 F.3d 600, 608 (9th Cir. 2009); *see, e.g.*, *Graf*, 610 F.3d at 1156; *Martin*, 278 F.3d at 999–1000.

Under these principles, Uber has failed to meet its burden of showing that many of the documents are privileged. A number of the emails and other communications do not include an attorney (element 1), were seemingly not created for the purpose of seeking or giving legal advice (elements 2 and 3), were sent to or received from third parties (including government agencies and regulators) (element 8), or were widely shared within the company in the form of "all hands" emails (elements 1, 2, 3, 4, and 8). Uber argues it has met its prima facie burden to prove the requested documents are privileged because it complied with the standard articulated in *In re Grand Jury Investigation*, 974 F.2d at 1071 (9th Cir. 1992). (MTQ at 8.) But that case merely recognized that a party may meet its burden by using "the privilege log approach." *Id.* To serve that purpose, however, the log must suffice to establish the eight elements of the privilege. For example, the subpoenaed party in *In re Grand Jury* submitted a detailed log with specific information and declarations of counsel providing details about the confidential nature of the requested documents. *Id.*

Uber has not provided a privilege log for the requested documents or a declaration of counsel. Instead, it maintains that the requested documents provide sufficient information to establish privilege "on their face." (MTQ at 8–9.) It is doubtful that the face of a document can ever establish, for example, that any privilege has not been waived (element 8). And even a cursory review of the documents shows that they fail to establish other elements of the privilege as well. Here are some examples:

- Sullivan has subpoenaed numerous emails surrounding the 2017 SoftBank transaction, including emails where ████████ (then the Co-Head of Global Investment Banking at Goldman Sachs) was copied on the email. Although some of these communications include Uber attorneys from Cooley LLP, Uber does not explain why its privilege has not been waived by the

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

DEF'S OPP. TO UBER MTQ FED. R. CRIM. P. 17 SUBPOENA
3:20-cr-00337-WHO                                        23

inclusion of ▮▮▮ on these emails. Indeed, some of Uber's redactions are of ▮▮▮'s statements (UBER-DATA-00056193), and at least one discussion among ▮▮▮ Uber CEO ▮▮▮ and Uber Head of Corporate Development ▮▮▮ has been redacted by Uber despite not having any lawyers on the thread at all. (UBER-DATA-0069066.)

- Uber has redacted the *subject line* of an email thread apparently related to the 2016 Incident even though an attorney was not added to the thread until later in the discussion after at least five emails had already been exchanged among the other participants. (UBER-DATA-00060169.)

- Uber has redacted a communication between Sullivan and an external security consultant named ▮▮▮. (UBER-DATA-00067210.) Although their exchange is later forwarded to Uber attorney ▮▮▮, there appears to be no basis for redacting the initial exchange between Sullivan and ▮▮▮

- In November 2017, Uber's VP of Communications drafted a statement for ▮▮▮ regarding the 2016 Incident. Although Uber Chief Legal Officer ▮▮▮ is copied on the email, it is difficult to see from the face of the email how this draft public statement is covered by the attorney-client privilege. (UBER-DATA-00069039.)

For three separate and independent reasons, Uber has similarly failed to establish that the documents sought are protected by the work-product doctrine. First, the work-product doctrine is a "qualified" privilege that protects "from discovery documents and tangible things prepared by a party or his representative in anticipation of litigation." *Admiral Ins. Co. v. U.S. Dist. Ct.*, 881 F.2d 1486, 1494 (9th Cir. 1989) (citing Fed. R. Civ. P. 26(b)(3)); *see also United States v. Nobles*, 422 U.S. 225, 237-38 (1975). Uber has not even identified which of the entirely withheld documents it claims are work-product,[12] much less established that they were prepared by Uber or its lawyers in anticipation of litigation. Second, the work-product doctrine "limits its protection to one who is a party (or a party's representative) to the litigation in which discovery is sought." *In re California Pub. Util. Comm'n,* 892 F.2d 778, 781 (9th Cir. 1989). Uber's claim of work product as to Sullivan's subpoena is inapplicable in this criminal case between the government and Sullivan. Third, as discussed below, Uber has waived any work-product protection that may have existed by selectively disclosing documents to the government and by affirmatively putting the purportedly protected documents at issue in this case.

