Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
   VS.                          )   NO. CR 20-00337-WHO-1
                                )
JOSEPH SULLIVAN,                )
                                )
          Defendant.            )
_____ )
```

San Francisco, California
Thursday, February 10, 2022

**TRANSCRIPT OF REMOTE VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES:** (Via Zoom videoconference.)

For Plaintiff:
                    STEPHANIE M. HINDS
                    United States Attorney
                    450 Golden Gate Avenue
                    San Francisco, California  94102
              BY:   **ANDREW F. DAWSON**
                    **ASSISTANT UNITED STATES ATTORNEY**

For Defendant:
                    LAW OFFICE OF JOHN D. CLINE
                    235 Montgomery Street - Suite 1070
                    San Francisco, California 94104
              BY:   **JOHN D. CLINE, ATTORNEY AT LAW**

      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1    **APPEARANCES**:   **(CONTINUED)**

2    For Defendant:
                              ANGELI LAW GROUP LLC
3                             121 SW Morrison Street - Suite 400
                              Portland, Oregon 97204
4                    BY:   **DAVID H. ANGELI, ATTORNEY AT LAW**

5    For Movant Uber Technologies:
                              COVINGTON & BURLING LLP
6                             Sales Force Tower
                              415 Mission Street - Suite 5400
7                             San Francisco, California 94105
                     BY:   **W. DOUGLAS SPRAGUE, ATTORNEY AT LAW**
8                          **GRADY JUNG, ATTORNEY AT LAW**

9                             COVINGTON & BURLING LLP
                              One City Center
10                            850 Tenth Street, NW
                              Washington, D.C.  20001
11                   BY:   **MONA M. PATEL, ATTORNEY AT LAW**
                           **STEVEN FAGELL, ATTORNEY AT LAW**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   <u>**Thursday - February 10, 2022**</u>                               <u>**2:18 p.m.**</u>

2                          <u>P R O C E E D I N G S</u>

3                              ---o0o---

4        **THE CLERK:**  I believe we're set to begin then in Case

5   Number 20-337, United States versus Joseph Sullivan.

6        Counsel, if you would please state your appearance for the

7   record.

8        **MR. DAWSON:**  Good afternoon, Your Honor.  Andrew

9   Dawson for the United States.

10       **THE COURT:**  Good afternoon.

11       **MR. CLINE:**  Good afternoon, Your Honor.  John Cline

12   and Dave Angeli for Mr. Sullivan, who is present.

13       **THE COURT:**  Good afternoon.

14       **MR. SPRAGUE:**  And good afternoon, Your Honor.  Doug

15   Sprague, Steve Fagell, Mona Patel, and Grady Jung on behalf of

16   third-party Uber Technologies.

17       **THE COURT:**  Great.  So good afternoon to you all.

18       Let me tell you how I analyze what I've read and then let

19   you argue.

20       From what I've read, most of the documents that the

21   defendant seeks appear to me to be relevant to potential

22   defenses, and specific.  Uber has used the crime-fraud

23   exception to attempt to avoid waiver in a unique way that has

24   the potential to unfairly target the defendant and the lawyer

25   also involved for conduct similar to what others in the company

 1    did.  And the defendant has the right, I think, to

 2    investigative whether that is true or not.

 3         So I don't think there is a basis to withhold documents

 4    that he sent or received, including those that occurred prior

 5    to the hack.  And he is also entitled to any notes and

 6    memoranda of interviews of him.

 7         I think the fully unredacted documents that show what

 8    Uber's knowledge and advice regarding the hack was, including

 9    the factual work product, should be disclosed.  The -- Uber

10    should produce unredacted documents after the hack that show

11    the manner in which it was handling it.  And it ought to

12    produce the documents regarding the FTC investigation that show

13    what Mr. Sullivan's role or lack thereof was.

14         So I would protect Uber in this way:  I would be willing

15    to review in camera any documents where the redacted material

16    is unrelated to the defenses that were outlined in the bullet

17    points on page 9 of the defendant's motion; and order that by

18    May 2nd, the defendant identifies to Uber any document that he

19    intends to use unredacted; and that after meeting and

20    conferring, Uber can file a motion for a protective order under

21    seal specific to those documents and -- by May 30th; and the

22    defendant can oppose on June 13th; and have a reply on

23    June 20th; with a hearing on July 7th.

24         And my expectation with respect to the in-camera review

25    would be that if there's any document to look at there would be

**PROCEEDINGS**

1  a very small number of documents.

