DAVID H. ANGELI (admitted *pro hac vice*)
EDWARD A. PIPER (Cal. Bar No. 288289)
TYLER P. FRANCIS (admitted *pro hac vice*)
MICHELLE H. KERIN (admitted *pro hac vice*)
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232 │ Facsimile: (503) 227-0880
Email: david@angelilaw.com; ed@angelilaw.com; tyler@angelilaw.com;
       michelle@angelilaw.com

JOHN D. CLINE (Cal. Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

*Attorneys for Defendant Joseph Sullivan*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH SULLIVAN,<br><br>Defendant. | Case No. 3:20-cr-00337-WHO<br><br>DEFENDANT JOSEPH SULLIVAN'S NOTICE OF MOTION AND MOTION TO DISMISS WIRE FRAUD COUNTS (COUNTS THREE, FOUR, AND FIVE)<br><br>Date: June 2, 2022<br>Time: 1:30 p.m.<br>Crtrm: 2, 17th floor<br><br>Hon. William H. Orrick |

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

1

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

**NOTICE OF MOTION AND MOTION**

TO THE COURT, Defendant JOSEPH SULLIVAN, through his attorneys, moves under Fed. R. Crim. P. 12(b)(3) for an Order dismissing the wire fraud counts in the superseding indictment (Counts 3, 4, and 5) for failure to charge an offense. In support of the motion, Sullivan relies on the attached Memorandum of Points and Authorities. This motion is noticed for the Court's criminal calender on June 2, 2022 at 1:30 p.m.

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

2

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## MEMORANDUM OF POINTS AND AUTHORITIES

The wire fraud charges (Counts 3, 4, and 5) represent the government's effort to transform an unappealing obstruction and misprision case into a full-fledged fraud case with sympathetic victims. This alchemy fails for five reasons.

First, *Kelly v. United States*, 140 S. Ct. 1565 (2020), requires that obtaining money or property be the *object* of the scheme to defraud, and not merely an "incidental byproduct" of the scheme. The wire fraud counts do not adequately allege that continuing to receive service fees (the money or property at issue) from Uber drivers (the alleged victims) was more than an "incidental byproduct" of Sullivan's alleged effort to conceal the 2016 incident.

Second, and relatedly, the wire fraud counts allege that the object of the charged scheme to defraud was to *maintain* the service fees paid by existing drivers, not to *obtain* new or increased service fees. The Ninth Circuit recently rejected the "maintenance" property theory in the context of an alleged scheme to permit the defendants to continue drawing their salaries. *See United States v. Yates*, 16 F.4th 256, 266–67 (9th Cir. 2021). The *Yates* holding applies equally in this context.

Third, to the extent the wire fraud counts rest on affirmative misrepresentations, they violate the convergence principle of *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), because the persons allegedly deceived (Uber's CEO and outside counsel) were not among the persons from whom Sullivan allegedly intended to continue receiving money or property (Uber's drivers). *See id*. at 221 ("[T]he intent [of the mail or wire fraud scheme] must be to obtain money or property from the one who is deceived.").

Fourth, to the extent the wire fraud counts rest on an alleged omission—Sullivan's nondisclosure of the 2016 incident to Uber drivers—those counts fail because Sullivan had no duty to disclose the incident under the California statute on which the charges rest (Cal. Civil Code § 1798.82(a)).

Finally, the government's omissions theory violates the federalism principles that have long guided interpretation of the federal fraud statutes. The government's approach would turn

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

3

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

almost any violation of a state data breach notification law into a federal felony. Section 1798.82(a), for example, provides only civil remedies for a failure to provide notification of a breach, and then only to persons actually injured by the nondisclosure. *See id.* § 1798.84(b). But under the government's theory, any such knowing failure (as long as it is furthered by a mailing or an interstate wiring such as an email) would expose the responsible person to federal felony liability and up to twenty years in prison. Such a dramatic shift in enforcement power from the states to federal prosecutors is especially inappropriate because Congress has repeatedly declined to enact a federal data breach notification statute, preferring to leave the matter to the states to regulate.

