STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ANDREW F. DAWSON (CABN 264421)
BENJAMIN KINGSLEY (CABN 314192)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7019
    FAX: (415) 436-7234
    andrew.dawson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:20-CR-337 WHO |
| Plaintiff, | UNITED STATES'S TRIAL MEMORANDUM AND PRETRIAL CONFERENCE STATEMENT |
| v. | |
| JOSEPH SULLIVAN, | |
| Defendant. | |

Pursuant to Criminal Local Rule 17.1-1, as supplemented by this Court's Pretrial Order entered at Docket No. 126, the United States hereby submits a combined Trial Memorandum and Pretrial Conference Statement.

**I.    Legal bases for the charges and the anticipated evidence.**

    **A.    Legal bases for the charges.**

Defendant is charged with two counts: (1) Obstruction of Proceedings before Departments, Agencies, and Committees, in violation of 18 U.S.C. § 1505, and (2) Misprision of a Felony, in violation of 18 U.S.C. § 4.[1]

---

[1] The Court, pursuant to the government's request, ordered the dismissal of three wire fraud

B.      **Anticipated evidence.**

When Defendant Sullivan was hired as Uber Technology, Inc's ("Uber's") Chief Security Officer in April 2015, Uber had recently disclosed to the Federal Trade Commission ("FTC") that it had been the victim of a data breach in 2014 ("2014 Data Breach"). That data breach related to the unauthorized access of approximately 50,000 consumers' personal information, including their names and driver's license numbers. In the wake of that disclosure, the FTC's Division of Privacy and Identity Protection embarked on an investigation of Uber's data security program and practices. In May 2015, the month after Defendant was hired, the FTC served a detailed Civil Investigative Demand on Uber, which was provided to Defendant in his new role as Chief Security Office.

The United States anticipates introducing testimonial and documentary evidence regarding the nature and scope of the FTC's investigation into Uber's data security, which was prompted by the FTC's learning of the 2014 Data Breach but which expanded to cover a full investigation of Uber's security practices and its protection of information of those using the platform. The United States may call one of the FTC attorneys responsible for managing the investigation to testify both about the nature of the investigation and Defendant's role in Uber's response. That testimony will reflect the FTC's central focus on measures taken by Uber to protect personally identifiable information ("PII") in its possession, including efforts to encrypt such materials. That testimony will also reflect Defendant's central role in Uber's response, both in terms of supervising Uber's response to the FTC, his participation in a presentation to the FTC in Spring 2016, and, most importantly, his deposition before the FTC in November 2016. Documents related to the FTC investigation will provide further evidence both of Defendant's knowledge of the investigation in general and his specific awareness of the FTC's focus on PII.

Those documents will also demonstrate that the FTC's investigation went far beyond the circumstances of the 2014 Data Breach. On the contrary, the FTC sought detailed information about *any* unauthorized access to personal information in Uber's possession. Over the course of the investigation, Defendant was aware that Uber's legal team informed the FTC of other data security incidents, and

---

counts against Defendant.

Defendant himself participated in a presentation to the FTC in which the Uber team discussed some of those incidents.

The United States anticipates that the transcript of Defendant's FTC deposition on November 4, 2016, will be a central exhibit at trial. Though there exists substantial other evidence of Defendant's awareness of and involvement in Uber's response to the FTC investigation, that transcript demonstrates that Defendant was acutely aware of the nature of the FTC's inquiry, both by virtue of Defendant's statements during that deposition and by virtue of the questions that were asked. He testified that he had prepared extensively for the FTC deposition—which will be corroborated by other testimony at trial. Defendant testified in detail about Amazon Web Services ("AWS"), about encryption, about database backups, and about other matters related to Uber's security operations.

The United States further anticipates introducing evidence that approximately ten days after Defendant's FTC deposition, he learned that Uber had been hacked again. The United States may call a variety of Uber employees assigned to the company's Security group—which was managed by Defendant—to testify about the circumstances of this hack. The hackers reached out to Defendant directly on November 14, 2016, via email, claiming to have found a major vulnerability. Testimony and documentary evidence will establish that Defendant's team quickly learned that the hackers had downloaded vast stores of data that Uber had stored on AWS, including approximately 600,000 driver's license numbers. A critical exhibit regarding this response effort will be the Preacher Central Tracker, which was a "living" document shared among the Security Response team members and used to record progress in the investigation in addition to tasks assigned to various team members. This contemporaneous record of the response effort demonstrates that Defendant was aware of the implications of the 2016 Data Breach for the FTC investigation. The document states that "Joe was just deposed on this specific topic and what the best or minimum practices that any company should follow in this area." In addition, the document contains the following statement: "Joe: This may also play very badly based on previous assertions."

Documentary evidence to be introduced at trial reflects that the hackers made clear that they expected a six-figure payout. Email and text correspondence to be introduced at trial, and supplemented

by witness testimony, reflect that Defendant sought to use Uber's bug bounty program to pay the hackers $100,000, even though that program had a nominal maximum bounty of $10,000. In addition, the terms and conditions of Uber's bug bounty program, which will be introduced at trial, plainly state that dumping user data from AWS did not comply with Uber's policy.

Testimony and documents at trial will also demonstrate that, as part of Defendant's effort to prevent news of the breach from getting out, he directed the creation of a non-disclosure agreement ("NDA") to be presented to the hackers as a condition of receiving their $100,000. That NDA falsely stated, in a section applicable to the hackers: "You promise that you did not take or store any data during or through your research and that you have delivered to us or forensically destroyed all information about and/or analyses of the vulnerabilities." Testimony will establish that defendant directed that this false language be included in the document, and documentary evidence will demonstrate that Defendant made extensive edits to the one-page NDA which contained that false language, but he never corrected that language despite knowing it was false. Payment was ultimately made to the hackers on or about December 8, 2016. Rather than using Uber's public bug bounty program—which would have risked some level of public exposure—Defendant's staff directed Uber's vendor to route the payment through a "private" bug bounty program with no risk of public exposure. Defendant's team identified the two hackers in January 2017, sent individuals to interview them, and obtained new copies of the NDA executed in the hackers' true names.

