Pages 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Orrick, Judge

```
UNITED STATES OF AMERICA,        )
                                 )
            Plaintiff,           )
                                 )
   VS.                           )      NO. CR 20-00337 WHO
                                 )
JOSEPH SULLIVAN,                 )
                                 )
            Defendant.           )
_____)
```

San Francisco, California
Monday, August 22, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                       STEPHANIE M. HINDS
                       United States Attorney
                       450 Golden Gate Avenue
                       San Francisco, California  94102
        BY:  **ANDREW F. DAWSON**
             **BENJAMIN KINGSLEY**
             **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant:
                       ANGELI LAW GROUP, LLC
                       121 SW Morrison Street - Suite 400
                       Portland, Oregon  97204
        BY:  **DAVID H. ANGELI, ATTORNEY AT LAW**
             **MICHELLE H. KERIN, ATTORNEY AT LAW**
             **TYLER FRANCIS, ATTORNEY AT LAW**

                       LAW OFFICE OF JOHN D. CLINE
                       600 Stewart Street - Suite 400
                       Seattle, Washington  98101
        BY:  **JOHN D. CLINE, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

1    **APPEARANCES:**   (continued)

2    For Movant Uber Technologies, Inc.:

3                              COVINGTON & BURLING, LLP
                              415 Mission Street - Suite 5400
4                              San Francisco, California  94105
                         BY:   **WILLIAM D. SPRAGUE, ATTORNEY AT LAW**
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>**Monday - August 22, 2022**</u>                    <u>**2:00 p.m.**</u>

2                          <u>**P R O C E E D I N G S**</u>

3                            **---000---**

4         **THE CLERK:**  All rise.  This court is now in session.

5    The Honorable William H. Orrick is now presiding.

6         **THE COURT:**  Good afternoon, everybody.  Please be

7    seated.

8                    (Pause in the proceedings.)

9         **THE CLERK:**  And we are here for criminal matter

10   20-337, United States versus Sullivan.

11       Counsel if you would please step forward and state your

12   appearance for the record.

13        **MR. DAWSON:**  Good afternoon, Your Honor, Andrew Dawson

14   for the United States.

15        **THE COURT:**  Good afternoon.

16        **MR. KINGSLEY:**  Good afternoon, Your Honor, Ben

17   Kingsley for the United States.

18        **THE COURT:**  Welcome to the case, Mr. Kingsley.

19        **MR. KINGSLEY:**  Thank you, Your Honor.

20        **MR. ANGELI:**  Good afternoon, Your Honor, David Angeli

21   for Mr. Sullivan.  With the Court's permission, I will

22   introduce the rest of our team.

23        **THE COURT:**  Please.

24        **MR. ANGELI:**  You, of course, know Mr. Sullivan;

25   co-counsel John Cline, Michelle Kerin, and Tyler Francis and

1    Cheryl Oakley at the end of the table is our tech whiz,

2    paralegal, and the glue that holds the whole thing together.

3              **THE COURT:**  Excellent.  All right.

4         So I'm going it take off my mask and I invite anyone who

5    is going to be speaking to take off your mask, and you can do

6    that for the -- for the entire hearing, whether you are

7    listening or speaking; but everybody else, the rule in the

8    courtroom is that people should maintain their masks unless

9    they are speaking.

10        All right.  So, I think the way that I want to proceed is

11   first with the motions in limine and then the motions to

12   exclude, then the evidentiary and other issues; and then we

13   will get to the logistical matters that we need to address.

14        So, let me tell you how I tentatively look at the motions

15   in limine.  Number 1, I would deny the motion.

16        I think the hackers' pleas are relevant to the misprision

17   charge and the pleas are to a different crime than as alleged

18   against Mr. Sullivan, and I would exclude the truth-telling

19   provisions.

20        Number 2, I would grant in part -- I don't think it is

21   relevant and it seems more prejudicial than probative that the

22   2016 incident required disclosure under California law.

23        The issue is whether Mr. Sullivan intentionally obstructed

24   a federal proceeding or knew a federal felony had been

25   committed and failed to notify the authorities.

1    However, terms like -- that the witnesses used like

2  "ransom" or "data breach" or "extortion" are permissible and --

3  when they are used in their ordinary as opposed to their legal

4  meanings.  And I'm happy to give a limiting instruction with

5  respect to that if it's requested.

6    Number 3, I would grant it.  Mr. Glover can testify to

7  what he did and why but not to what Uber's intention was.

8    Number 4, I am interested in the parties' position on

9  whether there is evidence that Mr. Sullivan knew of the other

10 contemporaneous hacks.  If so, I would be inclined to deny the

11 motion.  Otherwise, I would think about granting it under 403.

12   And number 5, I am not clear why individual number 1 is

13 relevant to the federal charges.  And if during the course of

14 the case the defense is that Mr. Sullivan secured the

15 information, then the Government might be able to use this

16 information on rebuttal but that's the way that I'm thinking

17 about it.

18   And obviously no matter how I come down on this, evidence

19 changes during the course of the trial.  So just because I say

20 something now doesn't mean that I won't change my mind based on

21 positions that the parties take that I don't anticipate during

22 trial.

23   So, with that, why don't I let the Defense first take on

24 any of the issues that you are interested in arguing.

25 Mr. Cline.

1        **MR. CLINE:**  So we are addressing the motions that you

2   just covered?

3        **THE COURT:**  Exactly so.

4        **MR. CLINE:**  Yes.

5        **THE COURT:**  And just accept everything that I have

6   said and that's also fine.

7                            (Laughter)

8        **MR. CLINE:**  Really the only one I want to talk about

9   is number 1, and I'm particularly concerned about that one.

10  Your Honor, I think, commented that the pleas by the hackers

11  are relevant but a different offense.

12        **THE COURT:**  Yeah.

13        **MR. CLINE:**  The problem is they are an element of the

14  offense with which Mr. Sullivan is charged which is misprision.

15  One of the elements is that a federal felony was committed.

16      If we were talking double jeopardy, they would be the same

17  offense because they are, in effect, a lesser-included offense

18  of what he is charged with.

19      And allowing that evidence in as evidence of an element of

20  the charge that Mr. Sullivan faces is contrary to what *Smith*

21  and *Halbert* and other cases have said, which is the evidence --

22  evidence of a witness' or a co-defendant's guilt cannot be

23  treated as substantive evidence of the Defendant's guilt.  And

24  here it is.

25      I mean, it's -- it would come in -- and the Government has

1    been very candid about how they want to use it -- as evidence

2    of one of the elements of the charge that Mr. Sullivan faces.

3        And that's not just a formality.  There is a real question

4    whether a jury would conclude beyond a reasonable doubt that

5    that element, that a federal -- that the hackers had committed

6    a federal felony, that that element was satisfied.

7            THE COURT:  It wouldn't be satisfied by a guilty plea

8    and a judgment?

9            MR. CLINE:  Well, that's the problem.  The jury would

10   undoubtedly give that probably decisive weight, but the guilty

11   plea itself -- and it's the same -- let me draw an analogy,

12   Your Honor, if I may.

13       It's the same as if they were coconspirators and the -- or

14   alleged to be coconspirators and the witness was saying "I pled

15   guilty to the same conspiracy as the" --

16           THE COURT:  So I guess I'm having trouble with that

17   premise.  Why is -- why are they coconspirators?

18           MR. CLINE:  They are not coconspirators.  I'm drawing

19   an analogy.

20           THE COURT:  I know, but why does the analogy work?

21           MR. CLINE:  It works because in the co-conspiracy

22   context the witness is saying, "I joined" -- there was a

23   conspiracy that existed.  I joined that conspiracy.

24       Even if the -- even if the coconspirator had no contact

25   with the Defendant at all and doesn't know the first thing

1    about the Defendant, that cannot come in as substantive

2    evidence that a conspiracy existed or that the witness,

3    coconspirator, joined it.

4         So the point is there is an intersection between what the

5    witness has pled guilty to and the elements of the crime with

6    which the Defendant is charged.

7         And that's exactly the case here.  There is an

8    intersection between what the witnesses, the hackers, have pled

9    guilty to and an element of the crime that Mr. Sullivan is

10   charged with.  And the jury will give it, in effect, conclusive

11   effect.

12        If the hackers came in and simply testified about their

13   conduct, that element would be very strongly contested because

14   I think there would be real questions about whether the

15   Government could prove beyond a reasonable doubt that the

16   hackers, in fact, engaged in the underlying offenses.

17        Once you let the guilty pleas in, that element is, in

18   effect, decided by the hackers themselves.  I mean, by their

19   admission -- their opinion, in effect, that they have committed

20   those crimes -- and, of course, people enter into guilty pleas

21   all for all kinds of reasons -- they --

22            **THE COURT:**  Okay, I understand what your point is.

23   Mr. Dawson.

24            **MR. DAWSON:**  Well, I think the -- I appreciate the

25   analogy to coconspirators.  I think the critical difference is

1    in a conspiracy case an element of the offense is not directly

2    that another party was guilty of the offense.  It is hazy a

3    little bit because the agreement requires the participation of

4    another party.

5        But misprision is categorically different that the

6    elements -- one of the elements is the commission of a separate

7    federal felony and critically not one the Defendant is accused

8    of committing.

9        So the cases like *Smith* in the Ninth Circuit, the primary

10    concern articulated is that the jury will just substitute this

11    Defendant's guilt on the charge to the co-Defendant's guilt on

12    the charge when he or she testifies, and this is a different

13    scenario because they are different allegations.

14        Mr. Sullivan is not accused of participating in the hack

15    itself.  The hack itself is simply an element of the offense

16    which is why, you know, Mr. Cline's argument has him in the

17    position of saying -- of conceding that the crime is an element

18    of the offense but then arguing that direct evidence in support

19    of that element is nevertheless inadmissible.

20        And we think that the opposite conclusion is actually

21    necessary.  If it is a discrete identified element that a

22    federal felony was committed, it is undeniably evidence that

23    the Defendant has pleaded guilty to and a court has accepted

24    the plea of guilty to that charged offense.

25        And you don't face the kind of risk that the jury will

1   simply substitute one Defendant's guilt for another Defendant's

2   guilt because ultimately the elements are different, and there

3   are various other elements that must be proved beyond a

4   reasonable doubt in order for a misprision charge to be proved.

5       So we don't think the comparison with the coconspirator is

6   actually availing, and we think the misprision elements make it

7   categorically different.

8           MR. CLINE:  The point is, though, they are taking an

9   element of the charge against Mr. Sullivan and disposing of it

10  through a plea -- and I think I just heard Mr. Dawson say --

11  through the Court's finding that the plea is -- that, I guess,

12  if there is an adequate factual basis and the plea is accepted.

13      In effect, you have a judicial ruling that an element of

14  the offense is satisfied.  It is being effectively taken from

15  the jury, and that -- that's just not supposed to happen.

16          THE COURT:  Well, so I get your point and I will think

17  about it when I get off the bench.  I'm not convinced that

18  that's -- that that's the way that it ought to go, but I will

19  take another look at it.

20          MR. CLINE:  All right.  There are a couple of other --

21  Your Honor asked on Motion Number 4 whether there is evidence

22  that Mr. Sullivan knew about --

23          THE COURT:  Yes.

24          MR. CLINE:  There are people here on the Defense side

25  who are far more steeped in the facts than I am, but I think

1    the answer is no.  I think -- I don't know of any evidence --

2    maybe Mr. Dawson is going to correct me -- that Mr. Sullivan

3    was aware at the time that the hackers were engaged in other

4    activities.

