Volume 2

Pages 210 - 389

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ORRICK, JUDGE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,           )
   VS.                          )   No. 20-cr-00337-WHO
                                )
JOSEPH SULLIVAN,                )
                                )
            Defendant.           )   San Francisco, California
_____)

Wednesday, September 7, 2022

**<ins>TRANSCRIPT OF TRIAL PROCEEDINGS</ins>**

**<ins>APPEARANCES:</ins>**

For Plaintiff:          STEPHANIE M. HINDS
                        UNITED STATES ATTORNEY
                        450 Golden Gate Avenue, 11th Floor
                        San Francisco, California  94102
                 BY:    **ANDREW F. DAWSON**
                        **BENJAMIN KINGSLEY**
                        **ASSISTANT UNITED STATES ATTORNEYS**


For Defendant:          ANGELI LAW GROUP
                        121 Southwest Morrison Street
                        Suite 400
                        Portland, Oregon  97204
                 BY:    **DAVID H. ANGELI, ESQ.**
                        **MICHELLE H. KERIN, ESQ.**
                        **TYLER FRANCIS, ESQ.**


Reported By:   **BELLE BALL, CSR 8785, CRR, RDR**
               Official Reporter, U.S. District Court
               **JOAN M. COLUMBINI, CSR 5435, RPR**
               Official Reporter Pro Tem, U.S. District Court


(Appearances continued, next page)

**APPEARANCES, CONTINUED**:

                          LAW OFFICE OF JOHN D. CLINE
                          600 Stewart Street
                          Suite 400
                          Seattle, Washington  98101
                    BY:   **JOHN D. CLINE, ESQ.**


For Uber Technologies, Inc.:
                          COVINGTON & BURLING LLP
                          415 Mission Street
                          Suite 5400
                          San Francisco, California  94105
                    BY:   **WILLIAM DOUGLAS SPRAGUE, ESQ.**


For The Federal Trade Commission:
                          FEDERAL TRADE COMMISSION
                          90 7th Street
                          Suite 14-300
                          San Francisco, California  94103
                    BY:   **ERIC EDMONDSON**

| | |
|---|---|
| 1 | **Wednesday, September 7, 2022**                    **8:03 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 |     (The following proceedings were held outside of the |
| 4 | presence of the Jury) |
| 5 |         **THE COURT:**  Anything to discuss? |
| 6 |     **MS. KERIN:**  We have been discussing exhibits for the |
| 7 | first witness, Your Honor. |
| 8 |         **THE COURT:**  Would you mind?  Thank you, Ms. Kerin. |
| 9 |     And you can take your mask off, and you can come up here. |
| 10 | Whatever you want to do. |
| 11 |     **MS. KERIN:**  Thank you, Your Honor. |
| 12 |     I believe the Government will be introducing several |
| 13 | exhibits through its first witness, Mr. Rossen, from the FTC. |
| 14 |     Several of those documents fall under our -- one of our |
| 15 | motions that was presented to you regarding exchanges between |
| 16 | Uber, on the one hand, and the FTC, on the other, that were not |
| 17 | seen by Mr. Sullivan.  At least two of these exhibits predate |
| 18 | Mr. Sullivan's employment, and several of them postdate his |
| 19 | employment, and we would like to object to those. |
| 20 |         **THE COURT:**  Okay.  Mr. Dawson? |
| 21 |     **MR. DAWSON:**  And, Your Honor, in terms of the ones |
| 22 | that predate his employment, they are a couple of preservation |
| 23 | letters the FTC sent that just spells out in very broad detail |
| 24 | what it's looking at.  And so we think, just for the jury to |
| 25 | understand the background of where the FTC was coming from that |

1   remains relevant even though Mr. Sullivan himself may or may

2   not have seen those precise documents.  The ones that postdate

3   his employment, most of those involve the revelation of the

4   2016 data breach publicly and the FTC's kind of belated receipt

5   of information on what had happened.

6       And so it informs the ultimate decision making of the FTC.

7   It ultimately is relevant to the 2018 settlement, the revisions

8   that the FTC made that reflect the gravity of the event and how

9   it affected the FTC's investigation.

10      **THE COURT:**  Okay.  So, Ms. Kerin, are you raising this

11  now because -- I'm not going to exclude what I haven't seen or

12  heard.

13      If what you want to do is raise the objection now so you

14  don't have to do it in front of the jury, and you want to be

15  specific about the documents, that's fine, and I'll tell you

16  that I'm conditionally admitting them and we can pick it up

17  later.  If you're telling me, do it now, Judge, I'm not going

18  to do it, so...

19      **MS. KERIN:**  I would not do that to you, Your Honor, I

20  assure you.  But I just wanted to know procedurally, because we

21  had discussed with the Government that before a witness takes

22  the stand, they would move into evidence the documents that we

23  don't object to, and all objections would be heard by Your

24  Honor before the presentation of evidence.

25      If you would like me to object and you'll understand what

PROCEEDINGS

1   that means as it's being introduced, I'm happy to do that as

2   well.  I just don't want to disrupt the flow of evidence and be

3   inconsistent with what I previously understood the Court's

4   direction.

5        THE COURT:  Right.  So if you -- I want you to be able

6   to preserve your record and to make sure that it is specific to

7   the documents.  If you know what those exhibits are and you

8   want to say, Your Honor, for the reasons that I just described,

9   we're objecting to Exhibits whatever they are, then you don't

10  need to do it during the testimony.  If you would like to do it

11  during the testimony just to make sure that I'm awake and that

12  I'm paying attention to you, you can make the objection, and

13  I'll say that I'm conditionally admitting it.

14       MS. KERIN:  May I address one specific exhibit right

15  now?  And I know you don't have it, but just as it comes up.

16  It's Exhibit --

17       MR. DAWSON:  I can hand it up.

18       MS. KERIN:  Okay.

19       MR. DAWSON:  We have a binder for the Judge.

20       MS. KERIN:  It's Exhibit 652.  And it's the Mandiant

21  report.  It's dated January 10th, 2018.  And, Your Honor, as

22  you know, this was --

23       THE COURT:  Hang on just a second.

24       MR. DAWSON:  And it's under Tab 31 in the binder I've

25  handed to you.

PROCEEDINGS

1          **THE COURT:**  Okay.  So 31 is the complaint?

2          **MR. DAWSON:**  It should be this document here.  Maybe I

3    can hand up this version.

4          **THE COURT:**  Maybe it's a different document.

5          **MR. DAWSON:**  I'll hand this up, and then I'll sort out

6    what's gone wrong with it.

7          **THE COURT:**  Okay.  Oh, it looks like 30 to me.  It's

8    Mandiant confidential --

9          **MR. DAWSON:**  Yes.

10         **THE COURT:**  -- January 10, 2018.

11         **MR. DAWSON:**  Yes.  Apologies.  That's the correct one.

12         **THE COURT:**  All right.

13         **MS. KERIN:**  So as Your Honor knows, Mr. Sullivan was

14   terminated in November 21st, 2017.  The Mandiant report was a

15   forensic report --

16         **THE COURT:**  Go ahead.

17         **MS. KERIN:**  -- commissioned by Uber and dug a little

18   deeper than Mr. Sullivan's analysis.  It revealed additional

19   information because it wasn't realtime.  Since Mr. Sullivan's

20   state of mind about what happened to the data, what was

21   happening at the time is the real issue before the jury, a

22   subsequent forensic part revealing additional vulnerabilities,

23   additional technical problems doesn't help the jury understand

24   the issues before it.  And it is more prejudicial than

25   relevant.

1          **MR. DAWSON:**  And, Your Honor, from the Government's

2     perspective, I think Ms. Kerin hit the nail on the head.  It

3     dug a little deeper than Mr. Sullivan's analysis.  And the

4     Government's case is that Mr. Sullivan didn't conduct the kind

5     of appropriate analysis that was required under the

6     circumstances.  And so, he didn't discover some of these things

7     because of his intent to conceal, because of his reluctance to

8     hire an outsider.  So we do think it is relevant to proving to

9     the jury what happened because of that failure to conduct that

10    investigation.  We think it's independently relevant for the

11    reasons I mentioned a little earlier about informing the FTC's

12    ultimate decision making.

13         The fact that it did -- the FTC altered its settlement

14    documents with Uber as a result of the revelation of the 2016

15    data breach, and it's documents like this Mandiant report that

16    informed that resolution.

17         And I think lastly, on the parties' joint exhibit list,

18    there is a different Mandiant report.  So the defense has

19    stipulated to the admission of a different Mandiant report

20    that's narrower and later in time.  And from the Government's

21    perspective, if the narrower, later-in-time Mandiant report

22    should come in, so, too, should the January 2018 one that was

23    submitted to the FTC.

24         **THE COURT:**  When you're presenting the Mandiant

25    report, are you going to be pointing out the areas that

 1   Mr. Sullivan was aware of and the ones where you're saying that

 2   he was deficient in figuring out what was going on?

 3          **MR. DAWSON:**  Well, I think there's a level of detail

 4   in the Mandiant report that, first, is unclear whether the

 5   response team articulated the precise same level of detail.  So

 6   in a sense it shows the kind of, in effect, sloppiness of the

 7   investigation, failure to kind of holistically present and

 8   preserve information.

 9          There's certain references in the Mandiant report, I

10   believe -- I'll have to go back and check -- to information

11   that they could not determine because it had been so long since

12   the breach.  So it illustrates the kind of consequences of the

13   failure to conduct that deeper investigation earlier in the

14   time frame.

15          **MS. KERIN:**  And, Your Honor, Mr. Dawson is free, the

16   Government is free to draw that out by its own experts, by

17   additional witnesses who will -- who were involved in the

18   investigation.  But the Mandiant report is, again, commissioned

19   by Uber, multiple people working on it.  It's a three-month

20   analysis devoted to determining the causes and the information.

21   And it's just not relevant to the issues before the jury about

22   Mr. Sullivan's state of mind.

23          If there is evidence that there -- it was a slipshod

24   investigation, and we don't think the evidence will show that,

25   Mr. Dawson is free to bring that out with the witnesses who

1   actually conducted the investigation.

2       **MR. DAWSON:** And we will bring that out, as well.  I

3   think some of the -- I mean, I think part of the issue is that

4   in the course of the defense, we anticipate part of the defense

5   will be that Mr. Sullivan's and Uber's technical response was

6   extraordinary, it was thorough, it was well done.  And if

7   that's the case, showing the kind of work that had to be to be

8   done later to actually gather all of the relevant details,

9   provide them to the FTC, remains relevant, particularly to the

10  FTC'S ultimate decision making and to illustrating the

11  deficient nature of Defendant Sullivan's response to the

12  breach.

13      **THE COURT:** I'm inclined to allow it.  And it sounds

14  as though your cross-examination will bring out all of those

15  points.  I think there are several different ways that this

16  document may be admissible, and so I'm inclined to allow it.

17  And if there's some problem down the road, I'll try and deal

18  with it.

19      **MS. KERIN:** Thank you, Your Honor.

20      **THE COURT:** Thank you.

21      **MR. DAWSON:** Thank you, Your Honor.

22      **THE COURT:** All right.

23      **MR. DAWSON:** And in terms of procedure -- and this is

24  a good way to set the stage.

25      **THE COURT:** Yep.

PROCEEDINGS

1          **MR. DAWSON:**  Should we move in the batch of exhibits

2    and then there will be conditional reservations, or should we

3    move in the ones for which there are no objections?  How would

4    Your Honor like to proceed?

5          **THE COURT:**  I am happy to do it either way.  So if you

6    have the list that is -- that you've agreed on, I'm happy to

7    deal with that now.

8          **MS. KERIN:**  Your Honor, we're happy to move them all

9    in at this time, and we will object at the appropriate time,

10   and you'll know all the reasons why.  Thank you.

11         **THE COURT:**  Okay.  Perfect.

12         **MR. DAWSON:**  And I'd be happy to read the list.

13         **THE COURT:**  Please.

14         **MR. DAWSON:**  So Exhibits 260 -- and I apologize.

15   These are in the order of, in which they will admitted, so

16   they're not chronological by exhibit number.  Exhibit 260,

17   Exhibit 2, Exhibit 274, Exhibit 8, Exhibit 290, Exhibit 292,

18   Exhibit 295, 301, 304, 310, 316, 327, 20, 340, 159, 455, 537,

19   542, 563, 578, 580, 584, 704, 705, 223, 225, 639, 231, 652,

20   689, and 706.

21         **THE COURT:**  All right.  And so the understanding is

22   that they are admitted unless there's an objection; is that --

23         **MS. KERIN:**  Yes, Your Honor.  Thank you.

24         **THE COURT:**  Okay.  Great.  So I will -- so you can

25   move accordingly that way.

1    **MR. DAWSON:**  Okay.  Thank you, Your Honor.

2        One thing to flag for Your Honor, there was a last

3    exhibit, Number 640, which is in your binder, which the defense

4    pointed out there was an error in our list, so we anticipate

5    fixing that exhibit number on a break, and then maybe before

6    the jury comes back we can move in that replacement exhibit.

7        **THE COURT:**  Okay.  That's great.

8        It is my firm hope -- I don't know whether you've done it,

9    but it's my firm hope that we're not going to see duplicate

10   exhibits with different numbers.  So whatever you can do to

11   ensure that that's the case.

12       **MS. KERIN:**  The parties have worked really hard, Your

13   Honor, to ensure that.

14       **THE COURT:**  That's great.

15       You know, I just have to say, you guys are really a joy to

16   have in the court because of your ability to work with each

17   other and because you're good lawyers.  So I really appreciate

18   that a lot.

19       **MR. DAWSON:**  Thank you, Your Honor.  And I feel

20   compelled to flag, in terms of the lack of duplicate exhibit

21   numbers, we have Ms. Oakley to thank for the vast majority of

22   that work.  So I didn't want to suggest that the Government had

23   done that substantially on its own.  It was with great

24   assistance.

25       **THE COURT:**  Great.  Thank you very much.

1    All right.  So we had information that one of the jurors

2  was running late.  We'll see how everybody does and be back

3  here as soon as everybody's ready.

4    (Recess taken from 8:17 a.m. until 8:56 a.m.)

5         THE COURT:  Are we ready for the jury?

6         MR. DAWSON:  One very small administrative task.

7  Defense counsel pointed out an exhibit for Mr. Rossen I failed

8  to mention.

9         THE COURT:  Okay.

10        MR. DAWSON:  Just Exhibit 579, which the Government

11  would also move into evidence at this time.

12        THE COURT:  Okay.  Great.

13    All right.  Let's get the jury.

14    (Jury in at 8:57 a.m.)

15        THE COURT:  Great.  Please be seated, everybody.

16    Good morning, ladies and gentlemen.  Welcome.  I want to

17  tell you why everybody was standing up when you came in.  This

18  is in honor of your jury service.

19    The Court recognizes the importance of what you're doing

20  and how it -- the sacrifices that you make in order to fulfill

21  your responsibility as a citizen.  And so whenever you come

22  into the courtroom, we stand up.  You can sit down.  You can do

23  whatever you want to do, but we are standing for you.  So I

24  appreciate that you're here and we're now going to proceed with

25  the trial.

1        So, Ms. Davis, if you'd go to the camera, I'm going to

2   provide you with the preliminary instructions, which will

3   happen, and then the lawyers will make their arguments.

4        So, ladies and gentlemen, you're now the jury in this case

5   and I want to take a few minutes to tell you something about

6   your duties as jurors and to give you some preliminary

7   instructions.

8        At the end of the trial I'll give you more detailed

9   instructions, both orally and in writing, that will control

10  your deliberations.

11       When you deliberate, it will be your duty to weigh and to

12  evaluate all the evidence received in the case, and in that

13  process to decide the facts.  To the facts as you find them,

14  you will apply the law as I give it to you whether you agree

15  with the law or not.

16       You must decide the case solely on the evidence and the

17  law before you.

18       Perform these duties fairly and impartially.  You should

19  not be influenced by any person's race, color, religious

20  beliefs, national ancestry, sexual orientation, gender

21  identity, gender, or economic circumstances.

22       Also, don't allow yourself to be influenced by personal

23  likes or dislikes, sympathy, prejudice, fear, public opinion or

24  biases, including unconscious biases.  Unconscious biases are

25  stereotypes, attitudes, or preferences that people may

 1    consciously reject but may be expressed without conscious

 2    awareness, control, or intention.  Like conscious bias,

 3    unconscious bias can affect how we evaluate information and

 4    make decisions.

 5        This is a criminal case brought by the United States

 6    Government.  The Government charges the Defendant with

 7    violations of Title 18 United States Code Section 1505,

 8    obstruction of proceedings before a department or agency of the

 9    United States, and Title 18 United States Code Section 4,

10    misprision of felony.

11        The charges against the Defendant are contained in the

12    superseding indictment.

13        The superseding indictment simply describes the charges

14    the Government brings against the Defendant.  The superseding

15    indictment is not evidence and doesn't prove anything.  The

16    defendant has pleaded not guilty to the charges and is presumed

17    innocent unless and until the Government proves the Defendant

18    guilty beyond a reasonable doubt.

19        In addition, the Defendant has the right to remain silent

20    and never has to prove innocence or present any evidence.  To

21    help you follow the evidence, I'll now give you a brief summary

22    of the elements of the crimes that the government must prove to

23    make its case.

24        The elements of obstruction of proceedings before a

25    department or agency of the United States are:

PROCEEDINGS

1          First, there was a proceeding pending before a department

2     or agency of the United States;

3          Second, the Defendant was aware of the proceeding;

4          And, third, the Defendant intentionally endeavored to

5     corruptly influence, obstruct, or impede the pending

6     proceeding.

7          The elements of misprision of a felony are:

8          First, a federal felony was committed;

9          Second, the Defendant had knowledge of the commission of

10    that felony;

11         Third, the Defendant had knowledge that the conduct was a

12    federal felony;

13         Fourth, the Defendant failed to notify a federal authority

14    as soon as possible;

15         And fifth, the Defendant did an affirmative act as alleged

16    to conceal the crime.

17         The evidence you are to consider in deciding what the

18    facts are consists of:

19         First, the sworn testimony of any witness;

20         Second, the exhibits that are received in evidence;

21         And third, any facts to which the parties agree.

22         The following things are not evidence and you must not

23    consider them as evidence in deciding the facts of this case.

24         First, statements and arguments of the attorneys.

25         I'm going to underscore that, statements and arguments of

1   the attorneys are not evidence.

2        Second, questions and objections of the attorneys;

3        Third, testimony that I instruct you to disregard;

4        And, fourth, anything you may see or hear when the court

5   is not in session, even if what you see or hear is done or said

6   by one of the parties or by one of the witnesses.

7        Evidence may be direct or circumstantial.  Direct evidence

8   is direct proof of a fact such as testimony by a witness about

9   what that witness personally saw or heard or did.

10  Circumstantial evidence is indirect evidence; that is, it's

11  proof of one or more facts from which one can find another

12  fact.  You are to consider both direct and circumstantial

13  evidence.  Either can be used to prove any fact.  The law makes

14  no distinction between the weight to be given to either direct

15  or circumstantial evidence.  It's for you to decide how much

16  weight to give to any evidence.

17       There are rules of evidence that control what can be

18  received in evidence.  When a lawyer asks a question or offers

19  an exhibit in evidence and a lawyer on the other side thinks

20  it's not permitted by the rules of evidence, that lawyer may

21  object.  If I overrule the objection, the question may be

22  answered or the exhibit received.  If I sustain the objection,

23  the question cannot be answered or the exhibit cannot be

24  received.  Whenever I sustain an objection to a question, you

25  must ignore the question and must not guess what the answer

1    would have been.

2        Sometimes I may order that evidence be stricken from the

3    record and that you disregard or ignore the evidence.  That

4    means that when you're deciding the case, you must not consider

5    the evidence that I told you to disregard.

6        Only the lawyers and I are allowed to ask questions of

7    witnesses.  A juror is not permitted to ask questions of

8    witnesses.  If, however, you're unable to hear a witness or a

9    lawyer, or if your cameras aren't showing an exhibit that

10   should be shown to you, please raise your hand and I'll correct

11   the situation.

12       During the trial, I may need to take up legal matters with

13   the attorneys privately, either by having a conference at the

14   bench while the jury is present in the courtroom or by calling

15   a recess.  Please understand that while you're waiting, we are

16   working.  The purpose of these conferences is not to keep

17   relevant information from you but to decide how certain

18   evidence is to be treated under the rules of evidence and to

19   avoid confusion and error.

20       Of course, we will do what we can to keep the number and

21   length of these conferences to a minimum.  I may not always

22   grant an attorney's request for a conference.  I usually don't.

23   Do not consider my granting or denying a request for a

24   conference as any indication of my opinion of the case or what

25   your verdict should be.

1    In deciding the facts in this case, you may have to decide

2    which testimony to believe and which testimony not to believe.

3    You may believe everything a witness says or a part of it, or

4    none of it.  In considering the testimony of any witness, you

5    may take into account:

6    First, the witness's opportunity and ability to see or

7    hear or know the things testified to;

8    Second, the witness's memory;

9    Third, the witness's manner while testifying;

10    Fourth, the witness's interest in the outcome of the case,

11    if any;

12    Fifth, the witness's bias or prejudice, if any;

13    Sixth, whether other evidence contradicted the witness's

14    testimony;

15    Seventh, the reasonableness of the witness's testimony in

16    light of all the evidence;

17    And, eighth, any other factors that bear on believability.

18    You must avoid bias, conscious or unconscious, based on a

19    witness's race, color, religious beliefs, national ancestry,

20    sexual orientation, gender identity, gender, or economic

21    circumstances in your determination of credibility.

22    The weight of the evidence as to a fact does not

23    necessarily depend on the number of witnesses who testify about

24    it.  What's important is how believable the witnesses are and

25    how much weight you think their testimony deserves.

1        We all have feelings, assumptions, perceptions, fears, and

2    stereotypes about others.  Some biases we're aware of, and

3    others we may not be fully aware of, which is why they're

4    called implicit or unconscious biases.  No matter how unbiased

5    we think we are, our brains are hardwired to make unconscious

6    decisions.  We look at others and filter what they say through

7    our own personal experience and background.

8        Because we all do this, we often see life and evaluate

9    evidence in a way that tends to favor people who are like

10   ourselves or who have had life experiences like our own.

11       We can also have biases about people like ourselves.  One

12   common example is the automatic association of male with career

13   and female with family.  Bias can affect our thoughts, how we

14   remember what we see and hear, whom we believe or disbelieve,

15   and how we make important decisions.

16       As jurors, you're being asked to make an important

17   decision in this case.  You must, one, take the time you need

18   to reflect carefully and thoughtfully about the evidence.

19       Two, think about why you're making the decision you're

20   making and examine it for bias.  Reconsider your first

21   impressions of the people and the evidence in this case.  If

22   the people involved in the case were from different

23   backgrounds, for example, richer or poorer, more or less

24   educated, older or younger, or of a different gender, gender

25   identity, race, religion, or sexual orientation, would you

1    still view them and the evidence the same way?

2        Three, listen to one another.  You must carefully evaluate

3    the evidence and resist, and help each other resist any urge to

4    reach a verdict influenced by bias for or against any party or

5    witness.  Each of you have different backgrounds and will be

6    viewing this case in light of your own insights, assumptions

7    and biases.  Listening to different perspectives may help you

8    to better identify the possible effects these hidden biases may

9    have on decision making.

10        And four, resist jumping to conclusions based on personal

11    likes or dislikes, generalizations, gut feelings, prejudices,

12    sympathies, stereotypes or unconscious biases.

13        The law demands that you make a fair decision based solely

14    on the evidence, your individual evaluations of that evidence,

15    your reason and common sense, and these instructions.

16        I will now say a few words about your conduct as jurors.

17        First, keep an open mind throughout the trial and do not

18    decide what the verdict should be until you and your fellow

19    jurors have completed your deliberations at the end of the

20    case.

21        Second, because you must decide this case based only on

22    the evidence received in the case and on my instructions as to

23    the law that applies, you must not be exposed to any other

24    information about the case or to the issues it involves during

25    the course of your jury duty.  Thus, until the end of the case

1    or unless I tell you otherwise, do not communicate with anyone

2    in any way, and do not let anyone else communicate with you in

3    any way about the merits of the case or anything to do with it.

4         This restriction includes discussing the case in person,

5    in writing, by phone, tablet or computer, or any other means,

6    via email, via text messaging, or any internet chatroom, blog,

7    website, or application, including, but not limited to

8    Facebook, YouTube, Twitter, Instagram, LinkedIn, SnapChat,

9    TikTok, or any other forms of social media.

10        This restriction also applies to communicating with your

11   fellow jurors until I give you the case for deliberation.  And

12   it applies to communicating with everyone else, including your

13   family members, your employer, the media or press and the

14   people involved in the trial; although you may notify your

15   family and your employer that you've been seated as a juror in

16   the case and how long you expect the trial to last.

17        But if you're asked or approached in any way about your

18   jury service or anything about this case, you must respond that

19   you've been ordered not to discuss the matter.  In addition,

20   you must report the contact to the Court.

21        Because you'll receive all the evidence and legal

22   instruction you properly may consider to return a verdict, do

23   not read, watch, or listen to any news or media accounts or

24   commentary about the case or anything to do with it, though I

25   have no information that there will be news reports about the

 1  case.

 2      Do not do any research such as consulting dictionaries,

 3  searching the internet or using reference materials, and do not

 4  make any investigation or in any other way try to learn about

 5  the case on your own.

 6      Do not visit or view any place discussed in this case.  Do

 7  not use the internet or any other resource to search for or

 8  view any place discussed during the trial.

 9      Also, do not do any research about the case, the law or

10  the people involved, including the parties, the witnesses or

11  the lawyers, until you've been excused as jurors.  If you

12  happen to read or hear anything touching on this case in the

13  media, turn away and report it to me as soon as possible.

