DAVID H. ANGELI (admitted *pro hac vice*)
TYLER P. FRANCIS (admitted *pro hac vice*)
MICHELLE H. KERIN (admitted *pro hac vice*)
URSULA LALOVIĆ (Cal. Bar No. 215551)
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232 │ Facsimile: (503) 227-0880
Email: david@angelilaw.com; tyler@angelilaw.com; michelle@angelilaw.com;
       ursula@angelilaw.com

JOHN D. CLINE (Cal. Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

*Attorneys for Defendant Joseph Sullivan*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOSEPH SULLIVAN, <br><br> Defendant. | Case No. 3:20-cr-00337-WHO <br><br> DEFENDANT JOSEPH SULLIVAN'S RENEWED MOTION FOR JUDGMENT OF ACQUITTAL AND ALTERNATIVE MOTION FOR NEW TRIAL <br><br> Date: December 14, 2022 <br> Time: 1:30 p.m. <br> Crtrm: 2, 17th floor <br><br> Hon. William H. Orrick |

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 14, 2022 at 1:30pm, or at such later date and time as the Court may order, in Courtroom 2, 17th Floor, 450 Golden Gate Avenue, San Francisco, CA 94102, before the Honorable William H. Orrick, Defendant Joseph Sullivan will and hereby does move under Federal Rule of Criminal Procedure 29 for a judgment of acquittal on both of the charged counts. In the alternative, the Court should grant Sullivan a new trial under Federal Rule of Criminal Procedure 33. This motion is based on the memorandum of points and authorities below, the documents in the record, and such other evidence and argument as may be presented to the Court.

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO

ii

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..................................................................................... ii

TABLE OF CONTENTS ..................................................................................................... iii

TABLE OF AUTHORITIES ................................................................................................. iv

MEMORANDUM OF POINTS AND AUTHORITIES .................................................................1

    I.      INTRODUCTION ................................................................................................1

    II.     ARGUMENT ........................................................................................................4

         A.     LEGAL STANDARD ................................................................................4

         B.     The evidence was insufficient to sustain a conviction under 18 U.S.C. § 1505 ....................................................................................4

              1.     The evidence concerning Sullivan's affirmative conduct is insufficient to sustain a conviction under § 1505. ..........................5

              2.     The evidence concerning Sullivan's failure to disclose the 2016 Incident to certain individuals is insufficient to sustain a conviction under § 1505. ........................................................20

         C.     For substantially the same reasons as under § 1505, the evidence was insufficient to sustain a conviction under 18 U.S.C. § 4 for misprision of a felony. ....................................................29

              1.     Like § 1505, § 4 requires a nexus between the defendant's affirmative conduct and law enforcement ....................................29

              2.     The evidence at trial was insufficient to establish that any of Sullivan's affirmative conduct would have had the effect of concealing the 2016 from federal law enforcement. .................31

         D.     The evidence was insufficient to show that Sullivan knew the hackers' conduct was unauthorized. ..........................................31

          E.     In the event the Court denies Sullivan's motion for a judgment of acquittal, it should order a new trial in its capacity as a "thirteenth juror." .......................................................................33

    III.    CONCLUSION ................................................................................................35

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO

iii

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

# TABLE OF AUTHORITIES

**Cases**                                                                   **Page(s)**

*Arthur Andersen LLP v. United States*,
 544 U.S. 696 (2005) ................................................................6, 9, 10, 24

*Bratton v. United States*,
 73 F.2d 795 (10th Cir. 1934) ............................................................30

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
 472 U.S. 749 (1985) ........................................................................11

*Facebook, Inc. v. Duguid*,
 141 S. Ct. 1163 (2021) ................................................................6, 21

*Flores-Figueroa v. United States*,
 556 U.S. 646 (2009) ..........................................................................7

*Hart v. Massanari*,
 266 F.3d 1155 (9th Cir. 2001) ....................................................11, 12

*Lancey v. United States*,
 356 F.2d 407 (9th Cir. 1966) ............................................................30

*Langere v. Verizon Wireless Servs., LLC*,
 983 F.3d 1115 (9th Cir. 2020) ...............................................12, 13, 14, 15

*LVRC Holdings LLC v. Brekka*,
 581 F.3d 1127 (9th Cir. 2009) ..........................................................33

*Marinello v. United States*,
 138 S. Ct. 1101 1104-05 (2018) ................................................. *passim*

*Nichols v. United States*,
 578 U.S. 104 (2016) ..............................................................7, 8, 21, 30

*Sessions v. Dimaya*,
 138 S. Ct. 1204 (2018) ......................................................................22

*Shefts v. Petrakis*,
 No. 10-CV-1104, 2012 WL 4049509 (C.D. Ill. Sept. 13, 2012) .............33

*Smith v. City of Jackson, Miss.*,
 544 U.S. 228 (2005) ........................................................................30

*TikTok Inc. v. Trump*,
 507 F. Supp. 3d 92 (D.D.C. 2020) ......................................................7

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO                           iv

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*United States v. Aguilar*,
   515 U.S. 593 (1995) ......................................................................................... *passim*

*United States v. Alston*,
   974 F.2d 1206 (9th Cir. 1992) ............................................................................34

*United States v. Bhagat*,
   436 F.3d 1140 (9th Cir. 2006) ..............................................................10, 14, 15

*United States v. Carona*,
   660 F.3d 360 (9th Cir. 2011) ..............................................................................21

*United States v. Cestoni*,
   185 F. Supp. 3d 1184 (N.D. Cal. 2016) ............................................................33

*United States v. Ciambrone*,
   750 F.2d 1416 (9th Cir. 1984) ............................................................................30

*United States v. Claxton*,
   685 F.3d 300 (3d Cir. 2012) ...............................................................................29

*United States v. Kilbride*,
   584 F.3d 1240 (9th Cir. 2009) ............................................................................22

*United States v. Markee*,
   425 F.2d 1043 (9th Cir. 1970) ............................................................................28

*United States v. Novak*,
   476 F.3d 1041 (9th Cir. 2007) .......................................................................9, 30

*United States v. Olson*,
   856 F.3d 1216 (9th Cir. 2017) ..............................................................29, 30, 32

*United States v. Price*,
   951 F.2d 1028 (9th Cir. 1991) ..............................................................................4

*United States v. Quattrone*,
   441 F.3d 153 (2d Cir. 2006) ...............................................................................15

*United States v. Safavian*,
   528 F.3d 957 (D.C. Cir. 2008) ................................................................22, 23, 24

*United States v. Shields*,
   844 F.3d 819 (9th Cir. 2016) ..............................................................................23

*United States v. Shill*,
   740 F.3d 1347 (9th Cir. 2014) ............................................................................21

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

v

*United States v. Singh*,
   979 F.3d 697 (9th Cir. 2020) ...................................................................21, 26, 28

*United States v. Tohono O'Odham Nation*,
   563 U.S. 307 (2011).................................................................................................9

*United States v. White Eagle*,
   721 F.3d 1108 (9th Cir. 2013) ..............................................................................23

*United States v. Worcester*,
   190 F. Supp. 548 (D. Mass. 1961) ........................................................................30

*United States v. Yates*,
   16 F.4th 256 (9th Cir. 2021) ............................................................................4, 9

*Valenzuela Gallardo v. Barr*,
   968 F.3d 1053 (9th Cir. 2020) ..............................................................................15

*Yates v. United States*,
   574 U.S. 528 (2015)................................................................................................8

**Statutes**

9 U.S.C. § 16...............................................................................................................13

18 U.S.C. 1515(b) .................................................................................................10, 20

18 U.S.C. § 2(b) ..........................................................................................................28

18 U.S.C. § 4 ......................................................................................................*passim*

18 U.S.C. § 1001 ...................................................................................................22, 23

18 U.S.C. § 1030(a)(2)(C) ...........................................................................................32

18 U.S.C. § 1030(a)(7)(B) ...........................................................................................32

18 U.S.C. § 1503 ................................................................................................*passim*

18 U.S.C. § 1505 ................................................................................................*passim*

18 U.S.C. § 1515(b)............................................................................4, 10, 21, 24

26 U.S.C. § 7212(a) ..........................................................................................6, 8, 9

Stored Communications Act, 18 U.S.C. § 2701, *et seq*....................................33

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO

vi

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

**Other Authorities**

5 C.F.R. § 2635.101(b)(5)...................................................................................22

5 C.F.R. § 2635.101(b)(11).............................................................................22, 23

16 C.F.R. § 2.7(a)..............................................................................................24

*Black's Law Dictionary* 1602 (6th ed. 1990)..................................................21

Fed. R. Civ. P. 23(f)...........................................................................................13

Fed. R. Crim. P. 29 .....................................................................................3, 4, 34

Fed. R. Crim. P. 33 .............................................................................................3

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO                                          vii

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

The Department of Justice has tried through this closely watched case to establish and enforce an obligation for companies to be transparent with the government about data security incidents. At the outset of this case, the government warned "Silicon Valley" that it "expect[s] prompt reporting of criminal conduct."[1] Following the jury's verdict, the government repeated that warning, making clear to "[t]echnology companies in the Northern District of California" that the DOJ expects them "to alert customers and appropriate authorities when . . . data is stolen by hackers."[2] Such a requirement may or may not be in the best interests of the public, but Congress has repeatedly declined to enact into law any such obligation. In the absence of such a requirement, the Department of Justice has instead sought to achieve its goals through the *in terrorem* effect of a high-profile criminal prosecution.

This case has alarmed the cybersecurity community in part because it rests on such flimsy evidence, leaving the thousands of CSOs who deal with complex security issues to fear that their fate depends on nothing more than the whim of federal prosecutors.[3] Virtually every obstruction case brought under 18 U.S.C. § 1505 has involved lies to the target agency, or directing others to lie, or destruction or failure to produce documents required by agency subpoena, or falsification of documents presented to the agency, or some combination of these circumstances. None of that happened here. Sullivan never lied to the FTC (or had any contact with the agency at all after the November 2016 incident), or directed others to lie, or destroyed or falsified documents that Uber

---

[1] Aug. 20, 2020 Statement of United States Attorney David Anderson, *available at* https://www.justice.gov/usao-ndca/pr/former-chief-security-officer-uber-charged-obstruction-justice.

