STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

ANDREW F. DAWSON (CABN 264421)
BENJAMIN KINGSLEY (CABN 314192
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7019
    FAX: (415) 436-7234
    andrew.dawson@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>   v.<br><br>JOSEPH SULLIVAN,<br><br>    Defendant. | CASE NO. CR 20-337 WHO<br><br>GOVERNMENT'S OPPOSITION TO MOTION FOR JUDGMENT OF ACQUITTAL AND ALTERNATIVE MOTION FOR NEW TRIAL<br><br>Date: December 14, 2022<br>Time: 1:30pm<br>Crtrm: 2, 17th Floor<br><br>Hon William H. Orrick |

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...........................................................................................................................1

LEGAL STANDARD......................................................................................................................1

ARGUMENT ..................................................................................................................................2

I.      The evidence was more than sufficient to sustain a conviction under 18 U.S.C. §
        1505..................................................................................................................................2

        A.      The jury instructions given by this Court incorporate the only proof of
                "nexus" required by the statute. ...........................................................................3

                1. A motion under Rule 29 is no place to relitigate jury instructions.......................4

                2. There is no "nexus" element in 18 U.S.C. § 1505...........................................5

                3. *Bhagat* remains controlling precedent......................................................9

                4. Clear evidence establishes that Defendant sought to obstruct—and for nearly a year
                succeeded in obstructing—the FTC's investigation of Uber................................10

        B.      Defendant obstructed the FTC's investigation in multiple ways, all of which
                are subject to the same legal standard. ................................................................16

II.     The evidence was more than sufficient to sustain a conviction under 18 U.S.C. § 4....................19

III.    Any reasonable juror would conclude Defendant knew the 2016 Data Breach was
        unauthorized...............................................................................................................20

IV.     There is no basis for a new trial under Rule 33. ...............................................................21

CONCLUSION..............................................................................................................................22

1

**TABLE OF AUTHORITIES**

2

*Branzburg v. Hayes*, 408 U.S. 665 (1972)………………………………………………………19

3

*Jackson v. Virginia*, 443 U.S. 307 (1979)……………………………………………………1, 2

4

*Marinello v. United States*, 138 S. Ct. 1101 (2018)………………………………………6, 7

5

*Pettibone v. United States*, 148 U.S. 197 (1893)………………………………………………7

6

*United States v. Aguilar*, 515 U.S. 593 (1995)……………………………………………… 6, 7

7

*United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992)……………………………………… 21

8

*United States v. Bhagat*, 436 F.3d 1140 (9th Cir. 2006)……………………………………5, 6, 8, 9

9

*United States v. Bunker*, 532 F.2d 1262 (9th Cir. 1976)……………………………………..2

10

*United States v. Crowe*, 563 F.3d 969 (9th Cir. 2009)………………………………………4

11

*United States v. Del Toro-Barboza*, 673 F.3d 1136 (9th Cir. 2012)…………………………………2

12

*United States v. Gudino*, 432 F.2d 433 (9th Cir. 1970)………………………………………..2

13

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010)…………………………………….... 1, 2

14

*United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017)………………………………………19

15

*United States v. Price*, 951 F.2d 1028 (9th Cir. 1991)…………………………………….... passim

16

*United States v. Rocha*, 598 F.3d 1144 (9th Cir. 2010)……………………………………...1

17

*United States v. Singh*, 979 F.3d 697 (9th Cir. 2020)…………………………… ……………...17

18

*United States v. Yossunthorn*, 167 F.3d 1267 (9th Cir. 1999)…………………………………...2, 20

19

**FEDERAL STATUTES**

20

18 U.S.C. § 4………………………………………………………………………………….1, 18

21

18 U.S.C. § 1001……………………………………………………………………………17

22

18 U.S.C. § 1503………………………………………………………………………………….7

23

18 U.S.C. § 1505………………………………………………………………………………passim

24

18 U.S.C. § 1515……………………………………………………………………………2, 16,18

25

26 U.S.C. § 7212(a)……………………………………………………………………………7

26

27

28

**FEDERAL RULE**

Fed. R. Crim P. 29………………………………………………………………………….. passim

# INTRODUCTION

Defendant Sullivan's motion is animated by a refusal to engage with the most damning evidence against him, paired with an attempt to evade clearly applicable law.  In its citations to the trial record, Defendant's motion scrupulously avoids citing to clear evidence demonstrating his guilt, while also inviting this Court to make implausible inferences in his favor.  Such inferences are forbidden when considering a motion under Rule 29.  In its citations to caselaw, Defendant's motion seeks to relitigate matters already decided by this Court in pretrial proceedings, and it does so by citing cases that have nothing to do with the statutes of conviction.  As to Defendant's conviction under 18 U.S.C. § 1505, close review of the cases cited by Defendant demonstrates why this Court was correct to reject Defendant's proposed "nexus" instruction.  The instructions previously approved by the Ninth Circuit, which were given by this Court at trial in this matter, already require that the jury find a connection between the defendant's conduct and the pending proceeding.  Defendant's attempt to litigate jury instructions in a Rule 29 motion should be rejected, and, on the merits, his additional proposed requirement is derived from cases interpreting dramatically different statutes and is inapplicable to § 1505.  As to Defendant's conviction under 18 U.S.C. § 4, the evidence was similarly compelling, and Defendant's request that the Court make implausible inferences in his favor—while simultaneously ignoring large swaths of incriminating evidence—must be rejected.

# LEGAL STANDARD

Federal Rule of Criminal Procedure 29 ("Rule 29") permits a court to set aside a jury's guilty verdict and enter a judgment of acquittal only if "the evidence is insufficient to sustain a conviction."  Where a jury has returned a verdict, however, courts must accord great deference to the jury's determination.  *See Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).  Indeed, "[t]he hurdle to overturn a jury's conviction based on a sufficiency of the evidence challenge is high."  *United States v. Rocha*, 598 F.3d 1144, 1153 (9th Cir. 2010).

The Ninth Circuit employs "a two-step inquiry for considering a challenge to a conviction based on sufficiency of the evidence."  *United States v. Nevils*, 598 F.3d 1158, 1163-65 (9th Cir. 2010) (en banc) (citing *Jackson*).  First, the evidence as presented at trial must be viewed "in the light most favorable to the prosecution."  *Id.* at 1164.  This "standard gives full play to the responsibility of the trier

of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319.  As such, the Court "must presume . . . that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Nevils*, 598 F.3d at 1164 (quoting *Jackson*, 443 U.S. at 326).  Second, the Court must "determine whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319) (emphasis in original).  "At this second step, however, a reviewing court may not 'ask itself whether *it* believes that the evidence at the trial established guilt[,] . . . only whether '*any*' rational trier of fact could have made that finding[.]" *Id.* (quoting *Jackson*, 443 U.S. at 318-19); *see also United States v. Del Toro-Barboza*, 673 F.3d 1136, 1143-46 (9th Cir. 2012).

