DAVID H. ANGELI (admitted *pro hac vice*)
TYLER P. FRANCIS (admitted *pro hac vice*)
MICHELLE H. KERIN (admitted *pro hac vice*)
URSULA LALOVIĆ (Cal. Bar No. 215551)
ANGELI LAW GROUP LLC
121 SW Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232 │ Facsimile: (503) 227-0880
Email: david@angelilaw.com; tyler@angelilaw.com; michelle@angelilaw.com;
        ursula@angelilaw.com

JOHN D. CLINE (Cal. Bar No. 237759)
600 Stewart Street, Suite 400
Seattle, WA 98101
Telephone: (360) 320-6435
Email: cline@johndclinelaw.com

*Attorneys for Defendant Joseph Sullivan*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH SULLIVAN,<br><br>Defendant. | Case No. 3:20-cr-00337-WHO<br><br>DEFENDANT JOSEPH SULLIVAN'S RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM<br><br>Date: May 4, 2023<br>Time: 1:30 p.m.<br>Crtrm: 2, 17th floor<br><br>Hon. William H. Orrick |

**INTRODUCTION**

The totality of the 18 U.S.C. § 3553(a) factors strongly support a probationary sentence. Mr. Sullivan's Sentencing Memorandum chronicled his life and professional history not to seek "special treatment," but rather because that history speaks so strongly to many of the factors the Court will be considering when fashioning an appropriate sentence. We of course agree that describing the "history and characteristics of the defendant" does little to inform that analysis if the Court is told merely that a defendant has powerful friends and has donated money to charitable causes. But Mr. Sullivan's history tells a much more compelling story, one that speaks powerfully and specifically to the critical questions before the Court: whether the specific conduct at issue in this case—involving allegations that Mr. Sullivan interfered with a government investigation into a company's cybersecurity practices—was truly aberrational (it inarguably was) and what sentence is sufficient, but not greater than necessary, to achieve the goals of incapacitation, deterrence, and just punishment. As the PSR recognizes, Mr. Sullivan's history and the other 3553(a) factors strongly support the conclusion that a probationary sentence would best satisfy those goals.

In its submission ("Gov. Mem."), the government provides a selective and incomplete rendition of the facts, portraying Mr. Sullivan in an unfairly nefarious light. Mr. Sullivan acknowledges the jury's verdict and has admitted to multiple failings in his response to the incident that occurred at Uber in November 2016. But the Court has heard the evidence which, as discussed in detail in our Sentencing Memorandum and more briefly herein, paints a much more nuanced picture than the government presents.

Whatever the factual differences between the parties, the inquiry now is focused on arriving at an appropriate sentence. The government's principal contention in support of its recommendation of incarceration is that such a penalty is necessary to ensure both that the technology industry learns the right lessons from this case and that Mr. Sullivan does not receive "special treatment" due to his status. We of course agree that general deterrence and encouraging respect for the law are important considerations at sentencing. We similarly concur that no

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1   defendant—"white-collar" or otherwise—is entitled to special treatment. However, a custodial

2   sentence is not necessary to vindicate either of those principles here.

3         The many letters submitted to the Court make clear that the industry understands what

4   this case is about and has stood up, taken notice, and implemented substantial changes as a

5   result. The government's contention that the industry's real takeaway is that Mr. Sullivan "is

6   being unfairly punished for a run-of-the-mill cybersecurity incident" (Gov. Mem. at 2) is belied

7   not only by industry members' letters, but by Mr. Sullivan's own letter to this Court—filed

8   publicly—readily acknowledging both the seriousness of the incident and his own failings in

9   responding to it.

10         In requesting a probationary sentence, Mr. Sullivan does not seek special treatment.

11   Rather, he asks the Court to examine how he has spent his 54 years, from the time he was born

12   and raised in modest circumstances through his rise to the station the government focuses on, to

13   the present day, following his conviction. It is true that defendants in privileged positions

14   sometimes improperly seek leniency by touting a newfound eagerness for supposedly

15   philanthropic endeavors, which are frequently motivated more by vanity than virtue. But an

16   examination of Mr. Sullivan's personal and professional life, chronicled in the many letters

17   submitted to this Court, reveals a very different story, the most noteworthy aspect of which may

18   be the remarkable consistency of the themes that run through it: hard work, devotion to family,

19   and a staunch commitment to public service, the betterment of his profession, and lifting up

20   those who have been marginalized. No "special treatment" is conferred by considering those

21   factors when determining an appropriate sentence, in a "white-collar" case or otherwise. To the

22   contrary, a critical part of the Court's task at sentencing is to consider "the fullest information

23   possible concerning the defendant's life and characteristics." *Pepper v. United States*, 562 U.S.