---

[12] By contrast, Uber does specify which of its *redactions* are based on privilege and which are based on work-product.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## B.    Uber waived its privilege regarding the 2016 Incident.

Uber has failed to establish that it did not waive any privilege or work-product protection it held over the requested documents. Indeed, the record demonstrates overwhelmingly that Uber *did* waive the privilege by selectively revealing otherwise privileged information regarding the 2016 Incident to the government and/or by affirmatively putting the protected information at issue in this case.

Courts have long recognized that the attorney-client privilege may be waived "either implicitly, by placing privileged matters in controversy, or explicitly, by turning over privileged documents." *Gomez v. Vernon*, 255 F.3d 1118, 1131 (9th Cir. 2001). The principal purpose of the doctrine of waiver is "to protect against the unfairness that would result from a privilege holder selectively disclosing privileged communications to an adversary, revealing those that support the cause while claiming the shelter of the privilege to avoid disclosing those that are less favorable." *Tennenbaum v. Deloitte & Touche*, 77 F.3d 337, 340–41 (9th Cir. 1996). Voluntarily disclosing privileged information to third parties, including to law enforcement, will generally destroy the privilege. *In re Pacific Pictures Corp.*, 679 F.3d 1121, 1127–28 (9th Cir. 2012); *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010). Furthermore, parties "cannot be permitted to pick and choose" in their disclosure of protected communications, "waiving the privilege for some and resurrecting the claim of confidentiality to obstruct others." *Permian Corp. v. United States*, 665 F.2d 1214, 1221 (D.C. Cir. 1981).[13]

---

[13] *See also* Fed. R. Evid. 502(a) (waiver "extends to an undisclosed communication or information in a federal or state proceeding only if 1) the waiver is intentional; 2) the disclosed and undisclosed communications or information concern the same subject matter; and 3) they ought in fairness to be considered together."). As noted by the Rule 502 Advisory Committee, subject matter waiver under these circumstances is required in order to "prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502(a) Advisory Committee Note (2011). The Rule therefore "does not alter the substantive law regarding when a party's strategic use in litigation of otherwise privileged information obliges that party to waive the privilege regarding other information concerning the same subject matter, so that the information being used can be fairly considered in context." *Id.* In such situations, "the party using an attorney-client communication to its advantage in the litigation has, in so doing, intentionally waived the privilege as to other communications concerning the same subject matter, regardless of the circumstances in which the communication being so used was initially disclosed." *Id.*

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

A few examples show that Uber deliberately revealed privileged information to the government related to the 2016 Incident and thus expressly waived the privilege:

- The PCT itself is marked "Attorney-Client Privileged & Confidential Work. Prod.," and contains numerous redactions of legal advice given to Sullivan and the Security team by ████. In this very document, however, Uber selectively revealed other privileged information to the government, including early discussions regarding what would need to be in any nondisclosure agreement between Uber and the hackers, ████'s advice that the Security team was permitted to log in to employee-owned GitHub accounts, and ████'s repeated advice that Uber did not have a data breach reporting obligation. (UBER-DATA-00072473.)

- An email chain, explicitly referenced in the Complaint, discussing a draft letter to the FTC in April 2017. (Compl. ¶ 37.). Although Sullivan and ████'s (privileged) comments to Uber's attorneys regarding this letter were disclosed to the government, Uber withheld the comments of Uber attorney ████. (UBER-DATA-00072800.)

- A September 25, 2017 email in which ████ (a WilmerHale attorney investigating the 2016 Incident for Uber) asked Sullivan a question over email. Uber has redacted not only ████'s question to Sullivan, but the majority of Sullivan's response as well. What remains of Sullivan's response is referenced in the Superseding Indictment, which alleges that Sullivan "falsely suggested" in this email "that the 2016 Data Breach was not, in fact, a data breach." (Superseding Indictment ¶ 10.) This selection of Sullivan's response to some undisclosed question from ████ is clearly privileged, again demonstrating the highly selective nature of Uber's redactions. (UBER-DATA-00079500.)