2      But that's, Mr. Sprague, what I'm thinking about; but why

3  don't you take that on and help me through to look at another

4  version of this.

5          **MR. SPRAGUE:**  Thank you, Your Honor.  And I would like

6  to take that opportunity.

7      The Court mentioned that the Court thinks that some of the

8  documents seem relevant and specific.

9          **THE COURT:**  I think virtually all of documents seem

10  relevant to the defenses that have been laid out.  And,

11  certainly, all the documents were specific because they were

12  identified.

13          **MR. SPRAGUE:**  So -- and is the Court saying that all

14  660, even though the defendant has only identified about 25

15  documents in his papers, or is the Court talking about the 25?

16          **THE COURT:**  I haven't seen the 660 documents.  You

17  have those.

18      I think that the documents that relate to the five

19  defenses that are laid out on page 9 are -- would be relevant.

20  You're the one who knows whether some of those aren't related

21  to those five defenses.  I'd be happy to took a look at ones

22  that are unrelated, and that was my idea on the in-camera

23  review.

24          **MR. SPRAGUE:**  Okay.  So if I'm understanding the

25  review the Court is proposing, it is that Uber takes the

PROCEEDINGS

1    defenses on page 9, looks at the 660 documents and determines

2    which of those would -- could be relevant to one or more of the

3    defenses laid out on page 9 of the defendant's brief, produces

4    those in the Court in camera for an in-camera review?

5              THE COURT:  Produces those to the defendant, and ones

6    that are unrelated to those of the 660 you can produce to me

7    and I can make a determination as to whether they are or not.

8              MR. SPRAGUE:  Okay.  All right.  All right.  Thank you

9    for that, Your Honor.

10        And certainly we disagree that the documents are relevant,

11   at least with many of them.  For example, you know, one

12   category that we think are clearly irrelevant are -- one of the

13   categories defendant seeks are many documents that post-date

14   his termination from Uber.

15        And he says that with those documents "Well, it could be

16   relevant to see what, quote/unquote, new management thought

17   about any disclosure obligations."  But we would submit that

18   what new management -- even if they did have some thought, a

19   year later, about disclosure obligations from the data breach,

20   what new management -- whoever that is -- thought, is clearly

21   irrelevant to whether defendant knew of a felony crime and did

22   not disclose it back in November of 2016; whether -- as one of

23   the charges in the indictment; whether he concealed what he

24   knew about this data breach from the FTC.  For people to

25   come -- for new management to come in a year later, and whether

**PROCEEDINGS**

1    or not they had a view on that, and whether or not they

2    expressed it, we don't think can possibly be relevant to

3    defendant's defenses.

4         And even if it were, what -- the Court mentioned at the

5    outset that the Court believes there is relevance and

6    specificity; but the other Nixon prong is admissibility.  And

7    documents such as that, that I just identified, in our view,

8    would be plainly inadmissible, would be pure hearsay even if

9    someone opined a year later -- quote/unquote, new management --

10   about what they may have thought, or anyone else did.  It would

11   be hearsay.  So both on relevance and inadmissibility, those

12   would fail the Nixon test, Your Honor.

13        The other -- the other piece that I would like to address

14   now is the crime-fraud exception.  And I know that the defense

15   counsel has portrayed this as some novel and unique application

16   of an exception to the attorney/client privilege.  And I

17   definitely want to address a couple parts of that.

18        First of all, defendant -- the defense spends their first

19   five pages of their sur-reply spinning a conspiracy about how

20   somehow Uber and their counsel wish to portray some,

21   apparently, false narrative to the Department of Justice

22   because Uber and, apparently, their counsel, had -- for some

23   reason wanted to serve up Mr. Sullivan, a -- another

24   attorney -- whose name I won't mention given the redaction

25   proceedings that have gone on, a former attorney at Uber -- to

**PROCEEDINGS**

```
 1    serve them up to the Government for some purpose.  They cite
 2    nothing for that.  It's their own theory.
 3          The only citation to any authority in those five pages is
 4    to the Department of Justice's long-time principle, long-time
 5    ask that corporations consider the crime-fraud exception when
 6    producing documents.  It's part of the DOJ manual.  It has been
 7    for many years.  And it is something that in this case, as the
 8    defense knows, the Department of Justice repeatedly asked Uber
 9    to consider.