For all these reasons, the Court should dismiss the wire fraud counts.

## BACKGROUND

The superseding indictment (ECF No. 71) ("SI"), adds three wire fraud counts—Counts 3, 4, and 5. The indictment rests those counts on an alleged scheme to defraud running from "on or about November 14, 2016, and continuing through in or about November 2017." SI ¶ 6. The alleged scheme's object, according to the indictment, was to deprive Uber's drivers of "material information relevant to a driver's decision to continue driving for Uber and paying the associated Service Fee to Uber." *Id.* ¶ 9.

The "Service Fee" paid by Uber's drivers appears to be the "money and property" at issue in the wire fraud counts.[1] The indictment alleges:

> According to the contracts governing Uber's relationship with its California drivers at the relevant time, Uber was a provider of a ride-sharing platform. Individuals who offered rides within that platform (hereinafter "drivers") were not characterized by Uber as "employees" under these contracts, and they were not promised a traditional wage. Instead, the drivers agreed to pay a "Service Fee"

---

[1] The wire fraud counts might be read to allege that the money or property at issue is "material information relevant to a driver's decision to continue driving for Uber and paying the associated Service Fee to Uber." Under controlling Ninth Circuit law, such "information" does not constitute money or property under the mail and wire fraud statutes. *See, e.g.*, *Yates*, 16 F.4th at 265 ("There is no cognizable property interest in the ethereal right to accurate information.") (quotation omitted). If the government pursues the "information" theory in its opposition, we will address it further in our reply.

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO                    4

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

> to Uber in exchange for the right to use that platform. Uber's role was to act as the drivers' agent in collecting fares from the users of Uber's platform (hereinafter "riders") via Uber's payment processing platform. The Service Fee paid by drivers to Uber was in exchange for the use of the driver application and certain other services.

*Id.* ¶ 7.

The alleged scheme to defraud involved both "materially false and misleading statements" and "failing to disclose material facts with a duty to disclose." *Id.* ¶ 6; *see id.* ¶ 16. The indictment alleges three misrepresentations:

(1) a nondisclosure agreement between Uber and the hackers responsible for the 2016 incident that "falsely stated that the hackers had neither taken nor stored Uber's data in the course of the 2016 Data Breach," *id.* ¶ 10;

(2) a September 20, 2017 email from Sullivan to Uber's CEO "falsely stating that the hackers' bounty had only been paid after the hackers had been identified" and "misrepresent[ing] the scope of the breach, suggesting both that the hackers had merely accessed folders containing Uber's data, as opposed to taking and storing that data, and suggesting that the event was not, in fact, a data breach," *id.*; and

(3) a September 25, 2017 email to Uber's outside counsel "falsely suggest[ing] . . . that the 2016 Data Breach was not, in fact, a data breach, and falsely claim[ing] that the incident was no different factually from many other security incidents," *id.*

The indictment does not charge that any of these alleged misrepresentations was directed to Uber drivers or was even known to Uber drivers.

The alleged omission rests on Cal. Civil Code § 1798.82(a). SI ¶ 8. According to the indictment, "California state law provides that a business operating in California that 'owns or licenses computerized data that includes personal information' shall disclose a breach to a resident of California 'whose encrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person.'" *Id.* (quoting § 1798.82(a)). The indictment charges that "[i]n the wake of the 2016 Data Breach, SULLIVAN took measures to ensure that drivers did not receive the notification required by state law." *Id.* ¶ 9.

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

5

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

# ARGUMENT

**I.   The wire fraud counts do not adequately charge that obtaining money or property from Uber drivers was anything more than an incidental byproduct of the alleged scheme.**

Under *Kelly v. United States*, 140 S. Ct. 1565 (2020), the wire fraud counts fail adequately to charge that obtaining money or property from Uber drivers was more than an incidental byproduct of the alleged scheme to defraud.