Simultaneous to these efforts, the evidence will demonstrate that Defendant was aware of ongoing negotiations with the FTC. Document evidence will demonstrate that he was copied on a variety of email chains with Uber's in-house counsel relating to the FTC's investigation—both in terms of ongoing disclosures to the FTC and in terms of potential settlement with the FTC—but in none of the correspondence did Defendant disclose the existence of the 2016 Data Breach that occurred only a few weeks earlier. Testimony from those in-house attorneys will further demonstrate the Defendant never disclosed to them that Uber had suffered another data breach.

The United States also anticipates that documentary evidence and witness testimony will establish that Defendant was asked to brief Uber's new CEO on the nature of the 2016 incident after

other internal investigation uncovered some evidence of it.  Defendant asked his team to prepare a summary, which they did.  But Defendant did not provide the summary he received to the new CEO.  Instead, he drafted his own summary that resulted in both affirmative misrepresentations and misleading omissions of fact.  For example, the documentary record will establish that the summary Defendant received disclosed that the hackers had gained access to "AWS buckets that contained potentially all ride and driver data in plaintext," and that the hackers "still had possession of our data" when they reached out to Uber in November 2016.  Defendant's summary, however, disclosed only that the hackers had gained access to "some rider and driver data" and removed any admission that the hackers had actually taken data.

## II.  Anticipated evidentiary, procedural, or other legal issues.

The parties have negotiated exhibits extensively and attempted to reach agreement on admissibility in advance of trial.  The parties have briefed certain remaining evidentiary objections.  Defendant's motions in limine further raise issues for the Court's resolution.

One procedural matter that is not addressed elsewhere in the parties' pretrial filings is how to address privilege concerns at trial.  As the Court is aware, Defendant and Uber negotiated the terms of an order by which certain privileged materials may be used at trial.  There remains the question of how to address potential privilege issues during testimony at trial, including whether and how to afford counsel for Uber to object in the event a witnesses testimony goes beyond the areas this Court has previously authorized for testimony.  Counsel for Uber plans to attend the Pretrial Conference in this matter on August 22 and may wish to be heard.

## III.  Disclosure and contemplated use of statements or reports of witnesses under the Jencks Act, 18 U.S.C. § 3500, or Fed. R. Crim. P. 26.3.

The United States has produced and will continue to produce prior statements of the witnesses pursuant to the Jencks Act and Fed. R. Crim. P. 26.3 as they are identified or generated.

## IV.  Disclosure and contemplated use of grand jury testimony of witnesses intended to be called at the trial.

Pursuant to this Court's order, the United States has produced grand jury transcripts for the witnesses it intended to call at trial.  The Untied States contemplates that these transcripts could be used

to refresh a witness's recollection, as substantive evidence under FRE 801(d) if appropriate, or potentially as Recorded Recollections under FRE 803(5).

**V.     Disclosure of exculpatory or other evidence favorable to the defendant on the issue of guilt or punishment.**

The United States has produced and will continue to produce any and all materials subject to *Brady*, *Giglio*, and their progeny. The United States continues to review its files and investigate whether any additional materials arguably implicated by those cases are in its possession, and if any such materials are identified they will be produced promptly.

**VI.    Stipulation of facts which may be deemed proved at the trial without further proof by either party and limitation of witnesses.**

The parties have been meeting and conferring on a variety of factual stipulations and anticipate having more details to provide the court at the Pretrial Conference.

**VII.   Evidence of prior convictions of any witness.**

The government is reviewing criminal histories of its witnesses and will make all necessary disclosures. As Defendant is aware, two potential witnesses—Brandon Glover and Vasile Mereacre—pleaded guilty to crimes that form the basis of the pending Misprision charge.

**VIII.  Pretrial exchange of witness lists.**

Pursuant to this Court's pretrial order, the parties will file their witness lists concurrently with this memorandum.

**IX.    Pretrial exchange of exhibits.**

Pursuant to this Court's pretrial order, the parties will file their exhibits lists concurrently with this memorandum. The parties have also engaged in extensive meet and confer efforts with regard to exhibits and will submit a joint exhibit list in addition to the parties' respective lists. The parties will also submit briefing regarding particular evidentiary objections.

**X.     Preparation of trial briefs on controverted points of law likely to arise at trial.**

Defendant has filed a set of motions in limine to which the United States will fill oppositions concurrently with this memorandum. The parties have also both brought motions regarding noticed expert testimony.

**XI.    Scheduling of the trial and of witnesses.**

The United States currently anticipates that its case-in-chief will take less than three weeks on the Court's proposed schedule.

**XII.   Request to submit questionnaire for prospective jurors and voir dire questions**

The parties previously met and conferred regarding a juror questionnaire, which the parties understand has been distributed.  In light of the detailed nature of those questions, the government does not believe any tailored voir dire from the Court will be necessary.  The Court's standard biographical voir dire questions, combined with the questionnaire responses, will be sufficient.

DATED:  August 15, 2022                              Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

_____/s/_____
ANDREW F. DAWSON
BENJAMIN KINGSLEY
Assistant United States Attorneys

UNITED STATES'S TRIAL MEMORANDUM AND PRETRIAL CONFERENCE STATEMENT
3:20-CR-337 WHO                         7