5              **THE COURT:**  Okay.  Mr. Dawson?

6              **MR. DAWSON:**  We do think there is such evidence.

7    There is in particular some grand jury testimony -- and I think

8    also on another subject of some disagreement -- notes of

9    Mr. Sullivan's interviews with Wilmer Hale, which I'm sure we

10   will get to later.

11        To sum up, there was an e-mail that one of Mr. Sullivan's

12   direct reports sent to the hackers when he had successfully

13   identified them -- at least one of them sent to Brandon Glover.

14        And that e-mail in our view -- and it was not just in our

15   view.  On the face of the e-mail it makes references to other

16   targets that the hackers had targeted.

17        My understanding from the evidence is that Mr. Henley knew

18   this based on his investigation into the attribution of the

19   hackers.  Once he attributed them, he saw folders in a folder

20   structure identifying these other targets of the hackers and

21   that he drafted an e-mail to the hackers in part to, for lack

22   of a better word, scare them.

23        And there is evidence both in Mr. Sullivan's notes of his

24   interview and in Mr. Henley's testimony that Mr. Sullivan was

25   aware of that e-mail.  And if that's true, then -- if he read

1  the e-mail, he would know that there was at least a suggestion,

2  if not Mr. Henley's conclusion, that there were other targets

3  by the same hackers.

4      THE COURT:  And would this evidence come in then

5  through Mr. Henley?

6      MR. DAWSON:  Well, it depends a lot on how various

7  other motions are resolved.  It may or it may come in through

8  the notes, if Your Honor were to admit the notes or if

9  Mr. Sullivan's statements to the interviewers otherwise came

10  into evidence, for instance, via testimony from the

11  interviewing attorneys.

12      We do think we would have evidence in that Mr. Sullivan

13  was aware of that e-mail and that the e-mail itself is on --

14  I believe it is just on our exhibit list.  I don't think that

15  is a joint exhibit.

16      THE COURT:  Okay.  All right.  Go ahead, Mr. Cline.

17      MR. CLINE:  I was just going to say I'm skeptical, but

18  this sounds like the kind of issue that perhaps should wait

19  until there is connecting evidence.

20      THE COURT:  Yeah, no, that's exactly where I was going

21  to go.  Okay.

22      MR. CLINE:  Your Honor, may I?

23      THE COURT:  Go ahead.

24      MR. CLINE:  Do you want to say anything about

25  Number 5?  I had motions 1 through 4.  Mr. Francis is going to

1   talk about Motion Number 5.

2           **THE COURT:**  Great.

3           **MR. FRANCIS:**  Good afternoon, Your Honor.

4           **THE COURT:**  Afternoon.

5           **MR. FRANCIS:**  So with regard to Motion 5, the issue, I

6   think I -- the way the Court articulated is:  If the Defense

7   puts on evidence that the data was secured, then possibly this

8   comes in through rebuttal.

9       And I think what is important to point out here is that

10  there is a difference between whether -- between the Defense

11  arguing that Uber, in fact, successfully secured the data and

12  evidence that they thought at the time that they had done so.

13      Only the -- only the second of those two actually matters

14  in terms of Mr. Sullivan's intent.

15      The Government in its opposition indicates just as much

16  saying that this evidence that they want to put on would rebut

17  an anticipated defense theory that the Defendant reasonably

18  believed that his efforts had secured the stolen data.  The

19  Government argues, therefore, it gets to show that that belief

20  was not held in good faith or was implausible.

21      And so far so good there.  I mean, if the Government

22  actually had evidence that that belief wasn't held in good

23  faith, if they had a witness, for example, who testified it was

24  pretextual or something like that, that argument would make

25  essential.

1           But the Government doesn't have that.  Their own witnesses

2    are going to testify that they really did believe at the time

3    that they had secured the data.  They don't find out that they

4    might be wrong until over two years later.  And so -- long

5    after the events in question, long after Mr. Sullivan had left

6    the company.

7           So evidence that they are wrong is not the same thing as

8    evidence of bad faith or pretextual belief at the time.  So if

9    we want to put on evidence that they believed at the time that

10   they had secured data, our position would be that that would

11   not open the door to this kind of evidence coming in, in

12   rebuttal.

13           **THE COURT:**  Okay.  Mr. Dawson.

14           **MR. DAWSON:**  I think Mr. Francis accurately summarizes

15   the Government's view.  I think I will just say a few more

16   words about that distinction between the good-faith belief and

17   the actual state of the world.

18           The basis upon which Mr. Sullivan and the other witnesses

19   believed that this evidence was, quote-unquote, secured, was in

20   part the statements of these two hackers at interviews that

21   were hoisted upon them under some pressure and duress and also

22   an analysis that Mr. Henley conducted of, as I understand it, a

23   remote desktop or a remote server.

24           Nobody looked at their computers.  Nobody searched their

25   houses.  Nobody looked at their communications.

1        And in our view when you are dealing with individuals like

2   Mr. Glover and Mr. Mereacre, who are on our witness list, the

3   two hackers here, that was simply not a credible basis upon

4   which to conclude in good faith the data has been deleted.

5        In our view and we think this will accord with other

6   evidence in the case, it was in effect a fig leaf.  It was a

7   cover story to create an argument of good faith, but nobody who

8   is sophisticated and experienced and familiar with all the

9   details of the investigation would have truly believed that

10  there was a good-faith basis to believe the information had

11  been deleted.

12       **THE COURT:**  What is in it for them not to -- to be

13  confident that -- that the information was secure?

14       **MR. DAWSON:**  So, one thing is by the time the hackers

15  were identified in January of 2017, it had been a number of

16  months since their participation in the hack and the

17  negotiations with Uber.

18       And as it turned out before Uber contacted them, they had,

19  in fact, shared this data with somebody else.  So they were

20  caught in the position of either having to admit to Uber that

21  the data was potentially still out in the world or telling Uber

22  what it wanted to hear and saying oh, no, I got it all.  It is

23  all deleted.

24       **THE COURT:**  I understand what is in it for the hackers

25  not to disclose.  I'm wondering what is in it for Uber not to

1    do its best to know that it was secure.

2         MR. DAWSON:  Well, I think in part it's best simply

3    could not have ever led to that confident conclusion because it

4    is not the Government; it is not the federal authorities to

5    whom the hack should have been reported.  There wasn't a

6    mechanism to reach that level of good-faith belief that the

7    data had been secured.

8         And we think that this fits into the overall scheme to

9    conceal that there was a fig leaf, as I said, to claim "Oh,

10   this is no harm no foul.  We know it is not out there;" but

11   nobody who is active in this area who was experienced would

12   have actually believed with any confidence that that was the

13   case.

14        THE COURT:  Okay.  I understand what your argument is.

15        MR. FRANCIS:  Judge, just one more thing, I mean,

16   if -- if the steps that they took at the time were so obviously

17   flimsy that no one would believe -- that it led to beliefs that

18   the data was secured, they were held in good faith, let them

19   put on that evidence.  But evidence that two years later we

20   all, including the Government, find out unbeknownst to anybody

21   at the time is a different story and it poses its own unique

22   form of prejudice.

23        MR. DAWSON:  And if I may, Your Honor, just one other

24   piece of evidence I'd be remiss if I didn't mention.  In terms

25   of the confidence of whether this data was, in fact, deleted,

there will be a lot of testimony about a non-disclosure

agreement that at various points people believed created an

obligation that the hackers delete the data.  It did not, in

fact, do so.

    The agreement as it was drafted, as Mr. Sullivan ratified

and edited, it had absolutely no obligation that the Defendants

delete the data because instead it claimed the Defendants never

took any data.

    So there was no -- even if a contract with these hackers

was reliable, the terms of that contract did not require

deletion of data stolen from Uber's AWS.

        **THE COURT:**  Okay.  I'm going to think a little further

on this.  It seems -- I just have to think through if there are

questions that point out the weakness of the actions that Uber

took, how far down the line those questions could go before it

gets into -- or whether it ultimately has to end up with the

disclosure of somebody that nobody knew about for two years,

which does seem prejudicial, if nobody knew about it but -- so

I will just think about it for a little bit.

        **MR. FRANCIS:**  Thank you very much, Your Honor.

        **THE COURT:**  Okay.  All right.  So, Mr. Dawson, does

the Government want to take on any of the other --

        **MR. DAWSON:**  I think so, yes, Your Honor.  The one

that I wanted to focus on was Number 2 about the reference to

state disclosure obligations.

1          **THE COURT:**  Yes.

2          **MR. DAWSON:**  I think there are two ways to approach

3     it.  One is pragmatic and the other I think is more legal.

4          I will start with the pragmatic.  There will be, in

5     documentary evidence and in testimony, ample evidence that the

6     question of disclosure, whether this had to be disclosed or

7     not, was on the minds of the security response team on

8     November 14th through December whatever it was -- December 8th,

9     16th.

10         This was a matter of some conversation, and it's in the

11    feature tracker, which is a long-running document cataloging

12    the efforts of the response team.  The references in there are

13    to disclosure.

14         So in a practical sense we are concerned that the evidence

15    simply won't make sense unless there is some explanation of

16    what "disclosure" means, what is this about.

17         And similarly with the witnesses, the engineers -- even

18    those who are not attorneys -- they are aware of this

19    obligation.  They are aware of disclosure of data breach

20    obligations and when they kick in.  They are not attorneys so

21    they are not responsible with making that decision, but this

22    informs their behavior.  This informs the things they do next.

23         There is going to be some evidence of Mr. Garbutt and

24    Mr. Clark cataloging the data taken, looking at precisely what

25    was taken, and figuring out oh, this category of information,

1     that's disclosable, so we have to take further steps.

2          So the actual step-by-step progression of the response is

3     intimately informed by these laws and by what they make

4     disclosable.

5          To set the pragmatic aside and move to the broader, we

6     also think it is directly relevant to Mr. Sullivan's motive.

7     The overall goal here was to keep this quiet; was to avoid the

8     embarrassment for Mr. Sullivan, the embarrassment for Uber.

9     And in order to make that happen, you couldn't just fight that

10    battle on one front.  That had to be fought on multiple fronts.

11    Any angle by which this could become public had to be squashed.

12         It is not an element of the offense but it is directly

13    relevant to motive.  So to the extent Mr. Sullivan had others

14    take efforts not to disclose, those efforts were in furtherance

15    of the overall goal of keeping it quiet.

16         So those efforts themselves corroborate the bad intent.

17    They corroborate that this wasn't just a one-off attitude

18    towards the FTC.  This was a comprehensive attitude that this

19    can't get out.  And if it can't get out, it can't get out by

20    any mechanism.

21         If it is disclosed to the drivers -- and in this case

22    there were 600,000 driver's license numbers approximately --

23    that kind of disclosure would immediately make it apparent to

24    the FTC.

25         So it is very much interwoven both in terms of the

1  evidence and the testimony of the witnesses and in terms of

2  Mr. Sullivan's intent and motive.  All of these things had to

3  rise and fall together, and the evidence of the steps taken to

4  avoid disclosure, corroborates the corrupt intent to obstruct

5  the FTC.