14      These rules protect each party's right to have this case

15  decided only on evidence that's been presented here in court.

16      Witnesses here in court take an oath to tell the truth and

17  the accuracy of their testimony is tested through the trial

18  process.  If you do any research or investigation outside the

19  courtroom or gain any information through improper

20  communications, then your verdict may be influenced by

21  inaccurate, incomplete or misleading information that has not

22  been tested by the trial process.

23      Each of the parties is entitled to a fair trial by an

24  impartial jury.  And if you decide the case based on

25  information not presented in court, you will have denied the

1    parties a fair trial.  Remember, you've taken an oath to follow

2    the rules and it's very important that you follow these rules.

3    A juror who violates these restrictions jeopardizes the

4    fairness of these proceedings and a mistrial could result that

5    would require the entire trial the process to start over.  If

6    any juror is exposed to any outside information, please notify

7    the court immediately.

8         At the end of the trial, you'll have to make your decision

9    based on what you recall of the evidence.  You will not have a

10   written transcript of the trial.  So I urge you to pay close

11   attention to the testimony as it's given.

12        If you wish, you may take notes to help you remember the

13   evidence.  If you do take notes, please keep them to yourself

14   until you and your fellow jurors go to the jury room to decide

15   the case.  Do not let note taking distract you from being

16   attentive.  When you leave court for recesses, your notes

17   should be left in the jury room; no one will read them.

18        Whether or not you take notes, you should rely on your own

19   memory of the evidence.  Notes are only to assist your memory.

20   You should not be overly influenced by your notes or those of

21   your fellow jurors.

22        The next phase of the trial will now begin.

23        First, each side may make an opening statement.  An

24   opening statement is not evidence.  It's simply an outline to

25   help you understand what that party expects the evidence will

1 show.  A party is not required to make an opening statement.

2  The Government will then present evidence and counsel for

3 the Defendant may cross-examine.  Then, if the Defendant

4 chooses to offer evidence, counsel for the Government may

5 cross-examine.

6  After the evidence has been presented, I will instruct you

7 on the law that applies to the case and the attorneys will make

8 closing arguments.  After that you will go to the jury room to

9 deliberate on your verdict.

10  So, ladies and gentlemen, those are the preliminary

11 instructions.  At the end of the case I'll give you more

12 substantive instructions, but now it's time for the opening

13 statements, and the Government goes first.

14  Mr. Dawson.

15   **MR. DAWSON:**  Thank you, Your Honor.

16     **OPENING STATEMENT**

17 **BY MR. DAWSON**

18  Good morning, ladies and gentlemen.  This is a case about

19 a coverup, about a payoff, and about lies.

20  In October and November of 2016, hackers stole tens of

21 millions of user records from Uber Technologies.  It was theft

22 on a massive scale.  In the wake of that theft, two hackers

23 reached out to Defendant Joe Sullivan anonymously.  At the time

24 Defendant Sullivan was the chief security officer for Uber.

25  After realizing the gravity of what had happened,

1  Defendant Sullivan chose to pay those hackers $100,000, the

2  amount they had demanded in order to buy their silence.

3      The evidence will show that Defendant Sullivan paid

4  handsomely for their silence, because at that very moment the

5  Federal Trade Commission, an agency charged with protecting

6  consumer privacy, was investigating Uber's data security

7  practices and programs, including a very similar breach that

8  happened about two years prior.

9      And more than that, the evidence will show that ten days

10  before Defendant Sullivan received that anonymous email, he sat

11  for a deposition, which is sworn testimony, in the FTC

12  proceeding, November 4th, ten days before receiving the email.

13      For hours the Defendant testified under oath about all the

14  things that Uber had done in his tenure to make sure that this

15  kind of theft, the kind of theft that happened in 2014, didn't

16  happen again, only to learn ten days later that it hadn't

17  worked.

18      But rather than disclose the breach to the FTC, rather

19  than tell federal law enforcement, rather than tell the users

20  whose data had been stolen, Defendant Sullivan chose to cover

21  it up.

22      Defendant Sullivan's efforts worked for months.  And it

23  wasn't until a new management team arrived in 2017 that they

24  started to put the pieces together.

25      When they did so, rather than tell the truth about what

1    had happened, Defendant Sullivan lied.  He lied about his role

2    in the hack response.  He lied about the gravity of the hack

3    itself, and he blamed his staff.

4         The story of this coverup begins on November 14th, 2016.

5    At 12:23 p.m. Pacific time, Defendant Sullivan got an email.

6    The email was short, one sentence long.  The sender identified

7    himself only as John Doughs, with the email address

8    johndoughs@protonmail.com.  The email said, quote:

9              "Hello, Joe.  I have found a major vulnerability in

10   Uber.  I was able to dump Uber database and many other things."

11        At the time Defendant Sullivan got this email, he worked

12   as the chief security officer at Uber Technologies, which is a

13   technology company located right here in San Francisco.

14        As the chief security officer, Defendant Sullivan had

15   broad responsibilities.  He reported directly to the CEO, and

16   he had dozens of people reporting up through the chain to him.

17   He had a team responsible for physical security, for trust and

18   safety, and, of relevance in this case, a team of engineers

19   working on cybersecurity.

20        He and his teams were responsible for, among other things,

21   safeguarding user data in Uber's possession.

22        Defendant Sullivan was no novice in the security industry

23   at this time.  Instead, he was considered an expert.  And

24   you'll hear testimony from a number of witnesses on that point.

25   Defendant Sullivan worked in the industry for many years and

1   for many different companies.  Before Uber he had been the

2   chief security officer at Facebook.  Before Facebook, he worked

3   for PayPal.  Before PayPal, he worked for eBay.  And before

4   that Defendant Sullivan worked for the Department of Justice as

5   an Assistant United States Attorney focusing on computer

6   hacking and intellectual property crimes.

7       Back to the November 14th email.  Emails like this were

8   not unheard of.  Sometimes, maybe even usually, they turned out

9   to be nothing.  Not everything said in emails from anonymous

10   sources named John Doughs turn out to be true, but sometimes it

11   is.

12       Defendant Sullivan got this email and a few minutes later

13   he directed it to his team to check it out.  Ultimately, an

14   engineer named Rob Fletcher, who we anticipate you'll hear from

15   in this trial, was asked to follow up.  Rob did so.  Over the

16   subsequent hours and days, Rob and the hacker, Rob and John

17   Doughs, had a back-and-forth email correspondence.

18       At first Rob didn't think anything would come of it.  He

19   told his supervisor that he thought it was almost certainly

20   nothing, but before long, that changed.

21       Ladies and gentlemen, the evidence will show that John

22   Doughs was not bluffing.  As Rob and his colleagues started to

23   investigate, they realized that whoever John Doughs was, he was

24   somehow in possession of vast stores of user data from Uber

25   Technologies.  This included internal data, including personal

1  information relating to a huge number of those users.

2      When it became clear just what John Doughs had, a team of

3  engineers gathered together, some in person, some joined by

4  videoconference, in order to figure out what had gone wrong.

5  Defendant Sullivan took charge.  He took control of the

6  response, he directed his teams, he asked questions, and he

7  planned the next steps.

8      Over the next few days, Sullivan's security response team

9  worked long hours investigating.  Ultimately, they discovered

10 that John Doughs, whoever that was, had used a two-step attack

11 in order to gain access and to download users' data.

12     Over the course of this trial you're going to be exposed

13 to a number of technical concepts of certain websites and

14 services.  Some of you may be familiar with them, some of you

15 may not.  And one of our tasks in the trial is going to be to

16 use the witnesses and the evidence to educate you and to give

17 you a crash course in some of those concepts and some of the

18 evidence that will be important to your assessment in this

19 trial.

20     To start at a high level, I want to talk about this

21 two-step attack and what the evidence will show.

22     First, the engineers discovered that the hacker had used

23 stolen password combinations to access a website called GitHub.

24 If you're not familiar with GitHub, it's a website you'll hear

25 more about at the trial, but it's a website used by software

 1  developers to store and to share software code.

 2      John Doughs was able to use stolen password combinations

 3  in order to get onto GitHub and find some of Uber's software

 4  code.  That was the first step.

 5      The second step, John Doughs found a special kind of

 6  password written into that code.  The password unlocked data

 7  that Uber had stored on something called Amazon Web Services.

 8  You may be familiar with Amazon from other contexts, but you'll

 9  also hear that they provide services to companies like Uber,

10  one of which is called S3.  If you're familiar with DropBox,

11  it's similar to a way of storing data on the cloud using Amazon

12  Web Services.

13      John Doughs used the special password he found on GitHub,

14  and he used it to access Uber's data stored on Amazon Web

15  Services.  Once there, he found a set of files that included

16  vast information about Uber users, about drivers, and he took

17  them.

18      The evidence in this case will show that in the

19  cybersecurity industry, a theft of user data is a big deal, but

20  for Uber in November of 2016, a potential data breach like this

21  was an even bigger deal.

22      At that moment a federal agency called the Federal Trade

23  Commission, also known as the FTC, was investigating Uber for

24  how it kept, maintained and protected user information in its

25  possession.  The FTC's job is to protect consumers, and the

1   FTC's division of privacy and identity protection had begun an

2   investigation into Uber, partially in response to an earlier

3   hack that Uber had suffered in 2014.

4        That FTC investigation looked broadly at Uber's

5   cybersecurity practices.  As part of the investigation the FTC

6   demanded exhaustive information from Uber about those

7   practices, information about the prior 2014 data breach, what

8   had happened in that breach, about unauthorized access to data,

9   about how Uber protected personal information about its users.

10       By November 14th of 2016, nobody knew more about the FTC's

11  investigation at Uber than Defendant Sullivan.  As I mentioned

12  earlier, ten days before receiving that email on November 14th,

13  ten days earlier, Defendant Sullivan sat for a deposition, for

14  sworn testimony under oath in the FTC proceeding.

15       For hours he testified about the details of what Uber had

16  done to protect user information, about measures it had taken

17  from the weight of the 2014 breach to make sure that didn't

18  happen again.

19       And it wasn't just that testimony.  It wasn't just one

20  day.

21       The evidence will show that from Defendant Sullivan's

22  first days at the company, he was involved in Uber's response

23  to the FTC investigation.  In the spring of 2016, Defendant

24  Sullivan flew to Washington, D.C., with some of his colleagues

25  to make a presentation to the FTC.

1        You'll hear about that presentation later today from Ben

2   Rossen, who was an attorney working for the FTC on that

3   investigation.  You'll hear that at the presentation Defendant

4   Sullivan and one of his direct reports, John Flynn, explained

5   all the improvements Uber had made to its security practices in

6   recent years.

7        The evidence will show that Defendant Sullivan knew that

8   the 2016 breach, the November 2016 -- sorry -- October and

9   November 2016 breach was exactly the kind of event that the FTC

10  wanted to know about.  Not only was it an outsider stealing

11  user data, it was remarkably similar to the breach the company

12  had suffered in 2014, only 2016 the breach was much, much

13  bigger.

14       I talked earlier about the two-step approach the hackers

15  used in 2016 to access the data, as you see on the slide, a

16  quick comparison of what happened in 2014 and what happened in

17  2016.  And over the course of the trial, you'll see exhibits

18  and you'll hear testimony about both of these breaches and

19  about some of these similarities.  In both, the attacker

20  accessed GitHub.  In both, the attacker found an Amazon Web

21  Services password.  In both, the attacker downloaded sensitive

22  data.

23       Now, there were some differences.  In 2014 the code that

24  was used was posted publicly.  It was in a form of GitHub

25  called a GIS, which was publicly accessible; whereas, in 2016

 1   it was hidden behind a password.

 2        But as you heard, the attackers in 2016 used a stolen

 3   password combination to break through that and to find the

 4   software code.

 5        The evidence will show that the 2016 data breach was a

 6   disaster for Uber and a disaster for Defendant Sullivan, who

 7   had days earlier testified under oath to the FTC about all the

 8   improvements on his watch.

 9        So rather than tell the FTC or to tell law enforcement or

10   any of the consumers whose data had been stolen, the evidence

11   will show Defendant Sullivan did what he could to make sure

12   none of them would ever learn about what had happened.

13        Now, how did he cover it up?

14        The evidence will show that he did so in a comprehensive

15   and calculated way.

16        First, he orchestrated the $100,000 payment to the hackers

17   in exchange for their silence.

18        Second, the hackers' promise to stay quiet was in a

19   non-disclosure agreement defended -- drafted by Defendant

20   Sullivan and a member of his team.  The agreement falsely

21   stated that the hackers, quote, did not take or store data,

22   which Sullivan knew was false.  The evidence will show that

23   this falsehood covered up the fact that the hackers had, in

24   fact, stolen user data and personal information on tens of

25   millions of Uber users.

1        Third, the Defendant lied to his team, claiming he was in

2   touch with Uber's executive team.  Instead, you'll hear

3   evidence only of cryptic communications with Uber's CEO at the

4   time.  You'll hear testimony from the general counsel at the

5   time, Sallie Yoo, that despite having regular meetings with

6   Defendant Sullivan in this time frame, Defendant Sullivan never

7   told her about the 2016 breach.  And that happened despite the

8   fact that Defendant Sullivan himself at the time held the title

9   of deputy general counsel for the company.

10       Fourth, the Defendant directed that the payoff to the

11  hackers be processed through Uber's Bug Bounty program, which

12  I'll talk more about later and you'll hear evidence about

13  during the trial.

14       This program existed for responsible researchers to report

15  flaws in software code, but which by the clearly written terms

16  of Uber's own program did not apply to an outsider who hacked

17  into Amazon Web Services and dumped user data.

18       Moreover, you'll hear evidence that the payment in this

19  case, the $100,000, not only was it the biggest payment by far

20  Uber had ever paid through the Bug Bounty program, it wasn't

21  even processed through the normal public Bug Bounty program.

22  Instead, Defendant Sullivan's staff directed the creation of a

23  private Bug Bounty program separate from the public one to

24  process this payment.

25       Fifth, for months following November 2016, Defendant

1    Sullivan continued to work with Uber's in-house legal team on

2    the FTC response.  The evidence will show the investigation was

3    ongoing.  Defendant Sullivan never once told the attorneys

4    representing Uber in that investigation what had happened.

5         Defendant Sullivan responded to emails.  He was invited to

6    review submissions to the FTC.  He reviewed and signed off on a

7    letter to the FTC in the spring of 2017 asking the FTC to close

8    its investigation.  When the FTC said no, Defendant Sullivan

9    participated in settlement negotiations, he reviewed drafts of

10   certain documents and paperwork going back and forth between

11   Uber and the FTC to settle the case, or settle the

12   investigation.

13        At no point in the course of these dealings did he tell

14   the relevant legal team or the FTC that Uber had suffered

15   another serious breach of personal data, a data breach that any

16   person aware of what the FTC was investigating would know would

17   be of great concern to the FTC.

18        Sixth, when information about the 2016 data breach

19   surfaced to Uber's new management in late 2017, starting around

20   August, including to the new CEO, Defendant Sullivan lied about

21   it.  Instead of telling the truth, he minimized what had

22   happened, he lied about his role in the response, and he blamed

23   others for what he had done.

24        Ladies and gentlemen, the evidence will show that

25   Defendant Sullivan took a variety of steps to conceal and to

 1  withhold the existence of the data breach from the FTC.  And in

 2  so doing, he did something else as well:  He unlawfully covered

 3  up the hacker's crime.

 4      Now, before I continue, I do want to take a moment to just

 5  introduce our team here.  I know we introduced ourselves

 6  quickly yesterday, but today it's fresh.  Yesterday was long,

 7  and I wanted to make sure we at least got our names out there.

 8  We'll be spending a fair amount of time together in the next

 9  couple of weeks.

10      My name is Andrew Dawson.  I am an Assistant United States

11  Attorney here.  I'm one of the attorneys for the United States.

12  My colleague here is Ben Kingsley, another Assistant United

13  States Attorney.  With us at our table we have Mario Scussel

14  and Welton Pollard, who are two special agents with the FBI who

15  have been working on this investigation.

16      As I mentioned a little earlier, one of the challenges in

17  this case is going to be some of the technical information that

18  may not be familiar to some of you.  As I mentioned, we plan to

19  introduce evidence as we go along in the hope of educating and

20  ensuring that you have the information and evidence you need to

21  do your job in this case.

22      I expect one of the most helpful ways to get familiar with

23  relevant technical concepts is going to be learning about what

24  exactly the FTC was investigating at Uber in this time frame.

25  So let's talk about that a little bit.

1       The FTC's investigation began in 2014.  At first it
2   focused on employee access to data.  But within a few months it
3   was broadened to include an investigation into Uber's data
4   security program and practices.
5       So we'll go through a little bit of a timeline about that
6   investigation.
7       March 12th, 2015, you'll hear a little more about this
8   later today, the FTC told Uber that the FTC was investigating
9   Uber's data security program and practices.
10      Two months later, on May 21st, 2015, the FTC issued what's
11  known as a civil investigative demand or a CID.  You'll hear
12  about the CID, which is sort of similar to a subpoena.  It's
13  the way that the FTC gathers evidence for its investigations.
14  And within the CID there are a bunch of different components,
15  one of which I wanted to focus on now.  They're called
16  interrogatories.
17      The FTC CID had a series of interrogatories, which is a
18  fancy lawyer word for questions.  You'll see these, they were
19  questions posed to Uber that over the course of subsequent
20  months Uber answered in written form, which you'll see Uber
21  answered a variety of questions about how it was safeguarding
22  consumer data, about things like encryption.  Of relevance
23  here, one of the questions asked for information about any
24  breach that the company suffered.
25      You'll hear evidence about, in the course of the

1  investigation, Uber disclosed to the FTC other smaller

2  incidents along the way.

3      You'll hear that there was a focus on something called

4  access controls.  Access controls mean how a company might

5  limit how many employees have access to sensitive user data.

6      You'll hear about a focus on encryption, which is a way of

7  locking down data and making it harder to read.

8      May 26, 2015, Defendant Sullivan received a copy of this

9  CID.  He had only recently joined the company and from those

10  early days he was let into the company's response to the FTC

11  investigation.

12      Over the coming months, through the middle to the end of

13  2015, the company responded to these questions, to these

14  interrogatories over a period of time.  July 31st, Uber

15  provided written details about the 2014 data breach to the FTC.

16  You'll hear more about that response later today.

17      The next month, August 27th, Uber gave details about other

18  breaches to the FTC, and one thing you'll hear is that the

19  notion of a breach has different definitions in different

20  contexts, but the FTC provided a specific and defined

21  definition of the term for purposes of this investigation in

22  the CID.

23      The next month, December 25th, 2015, Uber described its

24  use of Amazon Web Services to the FTC.  As I mentioned earlier,

25  that's the cloud provider that in 2014 and 2016 had been

1    breached and an outsider had downloaded Uber's data.  That same

2    month, in the same document, Uber described its use of

3    encryption to protect user data.

4        Moving into 2016.  On March 23rd, 2016, Defendant Sullivan

5    and others from Uber flew to Washington, D.C., to make a

6    presentation to FTC staff.  Later this morning, as I think I

7    mentioned earlier, you'll hear from Ben Rossen, who was an

8    attorney representing the FTC in that investigation.  He'll

9    explain to you that Defendant Sullivan and his colleagues went

10   through a presentation explaining all of the improvements the

11   company had made since the 2014 breach to protect user data.

12       You'll also hear about the November 4th deposition which

13   took place in San Francisco and Defendant Sullivan testified

14   under oath in the FTC proceedings about a variety of

15   cybersecurity topics that had come up in the FTC's

16   investigation.

17       You'll hear from Mr. Rossen and you'll see portions of a

18   transcript of that deposition as Mr. Sullivan is explaining

19   access controls, explaining encryption, explaining how the

20   company had begun encrypting certain database backups, about

21   how the company was working to ensure that secret passwords

22   like the one exploited by the hackers wouldn't be left in code.

23   You'll hear about something called Langley, a system developed

24   in order to ensure that such a thing wouldn't happen.

25       Ten days after that testimony, ten days after the

1  Defendant spent much of a day testifying under oath to the FTC,

2  he got that email from John Doughs.  It had happened again.

3  Over the course of the trial, you'll hear from a number of

4  individuals who participated in the response and investigation

5  of the 2016 breach, and you'll see contemporaneous documents of

6  the engineers working on this problem, working to figure out

7  what had happened, how to get the hackers out of Uber's

8  systems.

9      Central among these documents is something called the

10 Preacher Central Tracker.  The Preacher Tracker was a sort of

11 living document during the response.

12     Why Preacher?  You'll hear that Preacher was a nickname

13 used by the team to refer as a shorthand to this incident.

14     Engineers used the document to record their investigation,

15 to record progress, questions, anomalies, what they were

16 working on, what they were finding out.  The document's about

17 30 pages long and you'll see a series of updates over time as

18 the engineers are working through to figure out what had

19 happened, what the hackers had stolen and how they had stolen

20 it.

21     More importantly, the Preacher tracker is part of how you

22 will know what Defendant Sullivan was thinking at the time.  At

23 multiple points in the response the tracker records questions

24 from Defendant Sullivan, directives, observations.  It's a

25 realtime record of Defendant Sullivan recognizing that what had

1   just happened was a big problem for the FTC investigation.

2       A few of these comments I'll pull out here just to give

3   you an idea.  One of the things you'll see is the investigation

4   over time starts and stops, theories investigated, theories

5   debunked, more and more learned over time.  The engineers are

6   asking:  What is the worst data in there?  Backup of locket

7   database, backup of the user table.  We have not yet seen trip

8   data.

9       Next:  What was in this bucket that could have been

10  exposed?  All rider, partner and driver information from

11  July 2015 back to the beginning, including things like email,

12  first -- first name, last name, telephone, a variety of things

13  could have been in there.

14      You'll also see comments attributed directly to Defendant

15  Sullivan:  Information is extremely sensitive and we need to

16  keep this tightly controlled.  Discussion with other engineers

17  must be tightly controlled.  Joe is communicating directly to

18  the A team.

19      As we talked about earlier, Defendant Sullivan was not

20  communicating directly to the A team.  The A team, as you'll

21  hear, is comprised of the company's executives that included

22  the general counsel and a variety of other people.  We

23  anticipate the evidence will show only a series of cryptic

24  communications with the CEO, but critically not with the

25  general counsel for the company.

1    You'll also see in the tracker this comment:

2    (As read):  Joe, this may also play very badly based on

3    previous assertions.

4    Ten days earlier Defendant Sullivan had testified about

5    the assertions Uber had made to the FTC about encryption, about

6    access controls, about a variety of topics directly implicated

7    by the November 2016 breach.

8    (As read):  Task was to rotate keys within S3 to ensure

9    this could not happen in the future, but there are thousands of

10   tasks.  Joe was just deposed on this specific topic and what

11   the best or minimum practices that any company should follow in

12   this area.

13   The connection was made between this breach and

14   Mr. Sullivan's deposition ten days earlier.

15   Rotating keys is something you'll hear about as well.

16   Keys is another word for passwords or credentials.  You'll hear

17   a variety of different terms to refer to these things.  S3 is

18   the name of the specific Amazon Web Services service that was

19   accessed both in 2014 and in 2016 to acquire data.

20   You'll also see in a Preacher Central Tracker the origins

21   and the beginnings of what became a nondisclosure agreement

22   that was proposed to the hackers.

23   (As read):  Joe, the intent is to resolve this issue in a

24   complete manner.

25   You'll also note there's some typos in the course of this

OPENING STATEMENT / DAWSON

1   document which was drafted presumably quickly.

2        (As read):  We need to frame what exactly resolution will

3   be.  Renames will be -- must be used for all involved.  We must

4   confirm that they have to delete any data acquired.

5   Nondisclosure agreement short but clearly no potential to

6   disclosed in the future.

7        And sure enough, you'll see evidence of a nondisclosure

8   agreement sent to the hackers that obligated them to stay quiet

9   in exchange for the $100,000.

10        You'll see a variety of copies of this nondisclosure

11   agreement signed in different names.  This version here you'll

12   see is dated November 18th, 2016, signed by none other than

13   John Doughs.  You'll see other versions with different names

14   along the timeline.

15        For now I wanted to highlight one component, one provision

16   in this nondisclosure agreement.  Under the "Your Promises"

17   section, it states:

18            "You promise that you did not take or store any data

19   during or through your research and that you have delivered to

20   us or forensically destroyed all information about and/or

21   analyses of the vulnerabilities."

22        Why the false language?  The evidence will show the

23   hackers knew they had taken data.  The evidence will show that

24   Uber's response team knew the hackers had taken data; that was

25   the whole problem.  The evidence will show that the NDA, the

**OPENING STATEMENT / DAWSON**

1  nondisclosure agreement, was a critical step in the cover-up of

2  the November 2016 data breach.  This language made the incident

3  fit more cleanly into what's known as a Bug Bounty program,

4  which the Defendant used to pay the hackers their demanded

5  $100,000.  By processing the hackers' $100,000 payment through

6  a Bug Bounty program, which was by far the largest bounty ever

7  paid through the program, Defendant Sullivan made it look more

8  like a normal security vulnerability and less like a serious

9  data breach.

10      The evidence will show that by classifying the event as a

11  Bug Bounty, Defendant Sullivan made sure the breach wouldn't

12  draw undue attention.  And, sure enough, it ultimately didn't.

13      As I mentioned earlier, there were a lot of engineers

14  working on the response.  Word that something serious was going

15  on had started to leak out to certain people within the

16  company.  A number of people were aware that something was

17  going on, even if they didn't know quite what.  But once the

18  matter had been classified as a Bug Bounty, the evidence will

19  show the attention died down.

20      Uber ultimately paid the hackers $100,000 in December of

21  2016, but Defendant Sullivan had another problem.  He didn't

22  know who they were.  The person using the John Doughs email

23  account had sent signed versions of the NDA but not in the true

24  name of any person involved.  What came next was a feverish

25  effort to track down and find the hackers responsible and to

1    get them to sign in their true names.