[2] Oct. 5, 2022 Statement of United States Attorney Stephanie M. Hinds, *available at* https://www.justice.gov/usao-ndca/pr/former-chief-security-officer-uber-convicted-federal-charges-covering-data-breach.

[3] Bug bounty programs are essential to ensuring the safety of consumer and partner data for businesses in the 21st century. (Tr. (Flynn) 555:10-555:20, 681:4–681:13; *id.* ((Fletcher) 996:19–997:4.)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

was required to produce to the FTC. To the contrary, he made available to the Uber lawyers handling the FTC response a member of his security team—Alex Garbutt—who had participated directly in the 2016 incident response, without ever suggesting to Garbutt that he should hide that incident from the lawyers.

Rather than present evidence of any of the usual markers of obstruction, the government relied on a series of acts by Sullivan that were not only common and typical actions taken by CISOs but that also—as we discuss below—had no connection at all to the FTC proceeding. And the government relied on Sullivan's "failure to disclose" the incident within Uber—beyond the more than thirty people (including the CEO) who knew that it had occurred—without ever establishing that he had a duty to make such a disclosure, or that the nondisclosure had anything to do with the FTC investigation.

The misprision of a felony charge—a rarity in federal criminal law, used principally as the basis for a plea when the government cannot prove a more serious charge—similarly rests on unique circumstances. To begin, this is surely one of the few cases in the annals of 18 U.S.C. § 4 in which the government has offered the felon—here the hacker, Vasile Mereacre—a favorable deal so it could convict the misprisioner. Beyond that, the case against Sullivan blurred the critical line between not reporting a felony—conduct to which no penalty applies—and committing an "affirmative act" designed to conceal a felony, which turns the failure to report into the felony of misprision. The government pointed to various "affirmative acts" here—the NDA, the payment to the hackers, and so on—but it never showed that Sullivan intended those acts to conceal a felony.

If the misprision charge stands, it will invite prosecution of any CSO who handles a data intrusion through a bug bounty program. CSOs will know that they have a choice: either place themselves at risk of prosecution, sheltered only by the discretion of the prosecutor (scant comfort indeed, as this case shows), or report bug bounty participants to law enforcement, which will effectively end such programs because, as Mat Henley commented during the 2016 incident,

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

"Nobody would ever trust us again." (Ex. 658 at 2.)[4]

The evidence at trial was insufficient to sustain a conviction under either § 1505 or § 4.[5] As to the obstruction charge, none of the affirmative conduct ascribed to Sullivan had any meaningful connection to the FTC's ongoing investigation. It had, in other words, neither a "relationship in time, causation, or logic" to the investigation nor "the natural and probable effect of interfering with" it, as § 1505 requires. *United States v. Aguilar*, 515 U.S. 593, 599–600 (1995) (internal quotation marks and citations omitted) (interpreting 18 U.S.C. § 1503). And, as a matter of law, Sullivan's mere silence was insufficient to sustain the obstruction charge because the government failed to establish that he had any specific legal duty to disclose the 2016 incident, whether to the FTC, to any particular person within Uber, or otherwise. Similarly, the misprision charge fails because none of Sullivan's "affirmative act[s]"—an element of the misprision charge—were designed to cause the 2016 incident not to be disclosed to federal law enforcement.

Both charges against Sullivan failed for an independent reason as well: the government failed to present sufficient evidence that Sullivan knew the hackers' conduct was unauthorized, and thus that he knew the 2016 Incident was a "data breach" requiring disclosure to the FTC or a felony sufficient to support the misprision charge.

For those reasons, and as explained in greater detail below, Sullivan respectfully requests that the Court enter a judgment of acquittal on both counts. In the alternative, Sullivan requests that the Court grant Sullivan a new trial under Rule 33 of the Federal Rules of Criminal Procedure.

---

[4] For an analysis of the effect of the misprision conviction on CSOs, *see* https://www.lawfareblog.com/fallout-first-trial-corporate-executive-covering-data-breach.

[5] As Sullivan noted when making his oral Rule 29 motions at trial, he contends that the evidence is insufficient on each element of each count. This memorandum is not intended to, and does not, limit the scope of Sullivan's motion.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## II.    ARGUMENT

### A.    LEGAL STANDARD

Under Rule 29(a), the Court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The elements of the charged offenses determine whether the evidence is sufficient to sustain a conviction. *United States v. Yates*, 16 F.4th 256, 271–72 (9th Cir. 2021) ("The Court may set aside a conviction for insufficient evidence only if, viewing the evidence in the light most favorable to the government, no rational trier of fact could 'find the essential elements of the crime beyond a reasonable doubt.'" (quoting *United States v. Stoddard*, 150 F.3d 1140, 1144 (9th Cir. 1998))). Because the Court reserved decision on Sullivan's Rule 29 motion at the close of the government's case (Tr. 2352:14-2353:8), it "must decide the motion on the basis of the evidence at th[at] time[.]" Fed. R. Crim. P. 29(b). Sullivan renewed his motion for judgment of acquittal under Rule 29 at the close of the evidence. (Tr. 2540:4–7.)

### B.    The evidence was insufficient to sustain a conviction under 18 U.S.C. § 1505.

18 U.S.C. § 1505 provides, in relevant part:

> Whoever corruptly, . . . *influences*, *obstructs*, or *impedes* or *endeavors* to *influence*, *obstruct*, or *impede* the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, . . . [s]hall be fined under this title, [or] imprisoned not more than 5 years . . . .

(Emphasis added.) Thus, an offense under § 1505 "has three essential elements. First, there must be a proceeding pending before a department or agency of the United States. Second, the defendant must be aware of the pending proceeding. Third, the defendant must have intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding." *United States v. Price*, 951 F.2d 1028, 1031 (9th Cir. 1991) (internal citations omitted). (*See also* ECF No. 219 (final jury instructions) at 17.) "As used in section 1505, the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1515(b).

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

For two reasons, the government's case evidence failed to satisfy the third element. First, no rational juror could have concluded that any of Sullivan's affirmative conduct amounted to an intentional endeavor to "influence, obstruct or impede . . . any pending proceeding" because insufficient evidence connected the affirmative acts on which the government's case centered to the FTC investigation that Sullivan was alleged to have obstructed, and insufficient evidence established that Sullivan intended those acts to obstruct the FTC investigation. Second, the government's contention that Sullivan obstructed the FTC's investigation merely by failing to notify the FTC or certain others within Uber of the 2016 Incident is insufficient because insufficient evidence established that Sullivan had any legal duty to do so. As a result, the Court should enter a judgment of acquittal on Count One.

1.   **The evidence concerning Sullivan's affirmative conduct is insufficient to sustain a conviction under § 1505.**

a.   **Under § 1505, the government must establish "a relationship in time, causation, or logic"—*i.e.*, a "nexus"—between the defendant's conduct and the relevant proceeding.**

Section 1505 requires the government to establish a "nexus" between the defendant's conduct and the relevant proceeding.[6] The nexus requirement was first articulated in *Aguilar*, 515 U.S. 593, in which a federal judge was charged with obstruction under 18 U.S.C. § 1503 for lying to FBI agents who later relayed his false statements to a grand jury. The Supreme Court affirmed the Ninth Circuit's decision overturning the judge's conviction because the government proved only that the judge "testified falsely to an investigating agent[,]" and not that the judge "knew that his false statement would be provided to the grand jury" proceeding he was accused of obstructing. *Id*. at 601. The Court thus held that the government had not proved the required "nexus" between the defendant's false statements and the grand jury proceeding, *i.e.*, there was no "relationship in time, causation, or logic" between the two. *See id*. at 599–600. There was, in

---

[6] We recognize that the Court previously rejected a "nexus" requirement for § 1505 in the context of jury instructions. For the reasons set out in our previous submissions and below, we respectfully disagree with the Court's prior ruling on this point. (*See* ECF No. 156 at 46; Tr. 2359:11–13.)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

other words, no evidence that the judge's false statements would "have the natural and probable effect of interfering with" the grand jury proceeding. *Id.* at 599 (internal quotation marks and citations omitted). *See also Arthur Andersen LLP v. United States*, 544 U.S. 696, 708 (2005) (recognizing that *Aguilar* held that § 1503 required "a 'nexus' between the obstructive act and the proceeding" because a defendant who lacks knowledge that his actions are likely to affect the proceeding "lacks the requisite intent to obstruct").

The nexus requirement is not unique to § 1503. As the Supreme Court recently recognized in the analogous context of 26 U.S.C. § 7212(a),[7] "the verbs 'obstruct' and 'impede' suggest an object—*the* [*defendant*] *must hinder a particular person or thing*." *Marinello v. United States*, 138 S. Ct. 1101, 1106 (2018) (emphasis added). On that basis, and for other reasons also relevant here, *Marinello* interpreted § 7212(a) narrowly and in accordance with *Aguilar*. It concluded that the object of the statute's verbs ("the due administration of" the tax code) did not include "routine administrative procedures that are near-universally applied to all taxpayers, such as the ordinary processing of income tax returns." *Id.* at 1104. Endeavors to obstruct or impede those sorts of procedures, though perhaps wrongful for other reasons, are not endeavors to obstruct or impede "the due administration of" the Internal Revenue Code and are not within the scope of § 7212(a). *See id.* at 1106–09. *Marinello* held "that, to secure a conviction under [§ 7212(a)], the Government must show . . . that there is a 'nexus' between the defendant's conduct and a particular administrative proceeding, such as an investigation, an audit, or other targeted administrative action[,]" *i.e.*, a "'relationship in time, causation, or logic'" between the two. *Id.* at 1109 (quoting *Aguilar*, 515 U.S. at 599).

As a matter of statutory construction, § 1505 also requires a nexus between the defendant's conduct and the relevant proceeding. When construing a statute, courts "begin with the text." *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1169 (2021). The text of § 1505 does not

---

[7] In language nearly identical to § 1505, 26 U.S.C. § 7212(a) forbids "corruptly . . . obstruct[ing] or imped[ing], or endeavor[ing] to obstruct or impede, the due administration of" the Internal Revenue Code. *See Marinello v. United States*, 138 S. Ct. 1101 1104-05 (2018).