With respect to the weight of the evidence, the Ninth Circuit has held that the testimony of only a single witness can be sufficient when reviewing a Rule 29 motion for acquittal.  "The testimony of the one witness, if believed, was sufficient to support the conviction, and the resolution of any question as to his credibility was properly entrusted to the jury." *United States v. Gudino*, 432 F.2d 433, 434 (9th Cir. 1970); *see also United States v. Yossunthorn*, 167 F.3d 1267, 1270 (9th Cir. 1999), *as amended* (Mar. 31, 1999) (holding that "uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face" (quotation omitted)); *United States v. Bunker*, 532 F.2d 1262, 1264 (9th Cir. 1976) ("Credibility is exclusively within the jury's province.").

## ARGUMENT

## I.      The evidence was more than sufficient to sustain a conviction under 18 U.S.C. § 1505.

The Ninth Circuit has held that an offense under 18 U.S.C. § 1505 has three elements:  "First, there must be a proceeding pending before a department or agency of the United States.  Second, the defendant must be aware of the pending proceeding.  Third, the defendant must have intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding." *United States v. Price*, 951 F.2d 1028, 1031 (9th Cir. 1991) (internal citations omitted).  Congress has also provided a definition for "corruptly" as used in § 1505: "the term 'corruptly' means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information." 18 U.S.C. § 1515(b).

Defendant makes two arguments in support of his challenge to the 1505 conviction. *First*, he recycles an argument previously seen during litigation over proposed jury instructions: that some additional "nexus" between a defendant's conduct and the pending proceeding must be proved, despite the Ninth Circuit having already explicitly rejected such a requirement (a fact Defendant acknowledges). As an initial matter, a challenge to jury instructions is not a proper basis for a Rule 29 motion and Defendant's arguments, to the extent they merely relitigate jury instructions, should be rejected for this reason alone. But in any event, this Court already correctly followed binding precedent and held that § 1505 does not impose such a requirement and rejected defendant's argument. None of the cases cited by Defendant support an additional evidentiary requirement. *Second*, Defendant argues that, to the extent Defendant's conviction was premised on omissions, it must fall absent proof that Defendant Sullivan had a personal duty to disclose the "omitted" information. Again, this is just yet another improper attempt to repackage into a Rule 29 motion Defendant's meritless jury instructions arguments. But regardless, this Court's prior rulings on the jury instructions were correct. Defendant misunderstands § 1505 and mischaracterizes the government's case and the evidence at trial, which demonstrate that the Defendant took affirmative acts to obstruct justice, as required by § 1505.

### A. The jury instructions given by this Court incorporate the only proof of "nexus" required by the statute.

The bulk of Defendant's motion is trained on a variation of the same "nexus" theory that he tried, and failed, to incorporate into the jury instructions. During the various rounds of briefing and argument on the jury instructions, Defendant argued in favor of instructing on a purported fourth element of the offense: "Fourth, that there was a nexus between the defendant's conduct and the pending FTC proceeding." Docket 156, at 46. The Court correctly rejected that proposal in favor of instructing on the elements as ratified in Ninth Circuit caselaw. *See United States v. Price*, 951 F.2d 1028, 1031 (9th Cir. 1991). The argument is resurrected here in slightly different garb, this time in support of a judgment of acquittal.

The argument fails for multiple reasons. *First*, Defendant's argument is, at its core, a challenge to the Court's prior rulings on jury instructions. Defendant cannot simply relitigate jury instructions dressed up as a motion under Rule 29. *Second*, Defendant fails to recognize that the instructions as

given have a "nexus" requirement already baked in.  The jury could only convict upon a finding that Defendant "intentionally endeavored corruptly to influence, obstruct or impede *the pending proceeding*."  *See* Docket No. 219 (emphasis added).  That instruction quite obviously requires proof beyond a reasonable doubt of a connection between Defendant's conduct and state of mind, and a specific pending proceeding.  *Third*, Defendant's citations to other obstruction statutes have no bearing on § 1505, as the statutory language of the various cited provisions is critically different and the Ninth Circuit has already distinguished § 1505 from other obstruction statutes that require a nexus.  The cases interpreting those other statutes merely imposed a requirement that has always been apparent in the statutory language of 18 U.S.C. § 1505, and one that was perfectly captured by the jury instructions given in this case: that the defendant intended to obstruct a pending proceeding of which he was aware. *Fourth*, even if one were to adopt the formulation as proposed by Defendant, the evidence at trial overwhelmingly satisfied both that standard and the standard actually required by the Ninth Circuit.

### 1.    A motion under Rule 29 is no place to relitigate jury instructions.

Defendant first raised the issue of a supposed "nexus" requirement in the context of jury instructions related to 18 U.S.C. § 1505.  The government proposed that the Court give the instructions as set forth in *Price*, and Defendant objected, arguing that the Court should instruct on a fourth element, requiring that "there was a nexus between the defendant's conduct and the pending FTC proceeding." Docket No. 156, at 46.  But Defendant conceded "that the Ninth Circuit has rejected a 'nexus' requirement for § 1505."  *Id.*

The reappearance of this issue at the Rule 29 stage is curious, because a "Rule 29 motion for judgment of acquittal . . . is not the proper vehicle for raising an objection to jury instructions."  *United States v. Crowe*, 563 F.3d 969, 972 n.5 (9th Cir. 2009).  Properly preserved objections to jury instructions may be subject to appellate review, but not review via a motion under Rule 29.  To the extent Defendant's motion merely is a reprise of his jury instruction arguments, it should be rejected.[1]

---

[1] Defendant tacks on a Rule 33 motion at the end of his filing.  Motion at 41.  That two-paragraph argument, which essentially just restates boilerplate language for a Rule 33 motion, does not argue that the jury instructions were erroneous as a basis for Rule 33 motion, so any such argument is waived and now would be untimely.

### 2.      There is no "nexus" element in 18 U.S.C. § 1505.

Even if a Rule 29 were the proper forum to relitigate jury instructions, Defendant's legal arguments are wrong.  As Defendant previously conceded, *see* Docket No. 156 at 46, the Ninth Circuit has already rejected an additional "nexus" instruction for § 1505.  *See United States v. Bhagat*, 436 F.3d 1140, 1147-48 (9th Cir. 2006) ("Because Bhagat was charged under Section 1505 with obstructing an agency proceeding and not a judicial one, there was no need to create a causal nexus and, consequently, no need to supplement the *Price* Instructions with additional elements.").  Defendant now seeks to withdraw that concession, arguing that *Bhagat* either has been superseded by intervening Supreme Court case law or does not apply.  Both claims are wrong.

### (i)      Binding Ninth Circuit precedent establishes the elements of § 1505.

The Ninth Circuit has repeatedly addressed the elements of § 1505, and it has explicitly rejected arguments both to limit the conduct and state of mind covered by § 1505 and to import requirements from § 1503.