24   476, 480 (2011). Mr. Sullivan asks for nothing more.

25

26

27

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

## DISCUSSION

### I.    The government's factual narrative does not fairly portray Mr. Sullivan's conduct.

In his letter to the Court, Mr. Sullivan acknowledges and expresses deep regret for his missteps in connection with the response to the November 2016 security incident. He also makes clear that his intent at sentencing is not to make excuses or argue about interpretation of the facts. We acknowledge the jury's verdict and understand that relitigating the case in this context would serve no useful purpose. That said, to ensure that the nature and circumstances of the offense conduct are properly understood, certain of the government's factual characterizations deserve a response.

For example, the government's assertion that Mr. Sullivan "attempted to ensure that nobody on his team breathed a word about the breach outside the security group" (Gov. Mem. at 4)—much less the more serious allegation that he "tamper[ed] with witnesses" (*id.* at 14)—is not true. Every member of the incident response team who testified—most of them called by the government—testified unequivocally that Mr. Sullivan never told them to lie to or withhold information from corporate management, the FTC, or the company's lawyers. (Trial Tr. (Flynn) 696:1–700:6; *id.* (Garbutt) 837:11–839:24); *id.* (Fletcher) 1068:2–1070:9; *id.* (Clark) 2448:23– 1449:10); *id.* (Worden) 1763:15–1764:21; *id.* (Greene) 2259:14–2260:5; *id.* (Henley) 2375:19– 2376:15; *id.* (Guzman) 2488:2–2489:14; *id.* (Ensign) 2504:1–22.) To the contrary, their testimony established that the level of confidentiality surrounding the 2016 incident was "common," "normal," and "appropriate" in light of their experience with security investigations generally. (*Id.* (Clark) 1446:4–1448:11; *id.* (Worden) 1736:19–1737:3; *id.* (Guzman) 2471:21– 2476:25. *See also id.* (Flynn) 584:22–586:2 (articulating reasons for secrecy during cybersecurity incident response); *id.* (Borges) 726:8–727:18 (within Uber generally information was shared on a "need to know" basis); *id.* (Garbutt) 796:7–21 (level of confidentiality about the incident was "not significantly more than any security incident."); *id.* (Greene) 2238:14–2241:11; *id.* (Henley) 2404:17–2405:5).)

The government also continues to focus on a single conversation between Messrs.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Sullivan, Henley, and Flynn early in the incident response. The government asserts that Mr. Flynn "unequivocally" understood that the desire for confidentiality Mr. Sullivan expressed during this conversation ("this can't get out") stemmed from his desire to keep information about the security incident from the FTC. (Gov. Mem. at 3–4.) But Mr. Flynn testified at trial that Mr. Sullivan said nothing that caused Mr. Flynn to make that connection. (Trial Tr. (Flynn) 604:2–22.) Moreover, before any direction from Mr. Sullivan on this topic, Mr. Flynn (and Mr. Clark) had *already* instructed the team to keep the response strictly confidential, in keeping with standard practice. (*Id.* (Clark) 1446:9–1448:15; *see also* Ex. 352 (email from Clark to response team, urging to "please no one add anyone else to thread. If someone needs on LMK who" and making clear that "guidance from @four is we should keep this to the smallest audience possible").)