- During the government's investigation, Uber insisted on having its attorneys present for nearly every current and former Uber employee interviewed by the FBI, ostensibly to protect the company's attorney-client privilege. The 302s produced in discovery, however, reveal numerous instances where Uber permitted its employees to disclose otherwise privileged information to the government in order to suit the company's narrative. For example, ████ ████ (Uber's Security Communications Manager) repeatedly discussed her conversations with ████, including relaying to the government his legal advice that the 2016 Incident did not require disclosure as a "data breach." Similarly, ████ (the head of Uber's Security Response team during the 2016 Incident and the "Incident Coordinator" for the Incident itself) disclosed having internal discussions with ████ about whether Uber was required to disclose the incident to law enforcement. Attorneys for Uber were present for all of these interviews and permitted each witness to reveal otherwise privileged communications, apparently without objection.

- Uber disclosed multiple versions of a document entitled: "A/C Priv: Security Incident – Extortion Attempt" created by ████ and shared with Uber

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Privacy attorney ███ in order to seek legal advice from her about the developing situation. While the document contains some redactions, Uber permitted the disclosure of the majority of the document and communications surrounding it, even though it appears to have been created with the sole purpose of seeking legal advice from ███ and was followed by a discussion of who from Uber's Legal department would take point on the response. (UBER-DATA-00072512, UBER-DATA-00060799, and UBER-DATA-00072824).

- In late April 2017, Sullivan sent a detailed email to Uber attorney ███ ███, including questions, comments, and recommendations for how Uber's attorneys were going to approach the FTC settlement. Sullivan's entire communication appears privileged. Uber, however, selectively held back the majority of the email by ███ to which Sullivan was responding. (UBER-DATA-00079496).

In addition to these express privilege waivers, Uber implicitly waived privilege because "the party asserting the privilege [Uber] placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would [be] manifestly unfair to the opposing party." *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D. Wash. 1975). In making this determination, courts employ a three-pronged test: (1) whether the party is asserting the privilege as a result of some "affirmative act"; (2) whether, through that affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) whether application of the privilege would deny another party access to information vital to his defense. *See United States v. Amlani*, 169 F.3d 1189, 1194–95 (9th Cir. 1999); *see also In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2016 WL 4191612, at *3 (N.D. Cal. Aug. 9, 2016). In this case, having lowered the privilege shield to establish its own narrative for—and gain favor with—the government (including during meetings in 2017 and 2018 where Uber's counsel shared details of what the company had learned during an internal investigation over which it now claims privilege), Uber may not now raise it against Sullivan, who would be injured if the privilege were maintained. *See Permian*, 665 F.2d at 1221 (party may not "invoke the privilege as to communications whose confidentiality he has already compromised for his own benefit").

Similar waiver principles vitiate any work-product protection Uber may have had for the subpoenaed documents. The Ninth Circuit has held (1) that disclosure of work-product to an

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

adversary or potential adversary expressly waives the protection, and (2) that conduct toward an adversary or potential adversary inconsistent with maintaining the secrecy of work-product material constitutes an implied waiver. *See United States v. Sanmina Corp.*, 968 F.3d 1107, 1121, 1123-25 (9th Cir. 2020). Here, the United States was at least a potential adversary of Uber when the company made the disclosures outlined above; indeed, the "anticipated litigation" that underpins the work-product protection indisputably included potential litigation against the United States government, and the very purpose of the disclosures was to avoid prosecution of the company. Accordingly, under the principles recognized in *Sanmina*, Uber waived any work-product protection it held just as it waived the attorney-client privilege through its disclosures to the United States Attorney's Office and federal law enforcement.