10          The Department of Justice -- and Mr. Dawson I believe
11    would confirm this -- repeatedly asked Uber to apply the
12    crime-fraud privilege, consider the crime-fraud privilege in
13    their productions.  Uber did so.  It was not some conspiracy by
14    the company or its outside counsel to somehow find what the
15    defendants -- defense calls a scapegoat in this matter; not at
16    all.  It was complying with the Department of Justice request
17    and applying a well known privilege, well established in the
18    case law, and longstanding.
19          And that is what Uber did.  The documents are not
20    privileged for that reason.  Those pieces of the communication
21    simply are not privileged.
22          So I did want to address that part on this privilege idea
23    to refute this notion that this is some novel application or
24    some novel idea that the company had to allow it to achieve
25    some nefarious end that the defense has accused us of in their
```

 1   papers.

 2        **THE COURT:**  But you see the conundrum that it puts

 3   the Court and, perhaps, the defense in when the -- you, or

 4   Uber, makes the determination as to who it is that the

 5   crime-fraud exception might apply to; as opposed to, some other

 6   party that is actually involved here, somebody either whose

 7   liberty is at stake or the Government.  And when you waive part

 8   of the privilege and not others, it's -- it is -- I think not

 9   Uber's place at the end of the day to make that final

10   determination.  And that's why I think the documents need to be

11   disclosed in the way that I described.

12        **MR. SPRAGUE:**  And, Your Honor, I would say a couple of

13   points in response to that, if I may, one of which is we

14   weren't waiving part of a privilege or any privilege.  It was a

15   determination that at a certain point in time, 1:00 a.m. on

16   November 15th, there was a prima facie cause to believe -- to

17   have reasonable cause to believe that communications may have

18   been in furtherance of a scheme.

19        Prima facie, low standard.  As asked by the Department of

20   Justice, we applied that standard, and that was a principal

21   determination of a time when it was clear that Mr. Sullivan and

22   the other lawyer's name -- who, again, I won't mention due to

23   redaction processes that have been in place here -- knew that

24   about $600,000 -- 600,000 driver's licenses had been accessed.

25        And they then appeared, prima facie standard -- again, not

**PROCEEDINGS**

1   the reasonable doubt the Government has to show in this case,

2   but prima facie standard -- they appeared to then take steps to

3   conceal that information.  And that's who was involved.

4   Mr. Sullivan, in a nonlegal capacity in most instances, and

5   then the lawyer, in a legal capacity -- again, his name I'm not

6   mentioning.  And that was a principal determination of the

7   crime-fraud exception, not the decision to waive part of a

8   privilege.  Those communications then, they are not privileged.

9        The Department of Justice asked us repeatedly to back up

10   that privilege, to just go back farther and disclose it all;

11   but we held to the principle not to put any one person's

12   communications in and shield someone else.  Those were the

13   people involved in the response, Mr. Sullivan and this other

14   lawyer.

15        I know in the defense's papers they say "Well, there were

16   these other people so you should extend it to them."  Those

17   people either didn't know about the breach or they didn't

18   know -- or they weren't involved in responding to the FTC.

19        It is these other two, Mr. Sullivan and the other lawyer,

20   who had all the knowledge, the full knowledge there.  And that

21   was the basis for the determination.

22        I would like to make one more point if I might, Your

23   Honor.  I can make it much more briefly than I did the last.

24        Your Honor mentioned in his inclinations at the outset

25   that there would be notes, notes and memoranda of interviews.

**PROCEEDINGS**

1    Those are not on the table in this subpoena or motion.  Now, I

2    do think that's what's coming, Your Honor.

3         The Court may recall in footnote 6 of the defendant's

4    opposition to our motion to quash, he said that he intends to

5    serve another subpoena seeking, it appears -- he used the

6    phrase "internal investigation" information.  Specifically, it

7    was WilmerHale memos, notes of interviews that he is seeking;

8    but that's not on the table in this subpoena.

9         What it appears that defendant may have been trying to do

10   in this subpoena is, perhaps, get some ruling that would open

11   the door to that information -- again, information that has not

12   been subpoenaed yet.  The defense said they would do it before

13   this hearing or they intended to; but they haven't and it's

14   been a month since they filed that brief.

15        But I just wanted to clarify that, Your Honor, because,

16   you know, we -- I guess that's forthcoming.  The defense can

17   speak to that.  But right now those types of things are not at

18   issue in this subpoenas.

19             **THE COURT:**  Fair enough.

20        So anything else?  I said "fair enough."  I wasn't

21   shutting you off, Mr. Sprague.  Was there anything else that

22   you wanted to add at this point?