In *McNally v. United States*, 483 U.S. 350 (1987), the Supreme Court held that the mail fraud statute is "limited in scope to the protection of property rights." *Id*. at 360.[2] *Kelly*, arising from the George Washington Bridge lane realignment scandal known as "Bridgegate," declared that "property must play more than some bit part in a scheme: It must be an object of the fraud. Or, put differently, a property fraud conviction cannot stand when the loss to the victim is only an incidental byproduct of the scheme." *Kelly*, 140 S. Ct. at 1573 (quotations and citations omitted); *See, e.g.*, *United States v. Palma*, No. 19-20626, 2021 WL 5040326, at *3–4 (E.D. Mich. Oct. 28, 2021) (dismissing conspiracy to commit wire fraud charge for failure to allege a sufficiently direct causal nexus between the defendant's alleged fraud and the alleged victims' loss of money); *United States v. Ernst*, 502 F. Supp. 3d 637, 652 (D. Mass. 2020) (rejecting property fraud allegation where property—access to the work of a university's staff—was an "incidental byproduct" of the alleged scheme to obtain admission through dishonest means).[3]

The government maintained in *Kelly* that the defendants—a staffer for New Jersey Governor Chris Christie and a Port Authority official—sought to obtain the Port Authority's property by "depriv[ing] the Port Authority of the costs of compensating the traffic engineers and back-up toll collectors who performed work relating to the lane realignment." *Kelly*, 140 S. Ct. at

---

[2] The "scheme or artifice to defraud" element, including the money or property requirement, is construed identically in the mail and wire fraud statutes. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 20–21 (1999); *Yates*, 16 F.4th at 264.

[3] In the wake of *McNally*, Congress enacted 18 U.S.C. § 1346, which declares that "the term 'scheme or artifice to defraud' [in the mail, wire, and bank fraud statutes] includes a scheme or artifice to deprive another of the intangible right of honest services." Section 1346 is not at issue in this case.

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO
6

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1572. The Court rejected this theory. Although the Court acknowledged that "a scheme to usurp a public employee's paid time is one to take the government's property," it found that the defendants' plan "never had that as an object. The use of Port Authority employees was incidental to—the mere cost of implementing—the sought-after regulation of the Bridge's toll lanes." *Id.*; *see id.* at 1573–74 ("The time and labor of Port Authority employees were just the implementation costs of the defendants' scheme to reallocate the Bridge's access lanes. Or said another way, the labor costs were an incidental (even if foreseen) byproduct of Baroni's and Kelly's regulatory object. Neither defendant sought to obtain the services that the employees provided.").

The wire fraud counts here suffer from the very flaw *Kelly* identified. Fairly read, the indictment portrays the effort to characterize the 2016 Incident as a "bug bounty" as an attempt to conceal the incident from the FTC and, later, from Uber's new management. None of the facts alleged in the indictment suggests that Sullivan or anyone else involved in that effort even considered the drivers' service fees, much less that continuing to receive those fees was "an object of the fraud." *Kelly*, 140 S. Ct. at 1573. The most that can be said from the face of the indictment is that the continued payment of the service fees was an "incidental byproduct of the scheme." *Id.*

The discovery confirms what is evident from the face of the indictment. Not a single witness statement, email, text, or other contemporaneous document produced to the defense so much as hints that Sullivan or others at Uber responsible for addressing the 2016 Incident gave any thought to the drivers' service fees. Not a scrap of evidence suggests that maintaining such fees was the "object" of Sullivan's activities. The wire fraud charges do not satisfy *Kelly* and should be dismissed.

**II.     The Ninth Circuit recently rejected the government's "maintenance" property theory.**

The government's property theory has a second, related flaw: it rests on the allegation that the scheme to defraud "deprived [Uber's] drivers of material information relevant to a

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

7

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

driver's decision to *continue driving for Uber* and paying the associated Service Fee to Uber." SI ¶ 9 (emphasis added). In other words, the object of the alleged scheme was to *maintain* existing drivers and their associated service fees, not to *obtain* fees from new drivers or increased fees from existing drivers. The Ninth Circuit recently rejected this "maintenance" theory, *Yates*, 16 F.4th at 266–67, and this Court should do likewise.