6       THE COURT:  Is it necessary for an expert to opine

7  that the law was violated and those disclosure obligations

8  followed?  Or is it enough that the law says that these

9  obligations exist and that there was concern with respect to

10  it, if you see the distinction that I'm curious about.

11       MR. DAWSON:  I do but I don't want to step on my

12  colleague's toes with the expert issue, but I think in a sense

13  those are two different questions, both of which are relevant.

14  Part of the expert's testimony is not just on the law but on

15  the practice in the cyber security industry; how people behave,

16  what the norms are.  That's a separate question.  Mr. Sullivan

17  was a member of this industry for decades, and the expert can

18  speak, we think, with some authority on that subject.

19       I think the separate question of what the law, in fact,

20  requires, as to jury instructions we have obviously proposed

21  that the jury be instructed on the California law.  And we

22  think that in order to make sense of the behavior, the jury

23  needs to have that insight on what the law is, not just vague

24  references to notifications and data breach but something

25  tangible, something the jury can look at and see "this is the

1    law.  Is what Mr. Sullivan did reasonable?"

2         And I think Mr. Sullivan's part of the argument opens the

3    door to that.  If the SoftBank testimony comes in -- as has

4    been articulated, that SoftBank put the screws to Uber;

5    pressured them; and the choice to disclose wasn't a good-faith

6    application of the law but rather responding to a potential

7    investor -- if that's going to be the argument, the jury needs

8    to say what the law is.

9         It is not enough to say:  "Well, the law is something you

10   can't know about but SoftBank pressured them."  If the jury is

11   instructed on the law, we think it becomes very clear very

12   quickly that this was a disclosable event.

13        And to allow argument based on the SoftBank, as alleged,

14   pressures without that instruction and without a general

15   awareness of what data breach notification laws are we think

16   would leave the jury in a confused position and without all the

17   facts necessary to make that decision.

18            THE COURT:  Okay.  Mr. Cline.

19            MR. CLINE:  There certainly will be discussion of

20   disclosure in this case.  It's -- there's no question about

21   that.  But the issue is do these specifics of the California

22   disclosure statute get either put into evidence or instructed

23   by the Court.

24        And I think the answer to that is to the extent

25   Mr. Sullivan knew about them, perhaps, but if he didn't -- if

1   the Government can't show that Mr. Sullivan knew the details of

2   the California statute, then it should not come in.

3        And the reason is it doesn't go to an element of the case.

4   It's not something the jury needs to decide whether

5   Mr. Sullivan is guilty or not guilty.  It goes to his state of

6   mind.  And if it is something he didn't know, then it really

7   has no relevance to the case at all.

8        Now, there is going to be testimony in the case about --

9   not so much about the California statute specifically but about

10  disclosure, and it will come from a Government witness, Craig

11  Clark.  And the evidence is going to be that Mr. Clark gave

12  advice that there was no need to disclose, not with specific

13  reference to the California statute but generally.

14       That evidence is certainly -- is certainly relevant and it

15  is going to come in.

16       But if you go further and instruct the jury "here are the

17  elements of the California data breach statute; here is exactly

18  what it says," what you are basically inviting the jury to do

19  is form its own legal conclusion about whether what Clark

20  advised is right or wrong.

21       That's not the issue here.  The issue here is:  What did

22  Mr. Sullivan know about the statute independently of Clark and

23  then what was he told about the statute at the time.

24       And I think the evidence is going to be -- the Government

25  is certainly not going to be able to show, I don't believe,

1    that Mr. Sullivan was familiar with the California data breach

2    statute.

3        The evidence is going to be that Clark may or may not have

4    looked at that statute but that Clark offered legal advice on

5    disclosure generally, which Mr. Sullivan and others followed.

6        Now, the Government may view that legal advice as mistaken

7    but that's the advice that was given at the time.  And again,

8    to put the details of the California statute in front of the

9    jury unconnected to any element of the offense simply invites

10   the jurors to read the statute, form their own legal

11   conclusions, and judge Clark's legal advice, which is not what

12   happened in real-time.  So it's a -- very much of a 403 issue.

13           **THE COURT:**  Okay.

14       **MR. DAWSON:**  Well, a couple of responses.  I think

15   Mr. Cline mentioned Craig Clark and his anticipated testimony.

16   I think that illustrates how interwoven so many of these issues

17   are.

18       We anticipate putting on evidence that Mr. Sullivan was

19   instructed by Salle Yoo, the General Counsel, to go to a

20   particular person within the General Counsel's office for data

21   security matters; that is, matters relating to data breaches.

22   And he didn't do so.  He went to Craig Clark who was an old

23   colleague he worked with for many, many years.

24       And we think the choice not to do as instructed and to go

25   with somebody who was closer to Mr. Sullivan's orbit reflects

1  that understanding that he didn't want good advice; he didn't

2  want an expert rendering an opinion on disclosure because he

3  knew the answer.

4          And I think trying to exclude the disclosure, at least

5  some instruction on how disclosure works, would make that

6  evidence very difficult to comprehend.  But in reality, it is

7  very compelling that if somebody is told "here is your person

8  to consult," and instead you go over here to somebody who is

9  not on that list at all, who is an old friend, who you may have

10 more suasion over, we think that is very powerful evidence; but

11 it will be lost on the jury without some explanation of "Well,

12 what was this other person supposed to do?"

13         We also think again mentioning the notes, which I'm sure

14 will be discussed separately, part of what is in the notes that

15 Mr. Sullivan wants to enter in are comments about what the

16 rules are, comments about what would trigger disclosure, what

17 wouldn't.  And we anticipate that his statements that in the

18 Defense view reflect his good faith actually demonstrate he

19 wasn't -- he didn't do or believe what Mr. Clark told him.  It

20 was a much more, again, fig leaf to cover what Mr. Sullivan

21 would have known based on his experience was not a persuasive

22 legal take but rather an effort to conceal and further the

23 obstruction of the FTC.

24         **THE COURT:**  Go ahead, Mr. Cline.

25         **MR. CLINE:**  None of which requires instructing the

1   jury or putting in evidence the specifics of the California --

2        **THE COURT:**  But that is really the thing that I'm

3   trying to think through without knowing what the -- how the

4   evidence is actually going to be coming in.

5        So, I will -- uh-oh, Mr. Kingsley is coming up.  That is

6   usually a problem but --

7        **MR. KINGSLEY:**  Good afternoon, Your Honor, well

8   Mr. Dawson took several of my best arguments as he is prone to

9   do.

10        I think the Court is right that there is -- this issue

11   crosses several of the pieces of litigation in front of the

12   Court right now.

13        There is first the question of:  Does this subjective

14   understanding and discussion about the disclosure law, does

15   that come into evidence?

16        I think it is pretty clear that it does.  I'm not even

17   sure the Defense is contesting that.

18        Then there is separately the question of:  Once that is in

19   evidence, does the jury get told that what the law is by an

20   expert or by the Court or not at all?

21        And I think that the last option -- I think the Court can

22   defer this until the trial has gone on for a while.  We don't

23   anticipate calling Mr. Garrie as our first witness.  We would

24   call him, if at all, towards the end of the trial and to see

25   once the Court has understood the evidence what the right way

```
1    to handle it is.

2        The same thing with the jury instruction.  We proposed

3    that in part because the Defense -- you know, in our -- as we

4    talked about it was -- and in their motion to exclude

5    Mr. Garrie was objecting to the idea of having some expert

6    opine on what the law is.  And the Court is the party in this

7    proceeding who is supposed to tell the jury what the law is.

8        And I think once the Court sees all the evidence and

9    understands that Mr. Sullivan was, in fact, pretty

10   knowledgeable about this area, was a lawyer -- was a Deputy

11   General Counsel, what the actual law is will become apparently

12   relevant to the Court; but I don't think we need to decide this

13   issue now until really either on the expert or on the legal

14   instruction until the evidence comes in.  And I don't know if

15   Mr. Cline disagrees on that.

16       MR. CLINE:  That is sort of my general view of these

17   things.  I think if I were sitting where Your Honor is, that

18   would be my reaction to a lot of this stuff.

19       THE COURT:  That's always my reaction to motions in

20   limine.  If I can kick the ball down the field a little bit,

21   then I will have a better feel for what's --

22       MR. CLINE:  I think that's right.  We feel pretty

23   strongly about this, though, as I'm sure you can tell.  And

24   what I would ask of the Government and the Court is before

25   there is any mention of the specifics of the California data
```

1  breach statute, that we have a further discussion outside the

2  presence of the jury.  So I don't want to see this in, like,

3  opening and suddenly be like "Oh, my God, we should have done

4  something about that."

5          MR. KINGSLEY:  My only caveat on that is that there is

6  going to be witnesses talking about what their understanding of

7  the law was, which I think is separate from what Mr. Cline is

8  saying.

9          THE COURT:  Yeah, the line that I think is relatively

10 clear is that it's not necessary to the case and is tangential

11 to the case to say there was a violation of the California law.

12 So that's one thing.

13     What the disclosure obligations of the law were, what

14 people were concerned about in real-time with respect to

15 disclosure and what they were going to do I think is highly

16 relevant.

17     And so -- and then there is -- there is someplace between

18 those two things where there are going to be objections and we

19 have to sort them out, so -- and I think we can sort them out

20 at the time of -- during the trial.

21         MR. CLINE:  I don't think I disagree with anything the

22 Court just said.  All I would say on the real-time piece, what

23 is really important is not what, say -- you know, just to pick

24 somebody -- Matt Henley thought to himself about the disclosure

25 statute.  It is what people said to Mr. Sullivan or

1   communicated to Mr. Sullivan.  That would be what informed his

2   understanding, and it is his understanding that is important

3   here.

4          **THE COURT:**  Yeah, and I think that is the trick with a

5   number of the evidentiary issues that were presented is how do

6   you prove what Mr. Sullivan knew or was aware of at the time.

7   And you are not going to tell him -- tell the Government and so

8   we are just going to have to sort that out on a

9   document-by-document and witness-by-witness basis.

10         **MR. CLINE:**  Understood.

11         **MR. DAWSON:**  Your Honor, if I can return to one

12  aspect, I just wanted to flag on the point of SoftBank, I do

13  think if -- I don't know what Defendant's opening will be -- if

14  the argument is Uber only disclosed in November 2017 because

15  SoftBank put the screws to them, I think we have to be able to

16  put in evidence that it was, in fact, Uber's good-faith legal

17  judgment that disclosure was appropriate, and that requires

18  evidence of what the law is.

19      It would be one thing if this was a very ambiguous

20  uncertain and there is some sort of screw turning that pushed

21  the needle a little bit, but we don't think that's the case

22  here.  And if there is going to be a suggestion that Uber's

23  decision was, in fact, motivated by something nefarious, we

24  should have the opportunity to rebut that with, "In fact, this

25  is what the law requires and this is what Uber did."

1          **THE COURT:**  I don't disagree with that.  Okay.  All

2    right.  Does that take care of the arguments on the motions in

3    limine?

4          **MR. DAWSON:**  I think it does.

5          **MR. CLINE:**  Yes.

6          **THE COURT:**  Okay.  So on the motions to exclude, let

7    me -- who is taking this on for the Defendants, Mr. Cline?

8          **MR. CLINE:**  Not me.  The only one that I had was the

9    motion to exclude the hackers' plea agreements and --

10         **THE COURT:**  Okay.