2        You'll hear evidence that Mat Henley, who worked directly

3    for Defendant Sullivan, was ultimately able to identify the two

4    hackers.  Henley sent somebody to interview them, one in

5    Florida, one in Canada.  By early January, both hackers had

6    once again signed the nondisclosure agreements.

7        In the course of this trial, you'll hear from one of the

8    hackers.  You'll hear from John Doughs himself, who turns out

9    to be a man named Vasile Mereacre.

10        Mr. Mereacre will testify and explain to you how he hacked

11    Uber's data; how he and associate got paid $100,000; how he

12    extorted the company; and he'll also explain to you that when

13    Defendant Sullivan's staff interviewed him in January 2017, the

14    interview told -- interviewer told him that only a few people

15    at Uber knew exactly what they had done.

16        Now, in between the November 14th email and the execution

17    of the NDAs in real name in January 2017, the FTC investigation

18    continued.

19        Defendant Sullivan personally participated in a variety of

20    emails with the Uber lawyers working on the investigation.  The

21    primary in-house lawyer is a woman named Sabrina Ross who we

22    anticipate you'll hear from in the course of the trial.  In

23    none of these emails did Defendant Sullivan hint at the fact

24    that the company had suffered another data breach and had to

25    pay $100,000 to quiet it down.

1      You'll hear as time went on in 2017, Defendant Sullivan

2  received an email from Sabrina Ross, who I mentioned earlier.

3  Sabrina Ross was proposing that the company send a letter to

4  the FTC requesting that the investigation be closed.  The email

5  itself:

6      (As read):  I recommend sending this letter to the FTC

7  next week urging closing of its 2.5-year privacy security

8  information in to Uber.  In essence, we argue:

9      One, Uber's record of cooperation and engagement with FTC

10  staff over the last 28 months has been exemplary.

11      Two, even before the receipt of compulsory process, Uber

12  came forward to provide information on a voluntary basis and

13  has provided exhaustive information to staff.

14      Three, the data security incidents at issue reflect no

15  misdirected priorities, no failure to appreciate risks, and no

16  lack of data security, knowledge or care.  In other words,

17  nothing to see here.

18      Defendant Sullivan responds:

19      (As read):  Letter looks okay to me.  Thanks.

20      No reference to the breach, no reference to the hackers,

21  no reference to the payoff.

22      You'll learn that despite the letter that was ultimately

23  sent, the FTC did not close its investigation, but instead

24  started discussing settlement terms with Uber.  Defendant

25  Sullivan was involved in the settlement negotiations, providing

1    extensive comments on some of the paperwork.  I also expect

2    you'll hear testimony that when it came time for the company to

3    decide whether to settle with the FTC, Defendant Sullivan said

4    yes.

5        You'll hear that in the summer and spring of 2017, the

6    paperwork was getting finalized.  By July it was finalized.

7    But you'll hear the way the FTC works, even when the paperwork

8    is finalized, it takes time for the Commission, the agency

9    itself, to authorize and finalize the settlement agreement.

10       Ben Rossen will explain to you why that is and how long it

11   took.  And he'll explain to you that -- or other evidence will

12   show that while the company and the FTC was waiting for that

13   settlement to become final, a new CEO arrived at Uber and he

14   started asking questions.

15       You will hear about a series of interviews starting in

16   August 2017 initially focused on other issues in the security

17   group.  But the interviewers started asking questions about

18   something called Preacher.

19       In September 2017 the new CEO asked Sullivan for a summary

20   of the incident.  In response, Sullivan lied.  You will hear

21   and see an email on September 20th, 2017, from Joe Sullivan to

22   Dara Khosrowshahi.  We anticipate you'll hear from

23   Mr. Khosrowshahi, then the CEO and still today the CEO at Uber

24   about this email.

25       A few points for now.  A little bit of the summary at the

1   top.

2        Between October 13th, 2016, and October 15th, 2016, an

3   unauthorized party gained access to Uber employee GitHub

4   accounts, scanned them for AWS credentials, and then used those

5   credentials --

6        (Reporter requests clarification.)

7             **MR. DAWSON:**  And then used those credentials to access

8   AWS buckets that contained backup cold storage copies of some

9   rider and user data.  Remember the NDA.  The language in the

10  NDA made it sound like nobody had taken any data.  The email to

11  Uber's new CEO makes it sound like nobody had taken any data.

12  And look at the graph down below, the box in the middle:

13       (As read):  We then reached out directly to him and

14  confirmed we would only pay the bounty if he signed the

15  documents in his real identity and that we were sending someone

16  to interview him immediately.  He fully cooperated.

17       That was not true.  The hackers in this case were paid

18  before they were identified.  They were paid in December and

19  they weren't identified until January.

20       The last box:

21       (As read):  We only paid a bounty through the company's

22  Hacker One Bug Bounty program when we were confident the matter

23  was resolved with no harm to users.  We have paid out well over

24  a million dollars in the last year and a half.

25       The evidence will show they paid the bounty before they

 1    even knew who the hackers were.

 2         After this email you'll hear evidence about two more

 3    interviews with Defendant Sullivan, one later in September and

 4    one in October.  More lies.  Defendant Sullivan lied and

 5    claimed he had nothing to do with the drafting of the

 6    nondisclosure agreement.  He claimed he wasn't involved in

 7    assessing whether hackers stole personal information.  I

 8    apologize for the typo.  And, lastly, he blamed his staff.

 9         The evidence will show that Defendant Sullivan knew

10    exactly what he had done.  He had covered up a data breach, he

11    had covered up a crime, and he had obstructed the Federal Trade

12    Commission's effort to safeguard user data.

13         Ladies and gentlemen, at the end of this trial, the Judge

14    will instruct you on the elements of the two offenses with

15    which the Defendant has been charged.  After that, it will be

16    your task to weigh the evidence and to come to a verdict.

17    Based on the evidence we anticipate introducing in the coming

18    days, we will ask you to define -- to find the Defendant guilty

19    beyond a reasonable doubt to both charges against him.  Thank

20    you very much.

21         THE COURT:  Mr. Angeli.

22         MR. ANGELI:  Your Honor, could we have just a moment

23    to get our technology swapped out?

24         THE COURT:  Absolutely.

25         (Pause in proceedings.)

<u>OPENING STATEMENT</u>

**BY MR. ANGELI**

Good morning.

What this case is really about is a security professional who worked around the clock under enormous pressure to protect people's data.  A security professional who did not hide what had happened in 2016, and now the Government is second guessing him.

You're going to hear that when Joe Sullivan learned in November of 2016 that someone had gotten access to Uber's computer systems, one of the very first things he did was to notify the chief executive officer of the company.  And, of course, the CEO is the guy at the very top.  He's the leader of that A team that Mr. Sullivan referred to.  And he is the person who has the ear of everyone else at the company.

And as you'll hear, that's really important because in situations like this, lots of people have a job to do, and Mr. Sullivan made sure that Uber's legal department knew all about this incident too.  Because as you're going to hear, at Uber it was the legal department's responsibility to advise as to whether matters like this needed to be reported to agencies like the FTC.

That's what Uber's formal policies like this said, and it's the way things actually worked at the company, too.

Deciding on reporting requirements was the legal

1   department's responsibility.

2        And while the legal department was doing its job,

3   Mr. Sullivan, who was Uber's chief security officer, was doing

4   his.  He was leading a team of world-class security

5   professionals to investigate what had happened, to make sure

6   the problems had been fixed, and that the data was safe.  And

7   as you'll hear, there was a couple of dozen world-class

8   security professionals working on that project.

9        And the evidence will show that in the end, that team

10  reported to Mr. Sullivan that the problems had been fixed and

11  that the data was safe; that there wasn't a risk that that data

12  had made it out into the public domain where somebody might do

13  something bad with it.  And based on the advice that Uber's

14  lawyer had given to the team, they considered this matter

15  closed.  Mr. Sullivan had done his job.

16       So why are we here?  As Mr. Dawson said, the FTC had been

17  investigating another incident, a data breach that had happened

18  at Uber way back in 2014 -- excuse me -- and that's before

19  Mr. Sullivan's time.  And it turns out that the FTC wasn't told

20  about this 2016 incident.  Why?  We don't know why the FTC

21  wasn't told.

22       But what we do know and what the evidence will show is

23  that Uber's legal department had available to it all of the

24  information it needed to do its job, its job of advising as to

25  whether this incident needed to be reported.  And the evidence

1   will also show that whatever the reason why the FTC didn't

2   learn about this incident, it isn't because Mr. Sullivan was

3   concealing or obstructing something, which is what the

4   prosecution wants you to believe.

5       And I want to stop here for a minute because this is a

6   really important point for you to keep in mind as you hear the

7   evidence in this case.

8       This case is not about whether Mr. Sullivan did or didn't

9   tell one particular person or another about this incident; this

10  or that member of the A team, for example.  It isn't even

11  really about whether this issue should have been disclosed or

12  not.  The government's allegations against Mr. Sullivan are

13  that he concealed, he actively concealed this incident.  That's

14  the misprision charge, and that he obstructed the FTC from

15  learning about it.  And the evidence in this case will show

16  that that just did not happen.

17      And I'm going to talk to you now about a couple of pieces

18  of evidence that we're going to refer to to show you what I'm

19  talking about.  And first, you'd think if you were trying to

20  conceal something, one of the most important things you'd want

21  to do is make sure no one else found out about it.  But in this

22  case you're going to hear that the CEO, the guy at the very top

23  of this chart, at least two members of Uber's legal department

24  shown in orange over there, at least three members of the

25  communications team shown in green, and more than 20 of those

1    security professionals knew about this incident.

2        Now, it's true that they all had different levels of

3    knowledge about what had happened or how the situation was

4    being dealt with, but they all knew about it.  They all had the

5    ability to ask questions if they needed more information.  And

6    most importantly, the evidence will show that nothing was

7    hidden from any of them.

8        And we're going to come back to this chart in a few

9    minutes.  We're going to talk about some of the specific people

10   who are identified there.  But when you see and hear that all

11   of these people knew about this incident, you're going to have

12   to ask yourself during this trial:  Is that what concealment

13   looks like?  Because that's the allegation.

14       Here's something else.  This is a document Mr. Dawson

15   referred to.  It's called the Preacher Central Tracker, and

16   you'll see that this document really defeats the prosecution's

17   claim that Mr. Sullivan was trying to conceal or obstruct

18   something.  You'll learn that the team, pretty much immediately

19   after they learned of this incident, started to build this

20   document out.  And as Mr. Dawson mentioned, the document has

21   kind of a funny name, Preacher Central Tracker.

22       As Mr. Dawson mentioned, the team assigns code names to

23   projects that it works on.  In this instance, they called this

24   project Preacher, so that's the first name.

25       The word central, as you'll learn, means that all of this

1   information was centrally available to the response team who

2   was working on this incident.

3       And tracker means that the team kept track of or recorded

4   everything that it was doing during the first few critical days

5   of its investigation, all the decisions they were making, the

6   information that they were learning and what they were doing.

7       Now, remember, the government's case is about concealment

8   and obstruction.  And you'd think that if somebody was trying

9   to conceal or obstruct something, that all the emails and the

10  other documents relating to the incident would have been

11  deleted or destroyed, or at least that Mr. Sullivan had tried

12  to purge those files.  But you won't hear evidence like that in

13  this case.

14      In fact, you'll hear the opposite.  You'll hear that the

15  whole purpose of this document was to create a permanent record

16  of what the team was doing and saying and the decisions they

17  were making.  And this document wasn't hidden.  Lots of people

18  had access to it.  In fact, all the documents that you're going

19  to see during the course of this trial, the emails, the

20  Preacher Central Tracker and the other documents were

21  maintained permanently right there on Uber's system for anybody

22  to see.

23      And at the end of this case, you'll have to decide whether

24  evidence like this, telling the CEO, involving the legal

25  department, the communications department, and all those other

1    people, and creating a permanent record of what the team had

2    done, is that consistent with someone who was trying to conceal

3    or obstruct something?

4        Because cutting through it all, that's what this case is

5    about.  And you won't hear a single witness take that stand and

6    tell you that Joe Sullivan told them to lie to the FTC, or to

7    destroy documents, or to hide what had happened from Uber's

8    senior management, or to hide it from Uber's lawyers.  And we

9    won't hide from asking those questions to the witnesses, and

10   their answers to those questions will destroy the government's

11   allegations of concealment and obstruction.

12       So if everything was done right all along, you're probably

13   asking yourselves:  Why did the government get involved in

14   this?  Why did anybody start to look at Joe Sullivan?

15       Well, you'll hear that all of this came to a head in the

16   fall of 2017.  And remember, that's months after the incident

17   response team thought that this matter had been closed.  And as

18   you'll hear, Uber was having a lot of problems at that point in

19   time, financially and otherwise.  And in late August of 2017,

20   they announced that a new CEO was coming on board, a guy named

21   Dara Khosrowshahi, who Mr. Dawson mentioned.  And his mantra

22   was Uber 2.0.  He wanted to turn the page on the problems that

23   Uber was having.

24       But around the time that he arrived, there was an outside

25   law firm who was doing some work for Uber on another matter,

and they heard about this 2016 incident.  And as Mr. Dawson
mentioned, they interviewed Mr. Sullivan and members of his
team.  We're going to talk more about those interviews a little
later.  But that firm apparently disagreed with the advice that
Uber's lawyer had given to the response team almost a year
earlier.  And at some point, they and Uber's new management
decided that this matter should be disclosed.  But they didn't
disclose it right away.

Even though Mr. Sullivan and his team had told those
outside lawyers all the details about what had happened when
they asked him about it in August and September, Uber's new
management didn't disclose this incident in September 2017 or
October or the first half of November.  They didn't tell the
FTC or state regulators or Uber's drivers about it.

And finally, Uber made the decision to disclose this
incident at the end of November 2017, but that created a
problem for this new Uber 2.0 initiative.  Because, again, the
whole point was to push the public messaging towards the future
and to portray the new CEO as the guy who had changed things.

But by the time this incident was disclosed,
Mr. Khosrowshahi had been the CEO for three months.  This
matter had become his problem.  And he knew that when this
matter got disclosed, it might end up defining his tenure at
Uber before Uber 2.0 even had a chance to get off the ground,
unless he could distance himself from it.

1   So how to do that?  How could he distance himself from it?

2   By firing the last remaining senior executive who had been

3   hired by the original CEO and claim that he had concealed this

4   matter all along, even though that wasn't true.

5   And so as you'll hear, that's what Uber did.  On

6   November 21st, 2017, the same day they disclosed the incident,

7   they fire Mr. Sullivan and they planted a story in the media

8   claiming that he had covered the incident up all along and that

9   that's why Uber was just disclosing this incident now.  And

10  that is what put the target on Mr. Sullivan's back that landed

11  him here today.

12  We're going to come back in a few minutes -- that's kind

13  of a big-picture overview of what the evidence is going to show

14  happened.  And we're going to come back in a few minutes and

15  take that apart a little and talk about some of the specific

16  evidence that you're going to hear in this case relating to

17  each part of that narrative.  But before we do that, I want to

18  spend just a couple of minutes talking about Mr. Sullivan's

19  background and how that guided him through this incident that

20  he was dealing with in late 2016.

21  And as you're going to hear, Mr. Sullivan has been dealing

22  with hackers for a long time.  Since 2002 he's held senior

23  positions at a number of companies here in the Bay Area, eBay,

24  PayPal, Facebook, helping those companies to protect their

25  customers' data by setting up complex cybersecurity systems.

1   And as you'll hear, he was a pioneer in this area.  President

2   Obama appointed him to serve on the President's National

3   Commission on Enhancing Cybersecurity.  And between the time

4   that Mr. Sullivan got into this business in 2002, and the time

5   that this incident happened in late 2016, you're going to hear

6   that the industry really dramatically changed the way that they

7   deal with hackers.

8         And in particular, you'll hear that companies have known

9   for a long time that no matter what you do, there are always

10   going to be some really smart people out there who want to

11   spend their time trying to defeat these sophisticated security

12   systems that companies and even government agencies have set

13   up.  Those people are out there.  There's lots of them and

14   there always will be.  It's kind of a fact of modern life.

15         And you're also going to hear that companies have always

16   known that hackers, like most people, like to make money.  And

17   sometimes hackers make their money by stealing people's data

18   and selling it, or by hacking into a company's computer systems

19   and shutting those systems down and then demanding a lot of

20   money in exchange for providing the fix to the problem.

21         And you'll hear that in the security world, those people

22   are referred to as black hat hackers, and these are people who

23   want to do real harm.  We've all read about those stories.

24         On the other end of that spectrum are what the industry

25   refers to as white hat hackers.  And frequently these are

1   actually companies, and they get hired by other companies to

2   try to find problems and vulnerabilities in their systems.

3         But as you'll hear in this case, there are a whole lot of

4   people in between those two ends of the spectrum.  People whose

5   intentions aren't always clear.  Think of them as gray hat

6   hackers.  And as you'll hear, these people are typically young,

7   inexperienced, and not super sophisticated.  And they don't

8   always know where the lines are.  You'll hear they will

9   frequently just reach out to a company and say:  Hey, I've

10  hacked into your system, I found a big problem, pay me a lot of

11  money.  And it's not always clear whether, at the end of the

12  day, these folks want to help the company fix their problems or

13  whether they want to do harm.

14        And as you're going to hear in this case, for a long time

15  when these gray hat hackers reached out to companies and told

16  them that they had hacked into their systems, they got a really

17  hostile response.  Companies would threaten to sue them or even

18  refer them to the government to be prosecuted.  But as you'll

19  hear, over the last 20 years or so that thinking has really

20  started to change.

21        Companies and even the federal government have set up

22  programs called Bug Bounty programs.  They realized that these

23  aggressive responses to these hackers were creating all the

24  wrong incentives.  Threatening to report these people to law

25  enforcement or to sue them might only drive these people over

1  into the dark side, to the black hat category; they would just

2  take the data and sell it.  At the very least, if they knew

3  they were going to get that kind of response, they would never

4  come forward to begin with to report the problems.  And as a

5  result, companies weren't finding out that those problems even

6  existed and the companies' customers and their data would

7  remain exposed.

8      So they started to take a different approach, to pay

9  bounties or rewards to people who came forward to report these

10  problems.

11      A Bug Bounty is kind of a funny term.  Might not have even

12  ever heard it before this case.  But at the end of the day,

13  that's all a Bug Bounty is, paying a reward to someone for

14  finding a problem in your system as long as they don't cause

15  harm to the company along the way, like taking the data and

16  putting it out into the public domain where it's exposed.

17      And you'll hear that the amount of those bounties, which

18  sometimes is in the six figures, depends on the potential harm

19  that might result from the specific problem that the hackers

20  have found.

21      And you'll hear that companies and even federal government

22  agencies have set up formal Bug Bounty programs to actually

23  encourage this kind of behavior among hackers.

24      And that was the world Joe Sullivan knew on November 14th,

25  2016, when he first learned someone had accessed Uber's

 1  computer systems.

 2      And now I want to turn back to our narrative.  At the

 3  beginning I gave you kind of a high-level overview, but now I

 4  want to dig into that a little bit and tell you what you're

 5  going to hear during this case about what happened and why the

 6  incident was handled the way it was.

 7      As you'll learn, when Mr. Sullivan first learned about

 8  this incident, he thought it was potentially a really big deal.

 9  As we've heard several times now, the company had suffered a

10  data breach back in 2014.  And as Mr. Dawson said, from a

11  technological perspective, the specific problems that these

12  guys found in 2016, this incident looked pretty similar to what

13  had happened back in 2014, and that was troubling.

14      But Mr. Sullivan knew he needed to learn a lot more

15  information before he really knew what he had on his hands in

16  2016.  And what did he do to learn that information?  You'll

17  hear he did exactly what he was supposed to do.  And the first

18  thing he did was to put together something called a core

19  response team.

20      What does that mean?  It's a team made up of about 20

21  folks from various parts of the company and these were the

22  people who were going to dig in and figure out how to tackle

23  this problem, how to deal with it.  And right away that team

24  started to build out this Preacher Central Tracker that you've

25  heard about a couple of times this morning.  And remember,

1    that's the one that was reporting everything the team was

2    doing, the decisions that they were making.  And that document

3    ended up being a 31-page history of what the team had done.

4    And it included links to a lot of other documents, including,

5    for example, the whole history of emails between Uber and the

6    hackers.

7        Now, Mr. Dawson said something during his opening

8    statement that I want to take a minute to respond to.

9        He told you that at the beginning of this investigation

10   Mr. Sullivan told his team that they needed to maintain

11   confidentiality over what they were doing and he suggested

12   there was something sneaky about that, that maybe that's what

13   Mr. Sullivan was doing to try to conceal or obstruct what had

14   happened.

15       But members of the response team, one after another, will

16   take that stand and tell you there was nothing unusual or

17   abnormal about the level of confidentiality that was applied to

18   this investigation.  As they're going to tell you, when an

19   investigation like this starts, you don't know whether an

20   employee of the company might actually be the person on the

21   other end of those emails.  And so, as you're going to hear, it

22   was absolutely standard operating procedure at Uber and the

23   industry generally to keep a tight lid on what you're doing

24   during the investigation.

25       And that's what the team did.

1     But the important thing is that the evidence will show

2   that there was no effort to conceal what had happened in the

3   long run because while the team was investigating, yes, they

4   were maintaining tight confidentiality, but while they were

5   doing that, they were keeping a permanent record of what they

6   were doing so that when the investigation was over, it would

7   all be right there in black and white, kept permanently on

8   Uber's systems.

9     And what's more, the CEO and all the key components of

10  Uber knew what was going on.  This is that chart that we looked

11  at earlier.  It shows the people who knew about this 2016

12  incident.  And I want to talk in a little bit more detail about

13  some of the people on this chart, starting with a guy named

14  Craig Clark who I've circled there in that orange column.

15    As you're going to hear, Mr. Clark was an Uber lawyer.

16  Now, why was it important for him to be part of this core

17  response team?  Why does that matter?  Because as you'll

18  remember, it was the legal department's responsibility to

19  advise as to whether matters like this needed to be reported.

20  And as you're going to hear, that's a really complicated job.

21    You're going to hear that each of the 50 states have its

22  own laws relating to data security and privacy.  Those laws are

23  complicated.  They're confusing.  Sometimes they even conflict

24  with each other, and they're changing all the time.  And while

25  it's true that Mr. Sullivan was a lawyer, he hadn't practiced

1    law in years, and it was not part of his job responsibilities

2    at Uber to keep track of all of these changing and conflicting

3    laws.  For that, Uber had a full-time team of privacy lawyers

4    like Mr. Clark.

5         What's a privacy lawyer?  Well, Uber's own policies

6    describe what a privacy lawyer is.  It's the people who are

7    responsible for understanding the company's legal obligations,

8    for monitoring this privacy-related legislation, and for

9    advising the business teams like Mr. Sullivan's security team

10   about what their obligations were under those laws.

11        And as you're going to hear, Mr. Clark was highly

12   qualified to serve in that role.  He graduated at the top of

13   his class as both an undergraduate and a law student.  By this

14   point in time, he had been practicing law for 13 years, all in

15   the area of data security and privacy, first at a big

16   international law firm where he represented tech companies and

17   advised them about what their responsibilities were under these

18   laws, and then he went to work at Facebook.  And while he was

19   at Facebook, he interacted regularly with law enforcement

20   agencies and regulators, and he advised Facebook as to what its

21   obligations were under these laws.

22        So Clark was qualified to serve in this role.  And just as

23   importantly, he was the person who Uber's legal department

24   assigned to advise Mr. Sullivan and his security team on

25   incidents just like this.

 1          Who else was part of that team?

 2          You'll hear about a woman named Melanie Ensign.  She was

 3     part of Uber's communication group.  And as you'll hear,

 4     shortly after Ms. Ensign learned of this incident -- she was

 5     pulled in pretty much right at the beginning -- she informed

 6     her two superiors on the communications team.

 7          And again, as you hear the evidence in this case, you'll

 8     have to ask yourself questions like if I was trying to conceal

 9     something and make sure that no one else found out about it,

10     would I want the communications team to be part of this?

11     Because as the name suggests, the whole point of Uber's

12     communications team was to communicate facts outside of the

13     company.

14          Now, after pulling together that core response team,

15     Mr. Sullivan notified his boss.  In the early morning of

16     November 15th, which is just about 12 hours or so after the

17     team had found out about this, Mr. Sullivan had pulled together

18     the core response team, started that process of documenting

19     everything the team was doing.  Now he called the CEO,

20     Mr. Kalanick, the head of the A team, the top person at the

21     company.  Mr. Sullivan could not have reported this incident to

22     someone higher at Uber than the CEO.  He's the top person.

23          And just a few hours later, you'll hear Mr. Clark's boss

24     in the legal department, a woman named Candace Kelly, who's

25     another very experienced lawyer, a former federal prosecutor,

1  she was told about this incident and it was explained to her

2  what was going on.  And she was also told that Mr. Clark was

3  taking the lead for the legal department on this incident.  She

4  was fine with that.  She didn't suggest that some other lawyer

5  should be providing advice to the security team.

6      So now you have an idea of some of the people who knew

7  about this incident, some of the members of the core response

8  team, and now I want to focus a little bit more on Mr. Clark

9  and the legal advice that he gave.

10     At this point, again, we're just a day after learning of

11 the incident, you'll hear that the response team knew by now

12 that the hackers had actually obtained personal data from

13 Uber's systems, but they didn't yet know what, if anything, the

14 hackers had done with it or what they planned to do with it.

15 In other words, at this point in time, these guys were in that

16 gray hat category that we talked about before.