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

proscribe *every* "endeavor[] to influence, obstruct, or impede[.]" Rather, section 1505 is

structured in the same way as § 1503 and § 7212(a), and likewise prohibits only certain kinds of

"endeavors to influence, obstruct, or impede[.]" In § 1505, the object of the verbs "influence[,]"

"obstruct[,]" and "impede[]"—*i.e.*, the "particular person or thing" that the defendant must

"hinder" in order to incur criminal liability, *Marinello*, 138 S. Ct. at 1106—is "the due and

proper administration of the law under which any pending proceeding is being had before any

department or agency of the United States[,]" *i.e.*, a federal agency proceeding. As in *Aguilar*

and *Marinello*, then, the best reading of that language is one requiring that the defendant's

conduct have "a relationship in time, causation, or logic" to the relevant federal agency

proceeding. *Aguilar*, 515 U.S. at 599. That much is so for several reasons.

  ***First***, courts "interpret criminal statutes, like other statutes, in a manner consistent with

ordinary English usage." *Nichols v. United States*, 578 U.S. 104, 111 (2016) (internal quotation

marks and citations omitted). To an ordinary English speaker, the phrase "endeavor[] to

influence, obstruct, or impede . . . [a] pending proceeding" would describe only conduct that

might foreseeably impact that particular proceeding. "[E]ndeavor," "influence," "obstruct," and

"impede" are transitive verbs that "require an object—like an activity, process, or action—to

express a complete thought." *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 103 (D.D.C. 2020)

(citing The Chicago Manual of Style ¶ 5.98 (17th ed. 2017) (Bryan A. Garner, ed.)). The

meaning of a transitive verb thus depends on, and is limited by, its object. Consider, for example,

a bank teller who says that "Smith knowingly transferred the funds to his brother's account[.]"

*See Flores-Figueroa v. United States*, 556 U.S. 646, 650–51 (2009). It would be strange indeed

if, by that phrase, the teller meant that Smith had transferred the funds not directly to the brother

but rather to the brother's friend, speculating that the friend might independently convey them to

the brother. *Cf. id.* at 651 ("[I]f the bank official later told us that Smith did not know the account

belonged to Smith's brother, we should be surprised."). In those circumstances, because there is

no "relationship in time, causation, or logic" between the verb (transfer) and its object (the

brother's account), *Aguilar*, 515 U.S. at 599, the teller's statement does not accurately describe

the conduct he witnessed. And "ponderings" about how the teller's words might be twisted to fit the facts "cannot be the basis for imposing criminal punishment." *See Nichols*, 578 U.S. at 111.

The same principles apply to § 1505. The rules of ordinary English grammar are as applicable to the federal obstruction statutes as they are in other contexts. *See, e.g.*, *Marinello*, 138 S. Ct. at 1106; *Yates v. United States*, 574 U.S. 528, 544 (2015) (both citing dictionary definitions). It would make no more sense than the teller's statement above to say that a defendant "endeavor[ed] to influence, obstruct, or impede . . . [a] pending proceeding" by interfering in, say, an internal investigation into workplace misconduct that might or might not end up bearing on a federal agency proceeding. In fact, *Aguilar* explicitly recognized as much. The Court rejected the government's (and the dissent's) contention that "*any* act, done with the intent to obstruct . . . the due administration of justice, is sufficient to impose criminal liability." 515 U.S. at 602 (emphasis in original; internal quotation marks removed). In doing so, the Court contemplated "a man . . . [who] knew of a pending investigation and lied to his wife about his whereabouts at the time of the crime, thinking that an FBI agent might decide to interview her and that she might in turn be influenced in her statement to the agent by her husband's false account of his whereabouts." *Id*. "The intent to obstruct justice is indeed present, but the man's culpability is a good deal less clear from the statute than we usually require in order to impose criminal liability." *Id*. *Marinello* rejected a similar interpretation of § 7212(a). *See* 138 S. Ct. at 1110 ("The Government contends the processing of tax returns is part of the administration of the Internal Revenue Code and any corrupt effort to interfere with that task can therefore serve as the basis of an obstruction conviction."). "[T]he same could have been said of the defendant's effort to mislead the investigating agent in *Aguilar*[,]" noted *Marinello*, because "[t]he agent's investigation was, at least in some broad sense, a part of the administration of justice. But we nevertheless held the defendant's conduct did not support an obstruction charge." *Id*.

**Second**, as in *Marinello*, the "broader statutory context" supports a reading of § 1505 in which the government must prove a nexus between the defendant's conduct and the relevant proceeding. 138 S. Ct. at 1107. In *Marinello*, the Supreme Court noted that its reading of

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

§ 7212(a) "potentially overlaps" with § 1505. *Id.*; *see also id.* at 1115 ("The Court's interpretation also makes the Omnibus Clause largely redundant with 18 U.S.C. § 1505[.]" (Thomas, J., dissenting)). A decision rejecting the nexus requirement under § 1505 would thus render *Marinello*'s interpretation of § 7212(a) "nugatory through construction." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315 (2011); *see also United States v. Novak*, 476 F.3d 1041, 1051 (9th Cir. 2007) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject matter." (citations omitted)). In that case, because § 1505 and § 7212(a) each can apply to tax proceedings, prosecutors would need only charge tax cases under § 1505 to escape § 7212(a)'s more stringent burden of proof. Such a decision also would run counter to *Marinello*'s holding that courts should interpret federal obstruction statutes as a consistent whole: although *Marinello* conceded that "the language and history of" § 7212(a) "differ somewhat from that of other obstruction provisions we have considered in the past[,]" "[t]he language of some and the underlying principles of all these cases are similar." *See* 138 S. Ct. at 1109 (citing *Yates*, 574 U.S. 528, *Arthur Andersen*, 544 U.S. 696, and *Aguilar*, 515 U.S. 593) (additional citations omitted).

*Third*, each of the Supreme Court's recent obstruction decisions has taken pains to emphasize that courts "'have traditionally exercised restraint in assessing the reach of a federal criminal statute[.]'" *Marinello*, 138 S. Ct. at 1106 (quoting *Aguilar*, 515 U.S. at 600)); *see also Yates*, 574 U.S. at 547–48 (plurality opinion); *Arthur Andersen*, 544 U.S. at 703. Courts do so "both out of deference to the prerogatives of Congress, and out of concern that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed[.]" *Arthur Andersen*, 544 U.S. at 703 (quoting *Aguilar*, 515 U.S. at 600) (internal citations omitted). "Such restraint is particularly appropriate . . . where"—as in this case—"the act underlying the conviction . . . is by itself innocuous." *Id.* "Indeed, 'persuad[ing]' a person 'with intent to . . . cause' that person to 'withhold' testimony or documents from a Government proceeding or Government official is not inherently malign." *Id.* at 703-04 (internal quotation marks and footnote omitted). "Nor is it necessarily corrupt for an

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

attorney to 'persuad[e]' a client 'with intent to . . . cause' that client to 'withhold' documents from the Government." *Id.* at 704 (citing *Upjohn Co. v. United States*, 449 U.S. 383 (1981)). Those concerns are at least as applicable to § 1505 as they were to 18 U.S.C. §§ 1512(b)(2)(A) and (B), the statutes at issue in *Arthur Andersen. See* 18 U.S.C. 1515(b) (defining "corruptly" for purposes of §1505 to include, among other things, "withholding . . . a document or other information").

For all those reasons, the Court should interpret § 1505 as incorporating *Aguilar*'s nexus requirement.

> **b.** ***Bhagat*** **teaches only that** ***Aguilar*****'s nexus requirement is inappropriate in cases in which the defendant is alleged to have** ***directly*** **obstructed a proceeding, and in any event is no longer good law.**

It is true, as both parties observed in their jointly proposed jury instructions, that the Ninth Circuit has held in a § 1505 case that *Aguilar*'s nexus requirement did not require a separate jury instruction to that effect. *See United States v. Bhagat*, 436 F.3d 1140, 1148 (9th Cir. 2006) (*See also* ECF No. 151 at 15, 17).[8] For two reasons, though, *Bhagat* did not relieve the government of its duty to prove a nexus in its case against Sullivan.

***First***, *Bhagat* is distinguishable. It dealt solely with the defendant's request for a new trial on the basis of the court's failure to issue a nexus instruction *sua sponte*. *See* 436 F.3d at 1147–48 ("Because the provided jury instructions adequately addressed the elements needed to obtain a conviction under 18 U.S.C. § 1505, Bhagat is not entitled to a new trial on this basis."). And Bhagat, unlike Sullivan, was convicted not for attempting to influence the proceeding indirectly or through an intermediary, but for directly "making false statements to SEC investigators." *Id.* at 1147 (emphasis added).

Those features of *Bhagat* make it inapplicable in these circumstances. "In determining whether it is bound by an earlier decision, a court considers not merely the 'reason and spirit of cases' but also 'the letter of particular precedents[,]'" which in turn "includes not only the rule

---

[8] As we have noted throughout these proceedings, we respectfully disagree with *Bhagat* on this point.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

announced, *but also the facts giving rise to the dispute*, other rules considered and rejected and the views expressed in response to any dissent or concurrence." *Hart v. Massanari*, 266 F.3d 1155, 1171 (9th Cir. 2001) (quoting *Fisher v. Prince*, 97 Eng. Rep. 876, 876 (K.B. 1762)) (emphasis added). A "court confronted with apparently controlling authority must parse the precedent in light of the facts presented and the rule announced[,]" determining whether the factual differences between the two "are material to the application of the rule or allow the precedent to be distinguished on a principled basis." *Id*. at 1172. As an example, *Hart* cited a Supreme Court case that limited private plaintiffs' remedies against publishers in defamation actions. *See* 266 F.3d at 1170 n.25 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974)). Based on that case's "language and context", it then noted, a later Supreme Court case determined that the earlier case's rule applied only in actions involving matters of public concern—even though the literal language of the earlier case purported to impose no such limitation. *Id*. ("'Given the context of *Gertz*, however, the Court could have made "perfectly clear" only that these restrictions applied in cases involving *public speech*.'" (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 757 n.4 (1985)) (emphasis in original)); *see also Dun & Bradstreet*, 472 U.S. at 756 (summarizing the facts of *Gertz*, and noting that it "involved expression on a matter of undoubted public concern").