Specifically, in *United States v. Price*, 951 F.2d 1028 (9th Cir. 1991), the Ninth Circuit considered the application of § 1505 to a defendant who made a threat in connection with an IRS investigation into his taxes.  On appeal, Price argued that he lacked the intent to violate § 1505 because a particular threat had not been made directly to the IRS, but instead to an intermediate witness.  In response to this argument, *Price* defined the elements of § 1505, as discussed above: "First, there must be a proceeding pending before a department or agency of the United States.  Second, the defendant must be aware of the pending proceeding.  Third, the defendant must have intentionally endeavored corruptly to influence, obstruct or impede the pending proceeding." *Id.* at 1031 (internal citations omitted).  *Price* then stated, unequivocally, that "The requisite intent to violate section 1505, however, is merely that the defendant must have acted 'corruptly,' i.e., that the act must be done with the purpose of obstructing justice." *Id.* (internal quotations and citations omitted).

The Ninth Circuit explained that, for purposes of § 1505, instead of being delineated by particular types of acts, "the proper inquiry is whether a defendant had the requisite corrupt intent to improperly influence the investigation, not on the means the defendant employed in bringing to bear this influence." *Id.* (internal quotations and citations omitted).  "Section 1505, like the other obstruction of

1   justice statutes, can be violated by a variety of methods limited only by the imagination of the criminally

2   inclined." *Id.* (internal citations and quotations omitted).

3        Following *Price*, the Supreme Court decided *United States v. Aguilar*, 515 U.S. 593, 599–601

4   (1995). In *Aguilar*, the Supreme Court considered a challenge by a defendant to a conviction under

5   § 1503, the general judicial proceeding obstruction statute where the defendant had been charged with

6   § 1503 for making false statements to an agent during the course of a criminal investigation, on the

7   theory that the false statements to the agent obstructed a grand jury investigation. *Id.* at 600. The

8   Supreme Court explained that § 1503 required proof of "an intent to influence judicial or grand jury

9   proceedings" and that "it is not enough that there be an intent to influence some ancillary proceeding,"

10   and therefore held that, to violate § 1503, a "nexus" must exist between the act in question and the

11   judicial or grand jury proceeding. *Id.* at 599–600. In other words, "that the act must have a relationship

12   in time, causation, or logic with the judicial proceedings." *Id.* at 599.

13        Following *Aguilar*, in *United States v. Atul Bhagat*, 436 F.3d 1140 (9th Cir. 2006), the Ninth

14   Circuit rejected an argument from a defendant to import the nexus requirement announced by *Aguilar*

15   for § 1503 to § 1505. As the *Bhagat* Court explained, *Aguilar* found that "[t]o transpose the intent to

16   obstruct an agency proceeding into the judicial proceeding context, the [Supreme] Court held that there

17   had to be a 'nexus' between the two proceedings" to meet the elements of § 1503. *Bhagat*, 436 F.3d at

18   1147. A "nexus" required a showing by the government that the "natural and probable effect of the

19   defendant's conduct" would be to obstruct justice. *Id. Bhagat* explicitly rejected the applicability of

20   *Aguilar*, as § 1503 precedent, to § 1505, explaining that "*Aguilar* did not involve obstruction of agency

21   proceedings under 18 U.S.C. § 1505," and instead it was sufficient to prove what the Ninth Circuit had

22   required in *Price*—corrupt intent to influence, obstruct, or impede. *Id.* at 1147–48.

23      *Bhagat*'s reasoning is plainly correct, and it remains binding law in this circuit, as Defendant

24   conceded in litigating the jury instructions in this case.

25          **(ii)    Neither *Marinello* nor *Aguilar* applies to Obstruction of Agency Proceedings Under § 1505.**

26

27        Defendant nonetheless attempts another, new end-run around *Price* and *Bhagat*, placing special

28   emphasis on *Marinello v. United States*, 138 S. Ct. 1101 (2018), and arguing that *Marinello*'s logic

1    requires imposition of an addition element to § 1505.  This argument fails.

2         *Marinello* considered a different obstruction provision found at 26 U.S.C. § 7212(a).

3    *Marinello*'s reasoning rested extensively on its predecessor *Aguilar*, as both considered a statute

4    criminalizing the obstruction of the "due administration" of unspecified government activities.  In

5    *Marinello*, the statute applied to obstruction of the "due administration of [the Internal Revenue Code],"

6    while in *Aguilar* the statute applied to obstruction of "the due administration of justice."  Unsurprisingly

7    given that the Supreme Court found that § 1503 was "similarly worded" to § 1712(a), *Marinello*, 138 S.

8    Ct. at 1105, *Marinello* followed *Aguilar* in interpreting that language, and required a "nexus"

9    requirement for the similarly phrased § 7212(a).  *Id. at* 1105–09.

10        This holding is consistent with *Bhagat* and underscores the differences between § 1503 and

11   § 7212(a), on the one hand, and § 1505 on the other.  In both *Marinello* and *Aguilar*, the statutory

12   language in question did not require that a defendant intend to obstruct a particular, specific, and

13   pending agency proceeding.  In *Aguilar*, for example, the defendant had been convicted under 18 U.S.C.

14   § 1503 for "uttering false statements to an investigating agent . . . who might or might not testify before

15   a grand jury."  515 U.S. at 600.  The Court looked to precedent and noted that prior cases concluded

16   "that a person lacking knowledge of a pending proceeding necessarily lacked the evil intent to obstruct."

17   *Id.* at 599 (citing *Pettibone v. United States*, 148 U.S. 197 (1893)).  *Aguilar* ultimately held that

18   § 1503's reference to the "due administration of justice" swept too broadly and, notwithstanding the

19   absence of such a requirement on the face of the statute, required proof of "intent to influence judicial or

20   grand jury proceedings."  *Id.*  Similarly in *Marinello*, the Court concluded that the phrase "due

21   administration of [the Internal Revenue Code]" swept too broadly and that a conviction required a

22   connection between the conduct "and a particular administrative proceeding, such as an investigation, an

23   audit, or other targeted administrative action."  *Id.* at 1109.  In so doing, the Court reasoned that, without

24   such a limitation, § 7212(a) could apply to an enormous variety of conduct far removed from tax

25   administration—such as, for example, a person who pays a babysitter $41 per week in cash without

26   withholding taxes.  *Id.* at 1108.

27        In contrast, unlike the statutes interpreted in *Aguilar* and *Marinello*, § 1505 requires on its face

28   precisely that connection to a particular proceeding, as do the jury instructions given by this Court.