Similarly, characterizing Mr. Sullivan's descriptions of his communications with the "A-team" as "lies" goes too far. (Gov. Mem. at 4.) Mr. Sullivan acknowledges in his letter that he should have done more to directly engage with Uber's General Counsel, Salle Yoo. But he indisputably kept Uber's CEO, Travis Kalanick—the leader of the A-team—fully apprised of the incident and the security team's response. (Ex. 37; Ex. 232; Ex. 1055 at 6; Ex. 1111 at 7.) Mr. Sullivan was also aware that another A-Team member, Rachel Whetstone, had been briefed about the incident. (Trial Tr. (Ensign) 2537:8–12).) And while Ms. Yoo testified that she was not informed of the incident, Candace Kelly, head of Uber's legal privacy group and the person overseeing the FTC response (*Id.* (Kelly) 1958:4–20), was informed during the early hours of the response (Exs. 31, 32, 35, 40; Tr. (Kelly) 1956:9–14) and was informed specifically that attorney Craig Clark was leading Uber's legal response to the incident. (Ex. 39). Upon being informed of Mr. Clark's involvement, Ms. Kelly concluded that he was the "appropriate person" and that the incident response "was in the appropriate hands on the legal team," as this type of incident was "clearly in his wheelhouse or in his area of expertise and his area of responsibility." (Trial Tr.

ANGELI LAW GROUP LLC
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1899:9–14.)[1]

The government also overstates Mr. Clark's testimony concerning his conversations with Mr. Sullivan about whether the 2016 incident fit within the confines of Uber's bug bounty program. In its sentencing memorandum, the government contends that Mr. Clark testified that "Defendant directed him to come up with a way to conceal the breach by falsely portraying it as a standard interaction with security researchers within Uber's bug bounty program." (Gov. Mem. at 4, citing Trial Tr. (Clark) 1320:2–6; 1320:19–24.) The tortured evolution of Mr. Clark's testimony—which included a number of outright falsehoods and changed materially over time, always in ways intended to serve his own goal of avoiding prosecution—is well known to the Court. The government's continued reliance on that testimony to support critical portions of its argument is telling. But even assuming Clark's veracity, the government does not accurately paraphrase his testimony. Mr. Clark testified only that Mr. Sullivan *asked* him how they could fit the 2016 incident into Uber's bug bounty program, and that Mr. Clark *himself* took that "to be a directive to find a way to fit this into bug bounty." (Trial Tr. (Clark) 1320:2–6.) Mr. Clark also testified that he understood that Mr. Sullivan was not only providing direction, but that he was also in good faith seeking Mr. Clark's legal advice. (*Id.* (Clark) 1320:19–24).)

The government similarly overreaches when it claims that "the terms of Uber's 'bug bounty' program clearly excluded the precise technique employed by the hackers." (Gov. Mem. at 4.) As Collin Greene—the originator of Uber's bug bounty program—and Rob Fletcher—the security team member who oversaw the program—testified, the "terms" of Uber's bug bounty program (Exhibit 16) were not hard and fast rules but rather guidelines used to set the

---

[1] Ms. Kelly's awareness that a flaw in Uber's security infrastructure had allowed hackers to access "[a]ll rider/partner info from July 2015 & before, including: UUID, first name, last name, email addresses, phone numbers, country, and token info" (Ex. 40), and her own failure to ensure that the FTC was made aware of that flaw, further undermines the argument that a Guidelines enhancement is appropriate pursuant to § 2J1.2(2) for "substantial interference with the administration of justice." Even had Mr. Sullivan proactively sought out additional individuals in Uber's Legal department, it is unclear whether the company would have disclosed the incident in any event. Indeed, even after Uber's outside lawyers and new management team learned of the incident in late August 2017, the company did not disclose it to the FTC for almost three months.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

expectations of security researchers seeking to discover vulnerabilities in Uber's software. (Trial Tr. (Greene) 2254:7–2255:16; *id.* (Fletcher) 1006:1–1007:11.) To suggest that any "precise technique" was "clearly excluded" from Uber's bug bounty program contradicts Mr. Greene's unrebutted testimony that "[t]here's no Supreme Court of bug bounty rules" deciding which "techniques" are permitted or excluded. (*Id.* (Greene) 2255:8–9.) It also ignores Mr. Fletcher's unequivocal testimony that actions outside the scope of the guidelines did not automatically disqualify individuals from the program. (*Id.* (Fletcher) 1011:7–10.)