**C.      Sullivan's Fifth and Sixth Amendment rights override any valid privilege or work-product protection Uber still maintains in the requested documents.**

The Fifth Amendment's Due Process Clause and the Sixth Amendment's Compulsory Process Clause guarantee Sullivan a "meaningful opportunity to present a complete defense." *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotation omitted); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (same). The Supreme Court has long recognized that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *see also Washington v. Texas*, 388 U.S. 14, 19 (1967) ("[T]he right to present a defense . . . is a fundamental element of due process of law."). As the Ninth Circuit has observed, "[t]hese rules reflect the fact that individuals accused of criminal behavior should be permitted to present, within reason, the strongest case they are able to marshal in their defense." *United States v. Thomas*, 32 F.3d 418, 421 (9th Cir. 1994).

In *Nixon*, the Supreme Court addressed a conflict between the constitutional rights of due process and compulsory process and the President's interest in maintaining the confidentiality of his communications with other Executive Branch officials through the assertion of executive privilege. The Court held that the constitutional guarantees must prevail: "We conclude that when the ground for asserting privilege as to subpoenaed materials sought for use in a criminal

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

trial is based only on the generalized interest in confidentiality, it cannot prevail over the

fundamental demands of due process of law in the fair administration of criminal justice. The

generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a

pending criminal trial." *Nixon*, 418 U.S. at 713. Other courts have similarly recognized that

common law privileges must frequently yield to competing criminal justice concerns. *See, e.g.*,

*New York Times Co. v. Gonzales*, 459 F.3d 160, 170 (2d Cir. 2006) (government's interest in

maintaining secrecy of imminent asset freezes and searches was sufficient to overcome federal

common law privilege); *In re Grand Jury Subpoena, Judith Miller*, 438 F.3d 1141, 1150 (D.C.

Cir. 2006) (federal common law privilege protecting reporters from disclosing confidential

sources to grand jury was overcome by special counsel's interests in grand jury investigation); *In

re Sealed Case*, 121 F.3d 729, 757 (D.C. Cir. 1997) (claim of presidential privilege raised against

a grand jury subpoena may be overcome where the evidence is important to an ongoing grand

jury investigation and not available from another source). That is especially true where a

criminal defendant's competing rights are at issue (as opposed to, for example, a grand jury's

need for information). *See generally United States v. Paul*, No. CR19-0194JLR, 2020 WL

6544702, at *4 (W.D. Wash. Nov. 6, 2020).

As in *Nixon*, Uber's "generalized interest" in the confidentiality of its communications

with, among, and regarding lawyers, on a discrete universe of topics, over a brief period in 2016-

2017, must yield to Sullivan's "demonstrated, specific need for evidence" in his criminal trial.

That is particularly so in light of Uber's repeated compromise of that confidentiality in its

dealings with the government.

The district court's decision in *United States v. W.R. Grace*, 439 F. Supp. 2d 1125 (D.

Mont. 2006), is particularly instructive. W.R. Grace and several of its employees were charged

with environmental crimes. Some of the indicted employees sought to introduce W.R. Grace's

privileged communications to establish an advice of counsel defense. W.R. Grace refused to

waive the privilege and sought to exclude the privileged communications from trial. After

examining cases from the Supreme Court and the courts of appeals, the district court declared

DEF'S OPP. TO UBER MTQ FED. R. CRIM. P. 17 SUBPOENA
3:20-cr-00337-WHO                                    29

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

that "the nature and content of the privileged evidence must be weighed against the purposes served by the attorney-client privilege to determine whether any of the documents are of such value as to require Grace's rights under the attorney-client privilege to yield to the individual Defendants' Sixth Amendment right to present evidence." *Id.* at 1142.[14] The court concluded that although "Grace has asserted its legitimate interest in protecting its privileged communications unconditionally and in good faith," the law nevertheless "requires that the privilege yield where its invocation is incompatible with a criminal defendant's Sixth Amendment rights." *Id.* at 1145.