23             **MR. SPRAGUE:**  No, Your Honor.  No.  I heard you say

24   "fair enough."  Nothing more.  I don't know if either of my

25   colleagues on the screen wish to add anything, with the Court's

**PROCEEDINGS**

1   indulgence, or not, but not from me, Your Honor.

2            THE COURT:   I think I'll just go to Mr. Cline at this

3   point.

4            MR. CLINE:   Thank you, Your Honor.

5       We've laid out our position in great detail in our briefs

6   and I don't have anything to add, unless the Court has

7   questions which I'm happy to try to respond to.

8       I will say that Mr. Sprague is correct, the interview

9   memos have not yet been subpoenaed; they will be.  And we can

10  perhaps avoid a couple of steps by -- if the Court wants to

11  order them disclosed or we can serve the subpoena and then

12  proceed; but that is definitely coming.

13      The reason the request for the subpoena hasn't been filed

14  so far, my understanding is there have been some discussions

15  going on between my co-counsel and Mr. Sprague's office.  But

16  we can take care of that subpoena very promptly if those

17  discussions aren't going to be fruitful.

18           THE COURT:   All right.  So, Mr. Cline, why should I

19  order Uber to produce documents that were created after

20  Mr. Sullivan's termination?

21           MR. CLINE:   Because they shed light, we believe, on a

22  very important aspect of the case which is the -- well, they

23  may very well shed light on all of the events beginning in

24  November of 2016, when the incident occurred; but they are

25  especially likely to shed light on the SoftBank issue that

1    comes up at the -- really in the last month of Mr. Sullivan's

2    tenure there.

3         And just to very briefly recapitulate that, the old CEO

4    who, I think, indisputedly understood all the facts involving

5    the November 2016 breach, left the company in July of 2017, so

6    roughly eight months or so later.  The new CEO comes in in

7    August of 2017.  WilmerHale is investigating, as outside

8    counsel, a variety of issues going on in Uber, including the

9    November 2016 incident.

10        Mr. Sullivan is interviewed.  Those are the interview

11   memos that we're talking about.  And we expect that one

12   interview occurred in August of 2017, another in

13   September 2017.  We expect those interview memos will show that

14   Mr. Sullivan was truthful and laid the all the relevant facts

15   before WilmerHale.

16        Some time went by, a couple of months, during which Uber

17   did not make any disclosure.  And, in fact, as late as late

18   October, we think October 23rd, 2017, Uber, under new

19   management, with WilmerHale's input, had not yet determined

20   whether any sort of disclosure was required.

21        Along comes SoftBank.  SoftBank is looking to invest

22   $7 billion in Uber, and it's a vital transaction for Uber at

23   that point.  On November the 3rd, 2017, SoftBank tells Uber:

24   You must make this disclosure as a condition of our investment.

25   You must disclose the November 2016 incident to regulators, and

1   you must disclose it to the people whose data was accessed.

2        And at that point, Uber, under new management says:  Okay.

3   Let's have a secret side agreement under which we will

4   undertake to do that.  It won't be part of the main investment

5   agreement.  And we will make that disclosure.

6        SoftBank agreed.  That secret side agreement was entered

7   into.

8        That left Uber, under new management and touting its

9   newfound integrity, with a problem.  And the problem was:  How

10  do explain the delay in this disclosure that's now going to be

11  forthcoming?

12       And the solution was:  Blame it on Sullivan.  Blame it on

13  this lawyer -- who Mr. Sprague referred to and who we're not

14  naming.  Get rid of them, fire them, and proclaim that the

15  disclosure is being made as a sign of Uber's renewed commitment

16  to integrity, with no mention of SoftBank or the fact that

17  SoftBank, in effect, put a gun to Uber's head and required this

18  disclosure.

19       Events that took place in the days and weeks following

20  that transaction and that disclosure are very likely to shed

21  light on that sequence of events, which is quite important for

22  Mr. Sullivan's defense.

23       Bear in mind, please, Your Honor, that part of the

24  allegations in the indictment, the superseding indictment, are

25  that Mr. Sullivan not only thwarted the FTC investigation back

**PROCEEDINGS**

1    in 2016 and early 2017, but that he misled new management.  He

2    didn't tell them the facts and concealed what had happened and

3    misled them about what had occurred.  We expect at trial to

4    absolutely demolish that contention; but these documents that

5    we're talking about are crucial to making that showing.