In *Yates*, the government charged two bank employees with bank fraud. It alleged that the employees had deceived the bank about loans and other bank matters for which they were responsible. To satisfy the "property" element of the bank fraud statute, the government argued that the defendants sought to deprive the bank of their salaries and bonuses—that is, that "'the continuation of the benefits of employment . . . was a purpose of the conspiracy.'" *Id.* at 266 (quoting government argument).

The Ninth Circuit rejected this argument. It drew a distinction between "a scheme whose object is to obtain a new or higher salary and a scheme whose object is to deceive an employer while continuing to draw an existing salary—essentially, avoiding being fired." *Id.* After analyzing the Supreme Court's fraud cases, the court of appeals concluded that the government's "salary maintenance theory" did not suffice to establish an offense. *See id.* at 267–68.

The United States District Court for the District of Columbia recently applied *Yates* in dismissing a wire fraud charge. *United States v. Guertin*, No. 1:21-CR-262 (TNM), 2022 WL 203467 (D.D.C. Jan. 24, 2022). The defendant in *Guertin*, a State Department official, allegedly lied on his periodic background security questionnaire. The government charged him with wire fraud. The indictment alleged that, through his misrepresentations, Guertin sought to "'unlawfully enrich himself *by maintaining his State Department employment and salary*.'" *Id.* at *2 (quoting indictment; emphasis added by district court).

The district court found this allegation insufficient to satisfy the wire fraud statute's requirement that the scheme to defraud have as its object the "obtaining [of] money or property." The court observed that "a scheme to 'maintain' something is not synonymous with a scheme to 'obtain' the same thing. The word 'obtain' generally connotes affirmative action to secure

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

8

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1  something outside one's possession. The word 'maintain,' by contrast, connotes action to
2  preserve the status quo." *Id*. "The upshot," the court continued, "is that to state an offense under
3  the plain meaning of § 1343, the Government must allege a defendant's scheme sought to gain
4  possession of something not previously in his possession. And by extension, the Indictment's
5  allegation that Guertin merely sought to 'maintain' his salary does not suffice." *Id*. at *2. Relying
6  heavily on the Ninth Circuit's decision in *Yates*, the court concluded that "[b]ecause the
7  Indictment alleges that Guertin sought to 'maintain,' not 'obtain' a salary, it does not state an
8  offense within the plain meaning of § 1343." *Id*. at *4.

9        The government's wire fraud theory here has exactly the flaw identified in *Yates* and
10  *Guertin*. The indictment does not allege that the object of the charged scheme was to obtain new
11  drivers, with their associated service fees. Nor does it allege that the object of the scheme was to
12  obtain higher service fees from existing drivers. It alleges instead that Sullivan "deprived
13  [Uber's] drivers of material information relevant to a driver's decision to *continue driving for*
14  *Uber* and paying the associated Service Fee to Uber." SI ¶ 9 (emphasis added). In other words,
15  the stated object of the alleged scheme was to *maintain* existing drivers and their fees, not to
16  *obtain* new drivers or increased fees from existing drivers. To paraphrase *Yates*, the indictment
17  alleges at most that Sullivan sought to "deceive [Uber's drivers] while continuing to draw [the]
18  existing [service fees]—essentially, avoiding being fired" by the drivers. *Yates*, 16 F.4th at 266.

19        Counts 3, 4, and 5, like the wire fraud count in *Guertin*, must be dismissed for failure to
20  charge an offense under the plain language of 18 U.S.C. § 1343.