11         **MR. CLINE:**  -- we have already discussed that.

12         **THE COURT:**  So I'm interested in -- oh, Mr. Angeli, is

13   it you?

14         **MR. ANGELI:**  Your Honor, I will be speaking to the

15   Government's objections to the Defense exhibits.

16         **THE COURT:**  Okay.  So I'm actually interested in -- is

17   it Routh?  What is the --

18         **MR. ANGELI:**  Mr. Routh, yes.

19         **THE COURT:**  So I want the most knowledgeable person.

20         **MR. ANGELI:**  That would be Mr. Francis.

21         **THE COURT:**  Okay.  Mr. Francis, can you explain in

22   just a little bit more depth the experience that Mr. Routh has

23   with bug bounty programs and data breaches and how he knows

24   about payments of bounties and hacker communication?

25         **MR. FRANCIS:**  Certainly, Your Honor.  One moment here.

```
 1                      (Pause in proceedings.)

 2         MR. FRANCIS:  So part of the issue here is I think

 3    there is a little bit of a mismatch between the type of

 4    experience that the parties' two experts have.

 5         Mr. Garrie, the Government's expert, you know, has clearly

 6    spent some time being and holding himself out as a professional

 7    expert who very clearly meticulously documents the nature of

 8    the work that he does.

 9         Mr. Routh has spent that time -- that last 15 years --

10    actually doing the work as an industry professional.  He has

11    been a -- chief security officer -- a chief information

12    security officer for several Fortune 100 companies, and so he

13    has run these programs.  He has run cyber security for major

14    companies.

15         He is intimately familiar with bug bounty programs.  He

16    has led them in his own organizations.  He has led

17    cross-company and cross-sector organizations that consult on

18    cyber security trends, changing threats, best practices to

19    address those threats.

20         So his knowledge of this is through his experience

21    actually being a practitioner in this field.

22         THE COURT:  Okay.  And so would that include, like,

23    hackers communicating with each other?

24         MR. FRANCIS:  It would certainly --

25         THE COURT:  And how.
```

1          **MR. FRANCIS:**  So one of the -- one of the types of

2   information the cyber security professionals share with each is

3   threat intelligence, is actually monitoring communities of

4   hackers, is actually seeing what they are talking to each other

5   about so that companies can respond accordingly and proactively

6   to prevent harm to the company.

7          So this is -- this is -- this is definitely the type of

8   information that he is experienced with over the course of his

9   career, again, actually doing this work rather than engaging in

10  the academic study of it, for example.

11         **THE COURT:**  And has he also participated in -- in bug

12  bounties themselves?  Have his employers or his clients paid as

13  a result of hacks like this?

14         **MR. FRANCIS:**  Yes, Your Honor.

15         **THE COURT:**  All right.  Okay.  So let me give you my

16  tentatives on both of these experts.

17         I think they are both going to be qualified although I

18  will listen carefully to the evidence as it comes in.

19         I think Mr. Garrie's opinions -- basically, I think

20  everything comes in.  That's sort of my short tentative for you

21  with the exception of the issue on the California notification

22  and disclosure laws.

23         I don't think Mr. Garrie can say anything about

24  Mr. Sullivan intentionally doing anything, but he can certainly

25  state facts from which conclusions can be inferred; and he can

1   respond to hypotheticals, and he can use the term "ransom" with

2   respect to the 2016 incident.

3        And I'm -- as I said, I can give a limiting instruction.

4   I think his opinions regarding the FTC are relevant, so I think

5   he is fine.

6        And I think Mr. Routh, given the proffer that Mr. Francis

7   made, is also going to be able to testify on the opinions that

8   he has had.

9        So, Mr. Kingsley, do you have anything that you would like

10  to argue about?

11            MR. KINGSLEY:  No, Your Honor.

12            THE COURT:  Mr. Francis?

13            MR. FRANCIS:  Not at this time, Your Honor.

14            THE COURT:  Okay.  All right.

15            MR. KINGSLEY:  Thank you, Your Honor.

16            THE COURT:  So jury instructions, is there any reason

17  that I need to address conclusively any of the contested

18  instructions before you open?

19            MR. CLINE:  I don't think so.  We have agreed on, I

20  think, the first 16 joint proposed instructions are basically

21  the preliminary instructions.

22            THE COURT:  So I will give you -- Mr. Kingsley, do you

23  think that it is necessary before trial to get to any of the

24  substantive instructions?

25            MR. KINGSLEY:  I don't think so, Your Honor.

1      **THE COURT:**  Okay.  So I will try and give you my -- my

2  initial conclusions about the -- your disputes when we have a

3  meeting prior to the beginning of trial but besides that, I

4  think we will just deal with them when we have an instruction

5  conference.

6      **MR. KINGSLEY:**  Thank you.

7      **MR. CLINE:**  All right.

8      **THE COURT:**  Okay.  On the evidentiary objections, my

9  not -- not having seen the documents, of course, I'm very

10  comfortable making conclusions on them.

11      My general sense is that with the Defendant's objections

12  that the FTC investigation documents would be okay and it would

13  be easy to cross on lack of knowledge, data breach

14  investigations, relevant to what the Defendant knew and how he

15  responded would be admissible; that the workplace pattern and

16  practice would be relevant; that the communications with the

17  CEO would be relevant; that the deposition transcript would be

18  relevant; that the salary would be relevant.

19      And with respect to the Government's objections, I do

20  think that -- and this is something that we will need to -- we

21  may need to talk about -- I think the Government needs to be

22  provided with the third interview documents.

23      And I -- I know we had discussions earlier about how

24  the -- the documents would be shared between Uber and the

25  Defendant, but at no time was I assuming that -- that people

```
 1    wouldn't have a fair shot at -- at a category of documents and
 2    could cherrypick between one or the other.
 3         So I do think that that's the case.  With respect to the
 4    other interviews, I think they are going to be admissible, not
 5    for the truth but for the fact of the disclosure; and they
 6    probably qualify as past recollection recorded if not present
 7    sense impression.  And as business records I think the Clark
 8    documents are probably admissible certainly for impeachment and
 9    credibility.  And the extra SoftBank documents would seem
10    probably relevant to me.
11         At some point all of these documents, whether it is the
12    FTC investigation or the SoftBank documents, if they get
13    repetitive or there is just too much, then I would cut them
14    off; but otherwise, that's -- that was my general take based on
15    the arguments.
16         So, Mr. Angeli, do you want to take on the Defendant's
17    objections?
18         MR. ANGELI:  Your Honor, I'm actually speaking to the
19    Government's objections to our exhibits.  Can we do that first?
20         THE COURT:  Okay.
21         MR. ANGELI:  I think Ms. Kerin is going to handle the
22    other piece.
23         With respect to the Wilmer Hale interviews, I don't think
24    we necessarily have an objection.  I know that Uber is in the
25    room today too and, of course --
```

1          **THE COURT:**  I'm surprised by that.

2          **MR. ANGELI:**  As are we.  But Your Honor will recall,

3    as you pointed out in your order, the tension here is between

4    the two rights at issue, Mr. Sullivan's constitutional rights

5    and Uber's privilege.  And Uber has jealously guarded that

6    privilege.

7          And I will say just in response to the cherrypicking

8    concern, to the extent that that's what is driving Your Honor's

9    concern here, the process that we undertook with Uber took

10   months; and we were very cognizant of the legitimacy of the

11   arguments that they were making on the other side.

12         And the documents that we chose were those that we really

13   believed were essential to our defense sufficient to overcome

14   Uber's privilege.

15         And the reason we chose the two that we did, their whole

16   case -- as Mr. Dawson and Mr. Kingsley have been talking about

17   today -- is about active concealment; right.

18         And most of their evidence in this case is just going to

19   be "you didn't raise your hand; you didn't speak up as loudly

20   as you should have;" but two of the documents that play most

21   prominently for them in the act of concealment piece are the

22   two e-mails that were sent by Mr. Sullivan in September of

23   2017.

24         One was sent to the CEO -- the new CEO of the company on

25   September 20th and the other one was sent to a lawyer named

1  Randall Lee at WilmerHale on September 25th.

2      And the Government says, look, those two e-mails, we are

3  going to put our blinders on and they show Sullivan concealed.

4  We have said, well, wait a minute.  He was interviewed for

5  hours right at that time -- and this is the key limiting

6  principle in our view -- when he sent that e-mail to

7  Mr. Khosrowshahi, the CEO, on September 20th, he said:  You

8  have asked for more information.

9      And we say:  Well, yeah, he had been interviewed on

10  August 17th.  So to put that e-mail into context, we need to

11  know what he said on August 17th.  That's one of the memos that

12  we chose.

13      The September 25th memo -- or the September 25th e-mail

14  going to Mr. Lee, the Government says here is an example.  He

15  was trying to mislead Mr. Lee.  He was trying to minimize the

16  extent of this incident.  He met with Mr. Lee the next day.

17      And so what he said to Mr. Lee that next day in our view

18  is -- goes straight to the heart of whether he was trying to

19  lie to him or mislead him the day before.

20      The October interview is just a different kettle of fish.

21  It occurs in October.  So just from a timeliness perspective,

22  it doesn't go to the heart of the Government's allegation or

23  the defense in the same way the other two did.  And that's why

24  we chose them.

25      **THE COURT:**  Okay.  And that makes a lot of sense to

```
 1    me, but the entire basis of that defense is -- deals with, you
 2    know, what did Uber know, what was being concealed or not
 3    concealed from Uber; and there were three interviews and only
 4    two have been seen by the Government, and you are relying on
 5    the two.  So I think it's -- it is fair game to look at the
 6    third and important and relevant because it looks like that's
 7    going to be a central part of the defense.  And so I think -- I
 8    think the full picture is necessary.
 9          MR. ANGELI:  Understood, Your Honor, and I -- I think
10    you just won that one, so do you want to respond or I have
11    another question about the documents.
12          MR. KINGSLEY:  I wanted to help the Court complete its
13    record on a couple the things on this because obviously I agree
14    with what the Court is saying.
15          The first interview on August 17th mostly related to other
16    topics.  Then there was a meeting -- what is described in the
17    notes as a meeting -- on, I think we think it is around
18    September 26th.  Then the next one we are asking for is
19    actually October 2nd, we think.  So it is not, like, much later
20    in October.  It is about a week afterwards.  And that was
21    described as a more fulsome interview of Mr. Sullivan on the
22    specific topic here.  So, I think for those reasons everything
23    the Court said is right.
24          THE COURT:  So I'm going to order that that happen so
25    that the Government can look at it and then decide whether it
```

 1   is going to use it or not.

 2          **MR. ANGELI:**  Thank you, Your Honor.

 3       Just from a logistics perspective here, in terms of the

 4   documents coming in, the Court's pretrial order ordered the

 5   parties to confer and iron out all foundational objections

 6   unless there was a really good-faith, non-tactical basis for

 7   asserting them.

 8       With respect to the foundation for these documents as

 9   present sense impressions, for example, I don't think there is

10   a good-faith basis for arguing that.

11       And hauling the WilmerHale associates who are sitting

12   there transcribing these notes -- one of them had a baby last

13   week -- into the courtroom to lay that foundation of "yes, I

14   was taking these notes in real-time and they accurately reflect

15   what I heard," strikes us as a waste of the Court's and the

16   jury's time and is completely unnecessary.  So our hope would

17   be that we can stipulate to foundation and just put the

18   documents into evidence.