17     And the evidence will show that Mr. Clark, again, the

18 lawyer who the legal department appointed to advise the

19 security team on incidents like this, told the team that this

20 matter could be treated as a Bug Bounty and not a reportable

21 data breach if the team was confident that the hackers no

22 longer had the data, confident that the data was not

23 disseminated further.  In other words, that it hadn't somehow

24 gotten out into the public domain where someone could do

25 something bad with it and if they could get the hackers to sign

1    a nondisclosure agreement or NDA.  That was Clark's advice.

2        And why is that important?  Because as you've heard about

3    several times now, Uber had suffered this data breach incident

4    a couple of years earlier, back in 2014, and they treated that

5    incident as a data breach because after investigating it for

6    about five months, they were unable to get any assurances that

7    the data hadn't been disseminated out into the world.

8        And now, here in 2016, the team was asking those same

9    questions, looking and dealing with these gray hat hackers to

10   try to figure out whether they were dealing with another data

11   breach or whether the information and data had actually been

12   contained, trying to figure out where these guys ultimately

13   fell on that hacker spectrum.

14       And importantly, based on Clark's advice, the team knew

15   that if they found out that that data had gotten out into the

16   world, they'd have another data breach on their hands.  But if

17   they could confirm that the data had been deleted, that it was

18   safe, the matter would be treated as a Bug Bounty and Uber

19   could consider it closed.

20       And so as you'll hear, the team got to work on finding

21   answers to those questions:  What happened to the data and can

22   we get these guys to sign this agreement that Clark talked

23   about?

24       And now I want to tell you a little bit about what the

25   team did to gather that information.  And the first step was to

1   try to find out who and where these hackers really were.  In

2   other words, in the lingo of the industry, to get attribution.

3   But as Mr. Dawson told you, all that Uber had to go on at this

4   point in time were two anonymous email addresses.

5        Now, as you're going to hear, it's not unusual for gray

6   hat hackers to want to stay anonymous.  Because at this point

7   in time, they don't know how the company is going to respond to

8   them.  Are they going to get one of those aggressive responses

9   like we talked about?  And the company doesn't know who they're

10  dealing with either.  So at the beginning there's this

11  feeling-out process from both sides.

12       But Mr. Sullivan and his team knew that they needed to

13  figure out who they were dealing with, because once they knew

14  who they were dealing with, they'd have a much better sense of

15  what they were dealing with.  But how do you do that?  How do

16  you go from two anonymous email addresses to figuring out who

17  and where the people on the other end of those emails really

18  are?

19       And as you'll hear, the team used a lot of different

20  techniques to do that.  And one of the tools they used was the

21  nondisclosure agreement, the NDA, that you've heard about a few

22  times now.

23       On November 17th, the team sent the hackers this NDA.  And

24  there's a couple of things that I'd ask you to keep in mind

25  when you hear evidence about the NDA during this trial.

1          As we just talked about, Mr. Clark had told the team that

2     in the end they needed a signed NDA from these guys.  And, of

3     course, Uber wanted to know who they were actually entering

4     into an agreement with.  So in the end, real names would be

5     used to sign this document.

6          But the evidence will show that the main purpose of the

7     NDA at this point in time was just to get clues about who the

8     people on the other end of those emails really were.

9          Now, what do I mean by that?  How do you use a document to

10    get clues about who people really are?

11         Many of you have probably used software programs like

12    DocuSign to electronically sign documents.  And every time you

13    do that, you leave behind some clues about who you are, like

14    the digital address of the computer that's used to make the

15    electronic signature.  And that's what Uber did here too.  They

16    wanted the hackers to use a program called Adobe Sign, and the

17    idea was if they used Adobe Sign, they might leave behind some

18    electronic fingerprint, some clue as to who the hackers really

19    were.

20         And this is really important to keep in mind when you hear

21    arguments that the Government is making like why would Uber

22    agree to pay these guys money and sign a contract with them

23    before they even knew who their names were?  And again, the

24    evidence will show that's because this document was being used

25    to find out who their names were.

 1         At this point, the team knew that this guy's name probably

 2    wasn't Scott Wilson.  So why get Scott Wilson to sign this

 3    document at all?  In the hopes that he will leave behind some

 4    electronic fingerprint.  At this point in time, you'll hear the

 5    team didn't care if the name on this document was Mickey Mouse,

 6    as long as Mickey Mouse put his electronic signature on it,

 7    maybe they could figure out who he really was.

 8         And it worked.  When the hacker signed this document, one

 9    of them left behind an electronic fingerprint, this IP address

10    which gave clues as to where the computer was that was actually

11    used to sign this document.  And that helped Mr. Sullivan's

12    team track these guys down, both digitally and physically.

13         What do I mean by that?  One of the members of the

14    response team, a guy named Mat Henley, told Mr. Sullivan that

15    using this as a starting point, he was ultimately able to get

16    access to the hackers' computers and to confirm that the data

17    had been deleted.  That's what Mr. Henley believed and that's

18    what he told Mr. Sullivan.

19         And the team also sent a guy named Ed Russo, who's a

20    former CIA interrogator, out to interview these guys.  As

21    Mr. Dawson said, one of them was in Florida and one was in

22    Canada.

23         And based on all that, the team reported to Mr. Sullivan

24    that they were satisfied that the data had been deleted.  That

25    it had not gotten out into the public domain where someone

 1   would do something bad with it.  And then Russo had the hackers

 2   sign the NDA using their real names as a reminder to them that

 3   Uber knew who they really were in case they decided to do

 4   something bad down the road.

 5        So that was the end of it.  Case closed.

 6        Based on the advice that Clark, the lawyer, had given

 7   them, and in keeping with the professional experience from

 8   these -- from this group of security professionals, they

 9   believed the matter was closed and this incident was not some

10   reportable data breach.  And you'll hear the members of the

11   response team come in here and tell you they were proud of the

12   work that they had done on this team.  And the evidence will

13   show that in the end nothing was hidden, no evidence was

14   destroyed, and nothing was obstructed.

15        But even though all these people knew about the incident,

16   even though everything the team did was recorded carefully and

17   maintained on Uber's systems, the government still claims that

18   Mr. Sullivan somehow tried to cover it up.  And what will they

19   show you to try to convince you of that?  Mr. Dawson showed you

20   a few of those things and we'll talk about them again now.

21        He referred you to this language in the NDA, that the

22   hackers did not take or store any data.

23        Now, remember, this is the document that the team used to

24   lure the hackers out, but the prosecution claims that it was

25   somehow part of an effort to conceal or cover something up.

1    But the evidence isn't going to show that at all.

2        First of all, you'll learn that that language was written

3    by the lawyer, Mr. Clark.  Now, the prosecution reads that

4    language as saying that the hackers had never even downloaded

5    any of Uber's data, which they had, because as you're going to

6    hear, from a technological standpoint they had to download the

7    data to even be able to see what it was that they were dealing

8    with.  But the prosecution claims that Mr. Sullivan somehow

9    wanted this language in the agreement because he was trying to

10   put one over on somebody, trying to create an impression that

11   the data had never even been downloaded to begin with.

12       Well, there are a couple of things I'd ask you to pay

13   attention to as you hear evidence about this take-or-store

14   language during this trial.  And the first thing is that a half

15   dozen or so people saw this document at the time it was written

16   and none of them raised any concerns with Clark that they

17   thought the language was inaccurate, maybe because they read

18   that language as just asking the hackers to confirm that they

19   had deleted the data, that they didn't have it anymore.

20       Second, I'll ask you to pay very close attention to

21   Mr. Clark's testimony on how this language got into the

22   document, because as you're going to hear, when Clark realized

23   a year or so after he had written this language that

24   investigators were paying really close attention to it, he got

25   scared.  He thought he might be in trouble.  And so, as you'll

1    hear, his story changed over and over again about how this

2    language got into the document.  He blamed Mr. Sullivan for it

3    and he did that in exchange for a deal with the prosecutors to

4    get immunity for himself.  And so as you're listening to the

5    testimony and the evidence about this take-or-store language,

6    please listen carefully to how Mr. Clark's testimony has

7    changed over time, to what his motives are, and you'll hear

8    that his story doesn't add up.

9         What else did Mr. Dawson point to to try to convince you

10   that Mr. Sullivan had tried to cover something up?  Well, he

11   pointed out that Mr. Sullivan knew that the FTC was

12   investigating this incident that had happened back in 2014

13   before Mr. Sullivan was even at the company.  And they say he

14   should have known that in connection with that investigation,

15   the FTC would also want to know about this new thing that

16   happened 2-1/2 years later.

17        And they say that the fact that Mr. Sullivan didn't raise

18   his hand and make sure that the FTC knew about this new

19   incident somehow shows that he was trying to conceal it.

20        And we've already talked about some of the evidence that

21   you're going to hear showing why this whole cover-up narrative

22   just doesn't make any sense, but what about these FTC issues in

23   particular.

24        Well, to start with, you're going to hear that

25   Mr. Sullivan played a pretty specific role in the FTC

1   investigation.  When you hear from Mr. Rossen later this

2   morning, you're going to probably see lots of letters and

3   submissions that Uber made to the FTC, correspondence going

4   back and forth between the company and the agency.  But you're

5   going to hear that Mr. Sullivan wasn't the point person with

6   the FTC.  He wasn't involved in that regular communication

7   flow.  He never sent a letter to the FTC, never sent an email.

8   He spoke with them a total of three times during the whole

9   course of a 27-month investigation.

10      As Mr. Dawson said, he went to a meeting with them in

11   March of 2016, he was deposed, and he was on a phone call with

12   them at some point.  And importantly, as you'll hear, none of

13   those conversations that Mr. Sullivan had with the FTC occurred

14   after the middle of November of 2016.

15      Now, why is that important?

16      It's important because it's central to their case.  One of

17   their core allegations is that Mr. Sullivan somehow misled the

18   FTC after he found out about this incident in the middle of

19   November of 2016.  But after that date, he was never again in a

20   room with the FTC.  He never spoke with them on the phone.  He

21   never sent them an email.  He never sent them a letter.  He

22   never communicated with them at all.

23      But they've got a case to prove, so how are they going to

24   try to get around that?

25      Well, Mr. Dawson pointed to a few submissions that Uber's

1  lawyers made to the FTC in late 2016 and early 2017.  And

2  they'll say, aha, this was his chance to raise his hand and

3  make sure that the lawyers told the FTC about this new

4  incident.  But when you hear the full story behind each of

5  these submissions, you're going to see that they don't add up

6  to anything either.

7      And the first one were some answers to the

8  interrogatories.  As Mr. Dawson said, those were questions that

9  the FTC had asked.  And this particular set of questions

10  related to that 2014 incident, and the prosecution claims that

11  Uber's answers somehow should also have talked about 2016.

12      But what's important about this document?

13      First, as you'll hear, no one claims that Mr. Sullivan

14  played any role in drafting this document, reviewing it, or

15  editing it.  In fact, you're not going to hear any evidence

16  that he never even read this document or knew what it was that

17  the lawyers were saying to the FTC.  And much the same is true

18  with the second submission that Mr. Dawson referred to, this

19  letter that the lawyer sent to the FTC in April of 2017.

20      And the evidence will show that just like that previous

21  submission, Mr. Sullivan didn't write this letter.  It was

22  written by one of Uber's outside lawyers.  And a group of Uber

23  in-house lawyers, including at least two who were aware of the

24  2016 incident, were involved in that process, too.  And as

25  you'll hear, none of them will say that Mr. Sullivan was

 1  actually involved in drafting this April 2017 letter.

 2       And finally, much the same is true regarding the last

 3  submission Mr. Dawson referred to, this consent decree and

 4  complaint that was used to settle the FTC case.  Uber's lawyers

 5  negotiated that in the spring and summer of 2017, and you'll

 6  hear in this case evidence that Mr. Sullivan commented on only

 7  one specific portion of those submissions, the part where the

 8  FTC was asking Uber to implement changes going forward.  And

 9  Mr. Sullivan, you'll hear, paid attention to that because it

10  was his department who was going to have to implement those

11  changes going forward.  So, of course, it made sense for him to

12  be commenting on that.

13       Another important thing that you're going to hear about

14  these submissions, sometimes Uber's lawyers would come to

15  Mr. Sullivan and say:  Hey, we'd like to talk to members of

16  your team to answer some technical questions for us in our

17  responses to the FTC.

18       And as you'll hear, Mr. Sullivan always encouraged his

19  team members to go and talk to the lawyers, to answer whatever

20  questions they had, including team members who were aware of

21  the 2016 incident.  And so, again, when you hear that evidence

22  in this case, you'll have to ask yourself, if I was trying to

23  conceal this, would I be encouraging members of my team to go

24  off and talk to the lawyers without knowing what questions

25  we're going to be asked or what they're going to say?

OPENING STATEMENT / ANGELI

1       What else did Mr. Dawson talk about that the government

2   will try to show you to try to convince you that Mr. Sullivan

3   concealed some important information?

4       Well, as he mentioned to you, in the summer of 2017 these

5   outside lawyers were doing some work for Uber on another matter

6   and they heard about the 2016 incident, and so did the new CEO,

7   Mr. Khosrowshahi, and so they asked some questions about it.

8   They asked people at Uber, including Mr. Sullivan and other

9   members of the team.  And apparently that law firm ended up

10  concluding that the matter should be disclosed.  They disagreed

11  with Clark's advice.

12      And you're not going to be asked to decide in this case

13  necessarily who was right or wrong about that decision.  You're

14  going to be asked whether Mr. Sullivan tried to actively

15  conceal what had happened and to obstruct the FTC from learning

16  about it.  That's what the prosecution is claiming here.  And

17  Mr. Dawson and the prosecution suggested that when Mr. Sullivan

18  talked to these outside lawyers and Mr. Khosrowshahi in the

19  summer of 2017 that he somehow mislead them, that he lied to

20  them.  But the evidence is going to show precisely the

21  opposite.  And in particular you're going to hear about what

22  Mr. Sullivan said in August of 2017, the very first time that

23  he was asked about this.

24      Mr. Dawson put up an email that Mr. Sullivan had sent to

25  Mr. Khosrowshahi on September 20th.  Well, this interview took

1    place a month before that.  What did he do when he was asked

2    those questions?  Did he pull out that NDA and wave it around?

3    Because remember, the prosecution's whole theory about that NDA

4    is that Mr. Sullivan's goal was to have a document saying that

5    the hackers had never downloaded any of Uber's data so that he

6    could pull that document out if somebody ever asked him about

7    it.  And if that was his intent, this was his big opportunity,

8    this was his chance to do it.  So is that what he did?  No.

9          You'll hear that during this August 2017 interview, he

10   revealed all the key facts that he is now accused of having

11   concealed.  He told the lawyers that initially this incident

12   had looked a lot like what happened in 2014.  You'll hear he

13   didn't downplay that.  In fact, he said that he and

14   Mr. Kalanick had initially been very worried about this new

15   incident, so much so that they were willing to throw any

16   necessary resources at it.

17         He also said that the team had ultimately concluded that

18   the hackers had deleted the data, which, of course, made clear

19   that the data had been downloaded to begin with.  You can't

20   delete something that you don't have.  And he told the lawyers

21   that, ultimately, the team had concluded that this was not a

22   reportable data breach because the team believed that the data

23   had not been disseminated out into the public domain.

24         And at the end of this trial you'll have to decide how

25   that squares with the prosecution's claim of concealment and

 1   obstruction, because the evidence will show not only that

 2   Mr. Sullivan didn't try to conceal any of that information, he

 3   came right out and said it the first time they asked him about

 4   it.

 5        And now I want to talk about what happened at the end,

 6   when Uber let Mr. Sullivan go in November of 2017.  And as

 7   you'll hear, at that point in time a lot of things were going

 8   wrong at Uber.  The company had lost over $4 billion that year.

 9   Mr. Kalanick, the initial CEO, had left the company in June and

10   he was replaced at the end of August by Mr. Khosrowshahi.  And

11   he announced that his intent was to transform Uber into

12   something he called Uber 2.0, to get a clean slate and to just

13   move forward.

14        But Uber's outside lawyers had interviewed Mr. Sullivan

15   and the team and they had told them all about what had happened

16   in this 2016 incident.  But Uber didn't disclose that incident

17   until the end of November, and that created a problem for this

18   Uber 2.0 initiative, because now Mr. Khosrowshahi had been at

19   the helm for about three months.  This was now his problem and

20   Uber knew there would be a lot of media coverage when this

21   incident finally got disclosed.  And as the established CEO

22   now, he was going to have to own this.  This might actually

23   define him before this new initiative even got off the ground,

24   unless he was able to distance himself from it.  Unless at the

25   same time they disclosed this, they would fire the last

1    remaining senior executive that the old CEO had fired -- or had

2    hired and portray him as a rogue employee who had concealed

3    this incident all along.  Then the new management team could

4    just wash its hands of it.  And as you'll hear, that's what

5    with Uber did.

6         On November 21st, they fired Mr. Sullivan.  And almost

7    immediately, within an hour, stories started to pop up in the

8    national media repeating a narrative that Uber had carefully

9    fed to the reporters in the days leading up to Mr. Sullivan's

10   firing.  As you'll hear, the media knew Mr. Sullivan was going

11   to be fired before he did.

12        One of those stories claimed that the incident had

13   remained concealed until that day in November of 2017.  And

14   they talked about Mr. Khosrowshahi's Uber 2.0 plan, and Uber

15   claimed that this decision had been made because it was all

16   about doing the right thing.  But Uber apparently didn't tell

17   the media that more than 30 people at the company had been

18   aware of this incident while it was going on.  They apparently

19   didn't tell the media that all of the documents showing exactly

20   what had happened had been right there on Uber's systems all

21   along.  And they apparently didn't tell the media that

22   Mr. Sullivan had told Uber's lawyers all about this incident

23   over the preceding months when they had asked him about it.

24        Now, I said at the beginning that this case is about a

25   security professional who worked under enormous pressure to

 1  protect people's data, a security professional who did not hide

 2  what had happened in 2016, and that's what the evidence is

 3  going to show.  It's going to show that Mr. Sullivan led an

 4  extraordinary team of people who reported to him that the

 5  technological problems had been fixed; that the hackers had

 6  been located and didn't intend to cause any harm to Uber; and

 7  that the data had been deleted; that there wasn't a risk that

 8  it was in the public domain where someone might do something

 9  bad with it.

10      And the evidence will show that the key components of Uber

11  knew what had happened:  The CEO, the legal department, the

12  communications team.  And it will show that what the team did

13  was carefully documented in the Preacher Central Tracker, in

14  emails, in things that were retained right there permanently on

15  Uber's systems.  And it will show that when Mr. Sullivan was

16  first asked about this incident, he came right out and said

17  what had happened.

18      In short, the evidence will show that the way that

19  Mr. Sullivan behaved in this case is the opposite of what

20  someone would do if they were engaged in a cover-up.  And for

21  those reasons, at the end of this trial, we'll ask you to

22  return a verdict of not guilty on both counts.

23      Thank you.

24          **THE COURT:**  All right.  Ladies and gentlemen, you've

25  now heard the opening statements.  We are going to take a break

1  until 10 past 11:00.  And at that time, we'll have the first

2  witness for the Government.

3      So please remember the admonitions that I gave you before

4  about talking about the case, and also remember that what you

5  just heard is what the lawyers expect you're going to learn; it

6  was not evidence.  The evidence is going to begin when we come

7  back.

8      (The jury exited the courtroom.)

9          **THE COURT:**  All right.  We'll be in recess.

10     (Recess taken from 10:55 a.m. until 11:11 a.m.)

11     (The following proceedings were held outside of the

12 presence of the Jury)

13         **THE COURTROOM DEPUTY:**  Please come to order.

14         **THE COURT:**  You all ready?

15         **MR. ANGELI:**  Yes, Your Honor.

16         **THE COURT:**  Okay.  Let's get the jury.

17     (The following proceedings were held in the presence of

18 the Jury)

19         **THE COURT:**  All right.  Please be seated, everybody.

20     Mr. Dawson, who is the first witness?

21         **MR. DAWSON:**  The government calls Ben Rossen.

22         **BENJAMIN ROSSEN, GOVERNMENT'S WITNESS, SWORN**

23         THE WITNESS:  I do.

24         **THE COURTROOM DEPUTY:**  Be seated.  And if you would

25 please state your full name for the record, and spell it for

ROSSEN - DIRECT / DAWSON

1    the court reporter.

2            **THE WITNESS:**  Benjamin Rossen, R-O-S-S-E-N.

3            **THE COURTROOM DEPUTY:**  Thank you.

4                        <u>**DIRECT EXAMINATION**</u>

5    **BY MR. DAWSON**

6    **Q**    Good morning, Mr. Rossen.

7    **A**    Good morning.

8    **Q**    What do you do for a living?

9    **A**    Currently I'm an attorney at the law firm of Baker Botts

10   in Washington, D.C.

11   **Q**    Did you previously work for the Federal Trade Commission?

12   **A**    I did.

13   **Q**    Is that also sometimes referred to as "the FTC"?

14   **A**    Yes.

15   **Q**    What is the FTC?

16   **A**    The Federal Trade Commission is a civil law enforcement

17   agency with two missions.  To promote competition in the

18   marketplace, and to protect consumers from unfair or deceptive

19   practices.

20   **Q**    And is that a federal agency or a state agency?

21   **A**    That's a federal agency.

22         (Document displayed)

23   **Q**    Where did you work when you were at the FTC?

24   **A**    In Washington, D.C., in the FTC headquarters.

25            **THE COURT:**  Can we turn the screen off?  I don't know

**ROSSEN - DIRECT / DAWSON**

1   how it came on, but --

2        **MR. DAWSON:**  Sure.

3        (A pause in the proceedings)

4        **THE COURTROOM DEPUTY:**  That must be something that

5   Stefan just did.

6        **MR. DAWSON:**  Sorry about that, Your Honor.

7        **THE COURT:**  Apologies.  That may have been the

8   technical work that was done over the break; I'm not sure.

9        **MR. DAWSON:**  I'm confident it was our computer.

10       **THE COURT:**  Okay.

11  **BY MR. DAWSON**

12  **Q**   So, I apologize, Mr. Rossen.  Where did you work when you

13  were with the FTC?

14  **A**   In Washington, D.C., in the FTC's headquarters.

15  **Q**   You mentioned something about protecting consumer privacy?

16  **A**   So I didn't mention privacy, but privacy is one of the

17  things that the FTC's consumer protection mission involves.

18  **Q**   Why don't you explain something about the consumer

19  protection mission of the FTC?

20  **A**   Sure, so the Bureau of Consumer Protection at the FTC is

21  broadly tasked with protecting consumers across large sectors

22  of the American economy.  One division within Consumer

23  Protection is the Division of Privacy and Identity Protection,

24  which is where I worked.  And that division is charged broadly

25  with protecting consumer privacy and data security.  Security

ROSSEN - DIRECT / DAWSON

1    of consumer personal information.

2    **Q**    Did you work within a specific division within that group?

3    **A**    So the division was the Division of Privacy and Identity

4    Protection, which we called DPIP, I didn't work within any

5    further subdivision beyond that.

6    **Q**    And tell us a little bit about DPIP.  What kinds of cases,

7    investigations does that division do?

8    **A**    Sure.  So DPIP covers a number of different cases.  The

9    sort of typical example is when a company has a data breach or

10   some type of report about, you know, misuse of personal

11   information or some kind of privacy abuse, typically FTC staff

12   attorneys will investigate that to see if there's been a

13   violation of the law.

14   **Q**    Just at a high level, what do violations look like?  What

15   goes into that kind of assessment?

16   **A**    Sure.  So with data security in particular, the FTC looks

17   to see whether companies have either been deceptive about their

18   statements about the kind of security that they provide to

19   consumers, so, did they make statements that would have misled

20   a reasonable consumer about the security that was afforded to

21   their information, or the FTC looks to see whether a company is

22   providing reasonable security measures over personal

23   information, which is a pretty broad standard.

24        And when we investigate that, we really would look at kind

25   of the whole security posture of a company, all of those

1    different steps that they might take, ranging from written

2    policies and procedures to technical controls, to training, to

3    a whole variety of different practices.  And, try to determine

4    whether, on balance, those practices were reasonable.

5    **Q**    In the course of this kind of work, does the FTC bring

6    some kind of a lawsuit?  Or how do the course of those

7    investigations tend to play out?

8    **A**    So typically, if the FTC is going to bring an action

9    alleging the law was violated, staff would recommend a

10   complaint and order against a company.  Or in some cases an

11   individual.

12        And the complaint would set out basically the facts of the

13   case, would describe what the investigation revealed, and would

14   set forth the different counts about the particular law

15   violations that occurred.

16        And then there would be an order.  In the case of a

17   settlement that would be a negotiated order, but sometimes if a

18   company won't agree to one, you go to court and either within

19   the FTC's own court or in a Federal Court like this one,

20   lawyers would go and try to prove a case and get an order,

21   ordered by a judge.

22   **Q**    How long did you work for the FTC in that particular

23   group?

24   **A**    I was there for a little more than six years.

25   **Q**    And roughly when did you start and when did you finish?

ROSSEN - DIRECT / DAWSON

1   **A**    I joined the FTC in September, 2015, and I left in

2   November of 2021.

3   **Q**    In your time at the FTC were you involved in an

4   investigation into Uber Technologies?

5   **A**    I was.

6   **Q**    Can you briefly describe the nature of that investigation?

7   **A**    That investigation looked into -- it largely arose out of

8   a data breach that occurred in 2014, but also looked to a wide

9   range of other different incidents and privacy practices at the

10  company, and ultimately resulted in a settlement in 2017 and

11  2018.

12  **Q**    Okay.  Let's take a look at an exhibit that has already

13  been admitted.

14          **MR. DAWSON:**  If you can pull up Exhibit 260.

15          **MS. KERIN:**  Objection, Your Honor.

16          **THE COURT:**  So, overruled.  And I will admit this

17  conditionally.

18          You can proceed.

19          (Trial Exhibit 260 conditionally received in evidence.)

20          **MR. DAWSON:**  Thank you, Your Honor.