Bhagat's language and context, which dealt with a defendant who interfered *directly* with a federal agency proceeding, render it inapplicable in these circumstances, in which Sullivan was alleged to have interfered only *indirectly* with the FTC's investigation. In fact, *Bhagat* itself distinguished *Aguilar* for that very reason. *Aguilar*, the Ninth Circuit said, "addressed false statements made during the course of an *agency's* [the FBI's] investigative proceeding that obstructed a *judicial* proceeding[,]" and because "judicial proceedings are distinct from government investigations, . . . the intent to obstruct an agency proceeding did not automatically demonstrate intent to obstruct the related judicial one." *Id*. at 1147 (citing *Aguilar*, 515 U.S. at 599-601) (first emphasis added; second emphasis in original). The *Bhagat* defendant, by contrast, "was charged under Section 1505 with" directly "obstructing an agency proceeding and

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1    not a judicial one[.]" *Id*. at 1147–48. On that basis, *Bhagat* characterized *Aguilar* as

2    distinguishable from cases like the one before it, "where false statements were made *directly in*

3    *the relevant proceedings*[.]" *Id*. (citing *Aguilar*, 515 U.S. at 601 & n.2) (emphasis added).

4         On the facts, this case is much closer to *Aguilar* than *Bhagat*. Read fairly and in light of

5    its "language and context," *Hart*, 266 F.3d at 1170 n.25, *Bhagat* stands only for the proposition

6    that *Aguilar*'s nexus requirement does not apply in cases in which the defendant is accused of

7    interfering directly with a federal agency proceeding. By its own terms, its holding does not

8    apply in cases where, as here, the obstruction is said to have occurred indirectly. The

9    government's case against Sullivan fell squarely in that latter category. Thus, *Bhagat* did not

10   relieve the government of its duty to prove "a relationship in time, causation, or logic" between

11   Sullivan's conduct and the FTC's investigation. *Aguilar*, 515 U.S. at 599.

12        **Second**, to the extent it would require otherwise, *Bhagat* has been impliedly overruled by

13   the Supreme Court's decision in *Marinello*. Ninth Circuit precedent can "become[] effectively

14   overruled by a Supreme Court decision that is closely on point, even if the decision does not do

15   so expressly." *Langere v. Verizon Wireless Servs., LLC*, 983 F.3d 1115, 1121 (9th Cir. 2020)

16   (citing *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc)). A Supreme Court

17   decision on a related but different question can do so because the "deference" owed by lower

18   courts "extends to the reasoning of [Supreme Court] decisions, too—not just their holdings." *Id*.

19   (citations omitted). "Thus, even when the issue in the Supreme Court case is not 'identical' to the

20   one decided by our court, the Supreme Court's reasoning may be controlling nonetheless." *Id*.

21   (quoting *Miller*, 335 F.3d at 900). "This happens when the Supreme Court has 'undercut the

22   theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly

23   irreconcilable.'" *Id*. (quoting *Miller*, 335, F.3d at 900). "This burden is high, but not

24   insurmountable." *Id*. (citation omitted). For example, "it is enough that the issues, while not

25   carbon copies, 'ultimately derive[d] from the same inquiry.'" *Id*. (quoting *SEIU Local 121RN v.*

26   *Los Robles Reg'l Med. Ctr.*, 976 F.3d 849, 855 (9th Cir. 2020)). "At the end, [the] cases distill to

27   a simple principle: when a rule announced by this court and a rule later announced by the

Supreme Court cannot both be true at the same time, they are clearly irreconcilable." *Id.*

*Langere* is a good example of those principles at work. There, the Ninth Circuit considered an earlier circuit precedent permitting a plaintiff "to avoid arbitration and manufacture appellate jurisdiction simply by voluntarily dismissing his claims with prejudice." *Id.* at 1117 (citing *Omstead v. Dell, Inc.*, 594 F.3d 1081 (9th Cir. 2010)); *see also* 9 U.S.C. § 16 (setting forth rules of appellate jurisdiction for arbitration). The Supreme Court had since ruled, though, that putative class action plaintiffs may not employ the same tactic following the denial of a motion for class certification. *See id.* at 1119 (citing *Microsoft Corp. v. Baker*, 137 S. Ct. 1702, 1712 (2017)); *see also* Fed. R. Civ. P. 23(f). Even though *Omstead* remained technically good law, the Ninth Circuit determined in *Langere* that *Microsoft* had impliedly overruled *Omstead* by its reasoning:

> Were we to replace three words in *Microsoft*, "denying class certification," with "compelling arbitration," and substitute "Rule 23(f)" with "§ 16(b)," that decision would be indistinguishable from our own. One case is about class certification and one is about arbitration. But we cannot cover our eyes to binding Court decisions on that basis alone. The reasoning of *Microsoft* was that the voluntary-dismissal device cannot be permitted to subvert the final judgment rule or a finely wrought, discretionary-appellate regime. And that is precisely what the gambit before us now purports to do. Simply, the rationales of *Omstead* and *Microsoft* are incompatible and irreconcilable.

*Id.* at 1123.

To the extent it would free the government from its duty to prove a nexus between a defendant's conduct and the proceeding allegedly obstructed in a § 1505 case, *Bhagat* is similarly irreconcilable with *Marinello*. *Marinello*—which was decided 12 years after *Bhagat*—made it unmistakably clear that federal obstruction statutes should be interpreted consistently insofar as they feature similar language and structure. Because "Congress . . . used that same amended formulation" in both § 1503 and § 7212, *Marinello* noted, it was "helpful to consider how we have interpreted § 1503 and other obstruction statutes in considering § 7212." 138 S. Ct. at 1109. *Marinello* thus removed any doubt concerning how courts should interpret a statute imposing criminal liability on a defendant who "corruptly" "endeavors" to "obstruct" or

"impede" the "due" "administration" of some federal agency proceeding—words that appear in a materially identical formulation in § 7212, § 1503, and § 1505 alike. Specifically, *Marinello* teaches that minor syntactical differences between such statutes should not lead to divergent interpretations because "[t]he language of some and the underlying principles of all" of the Court's cases interpreting those statutes "are similar" and thus "highly instructive[.]" *Marinello*, 138 S. Ct. at 1109 (citing *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) ("[W]e begin with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." (citation omitted))).

For those reasons, "the Supreme Court's reasoning" in *Marinello* is "controlling" in these circumstances and "is 'clearly irreconcilable' with the reasoning of" *Bhagat*, at least insofar as *Bhagat* disclaims a nexus requirement. *See Langere*, 983 F.3d at 1121 (quoting *Miller*, 335 F.3d at 893). *Bhagat* appears to have come to that conclusion solely because § 1505 applies to "the due and proper administration of . . . pending proceeding[s] before any department or agency of the United States[,]" whereas § 1503 applies to "the due administration of justice[.]" *See* 436 F.3d at 1147. *Marinello* decided, however, that those distinctions are immaterial to the nexus issue. *See, e.g.*, 138 S. Ct. at 1106 ("[T]he whole phrase—the due administration of the Tax Code—is best viewed, *like the due administration of justice*, as referring to only some of those acts or to some separable parts of an institution or business." (citing *Aguilar*, 515 U.S. at 600–01) (emphasis added)). Instead, *Marinello* recognized, the nexus requirement arises from the structure of the sentence preceding that phrase and interpretive rules that "apply . . . with similar strength" to the various obstruction statutes that use those words. *See id.* at 1106. At bottom, *Marinello*'s reasoning and *Bhagat*'s interpretation of § 1505 "cannot both be true at the same time." *Langere*, 983 F.3d at 1121. It cannot be that the words "corruptly," "endeavors," "obstruct," "impede," "due," and "administration" mean different things in the various obstruction statutes when "[t]he language of some and the underlying principles of all" of the Court's obstruction cases, and the statutes they dealt with, "are similar[,]" "highly instructive[,]"

and have otherwise been consistently interpreted as requiring a nexus. *Marinello*, 138 S. Ct. at

1109 (citing *Smith*, 544 U.S. 228 (2005)).

It bears noting that *Bhagat*'s foundations have also begun to crumble at the circuit level.

*Cf. Langere*, 983 F.3d at 1123 (noting that "[o]ur court has previously acknowledged . . . that

*Microsoft* effectuated a change in law in our circuit" of the sort that the Ninth Circuit ultimately

recognized). For one thing, the only case other than *Aguilar* that *Bhagat* cited in support of its

conclusion has since been overturned. *Compare Bhagat*, 436 F.3d at 1148 (citing *United States v.*

*Gabriel*, 125 F.3d 89, 103–04 (2d Cir. 1997) (declining to incorporate a nexus requirement in

§ 1512 cases)) *with United States v. Quattrone*, 441 F.3d 153, 176 (2d Cir. 2006) ("Contrary to

earlier circuit precedent [including *Gabriel*], . . . the Supreme Court's recent decision in *Arthur*

*Andersen* makes clear that *Aguilar*'s nexus requirement applies to some degree to section

1512(b)[.]" (citing *Arthur Andersen*, 544 U.S. at 707-08)). For another, the Ninth Circuit has

more recently characterized § 1505 in *dicta* as among the obstruction statutes "requir[ing] a

nexus to an ongoing or pending proceeding or investigation." *See Valenzuela Gallardo v. Barr*,

968 F.3d 1053, 1064 & n.9 (9th Cir. 2020) (listing § 1505 and several other obstruction statutes).

As in *Langere*, then, a decision recognizing the demise of *Bhagat*'s § 1505 holding would "just

solemnize what seems obvious." 983 F.3d at 1123.