1    Unlike the broad phrases "due administration of justice" or "due administration of [the Internal Revenue

2    Code]"—which could sweep in all manners of conduct even in the absence of a discrete proceeding—

3    § 1505 is expressly limited to obstruction "of a pending proceeding . . . before any department or agency

4    of the United States" of which a defendant is aware.  Accordingly, the jury instructions given by this

5    Court required the jury to find both that the Defendant was aware of such a proceeding and that he

6    "intentionally endeavored corruptly to influence, obstruct, or impede the pending proceeding."  Docket

7    No. 219, at 17.  An additional "nexus" requirement in this context would therefore be superfluous and

8    confusing, as the jury instructions already required that Defendant's conduct be intentionally targeted

9    towards improper influence of a pending proceeding (in this case, the FTC proceeding).

10          *Marinello*'s analysis, far from undermining *Bhagat*, instead confirms its wisdom.  The Ninth

11   Circuit in *Bhagat* recognized that the problem identified in *Aguilar* was the disconnect between the

12   conduct and the object of the obstruction.  The *Bhagat* Court observed that "judicial proceedings are

13   distinct from government investigations, and that the intent to obstruct an agency proceeding did not

14   automatically demonstrate intent to obstruct the related judicial one."  436 F.3d at 1147.  The "nexus"

15   requirement therefore, bridged this gap in *Aguilar*—from obstruction of an administrative proceeding to

16   the obstruction of a judicial proceeding required by § 1503.  But, as *Bhagat* properly recognized, § 1505

17   has no such gap.  "Because Bhagat was charged under Section 1505 with obstructing an agency

18   proceeding and not a judicial one, there was no need to create a causal nexus and, consequently, no need

19   to supplement the *Price* instructions with additional elements."  *Id.* at 1148.  In other words, because the

20   statute itself (and the *Price* instructions) already ensured such a connection between the criminal

21   conduct and a particular, specified administrative proceeding, there was no need to add an additional

22   element.

23          With this context, Defendant's arguments dissolve.  For example, Defendant suggests that absent

24   an additional "nexus" requirement there would be a risk of conviction even if there were no connection

25   "between the defendant's conduct and the relevant proceeding."  Motion at 6.  Defendant again ignores

26   that the *Price* instructions already require such a connection, as they require proof beyond a reasonable

27   doubt that "the defendant intentionally endeavored corruptly to influence, obstruct, or impede *the*

28   *pending proceeding*."  Docket No. 219, at 17 (emphasis added).  Similarly, Defendant suggests

1    elsewhere that his "nexus" requirement is essential to ensuring that a defendant can only be convicted

2    for "conduct that might foreseeably impact that particular proceeding."  Motion at 7.  Again, the *Price*

3    instructions already provide such assurance, since they permit conviction only where the jury finds that

4    the defendant intended to obstruct "the pending proceeding."

5                    **3.      *Bhagat* remains controlling precedent.**

6            Defendant next trains his sights on *Bhagat*, arguing alternatively that it is distinguishable and

7    that it has been superseded by *Marinello*.  Both arguments fail.

8            Defendant first argues that *Bhagat* applies only to a defendant who "directly" interacted with a

9    federal agency.  This limitation is invented from whole cloth and has no basis in *Bhagat* itself.  *Bhagat*'s

10   analysis of the elements of a § 1505 offense does not turn in any way on the particular form of the

11   defendant's obstruction.  Indeed, Defendant's distinction between "direct" and "indirect" obstruction,

12   *see* Motion at 11, is not found anywhere in *Bhagat*, nor does the statute itself draw any apparent

13   distinction between the various forms of obstruction.[2]  The only citation offered by Defendant in support

14   of this argument pertains not to different means of violating § 1505, but rather to the distinction between

15   § 1505 and the "due administration" language in § 1503, which was analyzed by *Aguilar*.  *See Bhagat*,

16   436 F.3d at 1147-48 ("To transpose the intent to obstruct an agency proceeding into the judicial

17   proceeding context, the [*Aguilar*] Court held that there had to be a 'nexus' between the two proceedings.

18   . . . [But b]ecause Bhagat was charged under Section 1505 with obstructing an agency proceeding and

19   not a judicial one, there was no need to create a causal nexus and, consequently, no need to supplement

20   the *Price* instructions.").

21           This argument is also directly inconsistent with *Price*, where the defendant made precisely this

22   argument—that because the defendant's conduct was not directly targeted to the agency conducting the

23   investigation that was the "pending proceeding" (the IRS in that case), it did not violate § 1505.  *Price*,

24   951 F.2d at 1031.  The Ninth Circuit rejected that argument, explaining that "the proper inquiry is

25   whether a defendant had the requisite corrupt intent to improperly influence the investigation, not on the

26

27   _____

28   [2] It is notable that in Defendant's quotation of *Bhagat* at the bottom of page 11 of his brief, Defendant is
     forced to tweak the quotation by simply adding the word "directly" where it does not appear in the case
     itself.

1   means the defendant employed in bringing to bear this influence." *Id.* (internal quotations and citations

2   omitted).  "Section 1505, like the other obstruction of justice statutes, can be violated by a variety of

3   methods limited only by the imagination of the criminally inclined." *Id.* (internal citations and

4   quotations omitted).

5        In any event, as explained in more detail below, Defendant interacted directly with the FTC and

6   caused direct interactions with the FTC by others.  Even if this argument had any basis in the law, which

7   it does not, it factually completely fails.

8        Defendant's alternative argument that *Bhagat* has been impliedly overruled by *Marinello* also

9   clearly fails.  As discussed above, *Bhagat* already considered Supreme Court precedent, in the form of

10  *Aguilar*, on which *Marinello* nearly entirely rested.  *Marinello* addressed a dramatically different

11  statutory provision criminalizing obstruction of the "due administration of [the Internal Revenue Code],"

12  and its analysis turns entirely on concerns unique to that statutory formulation, which are cured by the

13  materially different statutory language (and resulting jury instructions) found in § 1505.

14          **4.    Clear evidence establishes that Defendant sought to obstruct—and for nearly
                    a year succeeded in obstructing—the FTC's investigation of Uber.**

15

16       Perhaps the most damning rebuttal of Defendant's argument of a lack of "nexus" between

17  Defendant's conduct and the pending FTC investigation is the fact that Defendant in fact *succeeded* in

18  obstructing that investigation for more than a year.  Ample evidence at trial—most of it simply ignored

19  in Defendant's motion—established that Defendant Sullivan took multiple concerted steps to obstruct

20  the FTC's investigation.[3]

21       At the outset, it cannot be disputed that Defendant was intimately aware of the nature, history,

22  and scope of the FTC's investigation as of November 2016.  After all, Defendant testified for hours

23  under oath to the FTC just *ten days* before the 2016 Data Breach.  *See* Exhibit 340.  That testimony

24  included in-depth analysis of Uber's data security practices as they related to the FTC's investigation,

25

26          [3] Defendant's motion does not challenge the sufficiency of the evidence as to any element
    actually instructed upon by this Court, but rather asks this Court to find a failure to meet his proposed—
27  and previously rejected—"nexus" instruction.  That instruction is the functional equivalent to
    Defendant's proposed "nexus" instruction, and the facts recounted in this memorandum establish
28  Defendant's guilt regardless of the precise wording of the instruction.