Furthermore, the government's continued insistence that certain language in the NDA with the hackers "had no purpose other than to minimize the significance of the 2016 Data Breach and to make it appear to fit within the bug bounty program" (Gov. Mem. at 5) elides the undisputed fact that neither Mr. Sullivan nor anyone else attempted to use the NDA for that purpose.[2] Far from establishing that Mr. Sullivan used the NDA to mislead the FTC, Uber's lawyers, or anyone else, the evidence at trial established only that Mr. Sullivan referred to the fact that the hackers ultimately signed the NDA in their real names as support for his conclusion that the data had ultimately been deleted and had not been released into the public domain. (Trial Tr. (Lee) 2216:21–2218:22.).[3]

Moreover, far from "lying" to Uber's outside counsel, Mr. Sullivan disclosed during his interviews the critical details that made clear the magnitude of the 2016 incident and the security team's response to it. For example, Mr. Sullivan made clear to Uber's lawyers that the hackers

---

[2] The evidence at trial established that Mr. Clark and Mr. Sullivan were not the only people at Uber who reviewed the NDA. Mr. Clark testified that he invited Collin Greene, Mat Henley, and Rob Fletcher to comment on and edit a draft of the NDA. (Trial Tr. (Clark) 1333:21–1337:18; 1338:12–24; 1491:1–1492:4, 1534:14–1536:6; Ex. 129; Ex. 130.) Mr. Clark also testified that both Mr. Fletcher and Mr. Henley signed a final version of the NDA and that neither of them raised any concerns about its accuracy. (Trial Tr. (Clark) 1508:24–1510:7; Ex. 144.) And when the document was first signed by one of the hackers under a pseudonym in November 2016, the signed copy was sent to Mr. Henley and Mr. Flynn, neither of whom told Mr. Clark that they thought the NDA was somehow false or misleading. (Trial Tr. (Clark) 1528:7–1530:3; *id.* 1573:23–1574:13).)

[3] Similarly, the government's refrain that the hackers were paid to ensure that they never disclosed their actions to law enforcement defies logic; the hackers obviously did not need a pecuniary incentive to refrain from reporting their own misdeeds to law enforcement.

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

had accessed "thousands, hundreds of thousands, maybe millions" of files containing personal information about Uber's customers and drivers. (Ex. 1111 at 6.) He also confirmed to Uber's lawyers that the hackers downloaded and then destroyed the data. (*Id.* at 8.) He described the 2016 incident as a "pretty scary situation" at which the company "would have thrown any resources" (Ex. 1051 at 8) and explained that Mr. Kalanick had signed off on the $100,000 payment to the hackers (Ex. 1111 at 6). And while Mr. Sullivan was focused on finding "the person and mak[ing] sure they didn't share the data," he also made clear to Uber's lawyers that he told Mr. Kalanick that if the incident response team could not "get attribution," they would "need to do something different." (Ex. 1055 at 6.) Finally, Mr. Sullivan repeatedly told Uber's lawyers that he was ultimately satisfied that no data was "out in the wild" and that the incident was not a disclosable data breach after the team "talked it over," the hackers had signed the NDAs in their real names, and Mat Henley had confirmed that the data had been deleted and had not been disseminated. (Ex. 1051 at 9, Ex. 1111 at 1, 7.)

Perhaps the government's greatest overreach is its erroneous insistence that Mr. Sullivan "lied" to Mr. Lee "about where he was during the incident." (Gov. Mem. at 6.) That is flatly untrue. Mr. Sullivan of course did not (and does not) deny participating in the incident response. But his early participation was by phone and Zoom. Mr. Sullivan was in California when the hackers first revealed themselves on Monday, November 14, but as he honestly told Mr. Lee, he "wasn't at 555 [Market Street (Uber's headquarters)]" (Ex. 1055 at 7) that week because: (1) he spent much of that Monday and the early part of Tuesday "deep in prep" (*id.* at 3) for "a major regulatory proceeding [on] Thursday/Friday where MD [would be the] first state to require every Uber driver to be fingerprinted" (*id.*); and (2) as Mr. Sullivan made clear in a contemporaneous message to Mr. Kalanick on Tuesday, November 15, he "fl[ew] to [the] east coast [that] afternoon to testify on Thurs/Fri in MD fingerprinting stuff." (Ex. 37.) Mr. Sullivan testified at the Maryland Public Utility Commission's hearing that began on November 17[4] and remained in

---

[4] *See* Public Service Commission of Maryland, Order No. 87957 (Dec. 22, 2016) at 4 (referencing hearing dates) & 8 n.10 (confirming Mr. Sullivan's testimony) (available at

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

Maryland and the District of Columbia through the end of the week. The government's assertion

that Mr. Sullivan "lied" to Mr. Lee about his physical whereabouts is simply false.