Following *in camera* review of the privileged materials, the *W.R. Grace* court concluded that some of those materials "may, depending on the proof at trial, be of such probative and exculpatory value as to compel admission of the evidence over Defendant Grace's objection as the attorney-client privilege holder." *Id.* at 1142. The court reserved its decision on the admissibility of particular privileged documents until trial, "where the probative value of each bit of evidence can be evaluated in the context of the government's case and in light of what the evidence shows." *Id.*; *see also United States v. Mix*, No. CRIM.A. 12-171, 2012 WL 2420016 (E.D. La. June 26, 2012) (relying on *W.R. Grace* and concluding that indicted employee's right to present a defense may overcome employer's attorney-client privilege).

The Court should employ a similar analysis here, by either conducting an *in camera* review of the privileged documents subject to the subpoena and ordering Uber to produce those that are sufficiently probative, or ordering the documents to be produced under an appropriate protective order and permitting Sullivan to review and identify the documents he seeks to use at

---

[14] A case on which the *W.R. Grace* court relied—*Murdoch v. Castro*, 365 F.3d 699 (9th Cir. 2004)—was later vacated by the *en banc* Ninth Circuit on other grounds. *Murdoch v. Castro*, 609 F.3d 983 (9th Cir. 2010) (*en banc*). Of the eleven *en banc* judges, five concluded that the Sixth Amendment right the appellant asserted to production of a letter protected by a witness's attorney-client privilege was not "clearly established" by the Supreme Court, as required by the Antiterrorism and Effective Death Penalty Act of 1996 for habeas review of a state court conviction; five dissenters would have held that appellant's Sixth Amendment rights were violated by the trial court's refusal to order production of the letter; and a concurring judge found no Sixth Amendment issue presented, because the appellant's counsel could have moved to strike the witness's testimony but chose not to.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

trial.[15] At that point, the Court could determine, on a document-by-document basis, which documents will be admitted over Uber's claim of privilege.

>    **D.     The Court can take steps to preserve the confidentiality of any privileged materials to the extent possible.**

Although Sullivan's Fifth and Sixth Amendment rights overcome any privilege or work-product protection Uber holds with respect to the subpoenaed documents, that does not mean Uber must entirely forfeit those protections. The Court can take several steps to protect the confidentialty of any privileged materials. *See generally Mix*, 2012 WL 2420016, at *3–*4 (entering protective order governing potentially privileged third-party materials).

First, the Court can make clear in its order on the motion to quash that Uber has not waived or forfeited the privilege or the work-product protection merely by producing documents to Sullivan under the subpoena. *See W.R. Grace*, 439 F. Supp. 2d at 1145 ("In any instance in which privileged communications are admitted, the Court will make clear that the privilege is abrogated over Grace's objection and that the compelled trial disclosure does not constitute a blanket waiver of Grace's attorney-client or attorney work product privileges."); *Mix*, 2012 WL 2420016, at *3 (no waiver from use and disclosure of third-party's privileged materials). Second, the Court can order that all documents produced under the subpoena must be handled according to the protective order the Court has previously entered to govern discovery materials. (*See* ECF No. 15.) If Uber seeks additional protections for materials the Court finds to be privileged, we will work cooperatively to reach agreement on an enhanced protective order to cover those materials. Third, the Court can order that any of the still-privileged subpoenaed documents introduced into evidence at trial will be placed under seal as soon as the trial has concluded. *See W.R. Grace*, 439 F. Supp. 2d at 1143 ("If some of Grace's privileged communications are introduced at trial, the dissemination of the exhibits beyond their presentation to the jury can be discussed."). And finally, the Court can order that any privileged or work-product documents

---

[15] To the extent the privilege has been waived with respect to certain materials, the Court should order Uber to produce those materials without having to undertake any such *in camera* process.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

produced under the subpoena (and all copies of those documents) must be either destroyed or returned to Uber when the litigation (including any appeals) has concluded.

## CONCLUSION

For the foregoing reasons, the Court should deny Uber's motion to quash the subpoena Sullivan has served on the company.

DATED: January 6, 2022

*s/ David H. Angeli*
David H. Angeli
Edward A. Piper
Tyler P. Francis
Michelle H. Kerin
John D. Cline

*Attorneys for Defendant Joseph Sullivan*

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880