6         **THE COURT:**  I thought I understood that chronology

7    which you just described.  It still doesn't tell me why the day

8    after Mr. -- what events are pivotal the day after Mr. Sullivan

9    was terminated that's going to shed light on the theory that

10   you have, that you would like to pursue, prior to his

11   termination.

12        **MR. CLINE:**  Because we believe -- and we've seen

13   redacted e-mails from after that date -- that there were

14   continued discussions between Uber and SoftBank about the --

15   and then, of course, internally within Uber about the nature

16   and timing of the disclosures and about, we believe, events

17   that had occurred before Mr. Sullivan was terminated.  So even

18   though the documents were created after November 21st, 2017,

19   the date of his termination, we believe that they will shed

20   light on events that occurred before that date.

21        **THE COURT:**  Okay.  All right.  Let me -- Mr. Dawson,

22   do you have a dog in this particular fight?  Would you like to

23   add anything?

24        **MR. DAWSON:**  I don't.

25      I -- the one thing which occurs to me based on

**PROCEEDINGS**

1   Your Honor's kind of preliminary, tentative response and your

2   anticipated order to produce certain documents to

3   Mr. Sullivan's counsel, I would simply ask -- and, honestly, I

4   don't necessarily have this framework in mind -- I would

5   suggest that whatever terms under which those documents are

6   produced to Mr. Sullivan's counsel, that they also be produced

7   to the Government.

8        There may be some argument that there should be different

9   standards, but I think in the adversarial process the idea that

10  the documents wouldn't be shared on both sides would undermine

11  the truth-seeking function Your Honor is getting at here, and

12  undermine the adversarial process if these purported defenses

13  are advanced at trial.

14       So I'm hoping Your Honor would be amenable to that.

15       **THE COURT:**  I'm not actually thinking that I would be

16  amenable to that, Mr. Dawson, at the front end because of --

17  although Mr. Sprague is referring to the crime-fraud exception,

18  the way that the crime-fraud exception has been handled as

19  being sort of more generally used and applicable.

20       I think the waiver issue is not obvious.  And I would -- I

21  think there is the potential of Uber wanting, being entitled to

22  try to preserve that unless the Fifth Amendment rights of

23  Mr. Sullivan sort of demand the disclosure.

24       And so by -- by the process that I'm contemplating, if the

25  full document is going to be used then, yes, the Government, of

**PROCEEDINGS**

1  course, would be entitled to it at the time of the hearing in

2  July.  And otherwise, the documents would maintain the

3  protection that Uber sought at the get-go from providing them

4  to you.  So that's what I'm thinking.

5        **MR. DAWSON:**  Your Honor, one thing which comes to my

6  mind in hearing that, obviously the U.S. Attorney's Office

7  employs filter teams to preserve privilege, and materials that

8  would otherwise be subject to an assertion of privilege could

9  be reviewed by a filter team, which would not waive that

10  privilege.  It would be sanitized before it goes to, you know,

11  a line prosecutor on the prosecution team.

12        I'm just wondering if there is some mechanism where we

13  could pursue something like that so there is no waiver concern;

14  but it could be -- for instance, it could be that there is

15  further -- it could be that the Department of Justice believes

16  that there's some other crime-fraud basis in those materials

17  which may differ from how Mr. Sullivan may view them.

18        And with the filter team, we would preserve the privilege

19  in the event that, you know, there is no such document or in

20  the event that the Government's views are wrong; but it does

21  seem like there may be other avenues to the admissibility and

22  relevance of these materials other than the materials that

23  would benefit Mr. Sullivan.  And that would, at least, avoid

24  the waiver issues.

25        I'm hoping, Your Honor, may be willing to consider that.

**PROCEEDINGS**

 1    And this could be something -- honestly, I'm improvising here

 2    because I had not necessarily foreseen this particular

 3    arrangement of facts.  It could be something I can review with

 4    my colleagues here and, perhaps, submit some brief on

 5    the Government's views, if Your Honor is willing, within a

 6    week.

 7        I'm just -- I'm unsteady about the idea of not having --

 8    if the defense has access to make arguments that certain

 9    materials are not privileged, that we don't have that access

10    given that it's not his privilege either, and we have a means

11    to protect and preserve the privilege.

12        **THE COURT:**  I hear you, Mr. Dawson, and I'll think

13    about that.