21  **III.**    **The affirmative misrepresentation theory violates the convergence requirement.**

22        The Ninth Circuit has held that "the intent [of the mail or wire fraud scheme] must be to
23  obtain money or property from the one who is deceived." *United States v. Lew*, 875 F.2d 219,
24  221 (9th Cir. 1989). The wire fraud counts' affirmative misrepresentation theory violates this
25  "convergence" principle and thus cannot support those charges. *See, e.g.*, *United States v.*
26  *Holmes*, No. 5:18-CR-00258-EJD, 2020 WL 666563, at *15–22 (N.D. Cal. Feb. 11, 2020)
27  (dismissing wire fraud counts that violated the *Lew* convergence principle).

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO
9

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

As discussed above, the wire fraud counts rest on three alleged affirmative misrepresentations: (1) a nondisclosure agreement between Uber and the hackers responsible for the 2016 incident that "falsely stated that the hackers had neither taken nor stored Uber's data in the course of the 2016 Data Breach," SI ¶ 10; (2) a September 20, 2017 email from Sullivan to Uber's CEO "falsely stating that the hackers' bounty had only been paid after the hackers had been identified" and "misrepresent[ing] the scope of the breach, suggesting both that the hackers had merely accessed folders containing Uber's data, as opposed to taking and storing that data, and suggesting that the event was not, in fact, a data breach," *id.*; and (3) a September 25, 2017 email to Uber's outside counsel "falsely suggest[ing] . . . that the 2016 Data Breach was not, in fact, a data breach, and falsely claim[ing] that the incident was no different factually from many other security incidents," *id.*

None of these alleged misrepresentations was directed to Uber drivers, from whom Sullivan allegedly sought to continue receiving service fees. The indictment does not allege that Sullivan intended the drivers to become aware of, or to be deceived by, the alleged misrepresentations. Nor, for all the discovery shows, will the government be able to offer any such proof at trial. Because the persons allegedly deceived by the alleged misrepresentations—Uber's CEO and outside counsel—were not among the persons from whom Sullivan allegedly intended to continue receiving money or property—Uber drivers—the misrepresentations cannot support the wire fraud charges. *See, e.g.*, *Holmes*, 2020 WL 666563, at *15–22.

**IV.   The omission theory fails because the Indictment does not allege a duty to disclose.**

"[A] non-disclosure can only support a fraud charge when the defendant has a duty to disclose the omitted information." *United States v. Shields*, 844 F.3d 819, 822–23 (9th Cir. 2016). Here, the duty to disclose charged in the indictment rests on Cal. Civil Code § 1798.82(a). SI ¶ 8. But that provision imposed no disclosure duty on Sullivan and thus cannot support the charges against him.

Section 1798.82(a) imposes a data breach notification duty, under specified circumstances, on "[a] person or business that conducts business in California, and that owns or

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

10

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

licenses computerized data that includes personal information."[4] The indictment does not allege, and the government could not prove at trial, that Sullivan "own[ed] or license[d] computerized data that includes personal information." *Uber* might (or might not) have "own[ed] or license[d]" such data (although the indictment does not clearly allege even that); *Sullivan*, the defendant in this case, plainly did not.[5] Because the sole statute on which the indictment relies for its allegation of a duty to disclose does not apply to Sullivan, the government's omission theory fails.

There is good reason to resist government efforts to expand the limited scope of § 1798.82(a) as a means of creating federal criminal liability. The Supreme Court has repeatedly repudiated prosecutorial efforts to use broadly worded federal criminal statutes to inject the federal government into areas traditionally regulated by the states. In *Cleveland v. United States*, 531 U.S. 12 (2000), for example, the Court rejected the government's argument that a Louisiana regulator parts with "property" for purposes of the mail fraud statute when it issues a video poker license. The Court emphatically declined the government's invitation to "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress. Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities." *Id*. at 24.[6]

---

[4] We assume solely for purposes of this motion—but do not concede—that the 2016 Incident involved a "breach of the security of the [Uber] system," as defined at § 1798.82(g).