19          **THE COURT:**  Okay.  And what is the Government's

20   perspective?

21          **MR. KINGSLEY:**  It is in good faith, Your Honor.  I

22   think one thing -- and this sort of stretches to some of the

23   other objections that the Government had that I'm going to

24   focus on here -- is the notes are, we don't dispute -- I don't

25   think -- that they were contemporaneously taken of these

1    interviews.  Yes, they are notes of the interviews.

2         I think it is not apparent at every single point in time

3    what a particular thing means.  And, you know, by way of

4    example, the Defense cites to particular things that are said

5    in those notes and characterizes them a certain way.

6         It could be argument as to whether that's the case or not,

7    but there is also witnesses that actually exist that can come

8    in and testify about them.  And it is the case that at least

9    one or two of the people involved were pregnant or just had a

10   baby, but at least three of the other participants are not.  We

11   started talking to one of them today.  We are going to try to

12   talk to the other two.

13        So what the Government has said to the Defense on this is:

14   We're not -- we don't want to drag somebody who just had a baby

15   into testify just that "these are my notes."

16        Nonetheless, the context in which this investigation was

17   taking place, the fact that there were three interviews but

18   they were each very different in terms of what was happening

19   and what was known at the time, and the ways in which the

20   particular statements in the notes meant particular things in

21   the context of the full conversation, those are all very

22   relevant facts.

23        And so like with any document, it is not that we don't

24   think that they can be relevant.  It's that the foundation

25   establishes the actual relevance of it instead of being

1    something that the parties just cherrypick whatever they want

2    to out of a document and argue based on it.

3        My guess is once we have talked to the witnesses, we will

4    probably be able to stipulate with the Defense the ways in

5    which these come in; but, you know, we got these very late.

6    And at the time we were conferring, our position was "I don't

7    really know what these witnesses are going to say about what

8    they were doing and why and some of these statements it is not

9    apparent to me what they mean outside of the context of the

10   testimony of a witness."

11       **THE COURT:**  Why don't you finish that -- those

12   discussions and then share the information that you receive

13   from those people with the Defense and see whether you can't

14   reach agreement on that.

15       They are going to come in probably and so how -- so

16   understanding them is important, and I can imagine that my note

17   taking would be very different than yours.

18       So I think it's worth -- it's worth finding that out, but

19   let's see whether you can't streamline the trial a little bit

20   by dealing with this and certainly for the -- for the new

21   mother, I don't want to see her.  So figure out how to deal

22   with that.

23       **MR. ANGELI:**  Your Honor, it is not an either-or

24   proposition, of course.  We are not suggesting if the

25   Government would want to call a witness live to testify, that

1    may be appropriate but the documents should come in too as

2    presence sense impressions.

3         And, of course, it's all right to put our evidence in the

4    way the rules allow them to be put in.  So we think the

5    documents come in.

6         If the Government wants to call a witness to add, you

7    know, additional factual information that was conveyed, my

8    guess is that to the extent they wanted to get into thoughts

9    and impressions that the lawyer had while they were listening

10   to the statements come in, Mr. Sprague back there is probably

11   going to jump up because there are privilege issues which is

12   why I think putting a witness on the stand is potentially

13   fraught.  But in any event, we think the documents should come

14   in separate and apart from whether a witness testifies.

15        **MR. KINGSLEY:**  Your Honor, I just want to flag one

16   thing here which is, even -- I don't know that the Government

17   agrees that every note taken of a meeting can come in as

18   presence sense impressions of the events in that meeting if the

19   events sort of have independent significance in the way the

20   Defense is arguing, but I'm going to cabin that for a second

21   and assume that for the purposes of argument.

22        I don't know that every statement in those notes actually

23   serves that purpose for the Defense, and I think the Government

24   wants to preserve that objection that there's some stuff in

25   there that is just self serving hearsay.  Here is what I did.

1   Here is why I did it, not "I'm telling you something candidly,"

2   which is the Defense's argument of the relevance of that

3   because Mr. Sullivan is being honest, that's the relevance, not

4   the underlying substance of the statements.

5       And the Government may just -- at the end of the day we

6   may just put them all in because we want a full picture.  We

7   want to put some of them in.  The Court is going to say they

8   all come in.  I'm not convinced of that yet, and I think that

9   the Defense should not be able to put in through those notes

10  the Defendant's self-serving hearsay statements.

11      MR. ANGELI:  To be clear, Your Honor, just so the

12  record is clear, we are not offering those statements for the

13  truth of anything that is there.

14      THE COURT:  Yeah, I read that.  I haven't seen the

15  documents, and my guess is that the two of you can actually

16  figure out how this should happen in a way that makes sense.

17      MR. KINGSLEY:  Thank you, Your Honor.

18      THE COURT:  Thinking holistically, as I know you will.

19      MR. ANGELI:  Very good.

20      MR. DAWSON:  Your Honor, just one pragmatic question

21  on the point of the third interview.  Mr. Angeli probably knows

22  more than I do.

23      My understanding pursuant to the Court's order is that the

24  Defense team no longer would have possession of the third note.

25      MR. ANGELI:  That is correct.

1          **MR. DAWSON:**  We will have to come up with some

2    mechanism, and I may have to ask --

3          **THE COURT:**  Well, I was going to appoint -- at some

4    point, do you want to come on up?

5          **MR. SPRAGUE:**  Thank you, Your Honor Doug Sprague on

6    behalf of Uber.

7          **THE COURT:**  Mr. Sprague, welcome back.

8          **MR. SPRAGUE:**  Thank you, Your Honor.  I had another

9    matter to address when the Court is ready for it.

10        On this point we heard the order and we can execute on

11   that.  It is consistent with my understanding that the Defense

12   shouldn't have that.  Uber, of course, does and we can execute

13   on that pursuant to the Court's order.

14         **THE COURT:**  That would be great.  So while you are

15   here, I was going to ask how -- the issue of how objections

16   would be handled was raised in the pretrial statements.

17        It's -- and rather I have an assumption about it, but have

18   you talked about what that procedure would be and what makes

19   the most sense?

20         **MR. SPRAGUE:**  We have, Your Honor.  I have spoken with

21   the Government and the Defense about it.  What I would propose

22   is that if we could get a standing objection from the Court --

23   of course, as the Court is well aware, Uber has vigorously

24   defended its privilege and tried to preserve its privilege

25   through this.  If we can have a standing objection that

1    information that may come out be privileged information --

2    capital P, capital I from the Court's prior orders -- if that

3    comes into the record through these documents -- the trial

4    documents, capital T, capital D -- that we have a standing

5    order -- objection to that as privileged information, that

6    would be one logistical piece.

7        Another is if the Court could reiterate -- and we could

8    propose an order to this effect -- that any disclosure of any

9    such information is pursuant to Rule 502(d), as the Court did

10   put in the prior orders.

11       **THE COURT:**  Yeah.

12       **MR. SPRAGUE:**  And then the last piece would be that

13   Uber would be provided the opportunity -- through me or another

14   lawyer on behalf of Uber -- to -- Mr. Angeli said "jump" -- I

15   hope it doesn't get that problematic but perhaps to stand -- if

16   we see that -- if we believe a question is being asked that

17   would elicit privileged information beyond what I have -- the

18   Court covered in the Court's orders with the trial documents

19   that I mentioned.

20       For example, a question could be put to if one of these

21   lawyers comes in -- I understand one did just to have a baby

22   another did not -- but comes in through these lawyers or

23   others -- that we would think well, that's beyond what has been

24   in the record so far.  It is in the trial documents, and that's

25   calling for a communication with an attorney or advice from an

1    attorney; that Uber has not waived privilege over

2    attorney-client privilege or work product.

3         Privilege that we would, perhaps, sit in the front there

4    and just stand in the Court's eyesight.  Other -- anecdotally

5    I'm aware this has occurred in other matters.  Some with

6    colleagues of mine in my firm, others in others.  And I

7    understand this happened with Judge Breyer in the *HP* matter.

8         I don't know that we would need to stand up and actually

9    say "objection."  I think the Court could probably see us and

10   we could say something if not.  We absolutely would try to do

11   that as little as possible, and we would be listening to all

12   the questions.

13        You know, an example earlier today was Mr. Dawson said

14   something about Salle Yoo, who is the former General Counsel,

15   Chief Legal Officer at Uber, directing something of

16   Mr. Sullivan.  Well, normally the ears would perk up with

17   something like that.  I happen to know there is a document that

18   I think Mr. Dawson was referring to, so I wouldn't have jumped

19   up at that moment.  There may be other questions, though, that

20   seem to elicit that information.

21        So that would be the procedure we would propose.  I have

22   discussed that generally with the Government -- and, of course,

23   everyone will correct me if I'm wrong -- I think their position

24   is they don't have an objection to that.

25        I've discussed it generally with the Defense, and the

1   position is that they are were not taking a position on that.

2   That's where we are.

3           THE COURT:  And so will it be you, Mr. Sprague, who is

4   here for the trial?

5           MR. SPRAGUE:  It will be me or a partner of mine in

6   our DC office, Steve Fagell, is also going to come out; and I

7   think we would schedule-wise be alternating a bit.  But I'm

8   anticipating being here at least the entire first week, much of

9   the second week if not all of it.  So it would be one of the

10  two of us, Your Honor.

11          THE COURT:  Okay.  And okay.  Mr. Cline, you wanted to

12  say something.

13          MR. CLINE:  I guess I'm taking a little bit of a

14  position here.  No problem with it not being a waiver of Uber's

15  privilege, of course.

16      The only thing I would say is if there is a need for

17  Mr. Sprague or his colleague to stand up, I think there needs

18  to be a record of what is going on.  And so I -- I would ask

19  that they simply say "objection" or something of that kind.

20      I'm sure there is no need, given our collective knowledge,

21  to spell out what the objection is; but I think there needs to

22  be something on the record indicating what is going on in the

23  courtroom rather than just the lawyer standing up and the

24  proceedings come to a halt.

25          THE COURT:  Yeah, I do think that that's -- that

1  that's true and would be necessary.  And the thing that I was

2  thinking about before we started was whether we could deal with

3  the objections at a break, but then I guess the cat would be --

4  the cows would be out of the barn.

5      And so it's -- yeah, I think that's the only way to do it,

6  and I have confidence with you making objections because I'm

7  sure there won't be any; but if --

8                         (Laughter)

9      **THE COURT:**  But because your colleague is not in front

10  of me, I don't -- I'm not going to be able to make the same

11  statement, but I would encourage all the lawyers to be aware of

12  the privilege issues as the case is proceeding and to

13  communicate with Mr. Sprague what is coming up.  If there is

14  something that -- where you think you are going to be -- where

15  he is going to need to pay particular attention to, give him a

16  heads-up so he knows and maybe he can deal with stuff ahead of

17  time.

18      You are welcome, Mr. Sprague, to come to our 8:00 o'clock

19  sessions where we deal with any issues that are coming up.  And

20  if you see something, you can say something.

21      **MR. SPRAGUE:**  Okay.  Will do, Your Honor, my colleague

22  has been very closely involved with all of these privilege

23  issues and if he is not listening right now, he will hear this

24  from me in a couple of hours.

25      **THE COURT:**  Okay.  Great.

1              **MR. SPRAGUE:**  Thank you, Your Honor.