21          (Document displayed)

22  **BY MR. DAWSON**

23  **Q**    All right.  Mr. Rossen, do you recognize this document?

24  **A**    I do.

25  **Q**    What is it?

1    **A**    This is a letter that was sent to Uber from another

2    attorney at the FTC before I joined the agency, describing an

3    inquiry that the FTC was opening against Uber Technologies,

4    Inc.

5              **MR. DAWSON:**  And if we can zoom in a little bit on

6    that first --

7              (Document displayed)

8    **BY MR. DAWSON**

9    **Q**    There we go.  First of all, there is a reference to

10   Ms. Yoo.  Do you know who Ms. Yoo is?

11   **A**    I know she was at one time Uber's general counsel.

12   **Q**    And in the second sentence there, it says (As read):

13              "The staff of the Federal Trade Commission's

14         Division of Privacy and Identity Protection is

15         conducting a non-public inquiry into Uber's data

16         collection and use practices.  Our inquiry includes,

17         but is not limited to, how Uber uses consumers'

18         personal information, including geolocation

19         information."

20        Do you know generally what the purpose of a letter like

21   this at this stage of an investigation is?

22   **A**    So this is essentially what's called a preservation

23   letter.  It's designed to put a company on notice, to let them

24   know that they need to preserve all documents and evidence that

25   might be relevant to an investigation that the company -- that

1    the FTC is opening.

2    **Q**    Okay.

3          **MR. DAWSON:**  Why don't we take the zoom down real

4    quick.

5    **BY MR. DAWSON**

6    **Q**    Just a small point at the top, there in the upper left, is

7    that the seal of the FTC?

8    **A**    Yeah.  It's hard to see, but I think that's correct.

9          (Document enlarged)

10         **MR. DAWSON:**  Perfect.  Let's pull up the next exhibit

11   which has been admitted, Exhibit 2 -- or I'll allow the Judge

12   and objections to come in.  Exhibit 2?

13         **MS. KERIN:**  Objection, Your Honor.

14         **THE COURT:**  All right.  So, same ruling.

15       And, ladies and gentlemen, we've had a discussion off the

16   -- while you were not in the courtroom.  And a number of these

17   documents are going to be admitted conditionally, and I will be

18   ruling at some point on their full admission.

19       But in order to make things more efficient, the parties

20   have agreed on a procedure that makes a lot of sense to me.  So

21   that is what we are doing.

22       This is conditionally admitted.

23       (Trial Exhibit 2 conditionally received in evidence.)

24         **THE COURT:**  Please proceed.

25         **MR. DAWSON:**  Thank you, Your Honor.

ROSSEN - DIRECT / DAWSON

1      (Document displayed)

2  **BY MR. DAWSON**

3  **Q**   So here is another letter.  This one is dated March 12,

4  2015.  And why don't we pull up -- I think it's the second

5  paragraph.

6      (Document displayed)

7  **Q**   So March, 2015 (As read):

8          "Staff is now also evaluating whether Uber's data

9          security program and practices - including as related

10         to the unauthorized access to approximately 50,000

11         consumers' personal information, including their names

12         and driver's license numbers - raise issues under

13         Section 5 of the Federal Trade Commission Act, which

14         prohibits unfair or deceptive acts or practices."

15     Do you know what that is a reference to in the first

16  paragraph, the unauthorized access to approximately 50,000

17  consumers' personal information?

18  **A**   That was in reference to a data breach that was reported

19  to have occurred in 2014.

20  **Q**   And did that ultimately become a subject of the FTC's

21  investigation?

22  **A**   Yes.

23  **Q**   And I think you mentioned something about this earlier,

24  but was the investigation solely focused on that incident?  Or

25  was it broader?

1   **A**   So when the investigation was initially opened, as

2   referenced on -- the previous exhibit was talking about

3   geolocation information, which was related to a separate

4   incident that had been reported in the news.  After the data

5   breach occurred, data security really became kind of the

6   principle focus of the investigation.  But it wasn't limited

7   just to this particular breach.

8       We were -- you know, as I said, the FTC would always look

9   to try to evaluate kind of the reasonableness of a data

10  security program.  So in seeking information, the FTC was

11  looking -- both myself and others on staff were looking at far

12  more information than just what happened in the breach.

13  **Q**   All right.  Let's look at that last sentence there:

14          "We will be requesting information and documents

15          from Uber in the weeks ahead."

16      Do you know if that happened?

17  **A**   Yes.

18          **MR. DAWSON:**  All right.  I'd like to pull up Exhibit

19  No. 274.

20      (Document displayed)

21  **BY MR. DAWSON**

22  **Q**   Mr. Rossen, do you recognize this document?

23  **A**   I do.

24  **Q**   What is this?

25  **A**   This is a civil investigative demand that was issued to

1  Uber Technologies, Inc. in 2015.

2  **Q**   What is a civil investigative demand?

3  **A**   So a civil investigative demand -- it's also called a

4  "CID" -- is similar to a subpoena, but it is the method that

5  FTC staff use under the FTC Act to get information like written

6  responses or documents or testimony from people at a company,

7  whoever is the subject of an investigation.  It is the primary

8  method that the FTC uses to gather information in an

9  investigation.

10  **Q**   Now, the document we looked at a moment ago made a

11  reference to -- I believe it was requesting documents in the

12  future.  Is this a kind of informal request?  Or is this

13  something that carries the force of law?

14  **A**   It is not an informal request.  It is a formal process

15  that has to be approved by the Commission.  It's issued and

16  signed by a Commissioner.  There's five different Commissioners

17  at the FTC.  One of them has to review and approve it.  And

18  once it issues, it carries the force of law and can be enforced

19  in Federal Court.

20       **MR. DAWSON:**  Let's look at the upper left-hand corner.

21    (Document displayed)

22  **BY MR. DAWSON**

23  **Q**   This says:

24       "Uber Technologies, care of Rebecca Engrav,

25    Perkins Coie."

1    Do you know who Rebecca Engrav is?

2  **A**   I do.

3  **Q**   Who was that?

4  **A**   She was Uber's outside counsel in this investigation.

5  **Q**   You may have mentioned something about this, but within

6  the civil investigative demand, are there often something

7  called "interrogatories"?

8  **A**   Yes.

9  **Q**   What are interrogatories?

10  **A**   Interrogatories are essentially requests for written

11  responses to questions.  So, FTC staff will put together a list

12  of questions that we want answers to, and it calls for a

13  narrative response from the company.

14  **Q**   And how about document requests?  Are those included in

15  CIDs?

16  **A**   Yes.

17  **Q**   Do you recall if those were included in this CID?

18  **A**   Yes.

19  **Q**   Let's take a look at a few portions in here.  So turn to

20  Page 4 of the exhibit, I just want to look at a few

21  definitions.

22    (Document displayed)

23  **Q**   So starting in general, is it common for CIDs to have kind

24  of definitions of terms?

25  **A**   Yes.

1  **Q**   And what role do they play?  What's the purpose of

2  defining those terms up-front?

3  **A**   The defined terms are to reduce any ambiguity in the CID,

4  and make sure that we're all on the same page about what we're

5  talking about.

6  **Q**   So when you get to the interrogatories, do those often use

7  the defined terms, and that helps clarify what's being asked?

8  **A**   Interrogatories, documents requests, other requests will

9  typically reference defined terms.

10  **Q**   Okay.  Let's take a look at the definition for "breach."

11     (Document displayed)

12  **Q**   So we'll talk more about it in a minute, but do you recall

13  if this CID included an interrogatory or any document requests

14  about breaches, in general?

15  **A**   Sorry.  Could you repeat the question?

16  **Q**   Do you recall if any of the interrogatories in this CID

17  included questions about breaches?

18  **A**   Yes.

19  **Q**   Let's take a look at the definition:

20        "'Breach' shall mean unauthorized access into the

21     company's systems for personal information in the

22     company's files, including but not limited to the

23     unauthorized access to the company's databases that

24     took place on or around May 12, 2014."

25     Do you see that?

ROSSEN - DIRECT / DAWSON

1    **A**    I do.

2    **Q**    The reference to May 12th, 2014, is that a reference to

3    the earlier data breach you were talking about?

4    **A**    I believe that's the breach of approximately 50,000

5    drivers' driver's licenses and other information.

6    **Q**    Okay.  To ask a kind of obvious question, does this

7    definition of "breach" apply only to where somebody downloads

8    information?

9    **A**    Um, it is not specifically limited to downloading

10   information.  It references unauthorized access.

11   **Q**    And then to personal information, do you know if there is

12   a definition for personal information that was used in this FTC

13   -- CID?

14   **A**    Yes.

15   **Q**    Why don't we turn to the next page.

16        (Document displayed)

17   **Q**    Page 5.  I won't ask you to read the whole thing here, but

18   to at least start (As read):

19            "'Personal information' shall mean individually

20        identifiable information from or about an individual

21        consumer, including but not limited to"

22        I'll just run through the first few.

23            "First and last name; home or other physical

24        address, including street name and name of city or

25        town; email address or other online contact

1           information, such as a user identifier or screen name;

2           telephone number; date of birth; government-issued

3           identification number such as a driver's license,

4           military identification, passport or Social Security

5           number, or other personal identification number..."

6           Setting aside the rest of those, are you familiar

7      generally, in the field of privacy, the notion of personally

8      identifiable information?

9      A    I am.

10     Q    And is that a universally agreed-upon definition?  Or are

11     there different definition in different contexts?

12     A    I think it varies from one context to another.

13     Q    So in this context, was this the definition that governed

14     the FTC's CID?

15     A    Yes.

16     Q    Okay.

17          MR. DAWSON:  Let's take a look at "Applicable time

18     period," which is on the next page.

19          (Document displayed)

20          MR. DAWSON:  There we go.

21     BY MR. DAWSON

22     Q    All right.  Applicable time period:

23           "Unless otherwise directed in the specifications,

24           the applicable time period for the request shall be

25           from January 1, 2014, until the date of full and

 1          complete compliance with this CID."

 2          Was it typical to include a kind of applicable time period

 3     in the CIDs?

 4     **A**     Every CID includes an applicable time period.

 5     **Q**     And does it always include the same applicable time

 6     period?  Or is it dependent on the investigation?

 7     **A**     Depends on the investigation.  We typically try to make it

 8     reasonable, and not seek documents that are going to extend way

 9     beyond the relevant timeframe of an investigation.

10     **Q**     And at the end there, what does "Full and complete

11     compliance with the CID" mean?

12     **A**     So I believe that it's defined in the CID, itself, where

13     it essentially means that a company has completed production,

14     and there's nothing left to produce under the CID.  And,

15     generally requires submitting a certificate of compliance that

16     the CID's production is complete.

17     **Q**     All right.

18          **MR. DAWSON:**  Let's take a look at one more defined

19     term on the next page.  I think this is something that

20     Mr. Rossen just mentioned.

21          I think we are looking for Page 8 of the exhibit.  Sorry.

22          (Document displayed)

23          **MR. DAWSON:**  There we go.

24     **BY MR. DAWSON**

25     **Q**     Certification.

1            "You or a duly authorized manager of the company

2        shall certify that the response to this CID is

3        complete.  This certification shall be made in the form

4        set out on the back of the CID form, or by a

5        declaration under penalty of perjury as provided by..."

6        The statutory citation.

7        Do you recall if Uber ever certified that its response to

8    the CID was complete?

9    A    I do not believe we ever received the certification of

10   compliance.

11   Q    And do you recall, did the company continue to make

12   responses under the CID into late 2016?

13   A    Yes, at least.

14   Q    And do you recall kind of ongoing correspondence with the

15   company, verging into 2017?

16   A    I believe so, yes.

17   Q    Did the company continue into 2017, sharing certain

18   information about its data security programs?

19   A    I know they continued to provide us information that was

20   submitted, either under the CID, or in lieu of further

21   compulsory process.

22   Q    Got it.  And we'll take a look at some of those details

23   later.

24        Let's focus now a little bit on what specifically the FTC

25   was asking for.

1    **MR. DAWSON:**  Let's go to Page 16 of the exhibit.

2    (Document displayed)

3    **MR. DAWSON:**  And try and highlight No. 4.

4    (Document highlighted)

5    **MR. DAWSON:**  And maybe a little further down, through

6    (d).  There we go.

7    **BY MR. DAWSON**

8    **Q**   All right.  Do you remember this interrogatory?

9    **A**   I do, generally.

10   **Q**   And can you generally describe to the jury what this is

11   requesting?  And we can talk as well a little bit about some of

12   the specifics.

13   **A**   So this interrogatory was asking for information about any

14   breach or any suspected breach that Uber might have experienced

15   under the applicable time period of the CID, which was

16   basically from 2014 through the data production.

17       And it has a whole bunch of subparts that asks for

18   different kinds of information about the breach.

19   **Q**   And we talked a little bit earlier about the definition of

20   "breach."  Were these requests limited to instances where data

21   was downloaded?  Or are these requests broader?

22   **A**   Well, the question, itself, asks, you know, for any breach

23   or any suspected breach.  And I believe in the definition of

24   "breach" it doesn't require anything to be downloaded.

25   **Q**   And do you recall, over the course of the investigation,

1    did Uber provide information about certain incidents that they

2    believed qualified under this definition of "breach" and

3    "personal information"?

4    **A**    I know they provided us information with a variety of

5    different incidents that occurred during the course of the

6    investigation, separate and apart from the 2014 breach that had

7    triggered the opening of the investigation.  I don't know, you

8    know, whether they believed it was under this definition or

9    not.

10   **Q**    Got it.  Understood.  Let's look just at (f) at the

11   bottom.

12       (Document displayed)

13   **BY MR. DAWSON**

14   **Q**    (As read)

15           "Describe in detail the information security

16       practices the company implemented in response to the

17       breaches, including when each practice was

18       implemented."

19       For the purposes of your investigation, what would the

20   relevance of this question be?

21       Why would you ask for this?

22   **A**    So this is in many ways kind of the central inquiry of our

23   data security investigation.  We wanted to know everything

24   about the information security practices that the company had

25   in place, and we especially wanted to know information about

1    when certain practices were put into place.  Because it's not

2    uncommon for a company in responding to a CID to kind of take a

3    bunch of corrective actions, tell us kind of the new and best

4    practices that they have in place, and not describe necessarily

5    what they had earlier.

6         So we are always careful to ask both:  What you are doing

7    now, and what you were doing previously, and let us know when

8    that changed.

9    **Q**    All right.  Now, when the company receives -- or when a

10   company receives a CID, what typically happens next?

11   **A**    The first thing that happens is that the company is

12   supposed to have what's called a "meet-and-confer" with FTC

13   staff, which is an opportunity to discuss the CID, and

14   potentially make modifications to the scope of the questions

15   and document requests that FTC staff is seeking.

16   **Q**    All right.  Do you recall, for purposes of this CID, did

17   Uber respond all at once?  Was it spread out, over time?

18   **A**    This was a pretty big CID.  And we negotiated what's

19   called a rolling production schedule, which essentially means a

20   series of deadlines, where the company was supposed to produce

21   different responses until eventually getting to everything.

22   **Q**    All right.  Let's start going through some of those

23   responses.

24        **MR. DAWSON:**  So let's pull up Exhibit 8.

25        (Document displayed)

1          **MR. DAWSON:**  Why don't we highlight the heading and

2    then the first paragraph.

3          (Document highlighted)

4    **BY MR. DAWSON**

5    **Q**    I'm going to try to avoid reading too much, but I'll read

6    a little bit to orient ourselves.

7          **MR. DAWSON:**  If you can move the box down a little

8    bit.

9    **BY MR. DAWSON**

10   **Q**    Mr. Rossen, can you see the date on the upper left there?

11   **A**    Yes.

12   **Q**    What is the date listed?

13   **A**    July 31, 2015.

14   **Q**    And so this is a few months after the CID.  Do you

15   remember the nature of this response?  What was Uber telling

16   the FTC?

17   **A**    So I believe, from what I can see, which is the narrative

18   overview in this response, this was the set of interrogatory

19   responses and document requests that addressed the May 12, 2014

20   breach.

21   **Q**    And do you recall if the responses from Uber kind of

22   separated out one response for the 2014 data breach and another

23   response for other incidents that may be responsive?

24   **A**    I think that's correct.

25   **Q**    And we will go through a little bit more.

1          **MR. DAWSON:**  Let's pull up the bottom portion of this

2    page.

3          (Document displayed)

4    **BY MR. DAWSON**

5    **Q**    All right.  Do you remember receiving a description from

6    Uber of the facts and circumstances of the 2014 breach?

7    **A**    Yes.

8    **Q**    And could you -- are you able to remember and kind of

9    summarize for the jury what that explanation was?

10   **A**    Yes.

11   **Q**    What is your recollection about what Uber told you about

12   the 2014 data breach?

13   **A**    At a high level, I recall that they told us that an

14   executive from Lyft who was in negotiations to work at Uber had

15   provided the company with some information about a AWS security

16   key that had come into -- that had been exposed, and that a

17   Lyft employee had used that to download information from Uber's

18   Amazon Web Services datastore.

19   **Q**    And let's talk about terms a little bit.  "AWS security

20   key."  Can you explain a little bit about what that is?

21   **A**    So "AWS" refers to Amazon Web Services, which is a

22   cloud-hosting service that provides a lot of different features

23   that companies use.  It is really widely used by technology

24   companies for a whole bunch of different purposes.

25          And my understanding was that the key at issue here which

1   was referred to as an "AWS security key" or an "access key" was

2   a series of letters and numbers that were used to get access to

3   that datastore.

4          MR. DAWSON:  Why don't we look at the next page.

5   Page 2.  Let's just pull up the first, the heading on the first

6   paragraph.

7      (Document displayed)

8   BY MR. DAWSON

9   Q    So we talked a little bit about AWS.  Do you recall if

10  GitHub played some role in the 2014 data breach?

11  A    Yes.

12  Q    What was that role?

13  A    So my understanding was that this AWS key was publicly

14  posted to something called a GitHub Gist.  So an Uber engineer

15  had been working with the code, and inadvertently posted this

16  security key on the website called "GitHub" that's used for

17  sharing information by engineers.

18     It was posted on a company GitHub Gist that was supposed

19  to be behind security protections, but inadvertently was posted

20  publicly.

21  Q    So what is your recollection of what data, if any, that

22  the outsider was able to access using that key?

23  A    My understanding is that an outsider used that key to run

24  a search on the -- or to -- to access the Amazon S3

25  datastore -- S3 is like the Simple Storage Solution datastore,

1   which is essentially a file storage service -- and downloaded a

2   single file from that datastore.

3   **Q**    And when you say "S3," is that roughly comparable to

4   something like Dropbox, just maybe on a bigger scale?

5   **A**    Perhaps.  I don't really know.

6   **Q**    All right.  Understood.

7           **MR. DAWSON:**  Let's move to Page 5.

8       (Document displayed)

9           **MR. DAWSON:**  And Agent Scussel, if you can pull up the

10  -- pull up the heading under (c) and then highlighting down

11  below.

12      (Document displayed)

13          **MR. DAWSON:**  I'm sorry, let's see if we can just do

14  the heading under (c) and then the highlighting, just to try

15  and make it more comprehensible

16  **BY MR. DAWSON**

17  **Q**    Again, I'm trying to be as efficient as we can, so I don't

18  want to go through the reading exercise.

19      But do you recall, in this CID and elsewhere, Uber

20  explaining to you and the FTC staff what kind of remedial

21  measures had been taken?

22  **A**    I do.

23  **Q**    Can you give a little summary?  We'll get into more

24  detail, but what do you recall kind of being the headlines of

25  what the remedial actions were?

ROSSEN - DIRECT / DAWSON

1  **A**    There were a series of steps that the company described

2  that they took in response to the breach, some of which

3  included things like adding encryption to the S3 datastore;

4  restricting the access controls, which meant sort of the, you

5  know, individuals and services that could access certain parts

6  of the datastore.

7       And I believe there were some other ones.  If it's

8  possible for me to get a full copy of the document, that would

9  help.

10  **Q**    That is a great idea.  Let me grab one.

11          **MR. DAWSON:**  Your Honor, do you mind if I hand up a

12  copy of the --

13          **THE COURT:**  Please.  Go ahead.  Yeah.

14          **THE WITNESS:**  Thank you.

15  **BY MR. DAWSON**

16  **Q**    Why don't you turn to Page 5.

17      (Document highlighted)

18          **MR. DAWSON:**  Thank you.

19  **BY MR. DAWSON**

20  **Q**    Let's take a look at the third paragraph, starting with

21  "Uber has...."  This is on Page 5.  Do you see that?

22  **A**    Yes.

23  **Q**    So:

24          "Uber has also made it more difficult to access

25      information within the S3 datastore by increasing

 1          encryption of certain files and sensitive data types

 2          and by instituting two-factor authentication for access

 3          to the datastore."

 4          I think you mentioned encryption a moment ago.  What is

 5   encryption?

 6   **A**   Encryption is a way of making data essentially unreadable

 7   or unusable unless somebody has appropriate access to decrypt

 8   the data.

 9   **Q**   And how is that relevant to the kinds of things that the

10   FTC is investigating?

11   **A**   That's one of many different security controls that we

12   would look to consider whether information security practices

13   were reasonable.

14   **Q**   And does that essentially afford an extra level of

15   protection to the data that might be in that data?

16   **A**   It can, yes.

17   **Q**   How about two-factor authentication for access?  Do you

18   know what two-factor authentication is?

19   **A**   I do.

20   **Q**   What is that?

21   **A**   Two-factor authentication essentially refers to having two

22   different pieces of information, essentially, in order to get

23   access to something.  So something you have and something you

24   know are kind of the two most common ones.  You might have, you

25   know, an authenticator app on your phone that gives a code that

ROSSEN - DIRECT / DAWSON

 1  you have to enter, and you would know a password that you would

 2  need to enter.  So there's two different steps to get access

 3  instead of just a single point of entry.

 4  **Q**    And similar to encryption a moment ago, is that a kind of

 5  extra step to afford protection to data?

 6  **A**    Yes.  It's one other security practice that can be used to

 7  ensure that only the people with appropriate access can get to

 8  the data.

 9  **Q**    All right.  Let's turn to Page 11.  And I think you

10  hopefully will have Page 11 up there as well.

11       (Document displayed)

12       **MR. DAWSON:**  Let's just highlight everything below

13  "Interrogatory 4(b)."

14       (Document highlighted)

15  **BY MR. DAWSON**

16  **Q**    So Interrogatory 4(b) states (As read):

17            "State when and describe how the company notified

18       consumers, law enforcement, and other third parties

19       about the breach.  Your response should include, but

20       not be limited to, a description of:  How the company

21       determined who to notify; and why the company notified

22       people and entities when it did."

23  **Q**    Can you explain a little bit why this would be relevant to

24  what the FTC is looking at?

25  **A**    Um, there's a few different reasons the FTC might seek

1    this information.  The biggest one is that the FTC does not

2    have -- there's no federal law that requires companies to

3    report a data breach to the FTC, like there is to, really, all

4    50 states.

5         One of the things that the FTC looks at is deception.  So

6    if a company is making representations elsewhere, and turns out

7    that those aren't true, that's a potential thing that we would

8    want to know.  And it was helpful for us, I think, to see the

9    representations that Uber made to all the different state AGs.

10        It's also helpful because one of the things the FTC looks

11   for is to ensure that a breach has been -- that there have been

12   remedial measures, so that consumers are not still at risk of

13   having their information stolen.  And so seeing those types of

14   notifications can be helpful to getting that sort of

15   information.

16   Q    And we spoke earlier about definitions of "breach" in

17   various contexts.  Do you know if -- you mentioned all 50

18   states.  Do they all have the same definition?  Different

19   definitions?  Do you know?

20   A    I believe they differ from one to another.  I don't recall

21   all 50 states' breach notification laws, but the different laws

22   can vary from one to another, somewhat.

23   Q    Okay.  I have one last portion of this document, on

24   Page 13.

25        (Document displayed)

1       **MR. DAWSON:**  Just highlight the first few paragraphs

2   under "Interrogatory 4(c)."

3       (Document highlighted)

4       **MR. DAWSON:**  Sorry, Agent Scussel, why don't we

5   include the interrogatory above as well.  And then down below,

6   see how much we can get.

7       (Document highlighted)

8   **BY MR. DAWSON**

9   **Q**    All right.  So Interrogatory 4(c):

10          "State the number of consumers whose personal

11          information was or may have been accessed; and the type

12          of information that was or may have been accessed; and

13          instances of purported identity theft..."

14          Whoops.

15          (Document displayed)

16  **Q**

17          "...identity theft of any kind using personal

18          information obtained, or believed to have been

19          obtained, from the breach."

20          Do you recall this question?

21  **A**    Generally, yes.

22  **Q**    Why would the FTC ask for this kind of information?

23  **A**    So the FTC is always -- any data security investigation

24  where there's been a breach, the FTC would want to know the

25  number of consumers that have been harmed.

1      And consumer harm is an especially important part of the

2  FTC's legal authority.  If we're going to charge a practice as

3  being unfair, it requires proof of substantial injury, is what

4  the statute says.  So identity theft is kind of the clearest

5  example of that.  And it's -- in looking at potential consumer

6  harm, that's the first thing that we would look at.

7  **Q**    All right.

8          **MR. DAWSON:**  Why don't we pull up the first few

9  paragraphs under the response.

10     (Document displayed)

11  **BY MR. DAWSON**

12  **Q**    So the second paragraph, I think you mentioned something

13  about this earlier (As read):

14          "Uber sent 48,949 notifications to partners

15          regarding this incident.  As described above, Uber

16          notified all U.S. partners whose driver's license

17          information was in the testing file.  The testing file

18          contained multiple entries for some partners, and

19          although Uber removed duplicate entries where they were

20          identified, some partners likely received more than one

21          notification and the true number of potentially

22          affected partners would have been somewhat less than

23          the number of notifications."

24     Do you remember getting any updates on this in terms of

25  the kinds of volume of notifications that the company sent out?