         **c.**     **There was insufficient evidence of a "a relationship in time, causation, or logic" between Sullivan's affirmative conduct and the FTC's investigation.**

The evidence at trial fell short of establishing the required nexus (*i.e.,* a "relationship in

time, causation, or logic") between any of Sullivan's affirmative conduct and the FTC's

investigation. *See Aguilar*, 515 U.S. at 599–600. As in *Aguilar*, the connection between the acts

on which the government primarily relied and the FTC's investigation was simply too attenuated

to support criminal liability under § 1505.

***First***, while the government points to the $100,000 payment Uber made to Vasile

Mereacre and Brandon Glover, there was insufficient evidence that Sullivan was responsible for

this payment. In an October 2, 2017 interview, Sullivan told Uber's attorneys from WilmerHale

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO            15

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

that Travis Kalanick, Uber's then-CEO—and Sullivan's superior—had approved the $100,000 payment to the outside actors. (Tr. (Lee) 2221:2–4; Ex. 1111 at 6–7; *see also* Tr. (Yoo) 1621:26; Ex. 165 (email to Kalanick, attaching signed NDA reflecting $100,000 payment)). The government offered insufficient evidence establishing how Sullivan's mere knowledge of the payment could be evidence of his endeavor corruptly to influence, obstruct, or impede the FTC's investigation if Sullivan did not authorize the payment in the first place.

Nor, critically, was there any evidence that the $100,000 paid to Mereacre and Glover was meant to impede—or, for that matter, had any relationship with—the FTC's investigation. In his October 2017 WilmerHale interview, Sullivan indicated merely that the money was paid to avoid potential "embarrassment." (Ex. 1111 at 6.) A general desire to avoid personal or corporate embarrassment is a far cry from "endeavor[ing] corruptly to influence, obstruct, or impede" the FTC's investigation. *See Aguilar*, 515 U.S. at 600–02. The government offered insufficient evidence linking Sullivan's alleged desire to avoid embarrassment to Uber's responses to the FTC in anything more than a speculative way. Without any such evidence, the leap between the two is too great to support criminal liability.

***Second***, although the government's case focused extensively on the non-disclosure agreement ("NDA") signed by the hackers, it failed to establish that the NDA had anything to do with the FTC's investigation. The government offered insufficient evidence that Sullivan and Clark discussed the FTC during the process of drafting the NDA, that Sullivan (or anyone else) showed the NDA to anyone at the FTC or any of Uber's lawyers involved in the FTC investigation, or that Sullivan urged anyone else to do so. Nor did Sullivan brandish the NDA defensively when he was directly asked about the incident in 2017 by Uber's outside lawyers at WilmerHale. As Clark told the WilmerHale lawyers during his October 2017 interview, whatever the origins of the NDA's specific language, its purpose was *not* to try to hide something. (Tr. (Clark) 1462:17–1463:6.) The government presented insufficient evidence to the contrary.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

*Third*, the government highlighted Sullivan's statements that he was communicating with Uber's executive team ("the A-team") in the hope that the jury would conclude (1) that this statement was false, because Sullivan only communicated with *some* but not *all* of the A-Team; (2) that Sullivan was implicitly instructing his team that they should *refrain* from informing anyone on the A-Team about the 2016 Incident themselves; and (3) that all of this was done in order to conceal the incident from the FTC. While such speculation would certainly have been helpful for the government's case, it was not supported by the evidence adduced at trial. The government failed to establish any relationship between Sullivan's statements regarding the A-team and the FTC's investigation. There is insufficient evidence that the statements Sullivan made to the incident response team about communicating directly with the A-team were calculated to suppress communications between members of the response team and the lawyers involved in the FTC investigation. Nor could they have been reasonably interpreted in that way: Sullivan never said who he was communicating with on the A-team, nor did he say that he was or was not communicating with Uber's General Counsel, Salle Yoo. (Tr. (Flynn) 586:3–16.) Moreover, members of the incident response team knew Sullivan *was* communicating directly with Travis Kalanick, Uber's then-CEO and the leader of the A-Team. (Tr. (Borges) 710:14-711:3; *see also, e.g.*, Exs. 37 (Sullivan/Kalanick text exchanges); 232 (phone records reflecting calls between Sullivan and Kalanick); 33 (Sullivan email to Kalanick regarding engineering response to the 2016 Incident); 165 (Sullivan email to Kalanick forwarding copy of signed NDA).)

Indeed, Sullivan did not object when members of the response team reached out to other relevant A-team members. For example, John "Four" Flynn informed Sullivan that he had reached out to Thuan Pham, Uber's then-Chief Technology Officer and a member of the A-team, about changes in the engineering organization that were needed because of the 2016 Incident. (Ex. 363.)

*Fourth,* while the government repeatedly suggested an improper motive behind Sullivan's reminders to the incident response team to keep the incident confidential, there was

insufficient evidence that these reminders were intended to "influence, obstruct, or impede" the FTC's investigation. It is true that Sullivan reminded the incident response team that information about the incident was "extremely sensitive" and should be "tightly controlled." (Ex. 29 at 14.) But members of the incident response team gave unrebutted testimony that the level of confidentiality surrounding the investigation of this incident was normal and in keeping with standard operating procedure relating to such investigations. (Tr. (Flynn) 584:22–586:2, *id.* (Borges) 726:8–24; *id.* (Garbutt) 796:4–12; *id.* (Clark) 1446:9–1448:11.) In fact, the very first people to remind the incident response team that they needed to keep the incident and the response confidential were Craig Clark—who himself participated briefly in Uber's responses to the FTC—and Four Flynn. (Ex. 352.) Despite the legitimate need for secrecy, many people were involved in the incident response, much of which occurred over open Zoom meetings precisely to facilitate individuals' participation at will. (Tr. (Clark) 1312:24–1313:7, 1448:12–15.) Not once did anyone on the incident response team link the need for secrecy to the FTC's investigation. (*See, e.g.*, Tr. (Borges) 724:7–21.)

***Fifth***, there was insufficient evidence that directing the hackers to submit their findings through Uber's bug bounty program at HackerOne was intended to "influence, obstruct, or impede" the FTC's investigation. The first person at Uber to tell the hackers that Uber's bug bounty program was the proper way to report the vulnerabilities they discovered was Rob Fletcher, when he first emailed the hackers at 12:51 p.m. on November 14, 2016. (Tr. (Fletcher) 952:6-12. *See also* Exs. 152, 350.) There is *no evidence* that Sullivan was involved in that communication or that Fletcher was even aware of the FTC's investigation at that time. Indeed, this communication took place not only before Sullivan was ever involved in the investigation, but before Collin Greene advised Fletcher to involve Clark and the Security Response team (Ex. 1122), before the incident response team's first meeting (Ex. 357), and well before the incident response team discovered that the hackers had accessed and downloaded the driver's license information of about 600,000 Uber drivers. (Ex. 29 at 16.)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

***Sixth***, there was insufficient evidence that Sullivan intentionally concealed or withheld information about the 2016 Incident from the Uber attorneys who were working on the FTC's investigation.[9] Sabrina Ross, the Uber lawyer primarily responsible for responding to the FTC's requests for information and documents between June 2015 to the summer of 2017, testified that Sullivan was "kept aware of the investigation response" at a "high level" and that the attorneys working on the FTC's investigation sometimes would have worked with him to identify who within his department could help them with the response. (Tr. (Ross) 1084:25–1085:14.) Although her direct interactions with Sullivan were limited and happened mostly by email, Ross testified that Sullivan was "always helpful" and made available to her anyone from the Security group, in each case without reservations or limitations. (Tr. (Ross) 1175:17–1176:18, 1177:10–17.) There was insufficient evidence that Sullivan ever instructed *anyone* to be anything less than fully forthcoming with Ross or any of the other Uber lawyers working on the responses. In particular, there was insufficient evidence that Sullivan told Flynn, Garbutt, or Clark—all of whom were both fully aware of the 2016 Incident and involved in assisting Ross with gathering information responsive to the FTC's inquiries—to withhold information from Uber's FTC attorneys. (Tr. (Clark) 1448:16–1449:10; *id.* (Flynn) 697:5–697:19; *id*. (Garbutt) 837:11–838:2).) Nor did Sullivan otherwise limit the types of information they could share with Uber's FTC attorneys.[10] (Tr. (Clark) 1455:3–10; *id.* (Ross) 1176:19–1177:9, 1213:11–1214:20.)

***Seventh*** and finally, the government failed to offer any evidence establishing a connection between the FTC's investigation and Sullivan's statements in September 2017 to

---

[9] The government did not argue or present any evidence that Sullivan made false statements directly to the FTC during the agency's investigation. Nor could it. Sullivan spoke directly with the FTC only three times during its investigation: a phone call in October 2015, a presentation with Four Flynn in March 2016, and an investigational hearing in November 2016. (Tr. (Rossen) 459:3–460:6). The government offered no evidence and did not argue that anything Sullivan said during those communications was false or misleading. Rossen testified that most— about 95 percent— of his communications with Uber about the FTC's investigation were with Rebecca Engrav. (Tr. (Rossen) 460:7–461:18.)

[10] Indeed, Ross's direct supervisor, Candace Kelly, was informed about the key details of the 2016 Incident within 24 hours after Uber was contacted by the hackers. (Tr. (Kelly) 1891:2-1892:7, 1895:24–1905:9; Exs. 31, 36, 39, 40.)

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO                                    19

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Dara Khoshrowshahi (who had just become Uber's new CEO) and John Dwyer (outside counsel to Uber's board of directors). Neither those communications nor the circumstances in which they took place suggested in any way that Sullivan believed his comments would be relayed to, or would otherwise influence others' communications with, the FTC. Indeed, by September 2017, the FTC and Uber had reached a negotiated settlement, subject only to final approval by the Commission. (Tr. (Ross) 1243:19-25; *see also* Exs. 612-614 (7/11/17 email from Ross to Yoo, attaching final settlement documents for signature); Ex. 209-210 (7/14/17 email from Engrav to Rossen, attaching signed settlement documents).

Simply put, none of the evidence discussed above had a "relationship in time, causation, or logic with" the FTC's investigation, or "the natural and probable effect of interfering with" it. *See Aguilar*, 515 U.S. at 599-600. Even giving the government the benefit of all favorable inferences, that evidence is insufficient to sustain a § 1505 conviction.