such as encryption of personal data, storage of access keys, use of Amazon Web Services, and vulnerabilities in GitHub. *Id.* Then, in the hours after Defendant learned of the 2016 Data Breach, contemporaneous business records establish that Defendant recognized that the breach revealed that Uber's prior representations—including those Defendant had made, under oath—to the FTC had been false. *See* Exhibit 29 (Preacher Tracker) at 11 ("Joe: This may also play very badly based on previous assertions."); *id.* at 18 ("Joe was just deposed on this specific topic and what the best or minimum practices that any company should follow in this area."); *see also* Tr. (Garbutt) 797:18-22 (testifying that "previous assertions" refers to prior assertions made to the FTC about data controls and access at Uber—assertions proven incorrect or incomplete by the 2016 Data Breach). Defendant then set about ensuring that the FTC never learned the truth, either about the 2016 Data Breach itself or the security vulnerabilities that had allowed it to happen. Defendant's direct report, John Flynn, testified that Defendant directed him unequivocally that "this can't get out" during a private conversation about the FTC's investigation in the early stages of the incident response, a conversation in which Defendant also referred to his own prior sworn testimony to the FTC. *Id.* (Flynn) 604:2-22. Defendant's direction that news of the breach "can't get out" in the midst of a conversation about the FTC's investigation is clear and powerful evidence of his intent to obstruct and undermine that investigation.

Subsequent events detail Defendant's calculated efforts to conceal the incident, which included both lies to his team and the creation of false and misleading corporate documents. The Preacher Tracker, for example, records Defendant's attempt to ensure that nobody on his team breathed a word about the breach outside the security group: "Joe Comments: 1. Information is extremely sensitive and we need to keep this tightly controlled. Discussion with other Engineers must be tightly controlled. Joe is communicating directly to the A-Team." Exhibit 29 at 14. Defendant's claim that he was "communicating directly to the A-Team" was a lie designed to create the impression that all relevant corporate stakeholders, to include the company's General Counsel, had been informed about the breach. The false claim had its desired effect: another of Defendant's direct reports, Craig Clark, testified that he understood Defendant to be claiming that, at a minimum, the general counsel (Salle Yoo) and the Chief Technology Officer (Thuan Pham) were in contact with Defendant. That was not true. *See* Tr. (Yoo) 1608:9–14; *id.* (Pham) 1822:3–16.

1    Clark further testified that after the team had learned that 600,000 driver's license numbers had

2    been stolen, Defendant directed him to come up with a way to conceal the breach within Uber's bug

3    bounty program.  Tr. (Clark) 1320:2-6; 1320:19–24.  At this time, Uber's Bug Bounty program clearly

4    excluded from the program the precise technique employed by the hackers.  Exhibit 16 at 4 (excluding

5    from program "use of AWS access key to dump user info").  Following Defendant's direction, Clark

6    nonetheless communicated a potential theory to Defendant, which involved pretending that the extortive

7    hackers were instead somehow, "nunc pro tunc," agents of the company.  *Id.* (Clark) 1322:3–14.

8    Defendant then reported back to Clark that the "A-Team" had decided to treat the incident as a bug

9    bounty.  This, of course, was a lie, since the A-Team writ large had not even been informed of the 2016

10   Data Breach.  The decision to treat the breach as a bug bounty report was, in reality, Defendant's

11   attempt to draw attention away from the incident, to make it appear to be a matter of little importance,

12   and to find a convenient way to pay the hackers' extortion demand.

13   The evidence established that Defendant was simply using the bug bounty program to further his

14   scheme to conceal the 2016 Data Breach from the FTC and the public.  For example, had Defendant

15   truly believed it fit within the program, there would have been no reason to direct Craig Clark to

16   introduce demonstrably false language in the draft Non-Disclosure Agreement ("NDA") with the

17   hackers.  Exhibit 144 ("You promise that you *did not take or store any data* during or through your

18   research . . . ." (emphasis added)); Tr. (Clark) 1345:9–10 (Q: Whose idea was that language?; A: That

19   was Joe's idea.").  That lie had no purpose other than to minimize the significance of the 2016 Data

20   Breach and to make it appear to fit cleanly within the Bug Bounty program.  Defendant knew that this

21   language was in the NDA and knew it was a lie.  His knowledge was amply demonstrated both by the

22   extensive line edits to the document (Exhibits 100 through 115) and his later blatantly false statements to

23   Randall Lee and other outside counsel for Uber, where he falsely claimed he did not "remember the

24   details" of why a separate NDA was drafted and that he "wasn't involved" in drafting the NDA.  Exhibit

25   1111 at 8; *see also* Tr. (Lee) at 2182:21–2183:14 ("My recollection is that he essentially said he didn't

26   have any role in it.").

27   Defendant's understanding that the data breach could not legitimately be treated as a bug bounty

28   was further demonstrated when he rewrote language for an email to Dara Khosrowshahi, his new boss,

1    in which he deleted comprehensive information establishing that the 2016 Data Breach had, in fact, been

2    a massive data breach.  Exhibit 212 (Consolidated Preacher Report Google document version with

3    Sullivan edits); Exhibit 218 (later version with more Sullivan edits).  His email to Khosrowshahi falsely

4    suggested that the hackers responsible for the 2016 Data Breach had never actually taken any data, let

5    alone personally identifiable data, and in which he lied about other circumstances of the breach

6    response.  Exhibit 623.  And, of course, the NDA furthered Defendant's attempt to conceal the event by

7    paying an exorbitant sum—$100,000—to the two hackers responsible for the breach in exchange for

8    their silence.  In other words, having instructed his team to keep silent about the breach, Defendant then

9    paid hush money to the hackers to ensure that they never disclosed what they had done.  *See* Exhibit 144

10   ("You promise that you have not and will not disclose anything about the vulnerabilities or your

11   dialogue with us to anyone for any purpose without our written permission.").  Such an agreement was

12   unprecedented within Uber's bug bounty program.  Tr. (Fletcher) 973:19–23.  Defendant's insistence on

13   such an agreement further supports the jury's finding that he was acting to conceal and cover up the

14   breach.