## II.    A probationary sentence would promote both general deterrence and respect for the law.

In urging the Court to ignore the PSR recommendation and impose a sentence that

includes imprisonment, the government focuses primarily on two parts of the 3553(a) analysis:

general deterrence and promoting respect for the law. As the PSR rightly concludes, both factors

would be better served by a probationary sentence.

### A.    General Deterrence

The government's argument that general deterrence can be achieved only through a

custodial sentence ignores the uncontroverted evidence that the cybersecurity industry has not

only been paying rapt attention to this case, but that it has implemented changes (and continues

to do so) to ensure that incidents like those at issue here are properly reported internally and,

where appropriate, to law enforcement and regulators. The government simply ignores the many

letters before the Court attesting to the industry's commitment to heed the lessons from this case

and the numerous news accounts confirming the same. (*See generally* Def.'s Sentencing Mem. at

30–31.)

Instead, the government's general deterrence argument centers on a single case, *United

States v. Levandowski*, Case No. 3:19-cr-00377 WHA, that has little to do with Mr. Sullivan's

situation aside from the fact that both men worked at Uber. Mr. Levandowski brazenly stole

extremely valuable and highly confidential technical information from his former employer,

Waymo, hoping to use that information to assist his new employer, Uber, in its efforts to develop

competing self-driving automobile technology. Before he downloaded 14,000 files containing

Waymo's core trade secrets, Mr. Levandowski negotiated a lucrative financial deal for himself

https://www.psc.state.md.us/wp-content/uploads/Order-No.-87957-Case-No.-9425-Rasier-LLC-and-Lyft-Inc.-Fingerprint-Waiver-Petitions.pdf); *see also* Ex. 470 (email correspondence between Mr. Sullivan and Ms. Whetstone (among others) discussing the Maryland PUC's decision following Mr. Sullivan's testimony).)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

with Uber. He was charged with 33 counts of Theft and Attempted Theft of Trade Secrets, in violation of 18 U.S.C. § 1832(a). His theft also spawned significant civil litigation, resulting in a $179 million arbitration award. When discussing the need for general deterrence in sentencing Mr. Levandowski to 18 months in prison, Judge Alsup clearly focused on Mr. Levandowski's substantial personal financial gain and the need to disincentivize others from similarly seeking to reap those types of personal profits from conduct characterized by the government as "industrial espionage." (*United States v. Levandowski*, Case No. 3:19-cr-00377 WHA, Dkt. No. 102 at 42–43, 72, 73; Dkt No. 86 at 7.) In short, Mr. Levandowski was clearly motivated by personal financial gain, engaged in numerous brazen acts of theft, and caused substantial harm to his victim by stealing the trade secrets that were at the core of that company's business. That case is wholly inapposite to Mr. Sullivan's situation, which involves none of these factors.

A truer comparator, on all fours with this case yet overlooked by the government, is *United States v. Jindal*, Case No. 4:20-CR-00358 (E.D. Tex.). Mr. Jindal was charged with, among other things, obstructing an FTC investigation in violation of 18 U.S.C. § 1505. In December 2022, following a jury trial in which he was found guilty of obstruction, Mr. Jindal was sentenced to three years' probation and a $10,000 fine. Mr. Jindal is the same age as Mr. Sullivan, with no health maladies, no criminal history, and a history of commitment to his family and community. As here, Mr. Jindal's offense involved no loss, no identifiable victim, and the related corporate entities, like Uber, entered into a consent decree with the FTC. (Angeli Decl. (ECF No. 253-1), Ex. 5 (Jindal Sentencing Tr.) at 14:13–24; 59:25–60:2.) Mr. Jindal's case featured several aggravating factors that are absent here: Mr. Jindal directly lied to the FTC multiple times (including in direct testimony to the agency) and was involved personally in the underlying offensive conduct that was the subject of the FTC's investigation. (*Id*. at 7:10–22; 41:8–42:8; 50:6–12; 63:16–25.) Mr. Jindal's Guidelines range was identical to that calculated by the PSR for Mr. Sullivan: a base level of 14 under § 2J1.2, with a three-level enhancement pursuant to § 2J1.2(2) for "substantial interference with the administration of justice." In imposing a noncustodial sentence, the court noted that deterrence was served by the probationary