14        Mr. Sprague, do you want to respond either to Mr. Cline or

15    Mr. Dawson's suggestion?

16        **MR. SPRAGUE:**  Yes, Your Honor, as to both, briefly.

17        With Mr. Dawson's suggestion, I think perhaps it's

18    something the parties could discuss afterwards to see if some

19    type of arrangement could be proposed to the Court, or not.  I

20    think that's maybe -- I don't know that we would hash that out

21    this afternoon.  At least I don't have a brilliant idea to hash

22    that out this afternoon.

23        With respect to Mr. Cline's comments, Your Honor, on the

24    post-termination documents, I heard an interesting

25    conspiratorial theory again; but what I didn't hear, when the

1    rubber hits the road on his argument, it is "We think it's very

2    likely that there are documents."  That is the quintessential

3    fishing expedition, that maybe there is something in there that

4    might -- to use another phrase from Mr. Cline -- shed light on

5    something that happened months and months earlier.  That's a

6    fishing expedition under Nixon, Your Honor, and they have not

7    shown the relevance of that.

8         And, again, you can't get beyond hearsay, even if they

9    could show that there was some direct commentary in there about

10   events that happened much earlier, it's going to be by people

11   who, by definition, were not at the company during the course

12   of the alleged scheme against Mr. Sullivan.  The superseding

13   indictment, I think, all three counts are November of 2016

14   until November of 2017.  And we're talking about perhaps

15   internal communications, if they exist, that post-date that.

16   It would be irrelevant and hearsay.

17            **THE COURT:**  All right.  Thank you.

18            **MR. DAWSON:**  Your Honor --

19            **THE COURT:**  Go ahead, Mr. Dawson.

20            **MR. DAWSON:**  I apologize.  Just very briefly, just to

21   follow up on that last comment of mine.

22        Federal Rule of Evidence 502(d) was just brought to my

23   attention.  And to the extent Your Honor is concerned about the

24   waiver that might apply in the event the Government were to

25   have access, Subsection D does have a provision that allows

1    the Court to order that the privilege is not waived by

2    disclosure connected with pending litigation.

3        So that could be a means as well to ensure there is no

4    waiver that protects Uber's rights and allows the adversarial

5    process to see both sides and whatever those documents may be.

6        **THE COURT:**  So here is my suggestion:  I think

7    Mr. Sprague had a good one, which is that you talk amongst

8    yourselves about what a -- if I am to -- if I follow my

9    tentative in some form, what the appropriate procedure would be

10   to protect Uber's privilege concerns and the Government's

11   ability to be treated fairly in -- when the documents are

12   disclosed in a protected way to Mr. Sullivan.  All right?

13       So I suggest that you do that.  If you have -- if you

14   reach agreement, great.  If you don't, I may issue this order

15   in two phases and require some briefing on the procedure that

16   I'm laying out so that the -- so that I get this as close to

17   right as I can.

18       Mr. Cline, did you have something else you wanted to say?

19       **MR. CLINE:**  This is an unrelated matter, Your Honor.

20   So if we're finished with the motion to quash, I'll raise the

21   other issue.

22       **THE COURT:**  Go ahead.

23       **MR. CLINE:**  I don't believe Mr. Sullivan has been

24   arraigned on the superseding indictment.  And I think we're

25   prepared to go forward with that now, if Your Honor wants to

**PROCEEDINGS**

1    handle it and get it out of the way, or we can schedule it for

2    another date.

3            THE COURT:  Okay.  You know, I just -- I don't have it

4    right in front of me.  I'd just as soon we do -- I believe

5    strongly that he ought to be arraigned, and let's do that

6    either the next time we're all together, if you'd let me know,

7    or if you want to arrange it in front of a magistrate judge,

8    that's also fine.  You can do it by Zoom, just get it done.

9            MR. CLINE:  All right.  We'll figure that out,

10   Your Honor.

11           THE COURT:  All right.  Thank you all very much.  And

12   I'll get an order out as soon as I can.

13           MR. CLINE:  Thank you, Your Honor.

14           MR. DAWSON:  Thank you, Your Honor.

15               (Proceedings adjourned at 2:49 p.m.)

16                        ---o0o---

17               __CERTIFICATE OF REPORTER__

18           I certify that the foregoing is a correct transcript

19   from the record of proceedings in the above-entitled matter.

20   DATE:   Saturday, February 12, 2022

21

22

23

24   _____
          Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
               Official Reporter, U.S. District Court

25