[5] By contrast, § 1798.82(b) imposes a notification duty on "[a] person [who] maintains computerized data that includes personal information that the person . . . does not own." But the notification duty under § 1798.82(b) runs to "the owner or licensee of the information," *not* to the person to whom the information relates. Thus, even if § 1798.82(b) applied to Sullivan (which we do not concede), it would impose a duty of disclosure to *Uber*, not to Uber's *drivers*. Sullivan satisfied any duty he owed under § 1798.82(b) by disclosing the 2016 Incident to Uber's then-CEO and others within the company.

[6] *See, e.g.*, *Kelly*, 140 S. Ct. at 1574 (rejecting reading of wire fraud statute that would cause a "ballooning of federal power" and allow "the Federal Government [to] use the criminal law to enforce (its view of ) integrity in broad swaths of state and local policymaking"); *Bond v. United States*, 572 U.S. 844, 862-63 (2014) (declining to read 18 U.S.C. § 229 broadly to "alter sensitive federal-state relationships") (quotation omitted); *Williams v. United States*, 458 U.S. 279, 290 (1982) (construing statute narrowly in part because the case involved "a subject matter that

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

11

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

These federalism concerns weigh heavily in this case. Since California enacted § 1798.82 in 2002, every state has adopted a data breach notification statute. Those statutes vary significantly in scope and, in particular, in defining the circumstances under which notification must be given. Enforcement mechanisms for violations of the notification statutes likewise vary—some states permit a private right of action, others leave enforcement to state authorities, and still others have no enforcement mechanism. But the states are united on one point: no state imposes criminal penalties on violators.[7]

While the states have been enacting these statutes, Congress has repeatedly considered and elected *not* to enact a *federal* data breach disclosure statute.[8] The opponents of such nationwide legislation have cited federalism—the importance of permitting states to regulate data breaches according to local needs—as a reason to eschew a one-size-fits-all federal statute. The government's omissions theory, based on a violation of § 1798.82(a), would effectively obliterate the legislative judgment Congress has made over the years to leave regulation of data breach notifications to the states.

An examination of the California data breach notification law demonstrates the "sweeping expansion of federal jurisdiction" the government seeks to accomplish through this case. The California data breach statutes reflect a carefully calibrated notification scheme. Section 1798.82 contains detailed notification provisions. The statute is replete with definitions,

---

traditionally has been regulated by state law"); *Rewis v. United States*, 401 U.S. 808, 812 (1971) (construing 18 U.S.C. § 1952 and rejecting a broad interpretation where it "would alter sensitive federal-state relationships"); *see also United States v. Ratcliff*, 488 F.3d 639, 648–49 (5th Cir. 2007) (rejecting application of mail fraud statute to local election fraud in part because "Louisiana law establishes a comprehensive regulatory system governing campaign contributions and finance disclosures for state and local elections, with state civil and criminal penalties in place for making misrepresentations on campaign finance disclosure reports").

[7] For a summary of state data breach notification statutes, *see* Foley & Lardner LLP, *State Data Breach Notification Laws*, https://www.foley.com/-/media/files/insights/publications/2021/11/21mc37325-data-breach-chart-1101821.pdf?la=en.

[8] For a history of Congressional consideration of federal data breach notification bills, *see* National Technology Security Coalition, *A National Data Breach Notification Legislation Framework* (2021), https://www.ntsc.org/assets/pdfs/NTSC_NationalDataBreach-Whitepaper-2021.pdf.

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

12

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

circumstances under which notification is and is not required, the precise form notification should take, and permissible means of notification. Section 1798.83 addresses a particular type of breach (not at issue here): when "a business has an established business relationship with a customer and has within the immediately preceding calendar year disclosed personal information . . . to third parties, and if the business knows or reasonably should know that the third parties used the personal information for the third parties' direct marketing purposes." Cal. Civil Code § 1798.83(a).