2              **THE COURT:**  All right.

3              **MR. DAWSON:**  Your Honor, if I could just flag -- I

4    don't think this is related to the attorney-client privilege

5    issue but is different -- the Federal Trade Commission, we

6    anticipate one of our witnesses will be an attorney from the

7    Federal Trade Commission.  I gather from their counsel's office

8    they have some concerns in the event some testimony related to

9    otherwise privileged, as deliberative process privileged,

10   information may be elicited.

11       I don't anticipate, at least from the Government's part,

12   this coming up since our inquiry would be about what they were

13   told, what happened next, all of that stuff outside of the

14   deliberative process.

15       I wanted to flag the issue.  I do think that there will be

16   a representative from the Federal Trade Commission here.  I

17   don't know if he is here today, but we could, in anticipation

18   of that testimony, perhaps work out a similar system.  I think

19   it is more unlikely that that were to come up, but I know they

20   would prefer to be heard in the event something were to come up

21   that would encroach on privileged information.

22              **THE COURT:**  Okay.  So why don't you communicate with

23   that person; and if that's what they want to do, they should

24   attend a hearing that I'm going to schedule once I get to the

25   logistics thing so that we can -- I can make sure that they

```
 1   understand what the rules of the game are.
 2            MR. DAWSON:  I will certainly let them know.
 3            THE COURT:  Okay.  Thank you.
 4            MS. KERIN:  Good afternoon, Your Honor.  I would like
 5   to address --
 6            THE COURT:  I'm sorry.  Would you introduce yourself
 7   for the record again.
 8            MS. KERIN:  Of course, Your Honor, Michelle Kerin for
 9   Defendant Joseph Sullivan.
10            THE COURT:  Thank you.
11            MS. KERIN:  I wanted to address some of your tentative
12   rulings regarding the Defendant's objections to the
13   Government's exhibit, if I may.
14            THE COURT:  Okay.
15            MS. KERIN:  And specifically with respect to the vast
16   number of FTC documents that Mr. Sullivan neither prepared,
17   edited or ever saw.
18      I understand, Your Honor, that you have directed the
19   parties to explore during cross-examination some of these
20   issues about Mr. Sullivan's involvement in it, and that would
21   be a good solution if there weren't quite so many.
22      So, for example, there are 74 documents that the
23   Government -- that the Defendant has identified that
24   Mr. Sullivan neither saw or edited or revised.  There is no
25   evidence in the record of that.
```

1    And, in fact, in some of instances of those exhibits the

2    evidence is that he didn't.  There is actually affirmative

3    evidence that he never saw them.

4    And so, for example, the 34 of the 74 exhibits fall in the

5    category of redline drafts of the consent decree and the

6    complaint that was exchanged in the final days between the

7    FTC's lawyers and outside counsel for Uber, and there is no

8    evidence that Mr. Sullivan saw that.

9    Presenting 34 documents and having lawyers talk about the

10   intricacies of these documents provides the jury a very

11   misleading impression that Mr. Sullivan knew or was involved in

12   these.

13   And cross-examining, again, over 34 documents, again,

14   Mr. Sullivan never saw it is really laborious and it doesn't

15   prove the point that the Government wants and the purpose of

16   this evidence is introduced for.

17   There are also examples of letters where Uber has

18   represented that there is no evidence Mr. Sullivan saw them,

19   and I guess the point is having this much evidence that is not

20   relevant to Mr. Sullivan's state of mind or his understanding

21   about the scope of the FTC's investigation is not probative of

22   anything and is a waste of the jury's time.  And it's

23   prejudicial to Mr. Sullivan.

24        **THE COURT:**  Okay.  Well, again, isn't the question,

25   though, how are the -- Mr. Sullivan was prepared for a

1   deposition over a considerable period of time and with respect

2   to the FTC case and what he was aware -- how is the Government

3   going to prove what -- exactly what he was aware of when that

4   information ultimately is contained in the head of Mr. --

5   Mr. Sullivan unless you can use documents that are logically

6   relevant to what he would have had to have known about?

7       And I also -- I can't believe that I'm going to see 34

8   drafts of any document, but that's a different topic

9   altogether.

10       **MS. KERIN:**  Well, Your Honor, there are plenty of

11   documents that will be introduced to the jury where

12   Mr. Sullivan was deposed about.  He was deposed -- you have

13   read about the deposition numerous times throughout the

14   briefings by the parties.  He will have a full -- all of that

15   evidence will come in.

16       He was provided all of the responses that were to the FTC

17   before his deposition.  All of those will come in.  He was

18   provided a copy of the CID.  It is on the Government's list and

19   that information will come in.

20       So there was plenty of evidence that the Government will

21   be able to introduce about what Mr. Sullivan actually knew.

22   Most of the documents that we are talking about that -- where

23   there is just no evidence that Mr. Sullivan knew about or saw

24   occur after the 2016 incident.  And so that's the consent

25   decree.  That's the eighth response to the CID, which plays a

1    central role, and some other smaller documents.

2           And again, in some instances Uber has represented to the

3    Government that Mr. Sullivan never saw them.

4           And in other instances there is just simply no testimony

5    or any other documentary evidence that Mr. Sullivan reviewed

6    them, noticed them, commented on them.

7           If the Government lays a foundation that any of these

8    documents were seen or discussed in front of Mr. Sullivan, then

9    that would be a completely different story.

10          But again, given the sheer breadth of the number of

11   exhibits, it really creates a misleading impression to the jury

12   that he was intimately involved in this; and it is really just

13   two lawyers outside of Uber and in Washington, D.C. who are

14   negotiating these things.

15          **THE COURT:**  Okay, Mr. Dawson.

16          **MR. DAWSON:**  So I think on the first point to the

17   extent the concern is the volume of evidence, you know, at the

18   exhibit list stage we cast with a wide net.  I don't anticipate

19   the vast bulk of any of the drafts to come in, the letter

20   correspondence.  Those things could conceivably become

21   relevant, so we wanted to keep them on the list so we didn't

22   waive them; but we are certainly not going to bore the jury and

23   waste the Court's time with those iterations.

24          On the more substantive points that Ms. Kerin raised, for

25   example, the eighth interrogatory responses, Mr. Sullivan got

1    an e-mail and there was a link to review the document -- review

2    a draft of that document.

3        Mr. Sullivan's team argues he didn't click the link.  We

4    argue maybe he did.  And there isn't evidence one way or the

5    other.  And if the argument is "I don't read my e-mails; I

6    don't click my links," that is a good argument.  It is not a

7    foregone conclusion.  If he received the link and could have

8    clicked it -- and at present we are not aware of any evidence

9    one way or the other logged in the system determining whether

10   or not he did, in fact, click it -- in the absence of that, we

11   think it is a fair inference that the jury can draw.

12       On the terms of the negotiation of the consent decree and

13   the complaint in the spring into summer of 2017, at the outset,

14   again, we don't anticipate 34 drafts.  There was a particularly

15   early draft where Mr. Sullivan was consulted in that drafting.

16   That will be a focus.

17       But there will also be, we anticipate, testimony about

18   Mr. Sullivan's involvement in the business decision to enter

19   into the settlement and how he weighed in on that settlement.

20       Now, that is not a particular document, but we do think it

21   could be possible that the jury will need to know something

22   about what those negotiations were; where the team ended when

23   the company decided to settle and documents were executed on,

24   I believe, July 7th of 2017, again, just to put into context

25   what it was Mr. Sullivan was doing at the time.

1       But again, this would be limited evidence.  This is not 34

2    drafts.  That is a protective category.  So I do want to assure

3    the Court that we are not going to waste time on extraneous

4    matters.

5         **THE COURT:**  All right.  So I am -- as with all of

6    these categories including the SoftBank documents, I think

7    generally that these may well be relevant.  I think

8    specifically there may be too many of them, and we will just

9    have to address that if it comes up.

10       **MS. KERIN:**  Of course, Your Honor.  May I address

11   another tentative ruling that you made?

12       **THE COURT:**  Go ahead.

13       **MS. KERIN:**  With respect to the communications by

14   Mr. Sullivan related to unrelated security incidents and then

15   the unrelated communications with the former CEO of Uber,

16   Travis Kalanick, I think those fall into the same category; and

17   I think Your Honor's tentative ruling reflected that.

18       And that is that the Government wants to put these

19   documents in presumably to demonstrate some kind of pattern and

20   practice by Mr. Sullivan, and there is no foundation for this

21   assertion that these documents represent some kind of pattern

22   and practice.  The Government hasn't indicated in any of their

23   briefing how they intend to do that.

24       This is akin to habit evidence under Rule 406, and the

25   advisory notes and the Ninth Circuit's case law cautions courts

1  to ensure that proper foundation for this type of evidence is
2  made before it's introduced.
3      We are not aware of anybody who will establish that the
4  characterization that the Government makes about these
5  communications -- that these communications are somehow candid
6  and thorough so that they can contrast it to the purported
7  cryptic and -- cryptic messages regarding the 2016 incident,
8  there is no evidence of what that foundation would be.
9      But when you look at the actual documents -- so the
10  Government needs to make that foundation in order to make the
11  argument and make this connection.  And they can't.
12      But when you look at the actual documents, Your Honor, you
13  will see that they don't even support the contention that the
14  Government indicates that it does.  And we provided an example
15  in our briefing but there are -- I could go through seven or
16  eight examples right now about how the communications aren't
17  just Mr. Sullivan on his own initiating information to be
18  provided to Mr. Kalanick or other C-suite executives about a
19  security incident or about anything really.
20      And remember, that these documents range a significant
21  subject matter.  They are, you know, riots in Paris and
22  earthquakes in Dubai and a lot of various different things.
23      And what you will see when you look at the actual exhibits
24  is many of them are other C-suite executives bringing in
25  Mr. Sullivan and asking him a specific question or they are a

1    one line.

2         Like, for example, there is communication with

3    Ms. Whetstone, who was the C-suite executive, and Mr. Kalanick

4    regarding protests outside the building.

5         And in late 2017 -- late January 2017 and in February 2017

6    there were numerous riots outside of Uber's headquarters, and

7    the e-mail simply says something along the lines of "not so bad

8    out there" and attaches a photograph.

9         It's hard to understand how the Government can argue that

10   this is some kind of pattern and practice with respect to

11   that -- this one sentence that shows candid and purported to be

12   forthcoming information as opposed to the information that is

13   provided in the 2016 incident.

14        And significantly, if we start to get into all of these

15   e-mails about, again, earthquakes in Dubai and riots in Paris

16   and drivers in Brazil, the Defense will necessarily have to

17   distinguish how those communications are different from the

18   2016 incident, right, and that why in those instances it was

19   referred to law enforcement and in this incident it wasn't.

20        And those are mini trials, and that's exactly what 403

21   prohibits.  That's exactly what the Ninth Circuit warns about

22   when they are talking about introducing evidence like this, and

23   this type of evidence -- and particularly without the

24   foundation -- is overly prejudicial and inconsistent with the

25   rules of evidence.

1          **THE COURT:**  Mr. Dawson.

2          **MR. DAWSON:**  I think at the outset it is important to

3     note that these are -- the relevance are the Defendant's own

4     statements.  So this isn't a grab bag of communications and

5     information from within Uber.  These are the Defendant's

6     statements.