1  **A**    I know that at some point further in the investigation,

2  Uber identified some additional information that they -- that

3  hadn't been discovered in the initial review of the breach.

4  **Q**    I think we'll get to that in the timeline.  But for now,

5  let's move to Exhibit 290.  We're going to move forward in time

6  here.

7        So when Uber sent these answers, would they sometimes

8  encompass multiple questions in the same document?

9        Do you recall how that was sorted out?

10 **A**    I don't remember the particular division of how the

11 questions were separated, but there was -- there were four or

12 five different production deadlines, each of which specified a

13 different number of interrogatories and document requests in

14 the CID that covered a range of different topics.

15 **Q**    All right.  And so this one's dated August 27, 2015?  Do

16 you see that?

17 **A**    I do.

18 **Q**    And let's move to Page 7.

19       (Document displayed)

20 **Q**    All right.  I think we talked earlier, I know we spoke a

21 moment ago about information provided by Uber about the 2014

22 data breach.  So let's take a look at Page 8.

23       (Document displayed)

24       **MR. DAWSON:**  And then just highlight the supplemental

25 response and the two paragraphs below.

1          (Document enlarged)

2   **BY MR. DAWSON**

3   **Q**    So supplemental response to Interrogatory 4.

4          "Uber previously responded to Interrogatory 4 as

5      to the breach that occurred on or about May 12, 2014.

6      Uber here responds regarding other incidents."

7      Do you recall receiving kind of a description of other

8   incidents that Uber provided in response to Interrogatory 4?

9   **A**    I do.

10  **Q**    Do you remember, were these matters that you also would

11  have spoken with someone representing the company about?

12  **A**    We definitely had calls with at least outside counsel

13  about it.

14  **Q**    And in general, the kind of correspondence or

15  communication in this phase of the investigation, we've looked

16  at a number of the written responses.  What other kinds of

17  communications were there?

18  **A**    We frequently would have email correspondence and

19  sometimes phone calls to discuss, you know, both the responses

20  and various additional incidents that occurred while the CID

21  was pending.  That was typically with outside counsel.

22  **Q**    Okay.  And as to these two incidents here (Indicating),

23  based on your involvement in the investigation, were these --

24  were these the subject of a lot of further inquiry?

25  **A**    There was some amount of documents that were produced

1  about these, and there was, you know, some discussion with

2  outside counsel, but neither of these made it into a complaint.

3  Q    And what is it that informs that kind of assessment?  Just

4  generally speaking, not asking for anything kind of internal.

5  A    Generally, staff is looking to try to determine what the

6  best use of resources are in an investigation, where is there

7  the most consumer harm, where are there, you know, where are

8  there issues that would be useful both in this particular case

9  to prevent consumer harm, but also to sort of send a message to

10 the market about the type of practices that other companies

11 should be focused on.  So there's a wide variety of reasons

12 that a company may -- that the FTC may or may not pursue a

13 particular set of facts that come up in an investigation.

14     Here, we wanted to get an understanding of the various

15 different incidents that have been reported, but ultimately

16 focused principally on the larger breach.

17 Q    And is that in part -- I should say, is one of the factors

18 that the FTC would consider relevant the kind of magnitude of

19 exposure of personal information?

20 A    Yes.  That's one of the factors.

21 Q    All right.  Let's move on to Exhibit 292.  I think this

22 will be the last interrogatory response for at least a little

23 while.

24     (Document displayed)

25 Q    So why don't we -- so first of all, in the upper left,

1    says September 25, 2015.  Do you see that?

2    **A**    I do.

3           **MR. DAWSON:**  So let's highlight those, and all the way

4    down to that -- perfect.

5           (Document enlarged)

6    **BY MR. DAWSON**

7    **Q**    All right. (As read)

8           "Identify the officers and manager of the company

9           who have prepared or supervised the preparation of its

10          response to this CID."

11          And the response:

12          "Joe Sullivan, chief security officer and John

13          Flynn, chief information security officer, supervised

14          the preparation of Uber's response to this CID.

15          Mr. Flynn, who recently joined Uber, assisted in

16          supervising this fourth set of responses.  For sections

17          of its responses related to topics other than security,

18          Uber gathered information from relevant business people

19          who are not at the officer or manager level."

20          What do you recall about when you first learned about

21   defendant Sullivan's role in this response?

22   **A**    I think this -- this may have been the first time that I

23   heard of his involvement.  I'm not sure.

24   **Q**    Okay.  And let's look below a little bit.  So,

25   Interrogatory 3(b):

1          "For each system used to collect, process,

2      transmit or store personal information by or on behalf

3      of the company, describe in writing and/or with a

4      diagram, the company flow path for each type of

5      personal information."

6      And then the response:

7          "As agreed, Uber responds regarding its Amazon S3

8      datastore, and it also identifies each other system

9      besides Uber's Amazon S3 datastore used to collect,

10     process, transmit, or store personal information by or

11     on behalf of Uber."

12     Do you recall negotiations with Uber about Amazon Web

13  Services, and what the focus of the response to this

14  interrogatory would be?

15  **A**    I think those occurred before I joined the agency, but

16  yes, I'm generally familiar with that.

17  **Q**    And what are the nature -- what is the nature of that

18  agreement?

19  **A**    There was an agreement to limit the scope of our

20  investigation --

21          **MS. KERIN:**  Objection, personal knowledge.

22          **THE COURT:**  Yeah.  Sustained.

23          **MR. DAWSON:**  Okay.  Well, let's just take a look at

24  the response down below under "Uber's Amazon S3 datastore."

25          (Reporter clarification)

1    **BY MR. DAWSON**

2    **Q**    Do you recall, over your tenure of this investigation, was

3    the Amazon S3 datastore as used by Uber a focus of your

4    investigation?

5    **A**    Yes.

6    **Q**    Why is that?

7    **A**    The Amazon S3 datastore was the focus of our investigation

8    because Uber agreed to modify the CID in a letter from the

9    associate director of the Division of Privacy and Identity

10    Protection, which limited our investigation only to the

11    Amazon S3 datastore as opposed to other parts of Uber's

12    infrastructure.

13    **Q**    And was there something about the Amazon S3 datastore that

14    was of particular interest to your investigation?

15    **A**    Yes.

16    **Q**    What was that?

17    **A**    It was the infrastructure that had been affected in the

18    2014 breach.

19    **Q**    Was it your understanding that Uber used this

20    infrastructure to store personal information?

21    **A**    My understanding is there was a wide variety of files

22    stored in the S3 datastore, some of which included a broad

23    variety of personal information.

24    **Q**    Let's take a look at Page 2.

25        (Document displayed)

1            **MR. DAWSON:**  And we'll just highlight the second

2     bullet.

3            (Document enlarged)

4     **BY MR. DAWSON**

5     **Q**    So (As read):

6            "Other buckets, the remaining buckets hold files

7            for various uses, ranging from temporary storage for

8            temporary files to storage of database backups and

9            databases prunes (discussed in more detail in response

10           to interrogatory 3(c)) and to storage of partner

11           payment invoices.  These files contain a wide range of

12           rider and partner personal information."

13           First, what is a bucket?  Do you remember that term and

14     how that fits in?

15     **A**    I do remember that term.  My understanding is that a

16     bucket is essentially the -- the -- it's the largest kind of

17     division of the -- if you have the S3 datastore you can divide

18     it into a bunch of different kind of folders, essentially, and

19     each one is called a "bucket."  And that is like the biggest

20     set.  You can have sub-buckets or sub-folders kind of within

21     that bucket, but each bucket was kind of the largest way to

22     divide it up.

23     **Q**    Based on your information, do you know what Uber would

24     have referred to as a database backup?

25     **A**    Per my investigation, yes.

1    **Q**    What's that?

2    **A**    My understanding was that a database backup was

3    essentially a complete copy of a database of information that

4    Uber had.

5    **Q**    And how about the next phrase, "database prune"?  Do you

6    know what that is?

7    **A**    Yes.

8    **Q**    What is that?

9    **A**    Database prune, as I understood it, was a -- it was

10   similar to a database backup, except that certain information

11   would have been removed or otherwise hidden.

12        So it was -- it was something that would have -- you know,

13   if there were fields that weren't necessary for whatever

14   purpose the prune file was being used for -- my understanding

15   is typically it was for testing.  You know, if there was some

16   information that wasn't necessary, that would be removed.  If

17   there were things that could be hidden, either through what's

18   called "hash" where -- essentially, a mathematical function

19   that changes the data and makes it harder to read -- or other

20   ways of kind of hiding that data, that prune file wouldn't have

21   the same amount of information that a database backup would

22   have.

23   **Q**    So just to focus in on that last part, based on what you

24   and the FTC were told, was it your understanding that a

25   database backup potentially had more personal information than

 1   a database prune?

 2   A    That was my understanding, based on what we were told.

 3        MR. DAWSON:  All right, let's go to Page 4 of the same

 4   exhibit.

 5        (Document displayed)

 6        MR. DAWSON:  And let's just do the responses down

 7   towards the bottom response to interrogatory, and then the

 8   language below it.

 9        (Document enlarged)

10        MR. DAWSON:  There we go.

11   BY MR. DAWSON

12   Q    So let's read a little bit here about encryption.  There

13   is one more portion on the next page, and then I think we'll

14   move on to some other exhibits.

15        But, do you remember encryption and Amazon Web Services

16   being a focus of the investigation?

17   A    Yes.

18   Q    Why is that?

19   A    It was one of several information security practices that

20   we wanted to follow up on.  In Uber's responses, encryption was

21   one of the things that they raised as a potential way to

22   remediate the breach, and keep the information more secure,

23   going forward.

24   Q    Do you recall if the data that had been taken in the 2014

25   breach had been encrypted or unencrypted?

1    **A**    My understanding is that it was not encrypted at rest.

2    **Q**    How about that last phrase?  What does "encrypted at rest"

3    mean?

4    **A**    So there's a couple of different ways to talk about

5    encryption.  "Encrypted at rest" means that you have files that

6    are, you know, in storage that are encrypted, so basically to

7    use those, somebody would have to decrypt that information.

8        Encryption in transit is another area of encryption that

9    we -- that the FTC often asks about.  "Encryption in transit"

10   refers to sending information, you know, from one service to

11   another.  That information can be encrypted while it's moving.

12       So, you know, secure socket layer or transactions are

13   ones, I think, kind of -- a lot of people encounter when you're

14   moving money from your bank, that information is encrypted,

15   from one place to another.

16   **Q**    Okay.  Let's take a look at the next page.

17       (Document displayed)

18        **MR. DAWSON:**  And particularly the bullet that is

19   entitled, "client-side encryption."

20       (Document displayed)

21   **BY MR. DAWSON**

22   **Q**    So you mentioned encryption in transit.  Do you know what

23   "client-side encryption" refers to?

24   **A**    Generally, I think that means encryption on a device as

25   opposed to, you know, on a server somewhere.

1   **Q**   Okay.  So I'll just read this portion of Uber's response

2   (As read):

3              "Uber also encrypts several files using its own

4        keys before those files are transmitted to S3.  For

5        example, all new database backup files have been

6        client-side encrypted as of August 2014.  Similarly,

7        starting in the spring of 2015, all database prune

8        files stored in Uber's Amazon S3 datastore have been

9        client-side encrypted."

10  We'll get to this later, but do you recall a deposition

11  with defendant Sullivan at some point in 2016?

12  **A**   Yes.  Technically, an investigational hearing, but it's

13  similar to a deposition.

14  **Q**   And do you recall in that -- in the context of that

15  hearing and that testimony, testimony specifically about

16  database backups and encryption?

17  **A**   There was testimony about that, and a broad variety of

18  other issues, yes.

19  **Q**   And we'll get to some of those a little bit later today.

20         Another phrase that I think maybe we could use today and I

21  wanted to cover is "access controls." Do you recall what role,

22  if any, access controls played in your investigation?

23  **A**   So access controls is another security practice that we

24  were looking at.  It was -- along with two-factor

25  authentication and encryption, it was one of the areas that we

1    were inquiring about.

2    **Q**    And is access controls just about employee limitations?

3    Or is there something as well about the keys you were talking

4    about earlier, the kind of Amazon passwords?

5    **A**    "Access controls" refers broadly to any controls that can

6    be put in place to limit the people or services, if it's a

7    machine, that can access a system.  And so the access key is

8    one form of an access control, yes.  And there are many others.

9    **Q**    And I think we have to focus on that a little bit.  You

10   mentioned something about, I think, service access?  I can't

11   remember the term you used.

12       But, what's your understanding of the ways in which data

13   in the Amazon S3 datastore would be accessed?

14   **A**    My understanding, from our investigation, was that there

15   are both kind of machine-to machine access keys, and then there

16   are also -- you know, individual users would have their own

17   access, which wasn't referred to as an access key.  I think

18   that was, like, "identity access management," is how Amazon

19   refers to it.

20   **Q**    And the machine-to-machine, do you have an understanding

21   of what that involves, what makes that different from other

22   forms of access?

23   **A**    At a high level, yes.

24   **Q**    What's that?

25   **A**    My understanding is, you know, there are different

ROSSEN - DIRECT / DAWSON

1    services that need to interact with one another, and it's not

2    like an individual user entering a name and password.  The

3    code, itself, passes a security key that's used to get access.

4    So it's one computer talking to another.

5    **Q**    Do you recall what form of access was implicated in the

6    2014 data breach?

7    **A**    I believe the access key was machine-to-machine code.

8    **Q**    And do you recall where that access key was discovered,

9    where the intruder in the 2014 breach found it?

10   **A**    My understanding was that it had been inadvertently posted

11   to a GitHub Gist.

12   **Q**    So let's take a look at Page 9 of the same exhibit.

13        (Document displayed)

14   **Q**    There is a section here -- and I don't want to get too far

15   into the weeds, but there is something called "automated secret

16   management."  Do you remember this topic coming up in your

17   investigation?

18   **A**    Yes.

19   **Q**    What is automated secret management?

20   **A**    As Uber described it in their responses, automated secret

21   management was a way to manage things like security keys,

22   when -- when code has to contain information like that.

23        You know, historically I think there were challenges in

24   how secrets were managed.  "Secrets" being things like

25   passwords or security keys or code that would gain access to

1  services.  And my understanding is that Uber built their own

2  proprietary system which was used to manage how these keys were

3  used in code.

4  **Q**    Let's look at this section here.  I believe it is the last

5  sentence in the first paragraph, starting with "This system..."

6          "This system allows Uber's engineers to easily

7          implement and deploy services using IAM access keys

8          without ever needing to view those keys with human eyes

9          or to copy the access keys into the source code itself.

10         Langley functions as described below."

11         Do you remember the word "Langley" coming up in this

12  context?

13  **A**    Yes.

14  **Q**    What is Langley, to your recollection?

15  **A**    Langley is a system, this secret automated management

16  system that Uber built.

17  **Q**    For the purposes of your investigation, do you recall what

18  would have been relevant about having an automated secret

19  management system like Langley?

20  **A**    Um, my understanding is it is -- it was -- the breach that

21  occurred in 2014 which included code -- an access key that was

22  just copied in code, my understanding is that a system like

23  Langley would make it less necessary to include code sort of

24  directly stored that way.  It was one more way that they could

25  make it more secure.

1  **Q**    And that last bit, "one more way," would that have been

2  relevant to providing an extra level of protection to any data

3  that could be accessed with such a key?

4  **A**    It was one of many different factors that Uber brought to

5  our attention when describing different steps that they had

6  taken to secure data after the breach.

7  **Q**    Okay.  Let's move on.  We will leave the interrogatory

8  responses for a moment.  Let's move to Exhibit 295.

9      (Document displayed)

10  **Q**    So it is an email chain from October of 2015.  So the

11  bottom email is from Kristen Anderson, with a cc to you.

12      The email is to Rebecca Engrav (As read):

13          "Rebecca, thank you for your voicemail late last

14      week.  I apologize for not getting back to you sooner;

15      I have been out of the office on work travel.  We

16      appreciate your reaching out to us regarding the recent

17      exposure of drivers' information and would like to take

18      you up on your offer to schedule a call, during which

19      you will share as much as you know about what happened,

20      when, and why."

21  And then let's move up to the top part of the email.

22  This is a response from Rebecca Engrav:

23          "Yes, I have discussed with Uber.  We would like

24      for Joe Sullivan (CSO) to be on the call as he can

25      address the facts well.  Joe is not available on

1          Thursday or Friday.  We have a window booked with him

2          for 1:00 p.m. Eastern on Monday - I'm hoping that works

3          for your team as we are juggling several travel

4          schedules on our end."

5          Mr. Rossen, do you remember this general conversation?

6     A    Generally.  I remember that a conversation like this

7     occurred.

8     Q    Do you remember the nature of the incident that was being

9     disclosed to you?

10    A    Based on the timing of this, from October, 2015, I'm

11    pretty sure that it was a separate incident, not the 2014

12    breach.

13    Q    And was that the kind of practice over the course of the

14    investigation, that the company would reach out with new

15    information as it became available?

16    A    Yes.  That happened multiple times.

17         (Document displayed)

18    Q    Just following up on your last answer.  So this is January

19    of 2016.  From Rebecca Engrav to Ms. Anderson and yourself.

20         First of all, who is Kristen Anderson?

21    A    Kristen Anderson was another staff attorney in DPIP.

22    Q    All right.  And the email states (As read):

23          "CONFIDENTIAL.  You may be seeing some stories

24          circulating in the press regarding an exposure of an

25          Uber driver's 1099.  Uber is investigating and

1          responding, and I'll be in touch to set up a time for a

2          call with you on it after we have the facts in hand."

3          Do you remember any incident involving a 1099 that was

4     referred to in this email?

5     **A**    I remember there was an incident that we looked into

6     involving a 1099.

7     **Q**    Okay.  All right.  Let's continue our chronology.  So that

8     is January, 2016.

9          MR. DAWSON:  Let's pull up Exhibit 304.

10         (Document displayed)

11    **BY MR. DAWSON**

12    **Q**    As we get to some of the longer ones, I'll be sure to hand

13    you copies as well.

14         MS. KERIN:  Objection to Exhibit 304.

15         THE COURT:  I'm going to conditionally admit it.

16         (Trial Exhibit 304 conditionally received in evidence.)

17         THE COURT:  And I'm going to tell Mr. Dawson that some

18    time in the next five minutes I would like to have our second

19    break in the afternoon.  So, when it's convenient for you.

20         MR. DAWSON:  I think after this exhibit will be a

21    perfect time.

22         THE COURT:  Okay.

23    **BY MR. DAWSON**

24    **Q**    All right.  So email, February 29, 2016.  So the first

25    paragraph says:

1        "We can confirm March 22 for an in-person meeting

2    with you and Joe Sullivan at our offices."

3    Do you recall a meeting like that happening at your

4 offices?

5 **A**    I do.

6 **Q**    All right.  Let's look at the second paragraph, if we can

7 zoom in on that.

8    (Document enlarged)

9 **Q**    (As read)

10       "To give you a general sense of the kinds of

11    topics we hope to cover, we would very much like to

12    hear more about Uber's company-wide initiatives to

13    strengthen data security and safeguard personal

14    information.  In particular, we are interested in

15    discussing the narrative overview provided in Uber's

16    second set of responses to interrogatories, including

17    the specific steps Uber has taken as part of its

18    'Broader company-wide data security initiative that

19    Uber began in the summer of 2014' described in SEC

20    1(C).  We would also like to discuss Uber's responses

21    to Interrogatories 3(d) through (k) in Uber's fourth

22    set of responses regarding the company's security and

23    cryptography protocols, intrusion detection systems,

24    access controls, and its policies related to

25    monitoring, logging, and training program.  If

1       possible, we would particularly appreciate if

2       Mr. Sullivan can discuss these issues as they apply to

3       Uber's live production databases, and not merely the

4       Amazon S3 datastore.  Finally, I anticipate we will

5       have some additional technical questions regarding the

6       more recent driver portal incidents and the password

7       reset issues we have previously discussed."

8       What kind of meeting was being arranged here?

9  **A**  This was an opportunity for the company to come in and

10  present to FTC staff and attorneys -- I believe there was a few

11  attorneys; there was a technologist who attended as well.  It

12  was an opportunity for the company to come in and essentially

13  tell their story to us, separate and apart from formal

14  responses to the interrogatories and document requests.

15  **Q**  And do you recall, was this something that the FTC

16  requested?  Or is this something that the companies

17  occasionally offer?

18  **A**  It pretty common in investigations for companies to want

19  to come in and do this.  Not something that the FTC requests,

20  but we generally entertain the meetings.

21  **Q**  And we'll get to the details after the break, but

22  generally speaking, what was -- set the scene a little bit

23  about that presentation.  Who was there, and what was the

24  nature of the presentation?

25  **A**  I don't know if I remember everybody who was there.  But

1    Uber's outside counsel arrived.  Mr. Sullivan participated in

2    the meeting.  I believe that John Flynn was at this meeting as

3    well.  And there may have been another in-house person for --

4    from Uber who was there.

5        And then, like I said, there was a number of FTC staff

6    attorneys, myself and a couple others who were working on the

7    case.  And I believe our staff technologist attended as well.

8    **Q**    What is a staff technologist?

9    **A**    So in DPIP there is -- I believe there is still only one,

10   but there is an employee who is on staff who has technical

11   experience -- I believe he has, you know, a Ph.D. in computer

12   science or some related field -- who's there to assist staff

13   with developing investigations, interpreting responses that

14   companies provide.  Can provide sort of an extra layer of

15   technical knowledge and advice that many attorneys don't have.

16       **MR. DAWSON:**  And Your Honor, I think that might be a

17   good time for a break.

18       **THE COURT:**  Good.

19       So ladies and gentlemen, we will take our second break.

20   Going to come back at 12:30.  So, a shorter break than usual.

21   Please, remember the admonitions.  And, we will be back at

22   12:30.

23       (Jury excused)

24       (The following proceedings were held outside of the

25   presence of the Jury)

1      **THE COURT:**  All right.  We are in recess.

2          (Recess taken from 12:19 p.m. to 12:31 p.m.)

3          (The following proceedings were held outside of the

4      presence of the Jury)

5          **THE COURTROOM DEPUTY:**  Come to order.

6          **THE COURT:**  Everybody ready?

7          **MS. KERIN:**  Yes.

8          **THE COURT:**  Mr. Dawson?

9          **MR. DAWSON:**  Yes.

10         **THE COURT:**  Okay.  Let's get the jury.

11         (The following proceedings were held in the presence of

12     the Jury)

13         **THE COURT:**  All right, please be seated, everybody.

14     Mr. Dawson, please go ahead.

15         **MR. DAWSON:**  Thank you, Your Honor.

16                    **DIRECT EXAMINATION, RESUMED**

17     BY MR. DAWSON

18     **Q**    I would like to move on to the presentation, itself, which

19     will be Exhibit 310.

20         (Document displayed)

21     **Q**    And let me hand you a copy.

22         Mr. Rossen, do you recognize Exhibit 310?

23     **A**    I do.

24     **Q**    What is this?

25     **A**    This is a copy of a presentation that was -- that -- these

1    are the slides that accompanied the meeting that Uber held at

2    our offices in March, 2016.

3    **Q**    And this is the meeting you were describing a little bit

4    before we had our break?

5    **A**    Yes.  This is the same meeting.

6    **Q**    Do you recall who, if anybody, kind of took the lead in

7    this presentation?

8    **A**    I remember Rebecca Engrav gave a sort of general

9    introduction and then handed it over to Mr. Sullivan, who

10   described most of the security developments that are in the

11   slides.

12   **Q**    Do you remember John Flynn playing a role?

13   **A**    I believe he was there, too.  I think he may have handled

14   one section of the presentation.

15   **Q**    Do you recall which section, or no?

16   **A**    I don't recall.

17   **Q**    All right.  Let's take a look at Page 2.

18       Nice thing about the presentation, I think it's formatted;

19   we probably don't need to magnify.  I'll save Agent Scussel the

20   trouble.

21       So here, for Mr. Sullivan, it lists:  Uber's Chief

22   Security Officer, April, 2015.  Prior to Uber, U.S. DOJ

23   cybercrime prosecutor, eBay and PayPal, Facebook CSO from 2009

24   to 2015, Commission on Enhancing National Cybersecurity.

25       At the time, Mr. Rossen, were you familiar with

ROSSEN - DIRECT / DAWSON

1   Mr. Sullivan's background?

2   **A**   I'm familiar with his background from what he testified to

3   in the investigational hearing and from his presentation.

4   **Q**   So in the timeline, is this the first that you remember

5   learning about some of his background?

6   **A**   I think I probably heard it before.

7   **Q**   Okay.  So let's turn to Page 4, which lists an agenda.

8       (Document displayed)

9   **Q**   So, the agenda for the presentation.  Do you remember

10  roughly the matters that were discussed at the presentation?

11  **A**   At a high level, yes.

12  **Q**   So, listed here are (As read):

13          "Uber's Security Organization, Security Culture

14      and Awareness, Security Software Development Lifecycle,

15      Access Controls, Threat Detection and Response, Uber's

16      Data Security roadmap."

17      And I think we talked about access controls before.  Can

18  you remind the jury what that term refers to?

19  **A**   Access controls are one of various security practices that

20  are used to limit who has access to certain information.

21  **Q**   All right.  Let's move to the next page, or why don't

22  we -- yeah, move to Page 6 this time.

23      (Document displayed)

24  **Q**   So this lists a kind of org chart with Mr. Sullivan

25  reporting to Travis Kalanick.

1      Do you recall, in the course of your investigation, any

2  interactions with Travis Kalanick?

3  **A**   No.  It would not be typical for staff to interact with

4  the CEO of a company we're investigating, of this size.

5  **Q**   Under Mr. Sullivan, we have (As read):

6          "Engineering Security, Four Flynn."

7      Were you mentioning somebody with the last name Flynn a

8  moment ago?