> **2.      The evidence concerning Sullivan's failure to disclose the 2016 Incident to certain individuals is insufficient to sustain a conviction under § 1505.**

In addition to his affirmative conduct, the government contended that Sullivan violated § 1505 merely by failing to disclose the 2016 Incident as widely as he should have. But, so far as the government's evidence established, Sullivan had no specific legal duty to disclose that information, whether to the FTC itself or to others within Uber who were in a position to convey the information to the FTC. Thus, the government's duty to disclose theory is also insufficient to sustain the § 1505 charge.

> **a.      When a § 1505 charge is premised on an omission, the government must establish that the defendant had a specific legal duty to disclose the information withheld.**

A § 1505 charge may be based on a defendant's omission, as opposed to affirmative conduct. *See* 18 U.S.C. 1515(b) (defining "corruptly" as including the "withholding [of] . . . information"). In those circumstances, though, the government must establish that the defendant violated some specific duty to disclose the withheld information. That much is true for several reasons.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1      *First*, construing "withholding" as requiring an antecedent duty to disclose is the most

2  natural way to read that word. *See Duguid*, 141 S. Ct. at 1169; *Nichols*, 578 U.S. at 111. "A

3  term's ordinary meaning may be determined with reference to its dictionary definition at the time

4  the statute was enacted." *United States v. Carona*, 660 F.3d 360, 367 (9th Cir. 2011)

5  (considering that word as used in 18 U.S.C. § 1512(b)(2)(A)) (internal quotation marks and

6  citation omitted). Section 1515(b) was enacted in 1996. At that time, Black's Law Dictionary

7  defined the verb in a way that contemplated more than passive silence: to "withhold" is "[t]o

8  retain in one's possession *that which belongs to or is claimed or sought* by another" or "[t]o

9  refrain from paying that *which is due*." *Black's Law Dictionary* 1602 (6th ed. 1990) (emphasis

10  added); *see also Carona*, 660 F.3d at 367 ("The definition of 'withhold' includes '[t]o omit to

11  disclose *upon request*; as, to withhold information.'" (quoting *Black's Law Dictionary* 1437 (5th

12  ed. 1979))). Those definitions reflect the commonsense way in which the word "withhold" is

13  normally used. Nobody would say that a law clerk who happens upon an interesting law review

14  article in her spare time and declines to bring it to her judge's attention has "withheld" the

15  article, even if she knows the judge would find it useful. In those circumstances, the clerk has

16  "withheld" the article from the judge only if the judge earlier instructed her to find and disclose

17  it. *See United States v. Singh*, 979 F.3d 697, 717 (9th Cir. 2020) ("In most of the cases where

18  courts affirmed § 1519 convictions based on omissions, the defendants either prepared the record

19  or document, or were responsible for doing so.").

20      *Second*, the doctrine of constitutional avoidance favors a reading of "withholding" that

21  requires a specific legal duty to disclose. Under that doctrine, "a 'statute must be construed, if

22  fairly possible, so as to avoid not only the conclusion that it is unconstitutional but also grave

23  doubts upon that score.'" *United States v. Shill*, 740 F.3d 1347, 1355 (9th Cir. 2014) (quoting

24  *Almendarez–Torres v. United States*, 523 U.S. 224, 237 (1998)). If "withholding" were construed

25  as not requiring the government to establish a specific legal to disclose, § 1515(b), and by

26

27

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO                21

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

extension § 1505, would be void for vagueness as applied to these facts.[11] *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) ("The void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have fair notice of the conduct a statute proscribes. And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges." (internal quotation marks and citations omitted)). "For statutes . . . involving criminal sanctions 'the requirement for clarity is enhanced.'" *Kilbride*, 584 F.3d at 1257 (quoting *Info. Providers' Coal. for the Def. of the First Amendment v. FCC*, 928 F.2d 866, 874 (9th Cir. 1991)).

Two circuit decisions interpreting 18 U.S.C. § 1001 illustrate why the void for vagueness doctrine requires the construction of § 1505 above. In *United States v. Safavian*, 528 F.3d 957, 963 (D.C. Cir. 2008), the GSA's chief of staff was charged under § 1001(a)(1) for failing to mention to an in-house ethics lawyer and later a GSA investigator that he was assisting Jack Abramoff's lobbying efforts. While the parties agreed that "there must be a legal duty to disclose in order for there to be a concealment offense in violation of § 1001(a)(1), . . . the government failed to identify a legal disclosure duty except by reference to vague standards of conduct for government employees." *Id*. (footnote omitted). Those "vague standards" included 5 C.F.R. § 2635.101(b)(5) ("Employees shall put forth honest effort in the performance of their duties.") and § 2635.101(b)(11) ("Employees shall disclose waste, fraud, abuse, and corruption to appropriate authorities."), among others. *Id*. at 964. The duties imposed by those regulations were too "tenuous" to support criminal liability. *Id*. Rather, "[c]oncealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for

_____

[11] To be clear, Sullivan does not contend that either statute is void for vagueness on its face. *See United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009) ("A statute is unconstitutionally vague on its face if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." (internal quotation marks and citation omitted)). He contends only that, if construed as not requiring proof of a legal duty to disclose, the statutes would be void for vagueness as applied to the facts of this case. *See id*. ("A statute is unconstitutionally vague as applied if it failed to put a defendant on notice that his conduct was criminal." (citing *United States v. Purdy*, 264 F.3d 809, 811 (9th Cir. 2001)).

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

disclosure of specific information." *Id.* (collecting cases). The void for vagueness doctrine, the court noted, was at the heart of that requirement:

> There is good reason for demanding such specificity: to comply with Fifth Amendment due process, the defendant must have fair notice . . . of what conduct is forbidden . . . . [T]his fair warning requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal. The ethical principles give no indication of the particular facts or information an executive employee must disclose. Nor do they suggest that they have any bearing on conduct during a GSA investigation or a request for an ethics opinion.

*Id.* (internal quotation marks and citations omitted).

*United States v. White Eagle*, 721 F.3d 1108, 1116 (9th Cir. 2013), concerned a Bureau of Indian Affairs official charged under § 1001(a)(1) for failing to report a third party's fraudulent loans. As in *Safavian*—on which *White Eagle* relied expressly—the government argued that 5 C.F.R. § 2635.101(b)(11) imposed a duty to disclose the fraudulent loans. The Ninth Circuit disagreed. Like *Safavian*, *White Eagle* held that a failure to disclose can support a conviction under § 1001(a)(1) only "where a statute or government regulation requires the defendant to disclose specific information to a particular person or entity." *Id.* at 1117 (citing *United States v. Tobon–Builes*, 706 F.2d 1092, 1096 (11th Cir. 1983)). And relying on *Safavian*, *White Eagle* cited fair notice as a reason for that rule. *See id.* at 1117 (quoting *Safavian*, 528 F.3d at 964).[12]

In these circumstances, fair notice is an even more urgent concern, and no less applicable to § 1505 than to § 1001. The failure to disclose of which Sullivan was accused involved a private employer (Uber) whose employees were (and are) not subject to any "good governance" statutes or regulations of the sort at issue in *Safavian* and *White Eagle*. Moreover, as explained below, undisputed evidence established that Sullivan *did* ensure that the 2016 Incident was made

---

[12] Similarly, in the context of the mail and wire fraud statutes, the Ninth Circuit has held that an omission can constitute a fraudulent misrepresentation only when the defendant was under a duty to disclose the omitted fact. *See, e.g.*, *United States v. Shields*, 844 F.3d 819, 822-23 (9th Cir. 2016).

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1  known to over 30 other Uber employees, including Craig Clark, the attorney responsible for

2  providing legal advice with respect to such incidents. The government's theory, then, was that

3  Sullivan had a duty to disclose certain facts to certain other individuals within Uber. The

4  problem, however, is that neither § 1505 nor § 1515(b) provides any clue as to how Sullivan

5  should have determined which particular facts needed to be disclosed to which particular

6  individuals. *See Safavian*, 528 F.3d at 965 ("The ethical principles give no indication of the

7  particular facts or information an executive employee must disclose."). That silence is

8  particularly problematic because, as discussed above, the act of "withholding" information is far

9  from inherently wrongful, particularly in the corporate context. *See Arthur Andersen*, 544 U.S. at

10  703-04 (citing U.S. Const., amend. V, *Trammel v. United States*, 445 U.S. 40 (1980), and

11  *Upjohn*, 449 U.S. 383).

12           **b.**     **The evidence was insufficient to establish that Sullivan had a duty to disclose the 2016 Incident, whether to the FTC directly or to others at**

13                    **Uber who were in a position to disclose the incident to the FTC, or that he provided anything more than minimal assistance in preparing**

14                    **Uber's responses to the FTC.**

15        As previously noted, the Department of Justice has yet to convince Congress to establish

16  generally applicable requirements for companies to disclose data security incidents to the federal

17  government, let alone reporting requirements for individual employees. And while the FTC's

18  investigation imposed certain disclosure obligations on the company, the government failed to

19  establish that *Sullivan* had any legal duty to disclose the 2016 Incident, whether to the FTC

20  directly, to others within Uber who were working on the company's responses to the FTC, or

21  otherwise. Of course, the FTC directed its civil investigative demand to Uber, not Sullivan

22  himself. Because Sullivan was not "the recipient named therein," he had no legal duty to respond

23  to it. *See* 16 C.F.R. § 2.7(a). Nor did the government establish that, in merely remaining silent,

24  Sullivan violated any legal duty to Uber or any other person or entity—much less one requiring

25  him to disclose specific information to a specific person, *see Safavian*, 528 F.3d at 965—that

26  foreseeably might have subjected him to criminal liability.