15           Nor is it true that Defendant's effort to conceal the breach was unconnected to the FTC

16   investigation.  As noted above, from the earliest hours of the response effort, Defendant knew that the

17   nature of the breach related directly to the FTC investigation in multiple ways, and he instructed his

18   subordinate that news of the breach could not get out.  Defendant's intent to obstruct that investigation

19   continued into the subsequent weeks and months.  In particular, Defendant's awareness of the FTC

20   investigation and his ongoing intent to obstruct that investigation is further demonstrated by his contacts

21   with the in-house legal team responsible for responding to that investigation in the months after the 2016

22   Data Breach.  It is undisputed that Defendant was copied on a series of internal emails regarding that

23   investigation, and yet he never spoke to *any* of the attorneys on the investigation about the enormous

24   scale of the 2016 Data Breach.  *See, e.g.*, Exhibits 188, 200, 450, 541.  Indeed, Defendant was sent a link

25   to a set of draft responses that contained false assertions regarding the nature of Uber's encryption of

26   personal information.  Exhibit 455 (falsely stating that "all new database backup files" had been

27   encrypted since August 2014).  The jury was entitled to make the reasonable inference that Defendant

28   read his emails—particularly those about a governmental investigation directly related to Defendant's

1    responsibilities—and knowingly permitted false information to be submitted to the FTC.  This is

2    particularly so when Defendant never mentioned the incident whatsoever to the in-house lawyers he

3    knew were responsible for the FTC investigation—Salle Yoo, Candace Kelly, and Sabrina Ross.

4         Evidence of Defendant's intent to obstruct the FTC investigation continued even into the spring

5    and summer of 2017.  Most damningly, Defendant was sent a summary of the FTC's initial draft of

6    settlement documentation in which it was apparent that the FTC was relying on false claims previously

7    provided by Uber—claims proved to be false by the 2016 Data Breach itself.  *See* Exhibit 703.  There

8    can be no dispute that Defendant read the email, as he drafted a lengthy response to the summary as it

9    related to a proposed order.  *Id.*  But Defendant ignored the fact that Uber had falsely told the FTC that it

10   had ceased storing unencrypted personal information on Amazon Web Service ("AWS") after March

11   2015, and that the FTC was relying on this false representation in negotiating a settlement.  Defendant,

12   of course, knew that the truth was far worse: unencrypted personal information remained on AWS until

13   at least November 2016, when two hackers stole a huge quantity of it.

14        Finally, evidence of Defendant's intent was extensively demonstrated by his many lies during his

15   interviews with Randall Lee and outside counsel for Uber.  The jury was reasonably able to infer that the

16   false stories that he told Uber's outside attorneys—which minimized his role in and knowledge about

17   the incident—were motivated by a guilty conscience, and an awareness that he had corruptly obstructed

18   the FTC proceeding.  For example, during those interviews, he told false and shifting stories about the

19   legal justification for not disclosing the data breach.  *See, e.g.*, Exhibit 1051 at 9 (August 2017

20   interview, said did not disclose "Because we were able to ensure that no data was out in the wild");

21   Exhibit 1055 at 7 (September 2017 interview, said decision not to disclose was "Same call we made 100

22   times"); Exhibit 1111 at 2 (October 2017 interview, said he did not recall discussed "issue of disclosure"

23   and that he hadn't "reviewed" Craig Clark's "work" on the "legal issues, analysis that needed to be

24   done" on disclosure).  He lied about where he was during the incident response.  Exhibit 1055 at 3 ("Not

25   physically part of the team"), *id.* at 7 ("That week I wasn't at 555, was in prep, in east coast.").  He

26   refused to answer as to "what PII was at stake" and falsely said he "wasn't involved" in that analysis.

27   Exhibit 1111 at 6; *see also* Exhibit 29 at 13, 15–16, 17, 20–21 (defendant repeatedly asking about or

28   being told what data and PII was involved).  In response to a question about whether he remembered

1  "discussions with any other a-team member about this incident," he falsely said that they "Went big very

2  fast."  Exhibit 1111 at 3; *see also* Exhibit 29 at 9–10 ("Our common story has to be: -This investigation

3  does not exist.").  And, as noted above, he lied about his role in both the inception of the NDA and its

4  drafting.  Exhibit 1111 at 8.

5       Defendant tries to avoid the weight of this evidence first by ignoring it, and then by asking this

6  Court to make implausible and/or irrelevant inferences from other evidence.  For example, Defendant

7  seems to believe the jury was obligated to credit Defendant's self-serving statements in October 2017

8  that Uber's then-CEO authorized the $100,000 payment to the hackers.  And whether another officer

9  authorized a payment of a particular size is irrelevant to whether *Defendant*'s intent was to buy the

10  hackers' silence to ensure that neither the FTC nor the public ever learned of the breach.  And ample

11  evidence proves that this was precisely Defendant's intent.  The Preacher Tracker reflects Defendant's

12  direction to his team that an NDA would be necessary with "clearly no potential to be disclosed in the

13  future."  Exhibit 29 at 9.  The jury was clearly entitled to infer from that context that Defendant's intent

14  with the NDA was to further his broader goal of concealing the breach from the public and the FTC.

15  That reasonable inference was further corroborated by the fact that the NDA misrepresented the nature

16  of the breach, falsely claiming that no data had been taken.  *See* Exhibit 144.[4]

17       Defendant also argues that the government "failed to establish any relationship between

18  Sullivan's statements regarding the A-team and the FTC's investigation."  Motion at 17.  Only the most

19  blinkered view of the evidence, supported by implausible inferences in Defendant's favor, could support

20  that view.  As detailed above, the evidence is clear that Defendant immediately made the connection

21  between the incident and the FTC investigation, and that the FTC's investigation was at the forefront of

22  Defendant's mind during the breach response.  During their conversation about the FTC investigation in

23  the midst of the breach response, John Flynn testified that Defendant was "stressed," and that Flynn was

24  not sure if he had "ever seen him that stressed out."  Tr. (Flynn) 602:15–25; *see also* Exhibit 29

25  (Preacher Tracker) (reflecting Defendant's comments about relevance of breach to the FTC

26

27

28  [4] The government resists the urge to catalogue the drafting history of the NDA and the development of
its false language, as the Court no doubt recalls the discussion of Exhibits 100 through 115, which
demonstrate Defendant's knowing involvement in the drafting of that false documentation.

1   investigation).  Defendant also, during that same private conversation about the FTC investigation,

2   instructed Flynn that "this can't get out."  *Id.* (Flynn) 604:2–22.  Nearly simultaneously, Defendant lied

3   to his team and claimed that he was in touch with the "A team."  Exhibit 29 at 14.  All this set against

4   the backdrop of Defendant having been hired in order to clean up Uber's data security practices in the

5   wake of a damaging data breach in 2014 and Defendant's striking failure to ever discuss the incident

6   with his peer, Salle Yoo, over a period of almost a year in which they had regular interactions (and in

7   which he told her about a different, unrelated data breach at a different company that *might* have

8   affected Uber data).  *See* Tr. (Yoo) 1607:2–24.  The jury was entitled to make the (obvious) inference

9   that Defendant's insistence on secrecy, and his lie about the A team's awareness, were designed to

10  support a campaign to conceal the breach from the FTC and others.