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1  sentence because of the collateral consequences to Mr. Jindal (*id*. at 59:17–21), the absence of

2  financial loss associated with his conduct (*id*. at 59:25–60:1), the limited duration of the conduct

3  (7 months) (*id*. at 60:7–8), and the fact that the conduct was "out of character" for Mr. Jindal (*id*.

4  at 60:8–10).

5      **B.      Promoting Respect for the Law**

6          In arguing that a custodial sentence is necessary to promote respect for the law, the

7  government contends that the cybersecurity industry has somehow been misled about the true

8  nature of this case and has concluded that Mr. Sullivan "is being unfairly punished for a run-of-

9  the-mill cybersecurity incident in which his good-faith actions are being unfairly second

10  guessed." (Gov. Mem. at 2.) As a result, the government contends, a custodial sentence is

11  necessary "to refocus the public—and the cybersecurity industry" and promote respect for the

12  rule of law.

13          As a threshold matter, every aspect of this case—Mr. Sullivan's termination from Uber,

14  the criminal complaint filed by the government in August 2020, the subsequent indictment and

15  superseding indictment, the multi-week trial and the jury's verdict, and the government's various

16  press conferences and media releases along the way—has been covered extensively by the

17  national media and trade publications. The government has had ample opportunity to explain to

18  the public the nature of its charges and it has done so repeatedly.

19          The government's contention that it has nonetheless failed to deliver its own intended

20  message is based on an unfair reading of 12 of the 186 letters submitted on Mr. Sullivan's

21  behalf.[5] Moreover, the government's suggestion that the industry's perception of this case has

22  _____

23      [5] For example, the government cites Ex. G at 10, a letter from Melanie Ensign, who was a
witness at trial. The Court will recall that Ms. Ensign was the head of communications for the
24  security team at the time of the 2016 incident, was present for much of the incident response, and
was part of Uber's Communications team when Uber unfolded "Project Phoenix," the
25  company's 2017 communications plan that publicly revealed the 2016 incident and described
Uber's response and the circumstances of Mr. Sullivan's termination. Ms. Ensign, who lived
26  through the incident and its aftermath and participated in the trial, clearly understands what this
case is about. Moreover, some of the authors of the letters cited by the government expressly
27  acknowledge that Mr. Sullivan did not properly handle the incident (Ex. I at 15 (Rob Chesnut))
and that Mr. Sullivan "got it wrong" (Ex. I at 3 (Merrit Baer)).

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

somehow been driven by Mr. Sullivan should be allayed by Mr. Sullivan's own publicly-filed letter to the Court. Far from portraying the case as mere "second-guessing" of a "run-of-the-mill cybersecurity incident," Mr. Sullivan candidly admits the seriousness of the incident, that he made mistakes in his response to it, and that he "clearly failed" to ensure that he "did right by the government, and expectations at the FTC in particular." He also accepts responsibility and expresses remorse for "inject[ing] a significant modicum of distrust into the dynamic between corporate security and government groups." Mr. Sullivan also clearly acknowledges that the United States "cannot be great at security as a country until we can establish much more transparency and much more collaboration between the private and public sectors." In other words, far from seeking to drive "a wedge between the cybersecurity community and law enforcement" (Gov. Mem. at 13), Mr. Sullivan is personally urging—and pledging to devote his energies to achieving—precisely the *opposite* outcome. As he makes clear in his letter, Mr. Sullivan has promised that "as soon as [he is] able, [he] intend[s] to seek out every opportunity to speak loudly to the security community about how [it] can do better," drawing on the mistakes he made. A noncustodial sentence would promote respect for the law in this case.

### III.    Mr. Sullivan does not seek "special treatment."

The government attempts to minimize the impact of the numerous letters submitted to the Court on Mr. Sullivan's behalf, dismissing them as the unremarkable byproduct of Mr. Sullivan's prior success and the type of submission that any successful executive could will into existence whenever necessary.