Section 1798.84 provides remedies for violations of the notification provisions. The statute does not impose criminal liability. It creates a $3000 civil penalty for a "willful, intentional, or reckless violation" of § 1798.83 (not at issue here), and a $500 penalty for other violations of that statute. By contrast, the statute does not authorize a civil penalty even for deliberate violations of § 1798.82, the statute on which the government relies here. *See id*. § 1798.84(c).

Section 1798.84(b) permits a civil cause of action to recover damages for "[a]ny customer injured by a violation of this title."[9] By its terms, § 1798.84(b) limits the class of potential plaintiffs to those who have been actually injured by the delay in disclosing the security breach. Persons who suffer no injury from a delayed notification or complete nondisclosure have no right of action. *See, e.g.*, *In Re Adobe Sys., Inc. Privacy Litig.*, 66 F. Supp. 3d 1197, 1218 (N.D. Cal. 2014) (dismissing § 1798.82 claims because, "by failing to allege any injury resulting from a failure to provide reasonable notification of the 2013 data breach, Plaintiffs have not plausibly alleged that they have standing to pursue a Section 1798.82 claim."); *In re Sony Gaming Networks and Customer Data Security Breach Litigation*, 996 F. Supp. 2d 942, 1010 (S.D. Cal. 2014) (same); *Boorstein v. CBS Interactive, Inc.*, 222 Cal. App. 4th 456, 466–67 (2013) (same).

---

[9] "Customer" is defined as "an individual who provides personal information to a business for the purpose of purchasing or leasing a product or obtaining a service from the business." Cal. Civ. Code § 1798.80(c). We assume only for purposes of this motion that Uber drivers are "customers" of Uber. They clearly are not "customers" of Sullivan personally.

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

13

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

The government proposes to take a sledgehammer to California's data breach notification scheme, and to similar schemes that other states have adopted. Under the government's omissions theory, the knowing breach of a state statute that lacks any criminal provision and even any civil penalty or private right of action will become (assuming a sufficiently related wiring or mailing, which will virtually always be present) a federal felony with a twenty year statutory maximum punishment. As *Cleveland* and similar cases make clear, the Court should embrace such a theory only if clearly compelled to do so by plain statutory language. There is no such language here. As discussed in Parts I and II, the government has failed adequately to allege that Sullivan sought to obtain the drivers' money or property (the service fees), and § 1798.82(a)—the sole source of his alleged duty to disclose the 2016 incident to the drivers—by its terms does not apply to him.

The government's approach has a related federalism problem. Because state data breach notification statutes vary, a person's potential mail and wire fraud liability will similarly vary depending on the applicable state law—and that, in turn, depends on the location of the person and the residence of those whose personal information has been acquired through the data breach. Most significantly, many states do not require notification if the holder of the data (here, Uber) conducts a prompt investigation of any breach and reasonably determines that harm to state residents is not likely to result.[10] Sullivan's Security department team conducted precisely

---

[10] *See, e.g.*, Ala. Code § 8-38-5(a) (notification required only if, after prompt, good faith investigation, information holder finds the breach is reasonably likely to cause substantial harm to the individuals to whom the information relates); Ariz. Rev. Stat. § 18-552(J) (similar); Ark. Code § 4-110-105(d) (similar); Colo. Rev. Stat. § 6-1-716(2)(a) (similar); Conn. Gen. Stat. § 36a-701b(b)(1) (similar); Del. Code Ann. tit. 6 § 12B-102(a) (similar); Idaho Code § 28-51-105(1) (similar); Ind. Code § 24-4.9-3-1(a) (similar); Iowa Code § 715C.2(6) (similar); Kan. Stat. § 50-7a02(a) (similar); Ky. Rev. Stat. § 365.732(1)(a) ("breach" occurs only when acquisition actually causes, or leads the information holder to reasonably believe has caused or will cause identity theft or fraud against state resident); La. Rev. Stat. § 51:3074(I) (no notification required if, after reasonable investigation, information holder determines that there is no reasonable likelihood of harm to resident); 10 Me. Rev. Stat. § 1348(1)(B) (similar); Md. Code Com. Law § 14-3504(b)(2) (similar); Mass. Gen. Laws § 93H § 1(a) ("breach" requires substantial risk of identity theft or fraud against resident); Mich. Comp. Laws §§ 445.72(1) (no notification required if information holder determines that the breach has not or is not likely to cause substantial loss or injury to, or result in identity theft with respect to, a state resident); Miss. Code § 75-24-29(3) (similar); Mo. Rev. Stat. § 407.1500.2(5) (similar); Neb. Rev. Stat. § 87-803(1) (similar); N.H. Rev. Stat. § 359-C:20(I)(a) (similar); N.J. Stat. § 56:8-163(a) (similar);