7          It is important as well in terms of timeline the example

8     that Ms. Kerin pulled out, January and February of 2017, this

9     is precisely when Mr. Sullivan's team was tracking down the

10    hackers, identifying them, getting a signature, enter name; and

11    no comparable e-mails related to that subject are sent in

12    almost the same timeframe.  That was early January.  I think

13    this is late January.

14         The documents on their face show Mr. Sullivan making

15    communications, whether it's not a habit but it shows his

16    conduct in other contexts, and I think it is a fair inference

17    for the jury to draw; that those kinds of communications --

18    keeping Ms. Whetstone informed, keeping Thuan Pham in some

19    instances informed, the Chief Technology Officer; showing

20    Mr. Sullivan's conduct and his statements to those people on

21    other matters, it inevitably puts his lack of statements in

22    this context into relief.  And I think the jury is entitled to

23    make a conclusion from that.

24         Now there are going to be arguments about whether or not

25    there should be a different conclusion, and I'm sure the

1    Defense can argue it differently; but that's the status of

2    these documents.  They should be subject to argument but not

3    categorical exclusion because they are undoubtedly Defendant's

4    statements.  In many instances they are in the same timeframe,

5    and they do show his communication with stakeholders in the

6    C-suite; and it contrasts dramatically with his lack of

7    communication with regard to the 2016 data breach.

8           THE COURT:  Okay.  All right.  So I'm not going to

9    categorically rule them out.  I hear the concern that you raise

10   and -- but I will be watching it as it comes in.

11          MS. KERIN:  Your Honor, point of clarification, will

12   the Government have to lay a foundation to ensure that those

13   are, in fact, pattern and practice or is it as Mr. Dawson --

14   the Government indicates, you can just tell by looking at them?

15          THE COURT:  Well, that wasn't exactly what I heard

16   Mr. Dawson say; but I'm not at the moment going to exclude them

17   or require foundation other than the normal type of foundation

18   that a document needs.  And then we will just see when the

19   objections are made how we -- how we move forward.

20          MS. KERIN:  Thank you, Your Honor.

21          MR. DAWSON:  Thank you, Your Honor.

22          THE COURT:  Thank you.  Okay.  Mr. Francis.

23          MR. FRANCIS:  With apologies for the rotating cast of

24   characters, Your Honor.

25          THE COURT:  It's okay.

1          **MR. FRANCIS:**  Your Honor, I'm here to address the

2     category 5 and 6 to the Government's --

3          **THE COURT:**  Okay.

4          **MR. FRANCIS:**  So category 5 deals with a set of

5     documents that -- that are the collections of exhibits or

6     collections of statements.  And, you know, so the first of

7     these is Mr. Sullivan's deposition to the FTC in the fall of

8     2016.

9          I think the Government's response here to some extent

10    misses the mark.  It is not that we doubt that there are some

11    things that are relevant here in this deposition -- that's not

12    our position -- but they have designated the entire transcript

13    and nearly all if not all of the 22 exhibits to it without

14    actually doing the work of indicating which portions of this

15    transcript and all of the exhibits to it that they are

16    intending to rely on.  And I believe that's still the case even

17    after filing our oppositions.

18         Our motion here is not that there is nothing in here that

19    is relevant.  It is we need to know what is because just

20    introducing the entire transcript and all of the exhibits to it

21    is overbroad if only portions of it are, in fact, relevant.

22         **THE COURT:**  Okay.  Mr. Dawson.

23         **MR. DAWSON:**  Well, Your Honor, as we put in our

24    papers, I don't have too much more to say; but the -- the --

25    it's hard to overstate the centrality of the November 4th

1  deposition.  And we think the process of trying to distinguish

2  and pluck out and designate, the jury is entitled to look at

3  the whole thing and the jury -- I think we should put the whole

4  transcript in evidence.  The jury can review it in their

5  deliberations.

6      Every aspect of what he is asked is relevant to this case.

7  Some of the examples pulled out in Defendant's briefing -- when

8  he is asked about certain documents he doesn't understand,

9  those documents relate to GitHub, which ends up being central

10 to the 2017 breach.  Some of them relate to Amazon Web

11 Services, central to the 2016 breach.

12     And once again, the 2016 breach occurs ten days later or

13 he learns of it ten days later.  So what is --

14     **THE COURT:**  Let me stop you for a second.  Is -- are

15 you -- is this a video deposition?  Is it going to be played to

16 the jury?  How is this evidence -- how does the Government

17 think it's coming in?

18     **MR. DAWSON:**  So it was not a video deposition, at

19 least we don't have a copy of a recording.  We anticipate

20 calling Ben Rossen, who was the FTC attorney who took the

21 deposition, and in our examination asking him about portions of

22 it.

23     We don't anticipate going over every word in the

24 deposition during testimony because that would be very

25 laborious, but we do think introducing the document as the

1    Defendant's statements and then using the witness to highlight

2    certain portions -- with the jury having the ability to read

3    the whole thing in their deliberations to ensure that they are

4    confident they have the complete picture -- would be the

5    appropriate approach.

6        **THE COURT:**  I don't usually send exhibits back to the

7    jury that give them the opportunity to start speculating about

8    things that didn't actually come in.

9        I'm not -- I don't know.  I guess the thing that -- that I

10   would say about this is that the transcript is generally

11   admissible and depending on how it is used during course of the

12   trial, I think we may well need to excerpt it before -- when it

13   goes back because I think it's -- I don't want the jury to just

14   start spending days reading through everything else that

15   Mr. Sullivan said that you haven't said is really important in

16   the case or that the Defense hasn't said is really important in

17   the case.

18       **MR. DAWSON:**  Well, it may be helpful to get an idea of

19   the ground rules and the plan because I -- our plan had been

20   for when Mr. Rossen is testifying to have the exhibit with the

21   transcripts and then to go through and pull out and highlight

22   certain portions and have him read them, maybe explain terms

23   that may be necessary.  And that will be -- there is the

24   designated exhibit on our list which is that transcript.

25       **THE COURT:**  Okay.

1          **MR. DAWSON:**  But I take Your Honor's position may be

2    to be once that happens, the exhibit wouldn't be admitted at

3    that point; and then we would highlight the portions that were

4    addressed.

5          **THE COURT:**  We might take a look at what we need to --

6    what is -- what would be appropriate.  Maybe there is some

7    questions before -- or answer before or after that the

8    testimony that you highlight that are germane, sort of like

9    allowing a complete record but something that the jury can

10   actually use --

11         **MR. DAWSON:**  Okay.

12         **THE COURT:**  -- fairly.

13         **MR. DAWSON:**  Understood.

14         **MR. FRANCIS:**  Understood, Your Honor.

15      The second group of exhibits in this category are a series

16   of -- they are called HipChats.  It is a form of instant

17   messaging that was used within Uber.  There are two documents

18   here covering three exhibits.  I believe two of them are

19   duplicates of each other.

20      The Government has agreed to remove the irrelevant

21   portions of it.  I think where the rubber hits the road here is

22   exactly what that means.

23      One of these documents -- I'm referring now to

24   Exhibit 657 -- it would appear that the entire document is

25   irrelevant.  There's two sets of conversations here.  One of

 1   them is primarily people talking about their lunch order; that

 2   somebody uses the word "preacher" once and that's, I guess, the

 3   Government's hook for why this whole conversation gets to come

 4   in or why it's relevant.

 5       The second set of messages is a corporate lawyer and a

 6   senior paralegal at the company gossiping about what had just

 7   happened when Mr. Sullivan was terminated and quoting bits of a

 8   Bloomberg article at each other.  Our position is this entire

 9   document should be out.

10       **MR. DAWSON:**  And on that document I think the

11   referenced preacher could conceivably come in.  I do think in

12   conferrals going forward, I don't anticipate needing much of

13   that document if anything.  And I think we would be happy to

14   meet and confer on that.

15       **THE COURT:**  Why don't you do that.  I don't have the

16   document so --

17       **MR. DAWSON:**  If I could, Your Honor, I think from the

18   Government's perspective, it is the other document in this

19   category that is the critical one where members of the response

20   team in real-time are discussing the ongoing extortion effort.

21       And just as the e-mails that are on the joint list reflect

22   what they were thinking, what they were doing, what their

23   understanding was, that stuff is at the very heart of the case;

24   and in our view it is indistinguishable from an e-mail or

25   another kind of corporate record of the team's communications.

1          **MR. FRANCIS:**  Again, I think where -- the issue here

2     is with the word "they," what they understood.  This exhibit

3     here that the Government is referring to contains the reactions

4     of some of Uber security employees after receiving a particular

5     e-mail message from the hackers while they are responding to

6     the breach.

7          Mr. Sullivan is not on any of these communications.  So

8     absent the foundation that their reactions to this e-mail,

9     which are captured in these chats, was actually conveyed to or

10    discussed with Mr. Sullivan, our position is that this wouldn't

11    come in.  This is not relevant to -- given that it is

12    Mr. Sullivan's state of mind, Mr. Sullivan's intent that is at

13    issue here, not the real-time reactions of other people not

14    named Joe Sullivan.

15         **THE COURT:**  Well, I will -- I will look forward to the

16    evidence and the objection when it comes in.  That sounds to me

17    like cross-examination more than exclusion, but I don't -- I

18    don't know what the setup is going to be; who are these people,

19    how close were they -- how close was the team working together,

20    where was Mr. Sullivan and the hierarchy, all those questions.

21    We will just have to see.

22         **MR. FRANCIS:**  Fair enough, Your Honor.

23         The last thing I want to address while up here is the

24    sixth category objections.  This is the salary.

25         So, Your Honor, I think *US v. Mitchell* is particularly

1    instructive here.  I think the Government -- the Government

2    characterizes this as well.  This is a case that says you can't

3    put on evidence that someone is poor to show that they had a

4    motive to steal money.

5        I think this misses the point.  The Court excludes this

6    type of evidence because it doesn't actually prove anything

7    that couldn't be said about many other people, if not everyone.

8        And I think the key tell here is in the Government's own

9    response to this, you know -- and I'm quoting here (as read:)

10   "The Defendant, like anybody else, would be highly concerned

11   about events that could lead to him losing his job and his

12   income."

13       Precisely.  This does not make the Defendant unique, and

14   this does not make relevant what his salary was in order for

15   the Government to be able to argue "Well, he was scared that he

16   might lose his job and that's our theory of motive here."

17       There is simply no connection between the amount of

18   Mr. Sullivan's compensation or the structure of that

19   compensation and the charged conduct here.

20       It would be different, I think, if he gets a raise for

21   every bad thing that he prevents or a percentage of every bug

22   bounty that he refers somebody to.

23       All they want to do here -- and I -- they are quite blunt

24   about this -- is they -- they want to parade his prestigious,

25   highly-compensated job in front of the jury; and I don't think

1    that's appropriate, and I don't think it's relevant even given

2    the Government's stated theory of motive that he was afraid of

3    losing that job.

4        **MR. DAWSON:**  In our view this case is about the

5    Defendant's job.  It is about the terms and conditions of that

6    job.  It is about his reputation.  It is about his career.  And

7    that informs everything about what he was doing at the relevant

8    time in late 2016 through 2017.  So we don't think this is

9    disassociated from facts that are directly relevant.