9  **A**   Yes, I believe Four Flynn is the same person referred to

10  on the front page of this presentation, John Flynn.  He went by

11  "Four."

12  **Q**   And then the group next to that, Investigations, lists Mat

13  Henley.  Do you know Mat Henley?

14  **A**   I don't know him.  I've seen his name.

15  **Q**   Do you recall what role, if any, he played in the response

16  to the FTC's investigation?

17  **A**   Not specifically.

18  **Q**   Did you ever meet him?

19  **A**   No.

20  **Q**   All right.  Let's move to the next page.  Page 7.

21      (Document displayed)

22          **MR. DAWSON:**  So in this one, zoom in on the couple

23  here on the left.

24  **BY MR. DAWSON**

25  **Q**   Chief Security Officer listed at the top, Joe Sullivan.

```
 1    On the left you have Engineering Security, under Four Flynn.

 2    Under that is Security Engineering, Product Security, Platform

 3    Security, Compliance, Security Response, enterprise security.

 4         Mr. Rossen, do you remember at all the kind of nature of

 5    the presentation that accompanied these slides?

 6  A    At a high level, yes.

 7  Q    What was that?

 8  A    Generally this presentation was intended to communicate

 9    kind of the changes that had been implemented at Uber since

10    Mr. Sullivan took over as CSO.  It was similar in many respects

11    to a lot of these recitations that FTC staff sees in

12    investigations like that.  We commonly refer to them as

13    "dog-and-pony shows," when companies come in and want to show

14    us everything that is most impressive.  And I think they --

15    they did a good job with that in this presentation.

16  Q    Okay, let's move to Page 9.

17       (Document displayed)

18  Q    Security Team Growth.  Do you remember there being

19    discussion at this meeting about the growth of Uber's security

20    team?

21  A    Yes.

22  Q    How was that explained?  What do you recall about that?

23  A    Uber's security team had grown pretty significantly over a

24    short period of time.

25  Q    And the last date on this chart lists December 31st of
```

1   2016.  The presentation we were talking about, I think, on the

2   front lists March 23rd.  Do you recall there being a discussion

3   of kind of prospective anticipated growth?

4   **A**   I don't recall.

5   **Q**   Okay.  So let's move to Page 31.

6        (Document displayed)

7   **Q**   Bug Bounty Program.  Do you remember any conversations or

8   a portion of the presentation about something called "bug

9   bounty"?

10  **A**   I do.

11  **Q**   What do you recall?

12  **A**   I believe this presentation came pretty shortly after Uber

13  had made a big public announcement about partnering with

14  HackerOne which is a company that operates bug bounty programs

15  and that they had launched with, you know a fair amount of

16  press in the sort of niche security world reporting on this

17  kind of thing, about instituting a bug bounty program at Uber.

18  **Q**   And what was your understanding, based on this

19  presentation, of what a bug bounty program is?

20  **A**   Generally, a bug bounty program is a way to incentivize

21  people to report security vulnerabilities that they discover,

22  instead of exploiting them or doing something else with the

23  information.

24       The idea is that there's a set kind of payment structure

25  that identifies, you know, if you come and report information

1  that leads to, you know, the ability to patch a major security

2  flaw, you can get a reward and get paid out.

3      So it's an incentive to bring that to a company's

4  attention instead of, you know, trying to do something more

5  nefarious with the data.

6  **Q**   Do you remember anything about the specific monetary

7  rewards that the Uber staff, Mr. Sullivan and Mr. Flynn,

8  discussed with you?

9  **A**   Yes.

10  **Q**   What do you recall?

11  **A**   My recollection was that the largest payout under the bug

12  bounty was, I think, $10,000, which was supposed to be for, you

13  know, critical vulnerabilities.

14  **Q**   All right.

15      **MR. DAWSON:**  Let's move to Page 32.

16      (Document displayed)

17  **BY MR. DAWSON**

18  **Q**   Do you remember a portion of the presentation focused on

19  other data security incidents separate and apart from the 2014

20  breach?

21  **A**   Yes.  From the slides, I remember that there was some

22  discussion about them.

23  **Q**   And do you have any independent recollection of that

24  general topic coming up?

25  **A**   At a high level, yes.  I know it was one of the topics we

ROSSEN - DIRECT / DAWSON

1  wanted to discuss.

2  Q    This first slide, "1099 Incident" -- first of all, do you

3  remember anything about the details of the 1099 incident?

4  A    Generally I remember that there was some reporting about a

5  driver portal that Uber had which was sort of how drivers would

6  see their own documents.  You know, there's -- whether it's tax

7  forms or pay stubs or whatever it is that drivers need to look

8  at.

9        There was some reporting about drivers seeing, you know,

10  other people's information.  So when they logged in, they could

11  see somebody else's tax form or -- I believe that's what's

12  referred to as the 1099 incident.

13  Q    We'll go forward and see if some of the other documents

14  might refresh you.  But the bullets under here, what do these

15  bullets reflect?

16  A    I'm sorry, I'm not sure I understand the question.

17  Q    So in general -- I'll just read a couple of them.

18            "Created custom documentation and training.

19            "Added to product security audit scope.

20            "Added additional positive and negative (invariant)

21            unit tests to this portion of code base.

22            "Exploring end-to-end testing."

23        Is it your understanding that this was essentially a list

24  of the things that Uber had done to respond to whatever that

25  incident had been?

1    A    Yeah.  Looking at the slides, I mean, these were different

2    remedial measures that they talked about at the meeting in

3    response to these different incidents.

4    Q    Let's move to the next page, which is 33.

5        So this one is titled "The Partner Portal Incident."  I

6    think you mentioned the portal --

7    A    Yeah.  This might have been the incident.  There were a

8    number of these kind of small incidents that involved, you

9    know, a relatively low number of consumers' information that

10    was exposed.  And it only lasted for a relatively short period

11    of time.  There were a few of these, and the details I don't

12    necessarily remember.

13    Q    And when you say "relatively small," do you have a

14    recollection of what we are talking about?  On the order of

15    ten, a thousand?

16    A    There were different incidents.  But I think, in some

17    cases, yes, there might have been ten or fewer.  They were

18    small numbers.

19    Q    All right.  So the partner portal incident, listing under

20    there (As read):

21            "Expire links after ten seconds, performed

22        in-depth security audit of entire code base of partner

23        portal, improved product security processes in

24        detection and alerting, exploring whether can greatly

25        reduce number of documents available in portal."

1    Let's move to one page the next page, on 34.

2    (Document displayed)

3    Q    So the title here is "Password Reset Incident."  Do you

4    recall anything about the password reset incident?

5    A    Yes.

6    Q    Generally, what do you remember?

7    A    There was some reporting that people who tried to reset

8    their passwords wouldn't end up logging out, kind of, from all

9    different devices.  So the way it was reported was, you know,

10    somebody changes their password if they forgot it, you know,

11    they get a password reset link, change their password.

12    But somebody else, you know, could have had -- the way it

13    was reported was that somebody else could have had access to

14    that account, and continue to use it for rides.  So it was

15    something that we end up looking at for a while.

16    Q    Okay.  The bullet at the bottom, "Working on passwordless

17    authentication" do you remember anything about that?

18    A    Not specifically, no.

19    Q    Let's move to the next page.

20    (Document displayed)

21    Q    Do you remember there being a portion of this presentation

22    on access controls?

23    A    Yes.

24    Q    All right.  Let's move one page ahead to Page 36.

25    (Document displayed)

1    **Q**    (As read)

2           "Access Controls, Our Approach.  Strong

3      authentication, least privilege, logging and

4      monitoring."

5      Based on your participation in the investigation, what is

6    "strong authentication"?

7    **A**    I don't remember specifically what this referred to in

8    this bullet.

9    **Q**    Okay.  How about "least privileged"?  Is that sort of a

10   commonly-understood security term?

11   **A**    Yes.

12   **Q**    What does that mean?

13   **A**    "Least privileged" is the concept of only giving people

14   access to the least amount needed or required to, you know,

15   fulfill their responsibilities.

16        So, you know, a customer service agent doesn't need to

17   have access to every single thing that a company has.  The idea

18   they just need what they need, to do their job.  And that's the

19   principle of "least privileged."

20   **Q**    Let's move to the next page to, Page 38.  Internal

21   Authentication.  First one is Multi-factor Authentication.  You

22   may have touched on this earlier, but do you have any

23   recollection at this meeting of a discussion of multi-factor

24   authentication?

25   **A**    I know it was discussed; I don't know specifically what

 1   was presented at this meeting.

 2   **Q**   How about "Langley Key Management for Keys"?  Do you

 3   remember what Langley was?

 4   **A**   Langley was the secret management service that we talked

 5   about previously.

 6   **Q**   And is that what we talked about earlier, the machine --

 7   machine access?

 8   **A**   It may have covered more than that; I don't remember.

 9   **Q**   Let's move to Page 40.

10           "AWS Key Improvements.  AWS Portal Issues Access

11       with 20-Hour Expiry on Keys."

12       Do you remember what that refers to?

13   **A**   Not specifically.

14   **Q**   How about "Multi-factor Authentication for Access to AWS"?

15   **A**   Yes, generally.

16   **Q**   And generally what does that refer to?

17   **A**   I know that there were some steps that Uber took to add

18   multi-factor authentication for -- certainly for individuals

19   that were accessing Amazon Web Service, and maybe -- it may

20   also have been for sort of machine-to-machine codes, but I

21   don't remember specifically.

22   **Q**   Do you remember about how long this meeting lasted?

23   **A**   We probably booked 60 to 90 minutes; I don't recall

24   specifically.

25   **Q**   Okay.  And at some point after this meeting in March, did

1    there come a time when the FTC asked Uber to basically provide

2    a witness who could testify under oath?

3    **A**    Yes.

4        (Document taken off display)

5    **A**    Yes.  We ultimately issued another CID that included

6    requests for oral testimony.

7            **MR. DAWSON:**  Let's pull up Exhibit 316.

8        (Document displayed),

9            **MR. DAWSON:**  I'll hand a copy to Mr. Rossen.

10    **BY MR. DAWSON**

11    **Q**    So Mr. Rossen, do you recognize this document?

12    **A**    I do.

13    **Q**    What is it?

14    **A**    This was the second CID issued to Uber in 2016.

15    **Q**    Before we get into the details, do you remember, did this

16    include interrogatories as well?

17    **A**    I believe there were some interrogatories, some document

18    requests.  And then also requests for oral testimony.

19            **MR. DAWSON:**  All right.  Let's just zoom in on the

20    first page, where it says -- yeah, that line over to where

21    "Your appearance will be before..." and the date and time of

22    hearing.

23        There we go.

24        (Document enlarged)

25

1    **BY MR. DAWSON**

2    **Q**    All right.  So (As read):

3              "Your appearance will be before Ben Rossen, or

4         other duly designated person.  Date and time of hearing

5         or deposition, August 12, 2016, at 9:00 a.m."

6         Did the hearing ultimately take place on that date?  Or

7    was it delayed?

8    **A**    No, it happened in November.

9    **Q**    All right.  Let's turn to Page 10.

10        (Document displayed)

11             **MR. DAWSON:**  I think that looks like 17.

12        (Document displayed)

13   **BY MR. DAWSON**

14   **Q**    All right.  Now, unfortunately, just the bottom line there

15   says "Oral testimony." Do you see that, Mr. Rossen?

16   **A**    I do.

17             **MR. DAWSON:**  Let's look to the next page.

18        (Document displayed)

19             **MR. DAWSON:**  All right.  And let's highlight, see if

20   we can just blow up what we can on that whole page of text.

21        (Document enlarged)

22   **BY MR. DAWSON**

23   **Q**    All right.  We won't spend too much time here.

24        So the top reads (As read):

25             "The company is required to designate and make

1          available one or more officers, directors, or managing

2          agents, or others who consent, to testify on its

3          behalf.  Unless a single individual is designated, the

4          company must designate in advance and in writing the

5          matters on which each designee will testify."

6      Do you recall which witness Uber designated to testify on

7    its behalf?

8    **A**    Uber designated Mr. Sullivan.

9    **Q**    And then the numbers below this, the rest of the page,

10   what do those numbers represent?

11   **A**    I'm sorry; which numbers?

12   **Q**    So, 1 through 6 on this page, if you can take a look, what

13   are those?

14   **A**    Oh.  So these are the different topics that we wanted to

15   cover at the investigational hearing.

16       Essentially, when we issue -- when the FTC issues a CID

17   like this for oral testimony, you ask the company to put

18   forward somebody that has personal knowledge on whatever topics

19   you want to address.  So the -- the CID lays out a number of

20   topics that were going to sort of set the bounds for what we

21   intended to discuss at the investigational hearing.

22          **MR. DAWSON:**  Let's pull up No. 3 with (a), (b) and (c)

23   below.

24       (Document enlarged)

25

1    BY MR. DAWSON

2    **Q**    All right.  (As read)

3              "For the time period from January 1, 2014 through

4         the date of full compliance with the CID, the company's

5         physical, administrative, or technical security

6         measures for safeguarding the personal information of

7         users and drivers.  This topic includes but is not

8         limited to all policies, practices, and procedures

9         relating to:

10             "(a) Encryption, including but not limited to the

11        extent to which the company collects, processes,

12        transmits or stores personal information in unencrypted

13        form?

14             "(b) Access controls relating to personal

15        information, including but not limited to the company's

16        use of authentication credentials or access keys;

17             "(c ) Information security-related training for

18        employees...."

19        So one definition of terms as we go, "authentication

20   credentials or access keys," based on your investigation, do

21   those have different meanings?  Or how do you interpret those?

22   **A**    I think at the time we drafted this, we were referring to

23   sort of the difference between, you know, individual

24   credentials versus the machine-to-machine keys that we were

25   talking about previously.

ROSSEN - DIRECT / DAWSON

1  **Q**    Let's move down to 4, if we can blow up No. 4.

2       So Topic No. 4 (As read):

3            "The company's Amazon S3 datastore, including but

4       not limited to the types and amounts of user and driver

5       personal information stored in the company's Amazon S3

6       'buckets,' and whether the access key that was used

7       without authorization to access the company's S3

8       datastore on or about May 12, 2014 could have been used

9       to access such personal information."

10      And then, one last one.  Let's look at 5 down below.

11      (Document displayed)

12 **Q**    (As read)

13           "The company's investigation and response to the

14      unauthorized access to personal information stored in

15      the company's S3 datastore that occurred on or around

16      May 12, 2014 (hereinafter, 'the breach'), including but

17      not limited to:

18           "The steps taken to identify any personal

19      information that was or could have been accessed ahead

20      as a result of the breach;

21           "The company's incident response policies and

22      procedures;

23           "And the company's notification to users or

24      drivers whose personal information was accessed without

25      authorization as a result of the breach."

1      Do you recall, did Mr. Sullivan ultimately provide

2  testimony on these subjects?

3  **A**    Yes.

4           **MR. DAWSON:**  Let's move to Exhibit 340.

5      (Document displayed)

6  **BY MR. DAWSON**

7  **Q**    Mr. Rossen, do you recognize this document?

8  **A**    I do.

9  **Q**    I will hand you up a paper copy, since it is relatively

10 long.

11     Did Mr. Sullivan ultimately provide sworn testimony on

12 November 4th, 2016?

13 **A**    Yes.

14 **Q**    And was that testimony pursuant to the CID we looked at a

15 moment ago, with those topics listed?

16 **A**    Yes.  There may have been some additional discussion

17 narrowing the topics, but generally, yes.

18 **Q**    Where did that deposition -- or investigational hearing,

19 as you mentioned -- where did that occur?

20 **A**    It was at the FTC's offices here in San Francisco.

21 **Q**    Do you recall who attended?

22 **A**    I attended, along with my colleague, Jim Trilling.

23 Mr. Sullivan was there, along with Rebecca Engrav.  I believe

24 there was also an Uber in-house attorney who attended.  And I

25 believe that was -- and a court reporter.

**ROSSEN - DIRECT / DAWSON**

1  **Q**    Do you recognize the name "Sabrina Ross"?

2  **A**    Yes.

3  **Q**    Do you know who she was?

4  **A**    She was an in-house counsel at Uber, at the time.

5  **Q**    And do you recall whether she may have been at the

6  hearing?

7  **A**    I think she was.

8  **Q**    Do you remember about how long the hearing lasted?

9  **A**    We had reserved a full day.  I think it ended up going

10  until about 3:00 or 3:30.

11  **Q**    You mentioned a little earlier about the presentation and

12  Mr. Flynn, so I just want to get our personnel straight.

13      Was Mr. Flynn in attendance at this hearing?

14  **A**    No, I don't think so.

15  **Q**    Are you familiar with an individual named Craig Clark?

16  **A**    I'm familiar with his name, yes.

17  **Q**    Did he attend this hearing?

18  **A**    No.

19  **Q**    Did you ever meet Craig Clark?

20  **A**    No.

21  **Q**    How about the name Mat Henley, who we talked about a

22  little earlier.  Do you recall if he was at this hearing?

23  **A**    He was not.

24  **Q**    So let's start going through this.

25      Now, my plan here -- and I apologize, since you have

1    already gone through this deposition once, but we have selected

2    a few portions that we're hoping to read for the benefit of the

3    jury.

4            And if it's convenient for you and for the Court --

5            **MR. DAWSON:**  I was going to have Mr. Rossen ask the

6    question, and then I was going to read the response for certain

7    designated portions.

8            **THE COURT:**  All right.

9            **MR. DAWSON:**  So let's turn to Page 4 of the exhibit.

10   All right.  And Mr. Rossen has the copy up here, and I think as

11   we go through Agent Scussel will try and magnify as we proceed.

12   **BY MR. DAWSON**

13   **Q**    So Mr. Rossen, why don't you ask the question at Line 7.

14   And, to be clear, when it says "Q," what does Q reflect in the

15   transcript?

16   **A**    Qs are questions that I asked.

17   **Q**    And what is referred to by "A"?

18   **A**    That was the witness's response, Mr. Sullivan's response.

19   **Q**    Was there another witness at this hearing or was it all

20   Mr. Sullivan?

21   **A**    No.  He was the only witness.

22   **Q**    Okay.  Why don't you proceed?

23   **A**    It says (As read):

24           "And you are formally a federal prosecutor,

25       correct?"

1     It should say "formerly," but we never corrected this

2  transcript.

3  **Q**     "That's right."

4  **A**     "And could you just walk through, I guess, starting with

5  your earliest job ut of law school, just quickly describe your

6  professional experience."

7  **Q**     "Sure.  When I graduated from law school -- well, when I

8  was in law school, I applied to the U.S. Department of Justice

9  Honor Law Grad Program.  I was accepted and did a one-year

10 clerkship with the Department of Justice.  After finishing the

11 clerkship, I went to work in Miami at a law firm.  I decided to

12 move to California.  So left my law firm, moved to California,

13 took a job again with the Department of Justice in

14 San Francisco.  Then I had the opportunity to become an

15 Assistant U.S. Attorney; moved to Las Vegas to join the U.S.

16 Attorney's office for the District of Nevada.  After some time

17 there, I had the opportunity to come back to Northern

18 California to the U.S. Attorney's office in the Northern

19 District of California, and I left that job in the spring of

20 2002."

21    And if you can proceed to with the next question.

22 **A**     "And in the Federal Prosecutor's office in California, was

23 that the Computer Hacking and IP Unit?"

24 **Q**     "Yeah, so when I came back from -- when I went to

25 Las Vegas, the U.S. Attorney's office, the Department of

1   Justice had a program called the Computer and Telecommunication

2   Crime Coordinator Program, and so one attorney from every U.S.

3   Attorney's office was qualified to receive special training on

4   computer and telecommunication crime.

5        "So during my time in Las Vegas, I was asked to take on

6   that role for the District.  Then a couple of years later, the

7   U.S. Attorney's office for the Northern District of California

8   decided to start a dedicated high tech crime unit called the

9   CHIP Unit, Computer Hacking and IP, and I got to become a

10  founding member that unit at the beginning of 2000.

11       "So that was kind of the type of -- so I was part-time

12  focused on high-tech in Las Vegas and then full-time when I

13  came back to Northern California."

14  **A**    "And in 2002 did you go to eBay?"

15       **MR. DAWSON:**  Maybe would it be easier, I'd be happy to

16  do the questions as well if --

17       **THE WITNESS:**  I mean, I can ask them if you want me

18  to.

19       **MR. DAWSON:**  How about, Your Honor, I'll do both

20  sides.

21       **THE COURT:**  That's fine.

22       **MR. DAWSON:**  Just to prevent the back-and-forth and

23  imposing further on Mr. Rossen.(As read)

24       ▪**QUESTION:**  And in 2002 did you go to eBay?

25       ▪**ANSWER:**  In 2020 -- in spring -- April, at the end of

1      April, 2002..."

2          MS. KERIN:  Your Honor, I'm sorry.  Excuse me.

3      I object, Your Honor.  Mr. Dawson is testifying.  Certain

4      questions to the witness, Your Honor.

5          THE COURT:  I'm sorry; Mr. Dawson is not testifying.

6      He's reading the transcript.  So --

7          MS. KERIN:  Your Honor, the witness could probably

8      read the transcript.  It seems improper to have Mr. Dawson read

9      the transcript.

10         THE COURT:  I don't think there's anything improper

11     with this.  Overruled.

12         MS. KERIN:  Okay.  Thank you, Your Honor.

13         MR. DAWSON:

14     "QUESTION:  In 2020 -- in spring -- April, at the end of

15     April, 2002, I left the Department of Justice, went to

16     eBay to oversee the investigations work, work with law

17     enforcement and manage regulatory affairs for the legal

18     department.

19     "QUESTION:  So was that a legal position?

20     "ANSWER:  It was kind of a hybrid role.  I reported to the

21     head of Trust and Safety, who also was a former federal

22     prosecutor, but he ran an operational department, but I

23     also served in a legal capacity.  So I managed and built

24     out the regulatory team on the one hand, but I also

25     managed and built out the law enforcement team on the

1    other and was part of the safety organization.

2    ▪QUESTION:  So eBay from 2002 to 2006; is that correct?

3    ▪ANSWER:  That's correct.

4    ▪QUESTION:  And then PayPal?

5    ▪ANSWER:  So during my time at eBay we acquired PayPal,

6    and after four years of kind of overseeing those two

7    different roles and building out those two different

8    teams, I moved over to PayPal to run The North American

9    legal team for PayPal.

10   ▪QUESTION:  And from PayPal where did you go next?

11   ▪ANSWER:  In December of 2008, I left PayPal to join

12   Facebook.

13   ▪QUESTION:  And what was your position at Facebook?

14   ▪ANSWER:  When I started, I was hired to do product

15   counseling and privacy.

16   ▪QUESTION:  Is that a legal position?

17   ▪ANSWER:  Yes, in the legal department.

18   ▪QUESTION:  Did there come a time when you became the

19   chief security officer at Facebook?

20   ▪ANSWER:  Yes, probably within a year.

21   ▪QUESTION:  Was that also a legal position at Facebook?

22   ▪ANSWER:  So the chief security role was not a legal

23   position.  It involved managing product security.  It

24   involved kind of the whole gamut of security.  I also was

25   responsible for physical security, investigations, product

 1    security, the team that worked with law enforcement and a

 2    bunch of other different kind of security functions,

 3    compliance.

 4         "I reported to the general counsel during my time

 5    at Facebook, but we considered it a separate

 6    department.  I also retained a legal title and

 7    primarily in the context of handling

 8    law-enforcement-related issues and investigations.

 9         "And so I had a -- similar to my time at eBay I

10    had a team of lawyers that reported to me, but I also

11    had a large department of investigations and product

12    security and engineering and all that.

13    "QUESTION:  And from Facebook, where did you go next?

14    "ANSWER:  And in April of 2015, I left Facebook to join

15    Uber.

16    "QUESTION:  Okay.  What is your title at Uber?

17    "ANSWER:  Chief Security Officer.

18    "QUESTION:  And as Chief Security Officer, what are your

19    primary responsibilities?

20    "ANSWER:  Really, it's managing any kind of risk for the

21    company that is -- I guess anyone in leadership at a

22    company manages risk, but my job is anything related to --

23    well, financial risk, information security risk, safety

24    risk for riders or drivers, physical security risk for

25    employees or assets, and also oversee investigations.  So

1    it's fairly similar to roles I've had at other companies,

2    except maybe -- this is the first company where I've

3    overseen the financial risk as well.  So like the fraud

4    function.

5         "Among your responsibilities, are you responsible

6    for developing the company's --"

7         **THE COURT:**  Question.

8         **MR. DAWSON:**  Oh forgive me.

9    **"QUESTION:**  Among your responsibilities, are you

10   responsible for developing the company's security

11   practices and policies?

12   **"ANSWER:**  Yes.

13   **"QUESTION:**  And as CSO, who do you report to at Uber?

14   **"ANSWER:**  I report to our CEO.

15   **"QUESTION:**  And what does Uber call your division, the

16   business unit that you oversee?

17   **"ANSWER:**  Generally -- well, I guess we officially call it

18   Security.

19   **"QUESTION:**  And is that its own department?  Is it part of

20   the legal department?

21   **"ANSWER:**  It's its own separate department.  I do have a

22   lawyer who reports to me who -- so I consider myself to

23   have a dotted line to the general counsel for purposes of

24   that, and if I'm going to be involved in legal affairs, I

25   need to be -- what's the right word? -- under her purview.

1      **"QUESTION:**  So I'm sorry, may have just missed the last

2      part.  Did you say you have a lawyer who reports to you or

3      that you report to?

4      **"ANSWER:**  That reports to me.  So due to the nature of the

5      type of work that we do in security, it's usually

6      important to have the vetted lawyers with the team in one

7      way or another.  And so that's kind of a practice I've had

8      over the years and continue to have with Uber.

9      **"QUESTION:**  Is there one lawyer on your staff?

10     **"ANSWER:**  Right now, yes.