27        The best evidence presented at trial that actually set forth Sullivan's duties in the event of

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO                                          24

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

a data breach was Uber's Data Breach Incident Response Plan. (*See* Ex. 9.) The undisputed

evidence, however, established that Sullivan complied scrupulously with his obligations under

that Plan, which required "Legal, the Security Response Team, and CISO" to be notified in the

event of a suspected data breach.[13] (Tr. (Ross) 1170:13–1172:13; *see also* Ex. 9.) And so they

were. Upon discovering the hacker had accessed Uber data, Collin Greene instructed Fletcher to

alert the Security Response team (which included Sullivan) and Craig Clark, the lawyer

designated to advise on such issues. (Exs. 1122, 352.) Sullivan was listed as the primary point of

contact for Uber's Executive Leadership and was already aware of the incident because he had

received the hacker's initial email. (Tr. (Flynn) 576:23–577:15; *see also* Ex. 28.) Nothing in

Uber's Data Breach Incident Response plan, Uber's Breach Incident Response Playbook, or any

other source required Sullivan to report a cybersecurity incident, including a suspected data

breach, to anyone else in Uber. (*See generally* Ex. 9.)

Nor, as explained in more detail below, did any of Sullivan's other conduct establish a

duty to disclose.

### 1)    Sullivan provided no substantive input into Uber's Eighth Set of responses to the FTC's CID.

A great deal of testimony at trial centered on Uber's Eighth Set of Responses to the

FTC's CID (Ex. 455). These interrogatory responses were submitted by the company in

December 2016, and represent the only such responses to occur *after* the 2016 Incident. For this

reason, the government argued at trial that these responses should have disclosed the 2016

Incident.

As an initial matter, the evidence at trial was clear that these responses related to

questions that were exclusively concerned with the state of Uber's cybersecurity in *2014*. (Tr.

(Ross) 1193:2–1194:12; *see also* Ex. 159.) But more importantly, the government offered

insufficient evidence that Sullivan ever saw this document, participated in its drafting or editing,

---

[13] Uber's Breach Incident Response Playbook similarly included a Contact Matrix that followed the Primary and Secondary Escalation contacts set forth in the Data Breach Incident Response Plan. (Tr. (Ross) 1174:16–1175:12; *see also* Ex. 22.)

or even received the questions that the response was designed to answer. (Tr. (Ross) 1194:14–1195:19; 1197:6-1201:21; *see also* Ex. 1088 (no privileged communications with Sullivan until December 21, 2016, the day before the responses were submitted to the FTC).) While the government invited speculation based on the (undisputed) fact that Sullivan *could* have accessed this document if he wanted to, it ignored the fact that Sabrina Ross did not ask Sullivan to review the Eighth Set of Responses, did not talk with him about the responses, and is unaware whether he even looked at them. (Tr. (Ross) 1204:20–1208:13; *see also* Ex. 188.) *Compare Singh*, 979 F.3d at 717 ("In most of the cases where courts affirmed § 1519 convictions based on omissions, the defendants either prepared the record or document, or were responsible for doing so.").

> **2)** **Sullivan's involvement in preparing Uber's January 2017 responses to the FTC's questions regarding internal access to account information was too limited to sustain a conviction under section 1505.**

Similarly, the government argued that Uber's January 2017 responses to the FTC's questions relating to internal employee access to confidential information (Ex. 537) should have referenced the 2016 Incident. The government offered exactly two items of evidence concerning Sullivan's involvement in those responses. First, it presented Sullivan's statement to Ross on December 20, 2016 that he was working with Clark to gather information to include in a chart as part of those responses and "locking down data access." (Tr. (Ross) 1208:18; *see also* Exs. 188, 537.) Second, it relied on a January 11, 2017 suggestion to Rebecca Engrav, Uber's outside counsel, that the response delete the word "temp." (Tr. (Ross) 1109:5–20; *see also* Ex. 534). Neither communication had anything to do with *past* security incidents involving outside actors, or otherwise called for Sullivan to say anything about the 2016 Incident.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

3)      **Other than providing operational comments to the FTC's proposed Consent Order, Sullivan was not involved in preparing Uber's submissions to the FTC in 2017.**

Except for certain comments relating to operational issues discussed in the FTC's proposed consent order—having nothing to do with past security incidents—the government failed to present evidence that Sullivan was involved in preparing Uber's communications to the FTC in the spring and summer of 2017.

Specifically, there was insufficient evidence that Sullivan was substantively involved in preparing Uber's April 2017 letter to the FTC requesting the agency to close its investigation into the company—or that what little assistance he did provide took place in circumstances requiring him to disclose the 2016 Incident. (Tr. (Ross) 1215:17-1217:7; *see also* Ex. 200.) The only evidence the government offered was an email from Ross to Sullivan and Yoo linking an early draft of the letter and providing a high-level summary of its contents. (Tr. (Ross) 1113:25-1118:2; *see also* Ex. 200.) Other than Sullivan's response that the letter "looks ok," the government offered no evidence that Sullivan reviewed the letter or made any other comments, substantive or otherwise. Given the language of the draft, it also would have been perfectly understandable for Sullivan not to have volunteered information about the 2016 Incident; the draft indicated in no uncertain terms that Uber was *not* contending that it was or could be entirely free of cybersecurity incidents. (*See* Ex. 200.)

Moreover, the evidence showed that the only comments Sullivan had about the FTC's draft Order were operational suggestions that reflected the practical limitation of the changes the FTC proposed. (Tr. (Ross) 1225:3-1239:16; *see also* Ex. 573.) There is no evidence that Sullivan reviewed any revised drafts of the proposed Complaint or Order after May 18, 2016 or participated in that process in any way until Uber's Executive Committee met in July 2017 to discuss settling with the FTC, where he expressed support. (Tr. (Ross) 1239:17-1245:6; *see also* Exs. 578, 587, 588, 591, 594, 598, 602, 606, 612.)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

### c.   18 U.S.C. § 2(b) does not save the government's case.

The government cannot cure its failure to establish that Sullivan owed a disclosure duty either to the FTC or to Uber's lawyers by relying on 18 U.S.C. § 2(b). It is true, of course, that Uber—as opposed to Sullivan himself—had a duty to respond to the FTC's inquiries. But in these circumstances, neither § 1505 nor §2(b) permitted the government to transform *Uber*'s duty into a basis for *Sullivan*'s criminal liability. In particular, *United States v. Singh*, 979 F.3d 697, on which the government relied in opposing Sullivan's proposed jury instruction on the duty to disclose, is distinguishable on both the facts and the law. There, the defendant made affirmative false statements to the individuals who were responsible for preparing the relevant government reports, which failed to disclose that the defendant had been paid to provide social media services to a political campaign. *See id.* at 715–16 (when discussing potential payment with the individuals who were responsible for preparing the reports, the defendant said "that he would 'voluntarily help'" and "'[d]on't worry. It's taken care of.'"). Here, however, insufficient evidence was presented suggesting that Sullivan did any such thing; at no point, for example, did Sullivan indicate to anyone responsible for preparing Uber's responses to the FTC that a cybersecurity incident had *not* occurred. As discussed above, to the limited extent that Sullivan was involved in Uber's response to the FTC's investigation, the evidence established merely that he remained silent regarding the 2016 Incident.

Under these circumstances, the government failed to prove either that Sullivan acted "willfully" or that he "caused" Uber to act as it did. Under § 2(b), "[w]hoever *willfully causes* an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal." (Emphasis added.) The emphasized phrase requires that the defendant's conduct be "the cause in-fact" of the third party's act and "that defendant have the specific intent of 'bringing about' the forbidden act." *United States v. Markee*, 425 F.2d 1043, 1046 (9th Cir. 1970) (quoting *United States v. Kenofskey*, 243 U.S. 440, 443 (1917), and *United States v. Leggett*, 269 F.2d 35, 37 (7th Cir. 1959)) (cleaned up). Nothing Sullivan did can reasonably be said to have "caused" Uber not to disclose the 2016 Incident to the FTC—much

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

less amount to a "cause in-fact" of its nondisclosure. Nor could a rational juror find beyond a reasonable doubt that Sullivan specifically intended Uber to fail to comply with its disclosure obligations to the FTC. As the undisputed evidence established, Sullivan knew that several individuals who contributed to Uber's responses to the FTC were aware of the 2016 Incident and he did nothing to prevent them from communicating what they knew to the Uber lawyers handling the company's responses to the FTC. To say that he simultaneously "cause[d]" Uber's lawyers not to disclose the incident merely by remaining silent when they asked him months later to review draft responses that others had prepared would, as a matter of logic, be a bridge too far. *See, e.g.*, *United States v. Claxton*, 685 F.3d 300, 312 (3d Cir. 2012) (courts need not defer to jury determinations that would be "irrational").

**C.    For substantially the same reasons as under § 1505, the evidence was insufficient to sustain a conviction under 18 U.S.C. § 4 for misprision of a felony.**

The government's evidence on the misprision charge failed for substantially the same reason as the obstruction charge: the misprision statute requires that a defendant engage in affirmative conduct designed to conceal a federal felony from law enforcement. The government presented no such evidence.

**1.    Like § 1505, § 4 requires a nexus between the defendant's affirmative conduct and law enforcement.**

18 U.S.C. § 4 provides:

> Whoever, having knowledge of the actual commission of a felony cognizable by a court of the United States, conceals and does not as soon as possible make known the same to some judge or other person in civil or military authority under the United States, shall be fined under this title or imprisoned not more than three years, or both.

"To establish misprision of felony, the government must prove beyond a reasonable doubt: '(1) that the principal . . . committed and completed the felony alleged; (2) that the defendant had full knowledge of that fact; (3) that he failed to notify the authorities; and (4) that he took affirmative steps to conceal the crime of the principal.'" *United States v. Olson*, 856 F.3d 1216, 1220 (9th Cir. 2017) (quoting *Lancey v. United States*, 356 F.2d 407, 409 (9th Cir. 1966)). The

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

government's case failed on the fourth element, which requires not merely that the defendant engage in some "affirmative" act, but also that the act be committed "to conceal the crime of the principal." *See id.* (*See also* ECF No. 219 (Final Jury Instructions) at 19 (the "affirmative act [must be] designed to conceal the fact that a federal felony has been committed").