11         **B.    Defendant obstructed the FTC's investigation in multiple ways, all of which are
12                 subject to the same legal standard.**

13         In an effort to forestall a comprehensive review of all the evidence against him, Defendant seeks

14  to divide his conduct into different buckets and have a different legal standard applied to each.  To that

15  end, he argues any conduct amounting to an "omission" is subject to a distinct legal standard that

16  requires a duty to disclose.  Motion at 20.  Again, this argument is essentially an attempt to relitigate

17  jury instructions that were already decided by this Court following extensive briefing and is not a proper

18  basis for a Rule 29 motion.

19         As the parties extensively argued previously and this Court already held, there is no basis for

20  adding a new "duty to disclose" requirement to § 1505, or distinguishing between omissions and

21  concealment under § 1505.  As *Price* explained, § 1505 turns not on the particular act, but the corrupt

22  intent to influence a pending proceeding.  To begin with, the language of § 1505 offers no support to the

23  theory that different forms of obstruction are subject to different legal standards.  Instead, as the Court

24  has already ruled in crafting its jury instructions, § 1515(b) provides that "[c]orruptly means acting with

25  an improper purpose, personally or by influencing another, including making a false or misleading

26  statement, or *withholding*, *concealing*, altering, or destroying a document or other information."  18

27  U.S.C. § 1515(b) (emphasis added).  Congress itself has expressly considered what it means to corruptly

28  influence an investigation—and expressly stated that withholding and concealing information is

1  sufficient without reference to a "duty to disclose."

2      Given the clear case law and statutory language,  Defendant is unable to point to any Ninth

3  Circuit case (or any case from any other circuit) applying such a requirement to § 1505.[5]  Instead,

4  Defendant turns to dictionary definitions, but not even they support the claim that the government must

5  prove a duty to disclose.  For example, Defendant cites to Black's Law Dictionary, which defines

6  "withhold" as, in part, "[t]o retain in one's possession that which belongs to or is claimed or *sought* by

7  another . . . ." *Black's Law Dictionary* 1602 (6th ed. 1990) (emphasis added); *see also* Motion at 21.

8  Notably, nothing in this definition requires a legal obligation or duty.  Simply retaining something that is

9  "sought" by another is sufficient, even in the absence of a legal compulsion. As the Ninth Circuit

10  explained in rejecting a similar argument that it should read a "duty to disclose" requirement into § 1519

11  in *United States v. Singh*:

12      It is difficult to differentiate between the culpability of one who intentionally omits
       information, and one who conceals or falsifies information.  It may also be difficult to

13      differentiate between acts of concealment and omission.  Imagine, for example, an
       individual who omits the detail of a specific, identifiable tattoo from a witness statement,

14      in order to conceal the identity of a perpetrator.  In such a situation, the omission is an act
       of concealment or falsification.

15

16  979 F.3d 697, 716–17 (9th Cir. 2020).

17      In any event, the debate is immaterial because there is no dispute that Uber *did* have an

18  obligation to provide, and did in fact provide, extensive information to the FTC.  *See, e.g.*, Exhibits 274,

19  290, 292, 316, 327, and 340.  Defendant's suggestion that the duty must run specifically to the

20  Defendant, as opposed to his employer, has no basis.  Defendant was Uber's Chief Security Officer, and

21  Uber's legal department relied on him and his team to review submissions to the FTC "for accuracy and

22  completeness."  Tr. (Yoo) 1610:20; *see also id.* (Yoo) 1610:22–24 ("So it was important for me that I

23  had -- that I knew that the security team had reviewed it, and that they had signed off on it.").  To

24  suggest that a duty must run specifically to the defendant, personally, not only has no basis in the statute,

25  such a rule would create open season for obstruction of justice by all manners of corporate employees.

26      Defendant's suggestion that a defendant's withholding of information from others can be isolated

27

28  [5]  It is telling that Defendant is forced to cite to a series of cases interpreting an entirely different statute:
    18 U.S.C. § 1001.

as a mere "omission" also ignores the facts of the case and Defendant's interwoven efforts at obstruction. This is not a case where the defendant merely sat silent in the corner, "withholding" information. Defendant actively concealed information about the breach, both by instructing his subordinates not to discuss it and by creating false and misleading corporate documentation. He had also himself provided false information to the FTC during his deposition, which he appreciated no later than ten days after giving that testimony. Then, in the months following the breach, he authorized or allowed the submission of further false and/or misleading submissions to the FTC. *First*, Defendant permitted the company to misrepresent the state of its data security program in the Eighth Interrogatory responses, which were submitted in December 2016.[6] *See* Exhibits 188 & 455. *Second*, in April 2017 Defendant signed off on a letter to the FTC that misrepresented the nature of Uber's response to the FTC's investigation. That letter ultimately claimed that Uber had provided "exhaustive" information to the FTC and that it had made voluntary disclosures beyond what was required by law. The letter also went into detail about the 2014 data breach, including an analysis of that breach that falsely suggested that Uber had taken sufficient measures to prevent such a breach from happening again. *See* Exhibit 563 at 4-5. As Defendant knew at the time, but the FTC did not, Uber had not even succeeded at implementing its own claimed improvements regarding access controls and encryption. *Third*, Defendant participated in a meeting to discuss Uber's redlines to the FTC's proposed draft complaint. Sabrina Ross testified that Defendant participated in a "robust discussion" regarding the redlines. Tr. (Ross) 1134:2-4. Those redlines incorporated the false claim that Uber had ceased storing unencrypted personal information on AWS after March 2015. Exhibit 579 at 5. Defendant nevertheless allowed those redlines to be submitted to the FTC. None of these instances is a simple omission. Instead, Defendant withheld information and impliedly ratified false or misleading statements made to the FTC. The fact that the words did not come out of Defendant's mouth is irrelevant to § 1505, which explicitly imposes liability where a defendant improperly "influenc[es] another" to make a "false or misleading statement." *See* 18 U.S.C. § 1515.

//

---

[6] Defendant is desperate for the Court to conclude that Defendant did not read a document that was sent to him, but the jury was entitled make the reasonable inference that he did.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.     The evidence was more than sufficient to sustain a conviction under 18 U.S.C. § 4.

Defendant argues that his conviction for misprision of a felony must be set aside "for substantially the same reason as the obstruction charge." Motion at 29. In fact, the two arguments fail for the same reasons. Defendant once again seeks to invent and apply an entirely new element to a statutory section that was among the first criminal provisions ever enacted by Congress and which traces back to the common law. *See United States v. Olson*, 856 F.3d 1216, 1221–22 (9th Cir. 2017) ("In this country, the First Congress enacted the American misprision statute as part of the Crime Act of 1790, the current version of which is functionally identical to its predecessor" (internal citations omitted)); *Branzburg v. Hayes*, 408 U.S. 665, 696 (1972) ("Misprision of a felony—that is, the concealment of a felony 'which a man knows, but never assented to . . . (so as to become) either principal or accessory,' was often said to be a common-law crime." (citing 4 W. Blackstone, Commentaries, *121)). There is no basis for such a wholesale change to a venerable statute.