Of course, the sheer quantity of the letters or the social standing of their authors offer little to the Court's analysis. But these letters draw their strength not from their *quantity* but from what they collectively reveal about the person—the whole person—who will stand before the Court to await sentencing later this week. The letters reveal a detailed portrait of a man who has lived his whole life dedicated to the core principles that should matter at such a critical moment in a person's life: integrity, service, devotion to family, and working to better the lives of others. Those efforts by Mr. Sullivan continue to this day, and while the government may sneer at them

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

as an attempt by Mr. Sullivan to "whitewash his criminal record" (Gov. Mem. at 15), they actually reflect the continuation and culmination of a lifetime devoted to serving the public.

What is remarkable about the letters submitted by Mr. Sullivan's friends, family, colleagues, and co-workers is their consistency in describing the kind of person Mr. Sullivan is and always has been, and the impact he has had on the lives of seemingly everyone he comes into contact with. The letters describe someone altogether different from the defendant—white-collar or otherwise—whose life has been spent cutting corners to get ahead and advancing simply to benefit themselves. That difference *matters* and is not only an appropriate, but a required, element of the Court's analysis. *See* 18 U.S.C. § 3553(a) (court must consider "history and characteristics" of the defendant; U.S.S.G. § 5K2.20 (downward departure authorized for aberrant behavior); *Pepper*, 562 U.S. at 480 ("[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (brackets in original) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

## IV.    Section 2J1.2(b)(3)'s enhancement for "otherwise extensive . . . scope, planning, or preparation" does not apply.

The government seeks a two-level enhancement under § 2J1.2(b)(3)(C), claiming that the obstruction offense was "otherwise extensive in scope, planning, or preparation." This enhancement is not applicable to the facts of this case.

In support of this enhancement, the government alleges that Mr. Sullivan "harnessed the resources of a major, international corporation in order to accomplish his goals." (Gov. Mem. at 9.) The government did not establish any such thing at trial, and no such conclusion can be read into the jury's verdict by implication. Rather, the evidence at trial established that Uber's resources were deployed in full (including the use of surveillance teams in Florida and Canada) *to catch the hackers*, not to cover up what had happened. Mr. Sullivan, his team, and even the new leadership at Uber remain proud of those efforts, even to this day. What Mr. Sullivan is *not* proud of, and what he candidly discusses in his letter to the Court, is his failure to ensure that the

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

incident became known to a wider audience at Uber and ultimately to the FTC.

Even setting aside the factual issues, Mr. Sullivan's conduct does not rise to the level necessary to trigger this enhancement. Although the Ninth Circuit has not explained what conduct meets the "otherwise extensive" standard, other courts have held that "the *duration* of the offense is not equivalent to its 'scope' for purposes of § 2J1.2(b)(3)(C)." *United States v. Newman*, 614 F.3d 1232, 1239 (11th Cir. 2010) (collecting cases recognizing a distinction throughout the Guidelines between "scope" and "duration") (emphasis added).

Furthermore, although caselaw in this area is sparse,[6] it is worth comparing the offense conduct in this case with some examples of offenses that *have* been held to be "extensive in scope, planning, or preparation." Such examples include:

- *United States v. Hahn*, No. 20-10417, 2022 WL 16707180, at *2 (9th Cir. Nov. 4, 2022). Offense conduct reflected "extensive planning" where defendant—a police lieutenant—participated in a multi-defendant conspiracy (led by Chief of the Honolulu Police Department and a deputy Honolulu prosecutor) to retaliate against victim by framing him for a crime he did not commit and then obstruct justice by covering up the frame job for years.

- *United States v. Jensen*, 248 F. App'x 849, 851 (10th Cir. 2007). Prison employee's "extreme and repetitive misconduct" contributed substantially to the undermining of the integrity of the operations at the prison where he enabled many inmates to avoid testing positive for controlled substances and where his "conduct was so prevalent that many residents were aware that they could avoid accountability through payment of money or sexual favors in exchange for criminal intervention on their behalf."