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO
14

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

such an investigation of the 2016 Incident and correctly determined that no harm would come from the hackers' intrusion. Under the data breach notification laws of more than 30 states (*see supra* note 10), neither Sullivan nor Uber would have had any notification duty (and thus no federal criminal liability) under the government's omissions theory. But because of the happenstance that some drivers whose data was accessed resided in California, that state's more stringent data breach notification statute applies (according to the government's incorrect reading of § 1798.82(a)), subjecting Sullivan to federal felony liability.

The Supreme Court has warned against precisely this circumstance. In *Rewis v. United States,* 401 U.S. 808 (1971), the Court rejected the government's broad interpretation of the Travel Act, 18 U.S.C. § 1952, in part because it "might well produce situations in which the geographic origin of customers, a matter of happenstance, would transform relatively minor state offenses into federal felonies." *Id.* at 812. The government seeks to do here what *Rewis* forbids: use the "geographic origin" of Uber drivers, "a matter of happenstance," to transform conduct that is not even a criminal offense under state law into a federal felony.

---

N.M. Stat. § 57-12C-6(B) (similar); Ohio Rev. Code § 1349.19-192(A)(1)(a) ("breach" only occurs when acquisition of data causes, reasonably is believed to have caused, or reasonably is believed will cause a material risk of identity theft or other fraud against resident); Ok. Stat., tit. 24, § 162(1) (similar); Or. Rev. Stat. § 646A.604(8) (no notification required if, after appropriate investigation, information holder reasonably determines that there is no likelihood of harm); 73 Pa. Stat. § 2302 ("breach" only occurs when acquisition of data causes, or the information holder reasonably believes has caused or will cause loss or injury to resident); R.I. Gen. Laws § 11-49.3-4(a)(1) (notification required if breach "poses a significant risk of identity theft"); S.C. Code Ann. § 39-1-90(A) (notification required when illegal use of the information has occurred or is reasonably likely to occur or use of the information creates a material risk of harm to resident); Utah Code § 13-44-202(1)(b) (no notification required if after reasonable and prompt investigation it is not revealed that misuse of personal information for identity theft or fraud has occurred or is reasonably likely to occur); Va. Code § 18.2-186.6(A)-(C) (similar); Wash. Rev. Code § 19.255.010(1) (notification not required if breach is not reasonably likely to subject consumers to risk of harm); W.Va. Code §§ 46A-2A-101(1), -102(a), (b) (similar); Wis. Stat. § 134.98(2)(cm)(1) (similar); Wyo. Stat. §§ 40-12-501(a)(i) ("breach" only occurs when acquisition of data causes or is reasonably believed cause loss or injury to resident), 502(a) (notification only required if investigation determines that misuse of resident's data has occurred or is reasonably likely to occur).

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO
15

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## CONCLUSION

For the foregoing reasons, the Court should dismiss the wire fraud counts for failure to charge an offense.

DATED: April 11, 2022.

                *s/ David H. Angeli*
                David H. Angeli
                Edward A. Piper
                Tyler P. Francis
                Michelle H. Kerin
                John D. Cline

                *Attorneys for Defendant Joseph Sullivan*

DEF'S MOT. TO DISMISS WIRE FRAUD COUNTS
3:20-cr-00337-WHO

16

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880