10       To respond to Mr. Francis's point, I do think a case

11   turning on some misconduct in somebody's job, the terms and

12   conditions of that job will tend to be relevant and will tend

13   to be admissible and the stakes for that person and what they

14   stand to lose if they do X and what they stand to gain if they

15   do Y.  This stuff is all very relevant and relevant to the

16   jury's assessments of what was in the Defendant's mind.

17       **MR. FRANCIS:**  I think that argument would make sense

18   if those terms and conditions spoke specifically to the charged

19   conduct.  If it was, "If you do these things, you will be

20   terminated," that argument makes sense.  The salary doesn't

21   engage with the argument here.

22       **THE COURT:**  Yeah, I'm not -- I'm not so sure.  And, of

23   course, the -- I'm speculating here because the salary wasn't

24   put into the papers that I saw, but I'm guessing that -- that

25   that may -- could -- I understand what the Government's theory

1   is with respect to that, so I'm inclined to allow it to come

2   in.

3           **MR. FRANCIS:**  Thank you very much, Your Honor.

4           **MR. DAWSON:**  Thank you.

5           **THE COURT:**  All right.  I think we have now gone

6   through everything except for the logistical information, so

7   I'm going to move onto that.

8        We were able to put into questionnaires all of the

9   questions that you had agreed on.  They are going out to the

10  prospective jurors.  I have asked for a time screen for four

11  weeks for people.

12       We should get the answers to the questionnaires back no

13  later than the 30th of August.  And what I would like to do is

14  have a hearing at 10:00 o'clock on the 1st of September at

15  which -- prior to which the parties will have met and conferred

16  about any prospective jurors that they would like to excuse for

17  bias or for other reasons that are obvious on the face of the

18  questionnaires.

19       My practice has been that if the parties agree, I will

20  excuse people.  And if there is disagreement, I don't.  And

21  people will come in.  But it is you can winnow down the number

22  of people who show up in an effective way if you do that.

23       So at 10:00 o'clock -- and we can do that hearing by Zoom.

24  I don't know where everybody is going to be or we can do it in

25  person.  I don't care.  If the Defense team is already in San

1    Francisco, we can do it in person.

2            **MR. ANGELI:**  Your Honor, part of the Defense team is

3    here and part isn't, so perhaps Zoom would be better unless

4    somebody has an objection.

5            **THE COURT:**  It's fine with me.

6            **MR. DAWSON:**  That's fine with the Government.

7            **THE COURT:**  So we will do it by Zoom.  And then for

8    voir dire itself, that -- I have reserved the ceremonial

9    courtroom, which is on the 19th floor for voir dire; and I have

10   done that so that people can be distanced somewhat during the

11   selection, but that we can also get everybody into the room

12   including spectators, if necessary, or if people want to be

13   there.

14       The ceremonial courtroom has jury boxes on either side.

15   It's bigger than this room so that everybody can come in at

16   once and we won't have to -- in some of the trials during the

17   pandemic I have had to have second sessions because we couldn't

18   have enough people in the room, and that I would like to avoid

19   if we can.  So I think we will be upstairs on the 19th floor

20   just for voir dire.

21       My -- the one downside with using the ceremonial courtroom

22   is there is no place to have a sidebar unless you go back into

23   the Judge's robing room, and we will deal with that -- we will

24   deal with that, but we won't be having sidebars.  So we will do

25   things -- I will excuse the jury.  If people need to speak

1  privately with us, they will line-up outside and come in one at

2  a time.

3      And when we do discussions on cause and hardship, we will

4  have everybody excused.  It will be at a break.  So I think

5  that's the way that we will proceed.

6      My idea -- given the way that the case has winnowed down,

7  I think we only need four alternates and I'm thinking four

8  weeks is enough for the trial.  Does someone want to disabuse

9  me of that notion?

10      **MR. DAWSON:**  Your Honor, I think from our perspective,

11  we are hoping our case in chief will be done in two-and-a-half

12  weeks, maybe three on the outside.

13      **MR. ANGELI:**  With that, Your Honor, four weeks will be

14  plenty, Your Honor.

15      **THE COURT:**  I think four alternates will be

16  sufficient.  Mr. Kingsley.

17      **MR. KINGSLEY:**  Your Honor, my only concern here is

18  that in the trial just before Judge Chen, the *Abouammo* case, I

19  think they ran through possibly six alternates just because

20  COVID still is around and people -- I mean, it is another two

21  people that would have to spend the time.

22      **THE COURT:**  Okay.  I'm happy to -- if we have got the

23  pool that is sufficient to get six, I will do -- I will do six.

24  It doesn't sound like we are going to need it.  Fortunately, we

25  are right now in a place where the pandemic is a little less

1   prevalent than it has been.

2       I am going to require everybody to wear masks in the

3   courtroom.  The people who are speaking do not need to wear

4   masks.  Witnesses do not need to wear masks unless they are not

5   vaccinated.

6       May I make an assumption that everybody who is in the well

7   right now, the team -- the lawyers' teams and everybody is

8   vaccinated?

9       And I would appreciate it if you would check with your

10  witnesses to -- on their status with respect to vaccination

11  because I would love to be able to tell the jury that -- well,

12  I don't know what I will -- I will tell the jury that all the

13  teams here are vaccinated.  We won't say anything about the

14  witnesses.

15      If there is somebody who is not vaccinated or who prefers

16  to wear a mask when testifying, we will have clear masks and

17  they will -- they can use that.  And if you know that there is

18  somebody with -- who is going to want to testify with a mask,

19  you might show them how to wear a clear mask because it's --

20  it's kind of funny when they can't figure it out, and it's --

21  it's caused -- it caused difficulty in my first trial during

22  the pandemic.  So that would be my trial tip.

23      As far as the trial itself, we are going to pick the jury

24  on the 6th.  Open on the 7th.  And the trial will be every

25  weekday except for the following:  September 17th, 20th and

1    21st are going to be dark days.  Other than that, we will go

2    Monday through Friday.  We will meet each morning at

3    8:00 o'clock here, and the trial will go from 8:30 to 1:30.

4         So the way that I conduct voir dire, I will be doing most

5    of it.  You will have had the questionnaires which asked all of

6    your questions.  I will ask each of the jurors something.  I

7    will get them to stand up.  I will get them to speak to you.  I

8    will ask some question that is relevant -- at least one

9    question that is relevant to the answers that they have given

10   on the questionnaires.  I will ask the things that I think need

11   a little bit of explanation.

12        And when I'm done with that, I will give each side roughly

13   15 minutes to ask specific questions.  If you are making a lot

14   of headway with people, uncovering things that I didn't get to

15   that matter, I won't cut you off.  The moment that you ask what

16   somebody's favorite movie is I will ask you to sit down.

17                            (Laughter)

18        **THE COURT:**  In between there, there is -- you can

19   guess where my predilections are.

20        After we have gone through the questioning, we will meet

21   to discuss hardship and causes.  And then for the -- I will

22   dismiss those folks, but I don't do that until after I have

23   questioned everybody.

24        And once the -- once I have excused people for hardship

25   and cause, I'm not going to fill up the box so that you can see

1   who the 18 people or 16 people are.

2        People are going to be -- come into the courtroom in their

3   randomized position.  So juror number 1 will be the first

4   person -- the box will have, you know, at least four people in

5   each row and those -- and there will be a row in front of the

6   box.

7        So let's say that there are 12 people over there.  They

8   are the first people that you have to care about because they

9   are going to be numbers 1 through whatever.  But then as people

10  are struck, I'm not going to have anybody move around from the

11  seats to which they have been assigned in the courtroom.

12       So you will know that juror number 50 is sitting in juror

13  number 50's seat and the same -- in the same place so that

14  you -- so that you don't -- you won't be confused about who

15  that person is.  So I hope that that explanation makes sense.

16       Once the -- we have met on the 1st and excused whoever we

17  have excused, then Ms. Davis is the person who will put numbers

18  on the chairs.  I refer to jurors by number not by name during

19  my questions.  And you will see where everybody is and then you

20  will be able to make your strikes accordingly.  And making your

21  strikes, we do it by passing a piece of paper back and forth,

22  so that nobody leaves the courtroom until that process is

23  completed.

24       I think the only other thing that I want to warn you about

25  is I like people relatively tethered to the podium, so like

```
 1   within an arm's length.  I don't like people strolling up and

 2   down next to the jury.  So I want you to keep that in mind.

 3        So those are the things that I wanted to tell you.  What

 4   questions, Mr. Dawson or Mr. Kingsley, do you have for me?

 5             MR. DAWSON:  Nothing comes to mind.

 6             THE COURT:  Okay.  And how about from the Defense?

 7             MR. ANGELI:  Your Honor, just on the last point, on

 8   the strolling point, does that apply to opening and closing

 9   too?

10             THE COURT:  Yeah -- yes, so the tip -- and I don't

11   want people closer to the jury than the edge of the

12   Government's table, so the edge that is closest to the jury.

13             MR. ANGELI:  Okay.  So typically -- if I may,

14   Your Honor -- you would have the podium here, for example?

15             THE COURT:  Exactly.  Exactly.  Okay.  Mr. Sprague?

16             MR. SPRAGUE:  If I may, I probably wrote this down

17   wrong.  I thought you said your dark days --

18             THE COURT:  Get to a microphone if you would, please.

19                   (Pause in the proceedings.)

20             MR. SPRAGUE:  Sorry, I was violating one of the rules

21   already.  I thought you said your dark days were going to be

22   the 17th, 19th -- 20th and 21st.

23             THE COURT:  You know, what I -- I don't know what year

24   I was looking at.  So it's the 19th -- thank you for raising

25   that.  It is the 19th, 22nd and 23rd, so Monday, Thursday and
```

```
 1   Friday.
 2           MR. SPRAGUE:  Thank you, Your Honor.  And that's
 3   what's on the unavailability --
 4           THE COURT:  Yes.
 5           MR. CLINE:  Now I'm confused.  Can you just repeat
 6   those one more time?
 7           THE COURT:  My apology.  We are picking the jury on
 8   the 6th.  Openings are on the 7th.  We are going to be dark on
 9   Monday, September 19th; Thursday, September 22nd; and Friday,
10   September 23rd.
11                       (Pause in proceedings.)
12           MR. CLINE:  Thank you.
13           THE COURT:  All right.  Any other questions?
14                       (No response.)
15           THE COURT:  All right.  So the hearing on the 1st is
16   primarily to deal with the jury questionnaires.  If there are
17   other issues that come up in the meantime that we ought to
18   address, just let me know in advance what you would like to
19   deal with if it requires any thought.
20           MR. DAWSON:  Would that be the hearing for the Federal
21   Trade Commission representative?
22           THE COURT:  Yes, and he or she should also be
23   available; and I urge you to continue to communicate -- it
24   sounds like you are communicating reasonably well -- about the
25   exhibits, winnowing things down, reaching agreements.  If there
```

1  are ways of avoiding disputes, it's in everybody's interest

2  that you do that.

3       All right.  With that, good luck over the next little bit

4  and I will see you by Zoom on the 1st.  Thank you.

5          **MR. DAWSON:**  Thank you, Your Honor.

6          **MR. ANGELI:**  Thank you, Your Honor.

7          **MR. KINGSLEY:**  Thank you, Your Honor.

8              (Proceedings adjourned at 3:45 p.m.)

9                     ---oOo---

1

2

3                    **CERTIFICATE OF REPORTER**

4           I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Thursday, August 25, 2022

8

9

10

11    _____

12        Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
       United States District Court - Official Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25