11     **"QUESTION:**  Do you similarly see your position as kind of

12     a hybrid legal and business, as you described some of your

13     previous positions?

14     **"ANSWER:**  It's very -- it's much less of a hybrid than the

15     other positions because the -- the legal role in -- that I

16     oversee in Uber or the responsibilities is much more

17     narrow.  I think it's really just focused on the

18     investigations and not even all of the law enforcement

19     stuff, so...

20     **"QUESTION:**  What percentage of your time do you spend on

21     legal issues?

22     **"ANSWER:**  In terms of like managing and giving legal

23     advice, I don't know, maybe 5 percent.

24     **"QUESTION:**  And who is the lawyer that reports to you in

25     your department?

1    **"ANSWER:** Craig Clark."

2   **BY MR. DAWSON**

3   **Q**    Mr. Rossen, you mentioned a minute ago that you were

4   familiar with the name "Craig Clark."

5   **A**    Yes.

6   **Q**    Do you recall any other instance in the course of your

7   investigation where his name came up, as we've just seen here?

8   **A**    I know his name also came up in conjunction with another

9   breach that occurred in 2016.

10  **Q**    Okay.  And we'll get to that a little bit later.

11           **MR. DAWSON:**  I would like to move, being as efficient

12  as possible, to the little "Page 16" at the bottom right.

13       (Document displayed)

14  **BY MR. DAWSON**

15  **Q**    So we'll start with the question.

16       **"QUESTION:**  What did you do prepare for the hearing today?

17       **"ANSWER:**  To prepare for the hearing, I had a number of

18       meetings with our counsel to go over the topics, and we

19       included some of the engineers in most meetings and then I

20       reviewed the materials.

21       **"QUESTION:**  Whoa were the engineers you included in the

22       meetings?

23       **"ANSWER:**  I think they were Alex Garbutt and -- was it

24       Collin Greene.  I can't recall anyone else.

25       **"QUESTION:**  Was there anyone else besides engineers and

1    counsel present at the meeting?

2    ▪ANSWER:  No.

3    ▪QUESTION:  Other than the engineers you mentioned, did

4    you speak with any current employees?

5    ▪ANSWER:  I sent -- so I asked a couple of people

6    questions about -- making sure that we had referenced the

7    up-to-date versions of our security policies, because I

8    noticed that some of these had dates and I knew that we

9    had specific changes in the works or may have already been

10   done.  I think that's the only other thing I checked on.

11   ▪ANSWER:  And were those the engineers that you spoke with

12   or were those other people?

13   ▪ANSWER:  No, that was one of our compliance leaders.

14   ▪QUESTION:  And what is that person's name?

15   ▪ANSWER:  Prithvi Rai, P-R-I-T-H-V-I  R-A-I.

16   ▪QUESTION:  And do you understand that some of these

17   topics relate to time periods before you were hired at

18   Uber?

19   ▪ANSWER:  Yes.

20   ▪QUESTION:  And what did you do to educate yourself about

21   the topics that relate to before you were hired?

22   ▪ANSWER:  Well, just what I mentioned.

23   ▪QUESTION:  Did you speak with any former employees?

24   ▪ANSWER:  No.

25   ▪QUESTION:  How much time did you spend preparing for the

1        hearing today?

2        "ANSWER:  I don't know.  That's a good question.  Maybe a

3        dozen hours over the course of -- I don't know how many

4        meetings we had.  Over the course of -- they were kind of

5        spaced out.

6        "QUESTION:  So over the course of a month or so?

7        "ANSWER:  Yeah.

8        "QUESTION:  With respect to some of the topics that

9        predate your employment, do you have knowledge about any

10       of these topics through your position at Uber?

11       "ANSWER:  Absolutely.  I was hired to come in and be

12       responsible for this area, so the first thing I did was

13       try and get a sense of where we stood.  I also had a sense

14       from the interview process and from my dialogue with the

15       company well before I started, because people at Uber had

16       been asking me for advice going back to 2014.

17       "QUESTION:  So separate from processes you took to educate

18       yourself about the topics, do you have personal knowledge

19       about Uber's security practices from the 2014 through 2015

20       timeframe?

21       "ANSWER:  Yes."

22  BY MR. DAWSON

23  Q    I wanted to focus, Mr. Rossen, about the series of

24  questions on preparation.

25       Is that a typical component of one of these hearings that

**ROSSEN - DIRECT / DAWSON**

1  you might undertake?

2  **A**    I would say those are standard questions for any

3  deposition.

4  **Q**    And, what is that -- what's that getting at?  What's the

5  purpose of that?

6  **A**    One of the reasons for this is that in a deposition like

7  this, where the company puts somebody up who's supposed to have

8  knowledge of topics that we have designated, we want to make

9  sure that the person can actually testify to the topics that

10  you have asked about.  And that they've taken, you know, the

11  appropriate steps to educate themselves, if there are areas

12  that they don't necessarily know, firsthand.

13  **Q**    And is that essentially part of the goal of making sure

14  that the FTC gets the most complete information that it can, in

15  these types of hearings?

16  **A**    Yes.  It is to make sure that the witness is able to

17  testify to the topics that we're asking about.

18      **MR. DAWSON:**  All right.  Let's move to Page 7 (sic) of

19  the exhibit.  And we'll start up in the upper left-hand corner.

20      (Document displayed)

21      **MR. DAWSON:**  So I'll start with the question at

22  Line 7 (As read):

23      **"QUESTION:**  So I know you have some interrogatories

24      responses I'm going to mark as an exhibit so that you have

25      a clean copy.  We'll start with the Fourth Responses.

1          "So mark as Exhibit 4 a document titled, Uber

2          Technologies, Inc.s Fourth Set of Responses to

3          Specifications for Interrogatories and Document

4          Requests."

5   BY MR. DAWSON

6   Q    So just to orient the jury a little bit with the process,

7   how do exhibits work in the course of a deposition?

8   A    In that deposition or an investigational hearing, which is

9   essentially the same thing, you can put exhibits in front of

10  the witness.  You just have to mark them for identification

11  first, and then refer to them by an exhibit number.

12  Q    And so to try and keep exhibit numbers somewhat straight,

13  the reference here is to Exhibit 4, which is the deposition

14  exhibit titled Uber Technologies Inc.'s Fourth Set of Responses

15  to Specifications for Interrogatories and Document Requests.

16          MR. DAWSON:  Can we pull up Exhibit 292, which I know

17  we went over a little earlier.

18      (Document displayed)

19          MR. DAWSON:  Just want to make sure it's clear what

20  we're talking about.  Just highlight the top portion.

21      (Document enlarged)

22  BY MR. DAWSON

23  Q    "Uber Technologies Inc.'s Fourth Set of Responses to

24  Specifications for Interrogatories and Document Requests."  Is

25  that the same document that was being discussed in the

1    deposition transcript?

2    **A**    Yes, it appears to be.

3    **Q**    All right.

4        MR. DAWSON:  Go back to Exhibit 340, Page 7.

5        (Document displayed)

6        MR. DAWSON:  All right, so the upper left-hand corner

7    of the transcript, so I'll start on Line 16, after the exhibit

8    was marked (As read)

9        **"QUESTION:**  Is this a document that you have seen before?

10        **"ANSWER:**  Yes.

11        **"QUESTION:**  So I'd like to call your attention to response

12        1B, which is on Page 1, where it states that 'Joe

13        Sullivan, Chief Security Officer, and John Flynn, Chief

14        Information Security Officer, supervised the preparation

15        of Uber's response to this CID.  Mr. Flynn who recently

16        joined Uber assisted in supervising this Fourth Set of

17        Responses.  The sections of the responses that related to

18        topics other then (sic) security, Uber gathered

19        information from relevant business people who are not at

20        the officer or manager level.'  Am I reading that

21        correctly?

22        **"ANSWER:**  Yes.

23        **"QUESTION:**  What does it mean that you supervised the

24        preparation of Uber's responses to the CID?

25        **"ANSWER:**  Well, it primarily means that I asked my team to

1    support the legal department at the highest level.  Yeah.

2    ▪**QUESTION:**  Were you personally involved with the

3    preparation of the CID responses?

4    ▪**ANSWER:**  Only to a very limited extent.

5    ▪**QUESTION:**  Before they were made, did you review them?

6    ▪**ANSWER:**  I don't know if I reviewed all of them, no.

7    ▪**QUESTION:**  Were there portions of it that you would have

8    reviewed?

9    ▪**ANSWER:**  I don't recall specifically.

10    ▪**QUESTION:**  To what extent were you involved in the

11    supervising the preparation of the security topics?

12    ▪**ANSWER:**  I think that I was involved in some

13    conversations but not a lot of detail.

14    ▪**QUESTION:**  Was Mr. Flynn more involved with the

15    preparation of the responses relating to Uber's security

16    practices?

17    ▪**ANSWER:**  I don't know.

18    ▪**QUESTION:**  Do you know what Mr. Flynn's role in

19    supervising the preparation of the responses --

20    ▪**ANSWER:**  No.

21    ▪**QUESTION:**  Since that time, have you reviewed the

22    interrogatories responses?

23    ▪**ANSWER:**  Yes.

24    ▪**QUESTION:**  And you're familiar with their contents?

25    ▪**ANSWER:**  Yes.

1   "QUESTION:  Did you similarly supervise the preparation of

2   responses to the Commission's 2016 CID?

3   "ANSWER:  Yes."

4   BY MR. DAWSON

5   Q   Mr. Rossen, in the course of these hearings, would it be

6   typical to kind of incorporate some of the responses that the

7   company had provided earlier in the investigation?

8   A   I think it really depends on the purpose of the

9   investigational hearing.  But, this hearing was largely

10  designed to fill in gaps from what had been submitted in the

11  responses.

12  Q   So was it to kind of -- when you say "fill in gaps," were

13  there things that were missing?  Or was it more of just a

14  deeper dive?

15  A   To get clarification on the responses, to ask additional

16  followup questions, and get a better understanding of what the

17  responses meant.

18      MR. DAWSON:  Okay.  So let's look at the same page,

19  the lower right-hand corner.  So this is the line starting at

20  16.

21      I'll do my best to remember the question and answer

22  portion.

23      "QUESTION:  Let's talk a bit about the breach that

24  occurred on or about May 12, 2014.

25          "Is it correct that in September 2014 Uber learned

```
 1              that an Amazon Web Services access ID had been

 2              publicly posted on GitHub?

 3    ▪ANSWER:  Yes.

 4    ▪QUESTION:  Do you know how those credentials came to be

 5    posted on GitHub?

 6    ▪ANSWER:  Yes.

 7    ▪QUESTION:  How did that happen?

 8    ▪ANSWER:  They were posted by an employee who was sharing

 9    code with another -- a newer employee.

10    ▪QUESTION:  And were they using a service called GitHub

11    Gist?

12    ▪ANSWER:  Right.

13         "What is GitHub Gist?"

14        THE COURT:  "Question."

15        MR. DAWSON:  I was literally circling the Q.

16    ▪QUESTION:  What is GitHub Gist?

17    ▪ANSWER:  Engineers have a common practice of using

18    something like a Gist to share -- it's basically like a

19    copy/paste tool at its most simple, and so it's like a

20    shared copy/paste environment.  And so engineers will

21    share snippets of code between them commonly on something

22    like that.

23    ▪QUESTION:  And in the 2014 timeframe, was that a common

24    practice at Uber for engineers to use GitHub Gist?

25    ▪ANSWER:  We were using GitHub and we were -- at Uber.  I
```

1      don't know how common it was for engineers to paste with

2      just like that answer.

3          **QUESTION:**  Does Uber continue to use GitHub Gist for

4      collaboration?

5          **ANSWER:**  We do, yes.

6          **QUESTION:**  Do you know whether engineers were made aware

7      of the default settings for GitHub Gist as of the

8      March 2014 timeframe?

9          **ANSWER:**  I think that -- I would be surprised if

10     engineers didn't understand the way the settings work on

11     GitHub Gist.

12         **QUESTION:**  What causes you to say that?

13         **ANSWER:**  It's a -- well, I mean, engineers are used to

14     working with engineering tools and are trained on how to

15     use them carefully and need to understand the risks of

16     posting things publicly."

17  **BY MR. DAWSON**

18  **Q**   Mr. Rossen, do you recall, as you mentioned earlier, was

19  this a followup on something that had been in some of the

20  written responses?

21  **A**   I don't recall if this was specifically a followup from

22  the written responses.  I think we were trying to, you know,

23  get background on the breach and, and get some additional

24  detail.

25  **Q**   And the question about -- well, why don't we -- I'll just

1  move on and try and keep things moving.

2      **MR. DAWSON:**  So let's move to Page 9 of the same

3  exhibit.  So I'll start on Line 10.

4      (Document displayed)

5      **"QUESTION:**  So is it your view that in March of 2014, it

6  was uncommon to -- for -- strike that.

7          "Is it your view that in March of 2014, it was

8          uncommon for companies to focus on security

9          vulnerabilities from the Cloud?

10     **"ANSWER:**  No.  It was -- I don't think that's exactly what

11 I was saying.  I think that when you -- when you do a risk

12 analysis, you need to have a different risk analysis when

13 things are in the Cloud and then you will always be -- you

14 will always being surprised along the way about how

15 vulnerabilities change.

16         "So for example, we were talking about this idea of

17         secrets in code.  If you go back and look at code

18         from five years ago from everywhere, there was

19         secrets in code, but it was we were in a world that

20         where secrets were in code that were inside your

21         network, and so you had to be inside the network to

22         have access to that code.

23         "Companies are really evolving to appreciate that

24         codes gets compromised, code is in the wild, and so

25         even if the code gets compromised, you can't have

1    secrets in code.  But it's an -- and we see and will

2    continue to see for many years issued related to that

3    historical practices of puttings secrets in source

4    code.

5    "So that's one of the challenges here in terms of

6    like companies internalize -- it's hard for someone

7    to look at code written a year ago and appreciate

8    that there's a secret buried in it.  so you want to

9    move to a world where people never put secrets in

10   code.  But then the way applications interact with

11   each other through APIs and the like, it's really

12   hard not to have secrets in code.

13   "And so that's why if you dug into our documentation,

14   you saw that the team back in 2014 was already

15   working on something that we call Langley, which

16   didn't exist.  So literally in the period between

17   2014 and now there have been developed a number of

18   different Langley-equivalent open-source tools and

19   security tools that are designed to help manage keys

20   in this kind of more volatile environment than

21   existed in the past.

22   "To me it's like -- it's a frustrating things that a

23   young startup company wouldn't be able to buy out of

24   the box a key management tool the equivalent of

25   Langley and that we're still in 2016 building these

1    things.  It is an example of the challenges of doing

2    security in this fast evolving world.

3    "That said, like moving data -- moving to the Cloud

4    is internally more secure in a lot of ways.

5    "So by using -- like when I came onboard, I saw that

6    which were using Amazon and that's a good thing

7    because they have really good security that come out

8    of the box.

9    **QUESTION:**  In terms of the security in the Cloud?

10   **ANSWER:**  In terms of the security in the Cloud.  I mean,

11   you could get bogged down in questions about whether, you

12   know, the default settings and what they encourage

13   everybody to do are ideal from a best practices standpoint

14   but...

15   **QUESTION:**  When did the Langley project begin?

16   **ANSWER:**  I'm not sure of the exact date, but I know it

17   was in 2014.

18   **QUESTION:**  Was it before you arrived?

19   **ANSWER:**  Yes.  It was in use before I arrived, I think.

20   **QUESTION:**  Are there other ways of abstracting secret

21   keys besides to custom build systems such as Langley?

22   **ANSWER:**  Yeah.  I mean, there are lots of different

23   complicated ways to manage keys.  There are no great key

24   management solutions even today.  Especially as a company

25   grows.

1    "QUESTION:  Given that key management solutions are

2    difficult, is it -- does that mean that in your view --

3    let me start over.

4         "Given the difficulty of managing keys for companies

5         of all levels as you've described, does that make

6         access controls for secret keys an important part of

7         a security program?

8    "ANSWER:  Key management is always an important part of an

9    overall security program for any company.  The -- yeah,

10   I'll leave it at that.

11   "QUESTION:  Well, going back to the particular key at

12   issue here, is it correct that that particular key was a

13   super admin key with access to all data in Uber's S3 data

14   store?

15   "ANSWER:  I think the answer is yes.

16   "QUESTION:  Do AWS access IDs have certain characteristics

17   in common with each other?  And to be more specific, are

18   there particular strings that every AWS ID has that makes

19   it possible to search for it?

20   "ANSWER:  Yes.  That's one of the things that kind of --

21   you asked why when the investigation started this becomes

22   a topic.  So it -- a couple of things happened.

23        "One, GitHub public just started getting indexed in

24        Google, and then, two, security people and malicious

25        outsiders came to realize that because of the unique

1          characteristics you could query Google and basically

2          pull-up these keys.

3          "So during -- I think probably around the end of 2014

4          it became a common fora practice for companies to

5          start doing these queries on their own and set up an

6          automatic process, which is something that we have

7          (sic) done.

8      "QUESTION:  Is that an automatic process for monitoring

9      the --

10     "ANSWER:  To make sure that keys hadn't gotten exposed and

11     indexed."

12  BY MR. DAWSON

13  Q    So I'm hoping to tie some of this in to some matters that

14  we spoke about a little earlier.

15      The question of secrets in code, what does that mean?

16  What are secrets in code?

17  A    Secrets in code are, as I testified earlier, things like

18  security keys and other access controls that have to be

19  included in code, but are the kinds of things that you need to

20  protect.

21  Q    And based on this portion of the transcript and what we

22  discussed earlier with the presentation, was it your

23  understanding that Langley was one way in which Uber, since the

24  2014 data breach, had tried to address this problem of secrets

25  in code?

1    **A**    That is what Uber represented to us, yes.

2          **MR. DAWSON:**  And Your Honor, in terms of timing, I

3    don't know, since we're approaching 1:30 -- there is a fair

4    amount of the deposition left, so I can keep going and stop

5    whenever Your Honor wishes.

6          **THE COURT:**  Well, I wish that in five minutes, I

7    dismiss the jury.  So you can decide when you want to stop.

8          **MR. DAWSON:**  I will -- I will use my five minutes.

9          **THE COURT:**  Okay.

10          **MR. DAWSON:**  Thank you, Your Honor.

11      Let's move to Page 12.

12      (Document displayed)

13          **MR. DAWSON:**  So I'm going to start on Page 18 --

14    sorry, Line 18, just in the middle of a question for

15    Mr. Rossen.

16          **THE COURT:**  Of which page?

17          **MR. DAWSON:**  So it's the upper right-hand corner, it

18    is 43 within the deposition.  It is Page 12 of the exhibit.

19          **THE COURT:**  Okay.

20          **MR. DAWSON:**  Line 18 is within Mr. Rossen's question

21    (As read):

22          "So I'd like to ask a few questions about these

23       directories and the file that was accessed.  First,

24       maybe just to level set, how is the S3 data store

25       organized broadly at a high level?

1    **ANSWER:**  Sure.  At Amazon we use S3 primarily as a

2    storage mechanism.  So Amazon offers a number of different

3    Cloud support service, and S3 is typically a place where

4    you would store back-ups or static images, and that's

5    exactly what we were using it for.  We had our own data

6    centers for purposes of kinds of running the app in

7    real-time.  But for purposes of developers running tests,

8    we would go against a backup or pruned backup, if you

9    will, that would be stored there.  And so generally

10   speaking, the static documents images and back-ups were

11   what we used the S3 for.  And still do.

12   **QUESTION:**  Thanks.  We'll go back to that, but I -- just

13   even at a higher level than that, is the data store

14   organized into something called buckets?

15   **ANSWER:**  Yes.

16   **QUESTION:**  What is a bucket?

17   **ANSWER:**  I guess you could consider it a bucket to be

18   like a folder.  It's just a way of organizing and storing

19   data.

20   **QUESTION:**  Is that is the highest level division in the

21   S3 data store?

22   **ANSWER:**  I think so.

23   **QUESTION:**  And can a bucket subsequently be divided into

24   directories?

25   **ANSWER:**  Yes.

1  **QUESTION:**  And is it correct that each bucket can have

2  individual access controls applied to it?

3  **ANSWER:**  Yes.

4  **QUESTION:**  Now, the perpetrator in the May 12, 2014

5  incident browsed through a number of directories titled,

6  DB backup.  Do you know what bucket those directories

7  would be located in?

8  **ANSWER:**  I don't know the name of the bucket or what we

9  named buckets, but it was -- we had created pruned records

10  for purposing of developers testing new versions of the

11  app and things like that, and that's the bucket that this

12  was stored in.

13  **QUESTION:**  So you mentioned prunes and database back-ups.

14  Is there a difference between those two kind a files?

15  **ANSWER:**  Yeah, the database backups would be a full copy

16  of the backup of the database, I think, or a part of it,

17  you know, depending on storage capabilities and things

18  like that.  And then a pruned copy would be a smaller set

19  of what's needed for testing.  I mean, pruned is just like

20  pruning a tree, you know, trimming out the stuff you don't

21  need for what you are doing.

22  **QUESTION:**  Is it understanding that within the directory

23  that the perpetrator looked at, they were database backups

24  and pruned files?

25  **ANSWER:**  I think so, but I'm not 100 percent certain.

1  **QUESTION:** Do database back-ups contain more personal
2  information of Uber's riders or drivers than pruned files
3  as a general matter?
4  **ANSWER:** Yes.
5  **QUESTION:** Would any personal information have been
6  removed from database back-ups?
7  **ANSWER:** It depends on what the backup is of and how we
8  were doing the back-up. In some instances some data is
9  removed as back-ups only backup what is needed to back up.
10  **QUESTION:** Sure. Do you have an understanding as to what
11  database back-ups were included in those directories?
12  **ANSWER:** I haven't looked at that recently.
13  **QUESTION:** Do you know whether there would have been, for
14  instance, trip records databases in that folder?
15  **ANSWER:** I don't know.
16  **QUESTION:** Do you know how many directors the perpetrator
17  of the May 12, 2014 incident viewed before selecting a
18  file?
19  **ANSWER:** I think -- so my understanding -- and it's been
20  a long time since I looked at this -- was that they looked
21  at -- you know, basically, it's just like clicking on a
22  directory and you see what's in it, and he did that
23  several times before he reached the one that had the file
24  PQ.
25  **QUESTION:** Is that information available somewhere if you

**ROSSEN - DIRECT / DAWSON**

 1    went back and were to look later to determine what

 2    database back-ups were in the folder and they viewed?

 3    **"ANSWER:**  Yeah.  And the one thing I remember was off the

 4    top of my head because when we were talking about through

 5    what -- I'm always curious to look at when someone is

 6    browsing, are they browsing in the manner of an insider

 7    who understands and knows this environment or are they

 8    browsing kind of like in a hunting mode, if you will.  And

 9    so that's one of the ways that you would assess whether it

10    was an insider or outsider and my conclusion was that it

11    was not an insider based on the way they were kind of

12    approaching it.

13    **"QUESTION:**  Is that based on the information that they

14    looked at?

15    **"ANSWER:**  In part, yeah.

16    **"QUESTION:**  What else is that based on?

17    **"ANSWER:**  I don't remember everything that was in my head

18    at the time in the last -- last spring, but one of the

19    things was where they went and looked just because an

20    inside- -- just talking -- from talking to engineers, an

21    insider would have known that we had security features

22    designed to minimize risk around a pruned database.

23    **"QUESTION:**  What security features are you talking about?

24    Is that the obfuscation of certain information in the

25    file?

1    "ANSWER:  Exactly.  When the team put together its

2    practice of creating these prunes for testing, they took a

3    bunch of steps to minimize PII in the document -- in the

4    prune, and you know -- so to remove as much as possible

5    and then also to replace certain things with random

6    information leaving only what was needed for purposes of

7    testing."

8        And I think this might be a good point, Your Honor.

9        THE COURT:  All right.  So we will stop there.

10    Ladies and gentlemen, we're finished with the first day of

11   testimony.  There's a long way to go.  So remember the

12   instructions that I gave you, and the admonitions that I gave

13   you.  Don't do any research about this case.  There is a lot to

14   come.  And, and so, you need keep an open mind.

15        Throughout.  Right now, I hope you have a good rest of the

16   afternoon.  And, please come promptly tomorrow so that we can

17   continue, and move this case along in an orderly and efficient

18   way.

19        Have a good afternoon.  Thank you.

20        (Jury excused)

21        (The following proceedings were held outside of the

22   presence of the Jury)

23        THE COURT:  All right.  Ladies and gentlemen, I'll see

24   you tomorrow morning at 8:00.

25        MR. ANGELI:  Thank Your Honor.

PROCEEDINGS

1          **MR. DAWSON:**  Thank you, Your Honor.

2          **MS. KERIN:**  Thank Your Honor.

3      (Proceedings concluded)

## <u>I N D E X</u>

Wednesday, September 7, 2022 - Volume 2

|  | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| Opening Statement by Mr. Dawson | 233 | 2 |
| Opening Statement by Mr. Angeli | 258 | 2 |

| <u>**GOVERNMENT'S WITNESSES**</u> | <u>PAGE</u> | <u>VOL.</u> |
|---|---|---|
| <u>**ROSSEN, BENJAMIN**</u> | | |
| (SWORN) | 290 | 2 |
| Direct Examination by Mr. Dawson | 291 | 2 |

## <u>E X H I B I T S</u>

| <u>**TRIAL EXHIBITS**</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 2, Conditionally | | 297 | 2 |
| 260, Conditionally | | 295 | 2 |
| 304, Conditionally | | 336 | 2 |

## CERTIFICATE OF REPORTERS

We, BELLE BALL, CSR, and JOAN COLUMBINI, CSR, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


_____
/s/ Belle Ball

Belle Ball, CSR 8785, CRR, RDR


_____
/s/ Joan Columbini

Joan Columbini, CSR 5435, RPR


Wednesday, September 7, 2022