It is axiomatic that "'[m]ere silence, without some affirmative act, is insufficient evidence' of the crime of misprision of felony.'" *United States v. Ciambrone*, 750 F.2d 1416, 1418 (9th Cir. 1984) (quoting *Lancey*, 356 F.3d at 410). The Ninth Circuit has not meaningfully addressed the origin of that rule, but other courts have explained that it arises from the word "conceal" and turns on the same basic issues—*i.e.*, the word's ordinary meaning, the rule of lenity, and the void for vagueness doctrine—discussed above. "Following settled rules of construction," held *Bratton v. United States*, 73 F.2d 795, 797 (10th Cir. 1934), "we must assume that Congress intended something by the use of the words 'conceal and.'" *See also Lancey*, 356 F.2d at 410 (citing *Bratton*, 73 F.2d 795, for that proposition). "If any meaning is to be given them, an indictment must allege something more than mere failure to disclose—some affirmative act of concealment, such as suppression of the evidence, harboring of the criminal, intimidation of witnesses, or other positive act *designed to conceal from the authorities* the fact that a crime had been committed." *Bratton*, 73 F.2d at 797 (emphasis added); *see also United States v. Worcester*, 190 F. Supp. 548, 566 (D. Mass. 1961) ("Most of the cases customarily cited to show that there was at common law such a crime as misprision of felony involve interference with officers of the law." (cited in *Lancey*, 356 F.2d at 410)).

The best interpretation of "conceal" in § 4 is one consistent with the construction of § 1505 outlined above; indeed, § 1515(b)'s definition of "corruptly" includes "concealing . . . a document or other information." *See Smith*, 544 U.S. 228; *Novak*, 476 F.3d at 1051. In other words, as a matter of ordinary English grammar, *Nichols*, 578 U.S. at 111, there must be a "relationship in time, causation, or logic" between the statute's verb ("conceal") and its indirect object ("some judge or other person in civil or military authority under the United States"), *Aguilar*, 515 U.S. at 599. Conduct that does not have the "'natural and probable effect' of"

shielding information from federal law enforcement cannot reasonably be said to amount to "concealment" that information from federal law enforcement. *Aguilar*, 515 U.S. at 601.

### 2. The evidence at trial was insufficient to establish that any of Sullivan's affirmative conduct would have had the effect of concealing the 2016 from federal law enforcement.

Just as the government failed to offer any evidence that Sullivan's affirmative conduct had any "relationship in time, causation, or logic" to the FTC's investigation, *Aguilar*, 515 U.S. at 599-600, the government failed to establish that any of that conduct was calculated to conceal the 2016 Incident from federal law enforcement, as § 4 requires.

In particular, the government failed to offer any evidence that it was Sullivan's responsibility to contact law enforcement. Uber's data breach response policies place that responsibility squarely with Uber's legal department—which, as explained above, was aware of the 2016 Incident and fully capable of exercising its responsibilities under those policies. Uber's Data Breach Incident Response Plan stated that it was the responsibility of "Legal/Privacy" to "manage any contact with authorities, including law enforcement." (*See* Ex. 9 at 9–10.) Uber's Data Breach Response Playbook provided that Legal was responsible for "any" and "all" contact with law enforcement. (Ex. 22 at 2, 3, 7.) Legal was also directed to consult with Engineering Security to determine whether to contact law enforcement. (Ex. 22 at 6.) The head of Engineering Security at the time of the 2016 Incident was Four Flynn. (Tr. (Rossen) 470:22–472:8; *id.* (Flynn) 550:11-551:9; *see also* Ex. 310 at 6.)

### D. The evidence was insufficient to show that Sullivan knew the hackers' conduct was unauthorized.

Both charges against Sullivan fail for an independent reason as well: the government failed to present sufficient evidence that Sullivan knew the hackers' conduct was unauthorized, and thus that he knew the 2016 Incident was a "data breach" requiring disclosure to the FTC (Count 1) or a felony sufficient to support the misprision charge (Count 2).

Each of the charges required the government to prove that the hackers' conduct was unauthorized. On Count 1, the FTC's definition of "data breach" required that Uber disclose only

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

those incidents involving "unauthorized" access to the company's data. (Ex. 274 at 4.) Similarly on Count 2, § 4 required the government to prove that a third party committed a federal felony and "'that the defendant had full knowledge of that fact[.]'" *Olson*, 856 F.3d at 1220 (quoting *Lancey*, 356 F.2d at 409). In other words, "§ 4 requires the government to prove the defendant knew the principal engaged in conduct that satisfies the essential elements of the underlying felony *and* that the defendant knew such conduct was a felony." *Id*. at 1225 (emphasis in original). Here, the felonies on which the government's misprision charged was based were violations of 18 U.S.C. §§ 1030(a)(2)(C) and (a)(7)(B)—each of which required proof that the hackers accessed Uber's computer systems "without authorization." (*See* ECF No. 71 (Superseding Indictment) at 6; s*ee also* ECF No. 219 at 20-21) In short, if Sullivan believed that the hackers' conduct was authorized, neither count is supported by sufficient evidence.

The evidence at trial demonstrated exactly that. It was undisputed that in-house Uber lawyer Craig Clark told Sullivan and the rest of the Security team that authorization could occur after the initial intrusion—*i.e.*, that Uber would be able to authorize the hackers' conduct retroactively—if certain conditions were met. Specifically, Clark advised the team that Uber could properly treat the incident as bug bounty if they could (i) secure the data, (ii) ensure the hackers had not disseminated it further, and (iii) obtain an NDA from the hackers. (Tr. (Clark) at 1424:7–13, 1320:14–17; Ex. 29 at 8.) Clark further advised that if the incident were properly treated as a bug bounty, it would by definition not be considered a "data breach" because the access would then be deemed "authorized." (Tr. (Clark) at 1423:18-1424:13.) As of January 2017, Sullivan and his team believed they had satisfied the conditions that Clark had specified. (Tr. (Clark) 1530:7-1531:6; *see also* Exs. 193, 217.) Not a *single* witness testified that they had any reason to believe otherwise at that time. To Sullivan, then, those undisputed facts established that no federal felony or FTC-defined "data breach" had actually occurred, because the hackers' access was, in the end, authorized.

The government presented no evidence suggesting—much less presenting a rational juror with a basis upon which to conclude beyond a reasonable doubt—that Sullivan disbelieved

Clark's advice. Its bare assertion to that effect is insufficient as a matter of law. *See United States v. Cestoni*, 185 F. Supp. 3d 1184, 1188 (N.D. Cal. 2016) ("The 'evidence is insufficient to support a verdict where mere speculation, rather than reasonable inference, supports the government's case.'" (quoting *United States v. Nevils*, 598 F.3d 1158, 1167 (9th Cir. 2010))). Indeed, Clark's advice was far from unreasonable. *See, e.g.*, *Shefts v. Petrakis*, No. 10-CV-1104, 2012 WL 4049509, at *7 (C.D. Ill. Sept. 13, 2012) (holding that "post hoc 'ratification' by the service provider is sufficient to grant 'authorization' to access stored communications under" the Stored Communications Act, 18 U.S.C. § 2701, *et seq.*); *cf. LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1135 (9th Cir. 2009) ("The plain language [CFAA] indicates that 'authorization' depends on actions taken by the employer.").

The government will undoubtedly trumpet the September 2017 email in which Sullivan informed Dara Khosrowshahi, Uber's new CEO, that "[b]etween October 13, 2016, and October 15, 2016, *an unauthorized party* gained access to Uber employee Github accounts, scanned them for AWS credentials, and then used those credentials to access AWS buckets . . . ." (Ex. 622 (emphasis added).) But that statement shows only that Sullivan believed that the hackers' conduct was unauthorized *at the time it occurred*, in October 2016. Once Clark's conditions were met, however, that changed, and Sullivan, Clark, and the rest of the team believed the hackers' access became retroactively authorized.

The government failed to satisfy its burden of proving on both counts that Sullivan knew the hackers' conduct was unauthorized. In fact, the evidence established exactly the contrary: that, based on Clark's legal advice, Sullivan believed that Uber properly authorized the hackers' conduct. For that independent reason, the evidence is insufficient to sustain a conviction on either of the charged counts.

**E.    In the event the Court denies Sullivan's motion for a judgment of acquittal, it should order a new trial in its capacity as a "thirteenth juror."**

If the Court declines to accept Sullivan's argument above, it should nevertheless order a new trial. It would be well within its discretion to do so: "'If the court concludes that, despite the

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO                                      33

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

abstract sufficiency of the evidence to sustain the verdict, the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.'" *United States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)). Unlike a motion for a judgment of acquittal, the Court's "power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *Id*. (citing 3 Charles Alan Wright, *Federal Practice and Procedure* § 553 at 245 (1982)). In *Alston*, for example, a district judge "determined that the evidence weighed heavily against the verdict" and ordered a new trial on that basis; the Ninth Circuit concluded that the judge had not abused his discretion in doing so. *Id*. at 1213.

For substantially the same reasons outlined above, the Court should do the same here. The evidence established that Sullivan *did* disclose the 2016 Incident to a broad range of individuals within Uber, including the company's CEO, and otherwise followed the company's policies regarding cybersecurity incidents to the letter. For those and other reasons, the jury's conclusion that he intentionally obstructed justice and unlawfully concealed a felony "preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred[.]" *Id*. at 1211–12. Thus, if it declines to enter a judgment of acquittal, the Court should exercise its discretion to order a new trial. And if the Court *does* grant judgment of acquittal, it should conditionally determine that a new trial should be granted if the judgment of acquittal is later vacated or reversed. Fed. R. Crim. P. 29(d)(1).

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1

### III.    CONCLUSION

For all of the foregoing reasons, Sullivan respectfully requests that the Court enter a

judgment of acquittal on both of the charged counts or grant Sullivan a new trial.

DATED: November 3, 2022.

*s/ David H. Angeli*
David H. Angeli
Tyler P. Francis
Michelle H. Kerin
Ursula Lalović
John D. Cline

*Attorneys for Defendant Joseph Sullivan*

DEF'S RENEWED MOT FOR J. OF ACQUITTAL
AND ALT. MOT. FOR NEW TRIAL
3:20-cr-00337-WHO                              35

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880