Defendant argues in favor of another "nexus" requirement, arguing that there must be a "relationship in time, causation, or logic" between the concealment and its object. Yet again, a Rule 29 is not the proper forum to relitigate jury instruction issues. And of course, the jury instructions as given by this Court already require just that, as the jury must find beyond a reasonable doubt that "the defendant did an affirmative act *to conceal the crime*." Docket No. 219, at 19 (emphasis added). There is no basis to apply any further restriction or duplicative instruction. And the evidence at trial more than satisfied the elements of the crime. Defendant, a former AUSA familiar with hacking crimes, instructed his direct report not to let news of the hack "get out, and he directed the creation of a contract that concealed the criminal nature of the hack. *See* Exhibits 679 (*United States v. Morch* Information) & 144 (NDA). The NDA itself explicitly recognized the criminal nature of the hackers' conduct, as it purported to obligate Uber not to "seek . . . criminal remedies against you." *Id.* Defendant Sullivan himself was responsible for the final language of paragraph containing that obligation. *See* Exhibit 108. The NDA further required the hackers not to "disclose anything" about their crime in exchange for a $100,000 payment, further concealing the crime. *See* Exhibit 144. The evidence was clear that Defendant knew the hack was a crime and took multiple steps to conceal it.

//

1

2

**III.    Any reasonable juror would conclude Defendant knew the 2016 Data Breach was unauthorized.**

3

Defendant next argues that he reasonably believed that the hackers' breach and extortion of Uber

4

was, in fact, "authorized" conduct such that it was neither a felony to support a conviction under Section

5

4, nor a "breach" falling within the scope of FTC's investigation.  The problems with this argument are

6

myriad.  At the outset, Defendant argues that it "was undisputed that in-house Uber lawyer Craig Clark

7

told Sullivan and the rest of the Security team that authorization could occur after the initial intrusion . . .

8

if certain conditions were met."  Motion at 32.  That claim is very much disputed.  In reality, Clark

9

testified that he never made such a recommendation to Defendant, but rather that he presented the best

10

theory he could come up with after Defendant directed him to do so.  Tr. (Clark) 1320:4–5; 1324:15–18

11

("It was certainly not a recommendation . . . .").  Ultimately, it was Defendant himself who informed

12

Clark that the company would treat the hack as a bug bounty, and he falsely claimed that the A Team

13

had authorized that decision.  *Id.* 1324: 24–25.  After that point, Clark was merely implementing the

14

strategy chosen by Defendant.

15

But more importantly, it was apparent from the evidence—and the jury was certainly entitled to

16

conclude—that Defendant did not in fact believe that the hack was authorized.  *First*, the theory was

17

ludicrous.  Defendant in effect argues that a rational juror was obligated to conclude that Defendant

18

sincerely believed that hackers who stole millions of customer records and then extorted the company to

19

the tune of $100,000 could be retroactively designated as "agents" of the company.  This is simply

20

absurd, and the jury was correct to reject the notion.  *Second*, Defendant himself referred to the access as

21

"unauthorized" in his email to Dara Khowrowshahi.[7]  *See* Exhibit 623.  *Third¸* if Defendant had thought

22

the hack was legitimately categorized as an "authorized" bug bounty, why would he lie in the NDA and

23

claim the hackers had not downloaded any data?  Why would he fail to ever mention the 2016 Data

24

Breach to any in-house attorney other than his "fixer," Craig Clark?  *See* Exhibit 530 (Defendant

25

26

[7]  Defendant asks this Court to draw the implausible inference in his favor that Defendant's reference to "unauthorized" in this email referred only to the hackers' status at the time of their access, not to when their conduct had been retroactively blessed as the conduct of an "agent."  Motion at 33.  But the Court must draw inferences in favor of the jury's verdict, not in favor of the Defendant.  It is telling that Defendant's email to the new CEO never explained how this conduct later became "authorized."  Instead, as noted above, he lied about the nature of the conduct.

27

28

1    describing Clark as "a fixer").  Defendant, a sophisticated and experienced cybersecurity professional,

2    knew that the malicious downloading of personal data, particularly when paired with naked extortion,

3    was flatly inconsistent with the terms of any bug bounty program, so he needed to lie and misdescribe

4    the hack in order for the payment to appear legitimate.  *See* Exhibit 144.  He could not rely on the

5    "retroactive agent" theory because he knew it was absurd.  The same need drove his subsequent lie to

6    Dara Khosrowshahi, when he falsely claimed via email that the hackers had merely gained access to

7    servers, but concealed the wholesale theft of user data.  *See* Exhibit 623.  Nor was such a

8    misrepresentation simply an innocent error—Defendant had to affirmatively rewrite his subordinates'

9    accurate summary of the 2016 Data Breach in order to present his sanitized (and false) version of history

10   to his new boss.  *See* Exhibit 218 (referring to unencrypted storage of "rider and driver data,"

11   acknowledging ability to "move around our data stores and download data at will," and cataloging data

12   stolen by the hackers).

13          As to Defendant's conviction under § 1505, Defendant also relies on an overly blinkered view of

14   the scope of the FTC's investigation.  Defendant claims that Uber was not obligated to disclose to the

15   FTC instances of "authorized" access, and thus not obligated to disclose the supposedly "authorized"

16   2016 Data Breach.  Motion at 32.  But Defendant's obstruction swept far beyond simply concealing the

17   2016 Data Breach.  As explained above, the FTC's investigation focused broadly on Uber's data

18   security program, and Uber had made various representations about encryption, access controls, and use

19   of AWS, all of which were revealed to be false by the 2016 Data Breach.  Defendant never informed the

20   in-house legal team of these inaccuracies, but instead permitted further misstatements of fact to be

21   communicated to the FTC in the months following the breach.

22   **IV.    There is no basis for a new trial under Rule 33.**

23          Defendant's last effort is to repackage his various arguments into a request for a new trial under

24   Rule 33.  Motion at 33–34.  The motion does not even cite the typical standard for Rule 33 motions, and

25   instead argues that the Court grant a new trial because "the evidence preponderates sufficiently heavily

26   against the verdict that a serious miscarriage of justice may have occurred."  *Id.* at 34 (citing *United*

27   *States v. Alston*, 974 F.2d 1206, 1211–12 (9th Cir. 1992)).  For the reasons explained above, the

28   evidence does no such thing.  Defendant Sullivan was proved guilty beyond a reasonable doubt of both

charged offenses.  Defendant's efforts to distort the evidentiary record via impermissible inferences in his favor, combined with wholesale evasion of the most powerful evidence against him, must be rejected under Rule 33 just as under Rule 29.

## CONCLUSION

For the foregoing reasons, Defendant's motion should be denied.

DATED:  November 23, 2022                             Respectfully submitted,

STEPHANIE M. HINDS
United States Attorney

_____/s/_____
ANDREW F. DAWSON
BENJAMIN KINGSLEY
Assistant United States Attorneys