- *United States v. Tomaskovic*, 275 F. App'x 884, 888 (11th Cir. 2008). Defendant took kidnapped child on the run for 16 months, fleeing through 4 countries, filed a misleading divorce petition in Florida for the dissolution of his previously dissolved marriage, purchased burner phones to elude detection, and purchased false identification documents in Honduras to hide from authorities.

- *United States v. Wilkins*, No. 20-14798, 2022 WL 98748, at *4 (11th Cir. Jan. 10, 2022). Defendant's witness tampering was "otherwise extensive" because of defendant's multi-faceted, seven-month campaign to prevent victim from cooperating, using different media to communicate with victim, disguising his identity to evade detection by authorities, and commenting to victim that he was extensively "plotting" while in jail and had engaged his "people," including his sister, to track victim.

- *United States v. Pegg*, 812 F. App'x 851, 860 (11th Cir. 2020). Defendant's crime

---

[6] *See United States v. Petruk*, 836 F.3d 974, 977 (8th Cir. 2016) (recognizing "dearth of caselaw" interpreting § 2J1.2(b)(3)(C)).

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

was "otherwise extensive in scope, planning, or preparation" because of his "elaborate gathering together of lies and misrepresentations" over four years, coordinated in secret from prison, and his direction of multiple individuals through coded phone calls and emails to disguise the true source of payments made to cooperators.

- *United States v. Rodriguez*, 499 F. App'x 904, 909 (11th Cir. 2012). Offense "otherwise extensive" where defendant planned and executed elaborate scheme to frame a prison guard for sexual assault, including obtaining semen sample from boyfriend and providing boyfriend with sample of her hair with semen stain to be used later for further corroboration.

These examples demonstrate the level of extensiveness and severity necessary to distinguish "ordinary" obstruction of justice from the more severe variety requiring the application of this enhancement. As the PSR ultimately concluded, Mr. Sullivan's offense conduct simply does not rise to this level. Indeed, the offense conduct principally consists of Mr. Sullivan's *failure* to take certain actions, such as specifically informing certain individuals or inserting additional language into documents and letters drafted by others. Even if one were to focus on Mr. Sullivan's *affirmative* conduct alleged during the trial—approving language that Craig Clark inserted into the NDA and minimizing the scope of the incident in an email to Uber's new CEO—these acts are a far cry from the extensive plotting and scheming described by previous courts that have applied this enhancement. By contrast, if Mr. Sullivan had gone back and destroyed or altered the contemporary documentation of the incident (or instructed others to do so), this enhancement might well apply. The enhancement would also likely apply if Mr. Sullivan had instructed his subordinates to lie or withhold information about the incident from the FTC, to company executives, or to Uber's attorneys.[7] But Mr. Sullivan took none of these steps, as even the government concedes. Accordingly, it has failed to carry its burden of

---

[7] As discussed above, the evidence on this point was all but unanimous from every witness who testified: The level of confidentiality surrounding the incident response was in keeping with standard industry practice and not one member of the 2016 incident response team testified that Mr. Sullivan asked, instructed, or suggested that they lie or withhold information from the FTC, Uber's lawyers, the company's executive team, or the company's new management team in 2017. (Trial Tr. (Flynn) 696:1–700:6; *id*. (Garbutt) 837:11–839:24); *id*. (Fletcher) 1068:2–1070:9; id. (Clark) 2448:23–1449:10); *id*. (Worden) 1763:15–1764:21; *id*. (Greene) 2259:14–2260:5; *id*. (Henley) 2375:19–2376:15; *id*. (Guzman) 2488:2–2489:14; *id*. (Ensign) 2504:1–22.)

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880

1  establishing that Mr. Sullivan's obstruction was "otherwise extensive in scope, planning, or

2  preparation."

3  <center>**CONCLUSION**</center>

4      For the foregoing reasons and the reasons set forth in his Sentencing Memorandum, Mr.

5  Sullivan respectfully requests that the Court impose a sentence of probation.

6

7  DATED: May 1, 2023.

        *s/ David H. Angeli*

8          David H. Angeli
        Tyler P. Francis

9          Michelle H. Kerin
        Ursula Lalović

10          John D. Cline

11          *Attorneys for Defendant Joseph Sullivan*

**ANGELI LAW GROUP LLC**
121 S.W. Morrison Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 954-2232
Facsimile: (503) 227-0880